### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| **MARISSA KUBICKI, individually, and on behalf of all others similarly situated,**<br><br>**Plaintiff,**<br>**v.**<br><br>**THE LEGAL AID SOCIETY, CONNIE PARK, in her individual capacity, LAURA WALSH, in her individual capacity, REBEKAH ALMANZAR, in her individual capacity, JACKIE QUIGLEY, in her individual capacity, and YONZEL BURT, in her individual capacity,**<br><br>**Defendants.** | **Case No. 26-cv-3882**<br><br>**CLASS ACTION COMPLAINT**<br><br>**Demand for Trial by Jury** |

Plaintiff Marissa Kubicki ("Plaintiff"), by her attorneys, The Dugger Law Firm, PLLC makes the following allegations against Defendant The Legal Aid Society ("The Legal Aid Society," "Defendant" or "Defendant Legal Aid Society"), [1] Connie Park ("Park" or "Defendant Park"), Laura Walsh ("Walsh" or "Defendant Walsh"), Rebekah Almanzar ("Almanzar" or "Defendant Almanzar"), Jackie Quigley ("Quigley" or "Defendant Quigley"), and Yonzel Burt ("Burt" or "Defendant Burt") (collectively, "Defendants").

---

[1] References to actions by The Legal Aid Society or Defendant Legal Aid Society are inclusive of actions by its employees acting on behalf of the organization. Similarly, references to "Defendants" refer to two or more of the pled Defendants.

**INTRODUCTION**

1.     Defendant The Legal Aid Society is a New York City nonprofit legal services organization that relies on skilled professionals to carry out its mission of serving indigent clients in criminal court.

2.     Plaintiff is one of those professionals: a Forensic Social Worker who devoted years of her career to serving Defendant's clients and supporting Defendant's attorneys in court.

3.     This case concerns Defendant's response after Plaintiff developed a serious medical condition and began medical treatment that made unnecessary prolonged exposure to crowded courthouse environments medically risky. Plaintiff did not seek to avoid client-facing work, attorney support, hearings, or court-related duties. She sought to limit unnecessary courthouse exposure while remaining available to attend court when her physical presence was needed. Rather than provide interim protection or conduct a good-faith individualized assessment, Defendant delayed, diverted, and imposed a new, up to full-day, "court presence" requirement that exposed Plaintiff to the very risk her provider sought to reduce.

4.     Plaintiff has ankylosing spondylitis and underwent medical treatment that rendered her immunocompromised.

5.     Ankylosing spondylitis is a chronic inflammatory autoimmune condition associated with chronic low back pain.

6.     Plaintiff's medical provider advised her to limit unnecessary in-person court exposure, while Plaintiff remained willing and able to perform her job duties, including appearing in court when needed to meet with clients, assist attorneys, or address specific court-related needs.

7.    Plaintiff had previously supported The Legal Aid Society's staff and clients by working from the Legal Aid Society office across the street from the courthouse in the Bronx, and by attending court or meeting with clients at the courthouse when scheduled for a client meeting,  court appearance, or specific attorney request for support in court, typically made the day before or the same day.

8.    Working in this manner allowed Plaintiff to reduce avoidable exposure to crowded public courthouse settings that her medical provider had advised her to limit because of her disability and immunocompromised status. It also allowed Plaintiff to work on case matters and administrative work when not actually needed in court.

9.    In short, Defendant Legal Aid Society refused to allow Plaintiff to continue working as she had successfully worked for years and instead it imposed a new requirement, applicable only to Plaintiff, that she remain physically present in court for up to seven hours a day, even when no client matter required her presence.

10.    Plaintiff alleges that, in its zeal to deny and push back against disability-based remote work requests, as alleged herein, Defendant Legal Aid Society required Plaintiff to sit in the courtroom for up to seven hours a day rather than permit her to work on case matters from The Legal Aid Society office across the street from the courthouse, where she could remain available while reducing unnecessary public exposure. This requirement placed Plaintiff in a setting where she often could not work on her cases, typically could not speak during court proceedings, and was exposed to courthouse conditions for longer than was necessary when no client-specific or attorney-specific need required her physical presence. Plaintiff had successfully performed her role for years by attending court when needed to support specific client matters.

11.     In other words, Defendant Legal Aid Society required Plaintiff to remain in court for as much as an entire workday, despite medical documentation advising that unnecessary prolonged courthouse exposure increased the risk of serious illness, hospitalization, and worsening of her disability-related condition.

12.     Plaintiff did ultimately become ill during the period when Defendant Legal Aid Society required the unnecessary, additional courthouse exposure.

13.     During the period when Defendant refused interim protection and continued to require disputed in-person courthouse coverage, Plaintiff became ill twice. Plaintiff does not allege that every court appearance during that period was unnecessary, nor that the precise source of either infection can be identified without medical and factual discovery. Plaintiff alleges that Defendant's refusal to provide an interim accommodation required unnecessary or excessive courthouse exposure while Plaintiff was immunocompromised, materially increased her risk of infection, and may have contributed to the illnesses and disability-related deterioration that followed.

14.     Following this deterioration, Plaintiff's health declined to the point that she now requires a wheelchair and assistance with many basic needs.

15.     Upon information and belief, Defendants' refusal to provide a reasonable accommodation and interim protection increased her risk of infection while immunocompromised.

16.     This action seeks, on behalf of Plaintiff and several classes, declaratory and injunctive relief requiring Defendant to cease its unlawful accommodation practices and to implement lawful accommodation policies, including prompt interim measures while requests are pending, as well as attorneys' fees, expert fees, and costs.

4

17. Plaintiff additionally seeks a declaration as to whether Defendant Legal Aid Society's conduct amounted to willful or wanton negligence, recklessness, conscious disregard of the rights of the Classes or conduct so reckless as to amount to such disregard.

18. This action further seeks, individually on behalf of Plaintiff, monetary relief including back pay (including lost wages, salary, employment benefits, and other compensation), compensatory damages, and punitive damages.

19. Plaintiff brings this action individually and on behalf of all others similarly situated pursuant to Section 504 of the Rehabilitation Act ("RA" or "Rehabilitation Act") and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 *et seq.* ("NYCHRL"), challenging Defendant Legal Aid Society's: (1) systemic failure to provide reasonable accommodations; (2) systemic delay in the provision of reasonable accommodations including provision of interim measures; (3) systemic failure to engage in a good faith cooperative dialogue; (4) systemic interference, coercion, and intimidation with respect to the employees' exercise of disability rights; (5) systemic medical inquiry violations; (6) systemic screening of disabled employees; and (7) a pattern and/or practice of retaliation.

20. Plaintiff further brings an individual aiding and abetting violation under the NYCHRL.

21. Plaintiff challenges The Legal Aid Society's policy, pattern, and/or practice of denying and/or delaying its employees' valid disability-based remote and/or location-based disability accommodation requests.

22. Plaintiff challenges The Legal Aid Society's policy, pattern, and/or practice of failing to engage in good-faith cooperative dialogues in response to and concerning its employees' disability accommodation requests.

23.     Plaintiff challenges The Legal Aid Society's policy, pattern, and/or practice of retaliation against its employees who request disability-based accommodations.

24.     Plaintiff challenges The Legal Aid Society's policy, pattern, and/or practice of interference, coercion, threats, and/or intimidation, or attempts at the same, against its employees who request disability-based accommodations.

25.     Plaintiff challenges The Legal Aid Society's policy, pattern, and/or practice of illegal screening of disabled employees.

26.     Plaintiff challenges The Legal Aid Society's policy, pattern, and/or practice of illegal excessive medical inquiries of disabled employees seeking disability accommodations.

27.     As reflective of these alleged policies, patterns, and/or practices, Plaintiff alleges that, upon information and belief, The Legal Aid Society:

a.     Partially denied and delayed an employee's temporary post-surgical telecommuting accommodation after the employee returned from medical leave following hip surgery and was still recovering from mobility limitations. The employee requested to work remotely except when essential job functions required in-person work, explaining that she had only recently begun walking without a cane, that commuting three days per week was not realistic during recovery, and that requiring her to report onsite for work that consisted largely of phone calls, Teams meetings, emails, and virtual appearances would over-exert her for the sake of strict compliance rather than job-related necessity. Although The Legal Aid Society processed an accommodation through Matrix, it approved only two remote-work days per week from April 13, 2026 through August 11, 2026, and left additional remote-work flexibility to supervisor-by-supervisor discretion. When the employee asked whether she could appeal and why she had not been approved to work remotely except for essential in-person functions, The Legal Aid Society's Senior Employee Relations Specialist, Defendant Walsh, responded that she did not view the matter as being at the appeal stage, stated that the practice generally defined the role as requiring attorneys to be onsite approximately three days per week, and suggested a further collaborative conversation with supervisors about onsite expectations. The employee reasonably understood this response as discouraging an appeal and leaving her dependent on discretionary approval rather than a clear accommodation matching her medical limitations and actual job duties;

6

b.    Denied an employee's request to return to work fully remotely, for an employee working in a unit relying significantly on remote work, after a disability-based leave, and forcing the employee to remain out of work (unpaid) until the request as originally made was withdrawn and the employee agreed to an ineffective alternative accommodation (at a risk to the employee's health), when the employee's economic situation became untenable on an extended unpaid leave. In this case, HR repeatedly sought additional duplicative unnecessary medical information from the employee regarding their disability accommodation request;

c.    Harassed, discriminated against, and retaliated against an employee after she disclosed a high-risk pregnancy (with respect to which she, upon information and belief, had an impairment of her reproductive system constituting a covered disability under the NYCHRL and requested accommodations of not going to Rikers and scheduling flexibility, by subjecting her to pretextual "coaching and counseling" (disciplinary) sessions for using medically necessary sick time, pressuring her to take unpaid FMLA instead of providing reasonable workplace flexibility, and making demeaning and inappropriate comments, including about her weight. Upon information and belief, after the employee disclosed her high-risk pregnancy and sought accommodations, The Legal Aid Society escalated scrutiny of her time and attendance and treated protected, medically necessitated absences as a performance/discipline issue -- calling her into "coaching and counseling" sessions and attempting to force her onto leave rather than accommodating her condition. In addition, The Legal Aid Society conflated protected leave categories with non-protected absences in documenting "attendance" concerns, and mischaracterized pregnancy-related medical limitations and restrictions (including limitations on assignments) as mere "requests." Ultimately, the conduct became so severe that, upon information and belief, the employee filed a hostile work environment complaint with HR in or about May 2025, which upon information and belief, has still not been resolved;

d.    Denied disability accommodation requests from several Defendant Legal Aid Society employees, including Plaintiff, with serious post-COVID chronic conditions who requested flexible scheduling and/or additional telecommuting days to recuperate from constant fatigue and preserve their health. These denials were based on The Legal Aid Society's knee-jerk, unexplained, non-individualized repeated response of the mantra that "the essential functions of the job" required in-person presence -- without provision of a single example of how this could not be navigated with a remote hybrid schedule.

e.    Failed to respond to or meaningfully respond to requests for disability-based accommodations for two months or longer (in one case more than five

months without a substantive response), without interim accommodation approvals (resulting in effective denials) even where the request was eventually partially or belatedly approved;

f.  Engaged in a bad-faith interactive process and/or cooperative dialogue process in which employees requesting disability-based accommodation were subjected to a repeated campaign of bad faith and/or harassing meetings, the purpose of which was not to engage in good faith cooperative dialogue, but to instead, filibuster, justify denial or delay, and/or find new grounds to deny the disability accommodation request. In turn, employees were exhausted and worn down by these bad faith meetings, each of which further delayed the approval of their requested disability accommodation (often without the grant of an interim accommodation), and were in turn accused of refusing to participate in the interactive process and/or cooperative dialogue; and

g.  Responded to requests for disability-based accommodation requests, including Plaintiff's request, with retaliation and interference, by attempting to re-define the role to make the role's essential functions retroactively incompatible with the requested disability accommodation. These back-handed denials, designed to circumvent accommodations rights, through job redefinition, impose exhausting costs on The Legal Aid Society employees already burdened with the underlying medical condition on which their disability accommodation was based. These employees were then forced to seek and legally qualify for disability-based accommodations -- an ever-moving target of evolving job duties being re-made to make their requested disability accommodation appear less reasonable and workable for accommodation than it was at the time of the disability accommodation request

28.  Plaintiff alleges that The Legal Aid Society has engaged in organization-wide practices that have violated the disability rights of its employees.

29.  These violations are especially unfortunate because The Legal Aid Society publicly positions itself as a premier public-interest organization committed to enforcing rights for low-income New Yorkers, including through affirmative and class-action law reform litigation. In fact, The Legal Aid Society maintains specialized disability-rights programs -- including its Government Benefits and Disability Advocacy Project -- and has itself brought

class-action litigation to secure reasonable accommodations for people (other than its own employees) with disabilities seeking access to public benefits.

30.     Yet, when the mirror is turned inward to the legality of its own disability accommodation practices, The Legal Aid Society ignored the very principles it champions in court and enforces on others through public-interest litigation when Plaintiff sought reasonable accommodations and equal access to the workplace.

31.     Instead, The Legal Aid Society denied and delayed reasonable accommodations, obstructed the interactive process, engaged in bad faith cooperative dialogues, interfered with its employees' disability rights, and retaliated against its employees for requesting disability-based accommodations -- applying one standard to those against whom it brought public-interest litigation while applying a lower standard to its treatment of its own workforce.

**Plaintiff's Work History**

32.     The Legal Aid Society employed Plaintiff as a Forensic Social Worker in the Parole Revocation Defense Unit ("PRDU") beginning on March 1, 2023, following a transfer from her previous position as a Forensic Social Worker in the Bronx Criminal Defense Practice ("CDP"), where she had worked since 2019.

33.     By 2024, Plaintiff had a disability and required medically necessary workplace accommodations. Upon information and belief, during 2024, The Legal Aid Society rolled back organization-wide hybrid work and limited employees to one work-from-home day per week. Plaintiff, however, was approved for a disability-based accommodation that permitted her to work from home three days per week and work in person two days per week. On or about November 8, 2024, Plaintiff returned from short-term disability leave with that

accommodation in place. The Legal Aid Society initially granted the accommodation on an interim basis, and the accommodation later became permanent in or about May 2025.

34.     Plaintiff successfully performed the essential functions of her Forensic Social Worker position with this accommodation. The approval and continuation of this accommodation confirmed that Defendant knew Plaintiff had a disability, knew she required reduced exposure to in-person workplace environments, and knew that Plaintiff could perform her job while working remotely three days per week and appearing in person two days per week.

35.     Defendant Legal Aid Society and Plaintiff's supervisors knew of Plaintiff's disability and accommodation status well before the later court-coverage dispute. On January 6, 2025, Defendant Quigley acknowledged in writing that Plaintiff had an accommodation in place to work from home with LAS equipment three days per week and to work in the office two days per week through May 2025.

36.     In early 2025, Defendant Legal Aid Society also processed additional disability-related equipment accommodations for Plaintiff, including a screen protector and an ergonomic chair with lumbar support. Plaintiff's treating provider had documented that Plaintiff had ankylosing spondylitis with chronic low back pain and needed a chair with lumbar support at all times.

37.     These prior accommodations gave Defendant Legal Aid Society, Human Resources, and Plaintiff's supervisors actual notice that Plaintiff had a documented chronic disability, that she required workplace modifications, and that she could successfully perform the essential functions of her PRDU Forensic Social Worker position with accommodations.

38.     Plaintiff's 2024 accommodation addressed her general weekly work schedule. It did not address the separate court-coverage issue that arose later, after Defendant Legal Aid Society began changing what it expected Plaintiff and another Bronx PRDU Forensic Social Worker to do during their in-person court-coverage days.

39.     On July 14, 2025, Plaintiff's treating provider again documented that Plaintiff was under medical care for treatment and monitoring of an autoimmune and/or auto-inflammatory disease, that the condition was chronic, and that Plaintiff should work from home three days per week followed by two in-person workdays.

40.     The July 14, 2025 provider documentation explained that the accommodation was medically appropriate not only because of Plaintiff's chronic pain and limited mobility, but also to reduce Plaintiff's exposure to illnesses.

41.     Accordingly, before Defendant escalated the court-coverage requirement and before Plaintiff submitted her amended court-exposure accommodation request, Defendant Legal Aid Society already knew that Plaintiff's medical condition required reduced exposure to illness as part of her disability accommodation.

42.     During June 2025, Defendant Walsh became the new Senior Employee Relations Specialist assigned to handle the Americans with Disabilities Act ("ADA") accommodation requests, replacing Taryn Anderson ("Anderson").

43.     Shortly thereafter, during August 2025, Defendant Quigley told Plaintiff and Luca Verano Diaz ("Verano Diaz"), another Bronx PRDU Forensic Social Worker, during separate supervision meetings, that they were expected to be physically present in court during court-coverage days even when they did not have clients or an identified client-specific need.

11

44.   The instruction was initially described as requiring court presence for approximately one hour on court-coverage days.

45.   On August 22, 2025, Plaintiff contemporaneously documented that the new court-presence mandate was not in the PRDU Forensic Social Worker job description and was inconsistent with existing court-coverage guidance.

46.   On August 22, 2025, Verano Diaz reported to social-work delegates that Defendant Quigley had stated during supervision that Bronx PRDU social workers would be required to be in court for at least one hour on court-coverage days to "build relationships" with attorneys.

47.   That same day, 1199SEIU delegate Kim Wirt contacted Defendants Quigley and Almanzar to request a meeting regarding the new court-presence practice.

48.   Defendant Legal Aid Society did not produce any written policy requiring continuous courthouse presence. Instead, management maintained that Plaintiff and Verano Diaz were expected to be in court for at least one hour on coverage days, rather than working from the Bronx office and going to court when needed.

49.   Plaintiff and Verano Diaz involved 1199 SEIU delegate Kim Wirt because they disputed the new court-presence instruction as inconsistent with their job duties, the established PRDU court-coverage model, and prior practice. The existing PRDU court-coverage model required Plaintiff to remain available and responsive to attorney and client needs, including by going to court when needed. It did not require Plaintiff to sit in court when no attorney, client, or court-related need required her physical presence.

50.   On or about November 24, 2025, after Defendant Legal Aid Society continued to maintain the disputed court-presence instruction, Plaintiff submitted updated medical

documentation and sought to amend her existing permanent disability accommodation. Plaintiff did so because her disease had progressed and, in or about October 2025, she had begun immunosuppressive treatment that made unnecessary courthouse exposure increasingly *medically dangerous*.

51.     Specifically, Plaintiff requested an interim accommodation to work from The Legal Aid Society's office during onsite court coverage shifts and to attend court when called, rather than maintaining physical presence in court for up to seven hours per day.

52.     Upon information and belief, beginning no later than November 25, 2025, Defendant Walsh assumed a central role in Defendant Legal Aid Society's disability-accommodation process for Plaintiff and similarly situated employees. After Walsh became involved, Defendant's practices moved away from the more prompt, collaborative approach reflected by Taryn Anderson's November 2024 interim accommodation for Plaintiff, and toward a more adversarial process involving pressure to accept alternatives, delays, repeated medical-information demands, refusal to provide interim measures, and reliance on asserted job-function requirements to narrow or deny accommodations. Plaintiff and other affected employees experienced Defendant Walsh as the principal Human Resources actor in these disputes. Upon information and belief, Defendant Walsh's involvement escalated and consolidated practices that affected Plaintiff and other putative class members in materially similar ways, while reflecting practices already present within Defendant's centralized process.

53.     Plaintiff would not have disclosed details of her personal treatment plan to Defendant Legal Aid Society but for Defendant's new and disputed court-presence instruction. Plaintiff's amended accommodation request sought to limit unnecessary courthouse exposure

13

while preserving Plaintiff's ability to perform all essential job duties, including attending court when needed for a client, attorney, hearing, meeting, or other specific court-related need.

54.     Following this protected accommodation request, Defendant Legal Aid Society escalated the disputed instruction primarily against Plaintiff.

55.     What began in August 2025 as an asserted one-hour court-presence instruction directed at both Bronx PRDU Forensic Social Workers became, after Plaintiff's amended disability-accommodation request, an asserted requirement that Plaintiff be in *court for up to seven hours per day* during court-coverage days, interact with attorneys, and confer with Defendants Almanzar and Quigley before leaving court.

56.     The escalation of the court-presence requirement against Plaintiff was not based on a new written policy, a preexisting job description, or longstanding PRDU practice. It arose during and because of Plaintiff's accommodation process, after Plaintiff requested protection from unnecessary courthouse exposure because she was undergoing immunosuppressive treatment.

57.     Despite Plaintiff's medical documentation and repeated follow-ups, Defendant did not provide any interim accommodation while it evaluated Plaintiff's request. Defendant left Plaintiff without *any* interim protection while her imminent court-coverage shifts approached, despite known medical risk and documented harm.

58.     During this timeperiod, Plaintiff became ill twice while Defendant continued to require disputed in-person court coverage without granting interim protection.

59.     On or about December 3, 2025, Plaintiff became ill with a stomach virus.

60.     On or about December 22, 2025, Plaintiff became ill again with an upper respiratory infection.

14

61.    Plaintiff's second December illness lasted more than a week.

62.    Upon information and belief, because Plaintiff was immunosuppressed, she was unable to fight off the virus without interrupting medically necessary immunosuppressant treatment for her autoimmune condition.

63.    Upon information and belief, as a result of the interruption, Plaintiff's autoimmune condition flared, and when her body was later able to tolerate treatment, the prior regimen became ineffective -- forcing Plaintiff to change her treatment course.

64.    During this same time-period, Defendant delayed and diverted the matter to its third-party administrator (Reliance Matrix) and demanded additional provider information on a compressed timetable while providing no interim measures.

65.    Defendants' refusal to provide interim accommodation relief while the request remained pending required Plaintiff to continue working under conditions that posed medically documented risks to her health. Upon information and belief, Defendants' refusal increased Plaintiff's risk of the infection that, upon information and belief, later exacerbated her medical condition.

66.    Plaintiff had proposed an interim modification that would have preserved full court-coverage availability while reducing unnecessary or excessive exposure.

67.    While Defendant Legal Aid Society did not grant Plaintiff an interim accommodation while evaluating her amended request, between November and December 2025, Plaintiff repeatedly sought guidance and interim protection through emails and meetings.

68.    With no meaningful interim relief and no timely resolution, Plaintiff -- through 1199 SEIU -- filed a grievance on or about December 19, 2025, challenging Defendant's delay and failure to provide a timely interim accommodation, and challenging Defendant's insistence

that PRDU forensic social workers must remain continuously in court for extended periods (up to seven hours) as a unilateral change in job expectations affecting disabled employees.

69. Defendant Legal Aid Society left Plaintiff to choose between following medical guidance and risking discipline under Defendant Legal Aid Society's newly asserted court-presence position.

70. In or about January 2026, Defendant Legal Aid Society continued to escalate the disputed court-presence requirement as to Plaintiff by asserting that Plaintiff was required to remain in court for up to seven hours during court-coverage days and could not leave court without first conferring with Defendants Almanzar and Quigley.

71. This was materially different from the earlier August 2025 one-hour instruction that had been directed at both Plaintiff and Verano Diaz.

72. Around the same time, Plaintiff began experiencing additional symptoms, including tachycardia, difficulty regulating body temperature, and other symptoms distinct from her original autoimmune condition. Plaintiff thereafter consulted with her cardiologist and rheumatologist. Plaintiff's rheumatologist attempted to restart immunosuppressive treatment, but Plaintiff's symptoms worsened, and Plaintiff was not able to resume consistent treatment until in or about April 2026.

73. Defendant Legal Aid Society used the accommodation process to reframe and enlarge Plaintiff's job duties, rather than to engage in a good-faith individualized assessment of whether Plaintiff could continue performing court coverage from the nearby Defendant Legal Aid Society office and attend court when actually needed for a specific client or matter.

74. Defendant Legal Aid Society did not escalate the disputed one-hour instruction against Verano Diaz into the same seven-hour -- Plaintiff-specific accommodation

16

requirement. Instead, Defendant Legal Aid Society escalated the issue primarily against Plaintiff after she sought disability-related protection from unnecessary courthouse exposure.

75. Plaintiff explained that court coverage operated like emergency coverage, with attorneys directed to contact a forensic social worker by call, email, or other channels when support was needed. Previously, court coverage required availability and responsiveness, not continuous courthouse presence when no attorney or client needed in-person support.

76. The coercive effect of the new court-presence instruction was immediate.

77. Defendant's disputed court-presence requirement placed Plaintiff in the position of risking discipline if she followed her medical restrictions and resisted unnecessary courthouse exposure.

78. Plaintiff did not refuse court coverage, and she did not ask to be excused from her responsibilities. She asked for a modest, workable interim modification that would allow her to remain fully available for court needs while complying with medical guidance designed to protect her health.

79. At all times, Plaintiff attempted to comply with both her job duties and her medical restrictions. Plaintiff sought clarification because Defendants were simultaneously telling her that continuous court presence was required, disputing that a mandate existed, and refusing to provide interim protection while her provider directed her to limit unnecessary court exposure.

80. Plaintiff's position was that she would continue attending court for client hearings, client interviews, psychiatric crises, detox concerns, attorney requests, emergencies, and other actual court-coverage needs. She objected only to unnecessary and prolonged

17

courthouse presence when no client-specific, attorney-specific, hearing-specific, or emergency need required her to be there.

81.     Plaintiff timely notified Defendants of her disability and her need for reasonable accommodations, providing medical documentation from her healthcare provider substantiating the need for interim accommodations.

82.     On January 20, 2026, Defendant denied Plaintiff's interim accommodation request -- asserting that in-person/onsite court coverage constituted an essential function of the PRDU social worker role.

83.     Defendant issued this denial despite Plaintiff's medical documentation being sufficient to substantiate the need for interim accommodations, and despite Defendants' failure to meaningfully engage in the interactive process required by the Rehabilitation Act and/or the good faith cooperative dialogue required by the NYCHRL.

84.     Plaintiff was subsequently forced to take Family and Medical Leave Act ("FMLA") leave because Defendant denied the requested disability accommodation and left her facing ongoing medically documented risks associated with unnecessary or excessive courthouse exposure, including risk of serious infection, hospitalization, and further worsening of her disability-related condition.

85.     Since beginning medical leave, Plaintiff's health has significantly deteriorated.

86.     Defendant's denial of accommodation and interim accommodation required Plaintiff to continue unnecessary or excessive courthouse exposure while immunocompromised and, upon information and belief, increased her risk of infection.

87.     Plaintiff seeks recovery for resulting harms to the extent caused or contributed to by Defendant's unlawful conduct.

18

88.    Since Plaintiff's illness in December 2025, she has developed additional serious, debilitating symptoms and conditions, including an inability to regulate her body temperature, extreme light sensitivity, persistent dizziness, and tachycardia with minimal exertion.

89.    Plaintiff's treating specialists have advised her that these symptoms are consistent with post-viral autonomic dysfunction, including Postural Orthostatic Tachycardia Syndrome ("POTS") and dysautonomia, which conditions can only be managed symptomatically and for which providers are unable to predict when -- if ever -- they will resolve.

90.    Plaintiff's medical team has advised that her deterioration is consistent with precipitation by post-viral infection and exacerbation by sustained work-related stress.

91.    Upon information and belief, the unnecessary or excessive courthouse exposure Defendant required increased Plaintiff's risk of infection while immunocompromised, which illness subsequently may have contributed to the medical deterioration that followed.

92.    Plaintiff is now dependent on assistance for the substantial majority of each day, including for routine errands and household tasks, and at times for basic activities of daily living -- she has required adaptive equipment (including, at times, a bedside commode and shower chair).

93.    Plaintiff is largely bedbound, cannot tolerate screens due to extreme light sensitivity, and is presently unable to work even in a fully remote capacity.

94.    Plaintiff has also suffered significant emotional distress, isolation, and depression as a result of the abrupt loss of independence and destabilizing uncertainty regarding her ability to work.

95.     Upon information and belief, Defendant Legal Aid Society and the individual Defendants denied, or contributed to the denial of, an effective accommodation and interim accommodation that would have avoided or materially reduced unnecessary and excessive courthouse exposure. Plaintiff seeks recovery for the harms caused by that denial, including emotional distress, lost wages, lost benefits, forced medical leave, impairment of her ability to work, and physical aggravation to the extent supported by medical records, treating-provider evidence, expert evidence, and discovery.

96.     Defendant's denial of accommodation forced Plaintiff onto medical leave, deprived her of the ability to continue working safely, and caused loss of wages, benefits, and employment opportunities.

97.     The Legal Aid Society and the individual Defendants could have granted an effective accommodation or interim accommodation that would have avoided or materially reduced unnecessary and excessive courthouse exposure and reduced Plaintiff's risk of infection. Defendants refused to provide such accommodation despite knowing Plaintiff was immunocompromised and medically restricted from unnecessary courthouse exposure. Upon information and belief, Defendants' refusal materially increased Plaintiff's risk of infection and may have contributed to the illnesses and disability-related deterioration that followed. Plaintiff remains employed by Defendant Legal Aid Society on medical leave and seeks to return to work if and when medically able with reasonable accommodations.

98.     Unless enjoined, Defendant Legal Aid Society's challenged accommodation practices, including delay, refusal to provide interim measures, excessive medical-documentation demands, and job-duty recharacterizations during the accommodation process,

create a real and immediate risk that Plaintiff will again be subjected to the same unlawful practices when she seeks to return from leave or requires additional accommodation.

## JURISDICTION AND VENUE

99.     The Court has subject matter jurisdiction over Plaintiff's federal claims under the Rehabilitation Act pursuant to 28 U.S.C. § 1331.

100.     The Court has supplemental jurisdiction over Plaintiff's claims arising under the NYCHRL pursuant to 28 U.S.C. § 1367(a), because those claims are so related to Plaintiff's federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

101.     This Court has personal jurisdiction over Defendant Legal Aid Society because it maintains its principal place of business in the State of New York, employs workers in New York and committed the unlawful employment practices alleged herein in New York, including within this District.

102.     The individual Defendants' challenged conduct arose from their New York City employment roles, including their participation in Plaintiff's accommodation process, court-coverage requirements, job-duty framing, medical-documentation demands, supervision, and/or enforcement of work-location requirements.

103.     This Court has personal jurisdiction over Defendants Park, Walsh, Almanzar, Quigley, and Burt because, at all relevant times, each acted as an employee, supervisor, manager, Human Resources representative, and/or agent of Defendant Legal Aid Society in New York City, directed conduct toward Plaintiff in New York City, participated in the employment practices alleged herein in New York City, and/or exercised authority over Plaintiff's New York City employment.

21

104.    Venue lies properly in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims occurred within this judicial district.

## PARTIES

**Plaintiff Marissa Kubicki**

105.    Plaintiff is an adult individual who resides in the Bronx, New York and maintained residence in, and worked within, New York City at all times during her employment with The Legal Aid Society.

106.    The Legal Aid Society employed Plaintiff in the Bronx as a Forensic Social Worker in the Parole Revocation Defense Unit ("PRDU") from approximately March 1, 2023, following a transfer from her previous position as a Forensic Social Worker in the Bronx Criminal Defense Practice (CDP), where she had worked since 2019.

107.    Plaintiff's essential job duties included providing forensic social work services to clients, conducting client assessments, consulting with attorneys to review client cases, preparing written work product and case documentation, and providing court-coverage support as scheduled.

108.    Court-coverage support required the forensic social worker to remain available and responsive to attorney and client needs during the court day, including attending court when her physical presence was actually needed for a particular client matter.

109.    Beginning in or about late 2025, Defendant instituted a new requirement that -- only Plaintiff -- remain continuously present in the courthouse or courtroom for extended periods during scheduled court-coverage days, sometimes described as up to seven hours per day regardless of whether services were needed at that time.

110.    Plaintiff disputes that continuous courthouse presence is an essential function of the position.

111.    Plaintiff has a disability within the meaning of the Rehabilitation Act and the NYCHRL that requires ongoing treatment, including limitations on unnecessary or excessive exposure to infections and substantially limits one or more major life activities and major bodily functions, including immune function, musculoskeletal function, walking, standing, bending, working, and caring for herself.

112.    Defendant knew of Plaintiff's disability and need for workplace accommodation no later than November 8, 2024. Defendant further knew no later than July 14, 2025 that Plaintiff's disability-related limitations included the need to reduce exposure to illnesses, and no later than November 24, 2025 that Plaintiff's disability-related limitations required limits on unnecessary courthouse exposure due to immunosuppressive treatment and heightened infection risk.

113.    Plaintiff has at all times been able to perform the essential functions of her position with or without a reasonable accommodation.

**Defendant The Legal Aid Society**

114.    The Legal Aid Society operates as the oldest and largest provider of legal services to low-income New Yorkers, operating multiple practice areas including criminal defense and civil legal services.

115.    Defendant The Legal Aid Society operates with its principal place of business located at 199 Water Street, New York, New York 10038.

116.    At all times relevant to this Complaint, including in the year before the alleged NYCHRL violations took place, The Legal Aid Society employed more than four employees.

23

117.    At all times relevant to this Class Action Complaint ("Complaint"), Defendant Legal Aid Society operated as an employer within the meaning of the Rehabilitation Act and the NYCHRL.

118.    At all times relevant to this Complaint, The Legal Aid Society maintained a Parole Revocation Defense Unit (PRDU) in which Plaintiff worked.

119.    At all times relevant to this Complaint, Defendant was and is a program or activity receiving federal financial assistance within the meaning of the Rehabilitation Act ("RA"), 29 U.S.C. § 794.

120.    The Rehabilitation Act prohibits discrimination on the basis of disability by recipients of federal financial assistance, including in employment, and it applies to the operations of covered entities, including their employment practices.

121.    Upon information and belief, Defendant receives federal financial assistance, including direct federal funding and federal funds passed through grants and governmental contracts.

122.    Defendant Legal Aid Society's own publicly available financial disclosures reflect this federal funding. For example, Defendant's publicly available audited financial statements for the fiscal year ended June 30, 2024 report that Defendant recognized $13,697,629 in federal financial assistance, including both direct federal funding and passed-through grants and contracts.[2]

---

[2]    *See The Legal Aid Society, Financial Report:* June 30, 2024, at 10 ("During the year ended June 30, 2024, the Society recognized federal financial assistance totaling $13,697,629. This amount was included in the direct federal funding and passed-through grants and contracts."); *see also The Legal Aid Society, Financial Report* June 30, 2025, at 7 (stating that The Legal Aid Society's civil practice relies in part on contracts with the federal government);

123.    Accordingly, Defendant Legal Aid Society is subject to the Rehabilitation Act and its implementing requirements, and its employment practices affecting Plaintiff and the classes are covered by the RA. *See* 29 U.S.C. § 794(b). Defendant Legal Aid Society is therefore required to comply with the RA's prohibition on disability discrimination and its reasonable-accommodation obligations, applying the standards of Title I of the ADA pursuant to 29 U.S.C. § 794(d).

124.    At all relevant times, Defendant Legal Aid Society also acted through Reliance Matrix, Matrix Absence, and related Matrix personnel (collectively, "Matrix") as its authorized agents for administering employee disability-accommodation requests, including Plaintiff's request.

125.    Defendant Legal Aid Society delegated to Matrix authority to communicate with employees and healthcare providers, request medical information, transmit Defendant's position concerning asserted job functions and accommodation requirements, impose response deadlines, collect and process accommodation-related documentation, and coordinate next steps in the accommodation process. Matrix performed those functions at Defendant's direction, for Defendant's benefit, and within the scope of authority Defendant granted it. Matrix's acts, omissions, communications, documentation demands, deadlines, and accommodation-process conduct are therefore attributable to Defendant.

---

*The Legal Aid Society, Financial Report* June 30, 2023, at 8 (stating that The Legal Aid Society's civil practice relies in part on contracts with the federal government).

126. Plaintiff did not select Matrix and did not independently retain Matrix to assist with her accommodation request. Defendant selected, authorized, and used Matrix to administer the accommodation process on Defendant's behalf.

127. Defendant's relationship with Matrix was reflected in Matrix communications identifying Matrix Absence Management, Inc. as acting "on behalf of Human Resources Department, The Legal Aid Society." Matrix therefore operated as part of Defendant's HR and accommodation-administration structure when communicating with employees about leave and accommodation issues.

**Defendant Connie Park**

128. Defendant Connie Park is sued in her individual capacity.

129. At all relevant times, Defendant Park was Chief Human Resources Officer of The Legal Aid Society.

130. In that role, Defendant Park exercised managerial and/or supervisory authority over The Legal Aid Society's Human Resources and Employee Relations functions, including the administration of disability accommodation requests, interim accommodation requests, medical-documentation demands, employment-record handling, essential-function determinations, workplace restrictions, work-location requirements, and communications concerning whether an employee's requested accommodation would be granted, denied, delayed, or conditioned on additional information.

131. Park had the authority and practical ability to dictate or administer Plaintiff's terms, conditions, and privileges of employment, including whether Plaintiff would be required to work in the courthouse up to seven hours per day, two days per week, whether Plaintiff would receive an interim accommodation while her accommodation request and grievance

were pending, and whether Plaintiff's job duties would be framed or expanded to include extended courthouse presence and case review with supervisors while she remained in court.

132.  Defendant Park personally participated in the conduct giving rise to Plaintiff's NYCHRL claims. Among other things, after Plaintiff and her union challenged the disputed courthouse-presence requirement and requested an interim accommodation, Defendant Park participated in the January 20, 2026 interim accommodation meeting, stated that she would respond to the interim accommodation request, and thereafter reaffirmed the seven-hours-per-day courthouse expectation and added new job duties, including case review with supervisors while Plaintiff remained in court.  Park therefore had ,exercised and retained, practical authority to dictate or administer Plaintiff's work location, schedule, job duties, accommodation status, and other terms, conditions, and privileges of employment.

133.  Upon information and belief, Park had authority over Defendant Legal Aid Society's Human Resources, Employee Relations, disability-accommodation administration, employment records, leave administration, return-to-work issues, workplace-modification processes, and HR communications concerning grievances, employment terms, and workplace restrictions.

134.  Upon information and belief, Park had formal and practical authority to dictate, administer, approve, deny, delay, ratify, and/or materially influence Plaintiff's terms, conditions, and privileges of employment, including Plaintiff's accommodation process, interim-accommodation status, job-function framing, court-presence expectations, leave status, employment records, grievance-related HR communications, and medical-documentation obligations.

135.    Park exercised senior HR authority and participated in, approved, condoned, ratified, and/or failed to correct the challenged conduct affecting Plaintiff's terms, conditions, and privileges of employment.

**Defendant Laura Walsh**

136.    Defendant Laura Walsh is sued in her individual capacity.

137.    At all relevant times, Defendant Walsh was a Senior Employee Relations Specialist and/or Human Resources employee of The Legal Aid Society. In that role, Walsh exercised delegated authority and practical control over Plaintiff's accommodation process, interactive-process communications, medical-documentation requests, essential-function framing, alternative-accommodation discussions, and the implementation or enforcement of work-location and courthouse-presence requirements.

138.    Walsh had the authority and practical ability to dictate or administer Plaintiff's terms, conditions, and privileges of employment, including whether Plaintiff would be required to remain in court up to seven hours per day, two days per week, whether Plaintiff would receive an interim accommodation, and what additional medical information would be demanded from Plaintiff or her provider before The Legal Aid Society would act on her requested accommodation.

139.    Walsh personally participated in the conduct giving rise to Plaintiff's NYCHRL claims. Among other things, Walsh communicated with Plaintiff regarding her updated accommodation request, participated in meetings concerning the accommodation request, stated and/or transmitted the position that Plaintiff was required to be in court up to seven hours per day, two days per week, and participated in the process by which The Legal Aid Society and/or its accommodation administrator sought additional medical information based on a

28

disputed characterization of Plaintiff's job functions. Walsh therefore had, exercised, and retained practical authority to dictate or administer Plaintiff's accommodation status, work location, medical-documentation obligations, and other terms, conditions, and privileges of employment.

140.    Upon information and belief, Walsh acted within Defendant Legal Aid Society's Human Resources and Employee Relations and participated in administering Plaintiff's disability-accommodation process, including communications with Plaintiff, communications with Matrix, requests for additional medical information, discussion of possible accommodations, consideration of interim measures, and communications concerning The Legal Aid Society's asserted description of Plaintiff's job functions.

141.    Upon information and belief, Walsh had formal and/or delegated practical authority to dictate, administer, recommend, approve, deny, delay, and/or materially influence Plaintiff's terms, conditions, and privileges of employment, including Plaintiff's accommodation process, interim-accommodation status, worksite expectations, court-coverage expectations, medical-documentation obligations, and the terms on which Plaintiff could continue performing her job while medically restricted.

142.    Walsh participated in and helped administer the challenged employment decisions and accommodation process that affected Plaintiff's terms, conditions, and privileges of employment.

143.    Walsh enforced, administered, and materially influenced accommodation decisions by accepting management's asserted job-duty descriptions, communicating those descriptions during the accommodation process, and maintaining them even when employees and union representatives disputed them.

144. With respect to Plaintiff, Walsh repeatedly maintained the position advanced by Plaintiff's supervisors that extended courthouse presence was part of Plaintiff's job, despite contrary information from Plaintiff and her union showing that continuous court presence was not part of Plaintiff's actual court-coverage duties or longstanding PRDU practice.

145. Upon information and belief, Walsh's administration of accommodation requests also coincided with a change from prior Defendant Legal Aid Society practice under which interim accommodations were provided while management evaluated whether requested accommodations would be approved permanently.

146. Walsh's failure to provide Plaintiff interim protection despite known medical risk and imminent court-coverage dates was consistent with that more restrictive practice.

**Defendant Rebekah Almanzar**

147. Defendant Rebekah Almanzar is sued in her individual capacity.

148. At all relevant times, Almanzar was a Social Work Supervisor and/or Post-Conviction Social Work Supervisor at The Legal Aid Society.

149. Plaintiff's Forensic Social Worker position reported to Almanzar.

150. Almanzar exercised formal supervisory authority and practical control over Plaintiff's day-to-day work, supervision, assignments, court-coverage expectations, case-related responsibilities, performance expectations, and other terms, conditions, and privileges of employment.

151. Almanzar personally participated in the conduct giving rise to Plaintiff's NYCHRL claims. Among other things, Almanzar participated in and/or approved the disputed courthouse-presence requirement, took the position with Defendant Quigley that the disputed court presence was part of the role and responsibility of PRDU Forensic Social Workers,

participated in meetings concerning that requirement, and maintained the position that Plaintiff should be physically present in court even when Plaintiff asserted that extended unnecessary courthouse exposure conflicted with her disability-related restrictions.

152. Almanzar therefore had, exercised, and retained practical authority to dictate or administer Plaintiff's work assignments, work location, court-coverage obligations, supervision, and other terms, conditions, and privileges of employment.

153. Almanzar had supervisory and practical authority over Plaintiff's work assignments, court-coverage expectations, day-to-day supervision, performance narratives, job-duty communications, file-review expectations, reporting expectations, and other terms, conditions, and privileges of Plaintiff's employment.

154. Almanzar participated in imposing, maintaining, and/or defending the challenged court-presence requirement, including the requirement that Plaintiff sit in court even when she did not have a client-specific need, attorney request, hearing, client meeting, or other identified reason requiring physical presence in court.

155. Almanzar had supervisory authority over Plaintiff and had practical ability to dictate and administer Plaintiff's work assignments, court-coverage expectations, supervision, and other terms, conditions, and privileges of employment.

**Defendant Jackie Quigley**

156. Defendant Jackie Quigley is sued in her individual capacity.

157. At all relevant times, Defendant Quigley was an Assistant Social Work Supervisor in The Legal Aid Society's Parole Revocation Defense Unit (PRDU).

158.    Quigley exercised supervisory and practical authority over Plaintiff's day-to-day work, supervision, court coverage, case-file review, performance expectations, work assignments, and other terms, conditions, and privileges of employment.

159.    Quigley personally participated in the conduct giving rise to Plaintiff's NYCHRL claims. Among other things, Quigley informed Plaintiff during supervision that Plaintiff would be expected to sit in court during court-coverage shifts even absent an identified client need, joined with Almanzar in asserting that court presence was part of the role and responsibility of PRDU Forensic Social Workers, participated in communications and meetings concerning the disputed courthouse-presence requirement, and requested Plaintiff's case files in a manner Plaintiff understood to be a departure from past practice and connected to heightened scrutiny after Plaintiff sought accommodation and union assistance.

160.    Quigley exercised, and retained practical authority to dictate or administer, Plaintiff's court-coverage obligations, supervisory review, case-file obligations, performance expectations, work assignments, and other terms, conditions, and privileges of employment.

161.    Quigley participated in imposing, maintaining, and/or defending the challenged court-presence requirement, including by instructing Plaintiff that she was required to sit in court during court-coverage shifts even when she did not have a client-specific need, attorney request, hearing, client meeting, or other identified reason requiring physical presence in court.

162.    Quigley further participated in the challenged retaliatory and interfering conduct by requesting Plaintiff's client files in a manner Plaintiff understood to depart from ordinary practice and by failing to provide a non-retaliatory explanation or consistent protocol for that demand.

163. Quigley had supervisory authority over Plaintiff and had practical ability to dictate and administer Plaintiff's work assignments, court-coverage expectations, supervision, case-file expectations, and other terms, conditions, and privileges of employment.

**Defendant Yonzel Burt**

164. Defendant Yonzel Burt is sued in her individual capacity.

165. At all relevant times, Defendant Burt was Director of Social Work for The Legal Aid Society's Criminal Defense Practice (CDP).

166. In that role, Defendant Burt exercised managerial and practical authority over CDP social-work operations across The Legal Aid Society's borough offices.

167. Upon information and belief, Burt's authority included authority over CDP social-work supervisors, PRDU social-work practices, social-work job duties, court-coverage expectations, work assignments, supervision practices, performance standards, staffing practices, remote-work practices, leave-related issues, accommodation-related work-location issues, and union concerns involving CDP social-work staff.

168. Defendant Burt had a supervisory role, managerial role, agency role, and/or practical ability to dictate or administer Plaintiff's compensation, terms, conditions, or privileges of employment.

169. Defendant Burt had the practical ability to dictate, administer, approve, ratify, suspend, modify, or correct Plaintiff's work location, court-coverage obligations, job-duty framing, social-work performance expectations, supervision, and other terms, conditions, and privileges of employment.

170. Defendant Burt personally participated in, approved, ratified, administered, or failed to correct the challenged court-presence requirement after Plaintiff and her union raised

concerns that the requirement was arbitrary, inconsistent with past practice, disparately applied to Bronx PRDU social workers, and in conflict with Plaintiff's disability-related accommodation needs.

171.    Defendant Burt participated in the December 2025 meeting with Plaintiff, union representatives, PRDU supervisors, and PRDU leadership concerning the challenged PRDU court-presence expectation.

172.    At and after that meeting, Burt was placed on notice that Plaintiff and her union disputed the challenged court-presence requirement as a change in job duties, inconsistent with past practice, disparately applied, and in conflict with Plaintiff's disability-related restrictions.

173.    After being placed on notice of those concerns, Burt approved, ratified, administered, or failed to correct management's continued position that PRDU Forensic Social Workers were expected to be in court on designated court-coverage days.

174.    Burt thereby had and exercised, or failed to exercise, practical authority to dictate or administer Plaintiff's work location, court-coverage obligations, job-duty framing, social-work performance expectations, and other terms, conditions, and privileges of employment.

175.    Defendant Burt is individually liable under the NYCHRL because she participated in, approved, ratified, administered, or failed to correct discriminatory, retaliatory, coercive, intimidating, threatening, interfering, and/or accommodation-related conduct affecting Plaintiff's terms, conditions, and privileges of employment.

176.    Defendant Burt participated in, approved, ratified administered, and/or failed to correct the challenged court-presence requirement after receiving notice of Plaintiff's disability-related accommodation needs and protected activity.

**Defendant Legal Aid Society's Agent Matrix**

177.    Plaintiff did not select Matrix Absence Management, Inc., Reliance Matrix, Matrix Absence, and related Matrix personnel ("Matrix") and did not independently retain Matrix to assist with her accommodation request. Defendant Legal Aid Society selected, authorized, and used Matrix to administer the accommodation process on its behalf.

178.    Matrix communicated with Plaintiff because Defendant Legal Aid Society had placed Plaintiff's accommodation request into Matrix's accommodation-administration process. Matrix identified Plaintiff's accommodation matter by a Matrix accommodation event or claim number and communicated with Plaintiff as part of Defendant's workplace-accommodation process.

179.    For example, on January 2, 2026, Matrix communicated that Defendant Legal Aid Society required additional information to consider Plaintiff's accommodation request. Matrix therefore did not act as an independent medical provider, neutral evaluator, or third party outside Defendant's control. Matrix acted as the mechanism through which Defendant requested additional information from Plaintiff and her healthcare provider.

180.    Similarly, Matrix transmitted Defendant's asserted description of Plaintiff's job function to Plaintiff and her healthcare provider, including Defendant's position that Plaintiff was expected to be onsite in the courthouse twice per week for up to seven hours per day. Matrix  conveyed Defendant's disputed job-duty framing during the accommodation process.

181.    Matrix similarly transmitted Defendant's proposed alternatives, including PPE and regular breaks, and asked Plaintiff's provider for information that would permit accommodations consistent with Defendant's preferred courthouse-presence requirement.

Matrix was conveying Defendant's accommodation position, not making an independent determination.

182. Matrix similarly required additional provider responses and a provider signature on a compressed deadline, warning that failure to respond within fifteen calendar days could affect the accommodation decision. That deadline and warning were part of Defendant's accommodation process and are attributable to Defendant.

183. Matrix similarly stated that, after receiving the requested information, it would coordinate next steps with Plaintiff and Defendant, confirming that Matrix administered the process for Defendant and within Defendant's delegated authority.

184. Defendant used Matrix as part of its broader accommodation process with Human Resources and Employee Relations. Defendant cannot avoid liability by attributing the disputed medical-documentation demands, deadlines, job-function framing, or delays to Matrix.

185. At all relevant times, Defendants used and related Matrix personnel to administer leave and accommodation processes on behalf of Defendant's Human Resources Department. Matrix communications identified Matrix as acting "on behalf of Human Resources Department, The Legal Aid Society," and Matrix communicated with Plaintiff and her provider in connection with Defendant Legal Aid Society's accommodation and leave processes.

186. Matrix's accommodation-process communications, documentation demands, deadlines, job-function descriptions, and next-step communications were made for Defendant's benefit and within the scope of authority Defendant gave Matrix.

**Strict Liability, Direct Liability, and Individual Liability Under the NYCHRL**

187.    At all relevant times, Defendants Park, Walsh, Almanzar, Quigley, and Burt were employees and/or agents of The Legal Aid Society within the meaning of N.Y.C. Admin. Code § 8-107(1)(a).

188.    At all relevant times, Defendants Park, Walsh, Almanzar, Quigley, and Burt were persons within the meaning of N.Y.C. Admin. Code §§ 8-107(6), 8-107(7), 8-107(15), 8-107(19), and 8-107(28).

189.    At all relevant times, Defendants Park, Walsh, Almanzar, Quigley, and Burt had some supervisory role over Plaintiff and/or otherwise wielded the ability to dictate or administer Plaintiff's compensation, terms, conditions, or privileges of employment, including through control or practical authority over Plaintiff's work location, court-coverage requirements, work assignments, job duties, supervision, performance expectations, accommodation status, interim-accommodation status, medical-documentation requirements, leave-related communications, and employment-record handling.

190.    Defendants Park, Walsh, Almanzar, Quigley, and Burt each participated in, approved, ratified, condoned, and/or failed to correct the conduct giving rise to Plaintiff's NYCHRL claims after having notice of Plaintiff's disability-related accommodation needs and protected activity.

191.    The Legal Aid Society is directly liable for its own discrimination, failure to accommodate, failure to engage in a cooperative dialogue, retaliation, interference, coercion, intimidation, threats, and aiding and abetting, including with respect to its policies, procedures, and/or practices, pursuant to N.Y.C. Admin. Code §§ 8-107(1)(a), 8-107(6), 8-107(7), 8-107(15), 8-107(19), and 8-107(28).

192. The Legal Aid Society is strictly liable for its employees' and agents' retaliation, interference with NYCHRL rights, failures to accommodate, and/or failures to engage in the required cooperative dialogue process, pursuant to N.Y.C. Admin. Code § 8-107(13)(a), including with respect to the conduct of Defendants Park, Walsh, Almanzar, Quigley, Burt, as well as with respect to Matrix and its agents acting within the scope of Defendant Legal Aid Society's accommodation process.

193. The Legal Aid Society is strictly liable for its employees' and agents' discrimination, for its employees and/or agents who exercised managerial or supervisory responsibility concerning Plaintiff, pursuant to N.Y.C. Admin. Code § 8-107(13)(b), including Defendants Park, Walsh, Almanzar, Quigley, Burt, and Matrix and/or its agents.

194. The Legal Aid Society is further liable for its employees' and agents' disability discrimination, because it knew or should have known of the discriminatory conduct alleged herein, and/or because this conduct was known to an employee or agent who exercised managerial or supervisory responsibility and failed to take immediate and appropriate corrective action.

195. The Legal Aid Society is further liable for the NYCHRL violations committed by employees and agents because it had knowledge of Plaintiff's disability-related accommodation needs, Plaintiff's protected accommodation requests, Plaintiff's union-supported objections to the disputed court-presence requirement, Plaintiff's request for interim accommodation, and the pending grievance concerning the mischaracterization of Plaintiff's job duties, but nevertheless continued to enforce, ratify, administer, or permit the challenged court-presence requirement.

38

196. At all relevant times, Defendants Park, Walsh, Almanzar, Quigley, and Burt were employees and/or agents of The Legal Aid Society within the meaning of N.Y.C. Admin. Code §§ 8-102 and 8-107(1)(a).

197. At all relevant times, Defendants Park, Walsh, Almanzar, Quigley, and Burt were persons within the meaning of N.Y.C. Admin. Code §§ 8-102, 8-107(6), 8-107(7), 8-107(15), 8-107(19), 8-107(28).

198. At all relevant times, Defendants Park, Walsh, Almanzar, Quigley, and Burt had formal supervisory authority, delegated human-resources authority, managerial authority, and/or practical authority to dictate or administer Plaintiff's compensation, terms, conditions, or privileges of employment.

199. Each had a supervisory role, agency role, managerial role, delegated HR role, and/or practical ability to dictate or administer Plaintiff's work location, court-coverage obligations, job-duty requirements, supervision, performance expectations, accommodation status, interim-accommodation status, medical-documentation obligations, or other terms, conditions, and privileges of employment.

200. Defendants Park, Walsh, Almanzar, Quigley, and Burt had the ability to dictate or administer the compensation, terms, conditions, or privileges of the Plaintiff's employment. Each had and/or exercised authority over Plaintiff. Their conduct affected Plaintiff's work location, court-coverage obligations, job-duty framing, accommodation process, medical-documentation requirements, interim-accommodation status, supervisory review, case-file obligations, and other terms, conditions, and privileges of employment.

201. In addition, Defendants Park, Walsh, Almanzar, Quigley, and Burt may be held personally liable for NYCHRL violations other than violations of 8-107(1)(a) regardless of their supervisory or managerial control over Plaintiff.

202. The Legal Aid Society is also liable for the acts, omissions, communications, deadlines, documentation demands, job-function descriptions, and accommodation-process conduct of Matrix and related Matrix personnel because Defendant used Matrix to administer employee disability-accommodation and leave processes on behalf of Defendant and its Human Resources Department.

203. At all relevant times, Matrix acted as Defendant's agent in connection with Plaintiff's accommodation process. Defendant authorized Matrix to communicate with Plaintiff and her healthcare provider, request medical information, transmit Defendant's asserted position concerning Plaintiff's job functions, impose response deadlines, collect and process accommodation-related documentation, and coordinate next steps in the accommodation process.

204. Matrix acted at Defendant's direction, for Defendant's benefit, and within the scope of authority Defendant gave it. Matrix was not selected by Plaintiff, did not act for Plaintiff, and did not operate outside Defendant's accommodation process.

205. Matrix's medical-documentation demands, response deadlines, job-function framing, communications with Plaintiff and Plaintiff's healthcare provider, and delays in the accommodation process are therefore attributable to The Legal Aid Society.

**FACTUAL ALLEGATIONS**

**Plaintiff's Employment History and Performance**

206.    Plaintiff transferred within The Legal Aid Society to the Parole Revocation Defense Unit ("PRDU") as a Forensic Social Worker on or about March 1, 2023, following a comprehensive internal hiring process that included multiple interviews, reference checks, and verification of her professional qualifications and licensure.

207.    Plaintiff's comprehensive job duties as a PRDU Forensic Social Worker included, but were not limited to: (1) conducting thorough forensic social work assessments of clients facing parole revocation, including psychological and social evaluations; (2) preparing detailed written reports documenting client histories, mental health status, substance abuse issues, family circumstances, and treatment recommendations; (3) participating in strategic case planning meetings with defense attorneys to review client files, discussing case strategies, and identifying potential mitigating factors; (4) providing expert testimony in parole revocation hearings when required; (5) coordinating with community-based treatment providers, family members, and other support systems to develop comprehensive reentry plans; (6) maintaining detailed case documentation in compliance with The Legal Aid Society policies and professional social work standards; (7) providing in-person court coverage during scheduled court workdays to offer immediate consultation and support to attorneys and clients when needed for a particular client matter; and (8) collaborating with other PRDU staff members, including attorneys, paralegals, and administrative personnel, to ensure comprehensive client representation.

208.    Prior to Defendant's knowledge of Plaintiff's disability and accommodation request, Plaintiff consistently performed all aspects of her duties at an exemplary level,

receiving positive feedback from supervisors regarding her clinical skills, written work product, client rapport, and professional collaboration with legal team members.

209.    For example, in Plaintiff's March 2024 probationary annual performance evaluation, Defendant Almanzar rated Plaintiff as fully meeting all standards for her position. The evaluator noted that Plaintiff quickly learned PRDU's legal process, began court coverage within approximately one month of her transfer, and demonstrated strong interviewing skills, effective collaboration with assigned attorneys, and the ability to process information and timely produce work product for court under short deadlines. The evaluator further praised Plaintiff as a dependable teammate and an invaluable member of the team with a promising future in PRDU. The evaluation also commended Plaintiff's organization and time-management skills, including excellent electronic case tracking and file management, timely delivery of documentation to attorneys and the court, and accurate and timely submission of required statistics.

210.    In Plaintiff's March 3, 2025, annual performance evaluation by Defendant Quigley, Plaintiff continued to receive strongly positive feedback, including an "Exceeds standards" rating for establishing good working relationships with clients and their families, and praise for quickly building rapport and trust with clients, using collateral documentation and community supports to bolster mitigation, and consulting with attorneys at referral and throughout the case.

211.    The evaluation also recognized Plaintiff's professional leadership and development, including participation in trainings and assisting in the development of training tools for attorney staff, and the supervisor expressly noted that no concerns had been raised about Plaintiff's work from any supervisor, attorney, or client perspective.

**Court Coverage and Essential Functions**

212.    Historically, PRDU forensic social workers performed court-support work primarily from The Legal Aid Society's office and attended court when attorney/client needs required.  In the Bronx model in particular, the Legal Aid Society office is located across the street from the courthouse, allowing immediate response without requiring prolonged, continuous waiting in the courtroom when no social-work services are needed in-person.

213.    Other PRDU practices confirmed the same as-needed coverage model. Upon information and belief, Manhattan-based PRDU social workers traveled to Brooklyn Supreme Court as needed rather than remaining in court all day, while Bronx PRDU social workers historically worked from the nearby office and crossed to court when needed. Defendant's stricter application of continuous courthouse presence to Plaintiff, and initially, another Bronx PRDU Forensic Social Worker supports Plaintiff's allegation that the asserted requirement was not an essential function.

214.    Beginning in late 2025, Defendant began asserting that a PRDU Forensic Social Worker's court coverage responsibilities required arriving at the Legal Aid Society office between 8:30 and 9:00 a.m., reviewing the day's court calendar and client files, traveling to the designated courthouse, and maintaining physical presence in the courtroom or courthouse waiting areas for periods that could extend up to seven hours per day, depending on the volume and complexity of cases scheduled for that day.

215.    The Legal Aid Society newly maintained that continuous in-person and onsite court coverage constituted an essential function of the PRDU social worker role -- ultimately requiring Plaintiff alone -- to remain physically present throughout court sessions to provide

immediate consultation to attorneys, conduct crisis interventions with clients, and offer real-time clinical assessments as circumstances developed during proceedings.

216.    Defendant Legal Aid Society did not identify any preexisting written PRDU policy, job description, weekly coverage instruction, or collectively bargained rule requiring Plaintiff or other PRDU forensic social workers to remain continuously present in the courthouse for up to seven hours on court-coverage days when no client-specific or attorney-specific need required their physical presence. Defendant Legal Aid Society instead asserted the requirement during the accommodation process, after Plaintiff requested protection from unnecessary courthouse exposure.

217.    Yet, PRDU's own weekly court-coverage schedules reflected that forensic social work coverage could be provided virtually in at least some circumstances -- for example, schedules noted that Friday coverage for forensic social workers was provided virtually with one forensic social worker covering calls for both courts.

218.    The existence of virtual Friday forensic social work coverage confirmed that physical courthouse presence was not categorically necessary to provide PRDU court coverage.  It also confirmed that Defendant had already accepted a coverage model under which forensic social workers could remain available, receive requests, respond to attorney and client needs, and provide coverage without continuous courthouse presence.

219.    Defendant's written PRDU materials also confirm a referral-based court-coverage model, not a continuous courthouse-presence requirement. The PRDU Forensic Social Worker posting described the role as interviewing clients and collateral contacts, gathering life history, advocating for alternatives, evaluating treatment needs, preparing

paperwork and supporting documents, educating clients about treatment options, providing crisis intervention and short-term counseling, and providing essential information to attorneys.

220.    The materials did not indicate a need for waiting in court for hours without a client-specific or attorney-specific need as an essential function. Defendant's weekly court-coverage guidance likewise directed attorneys to contact the social worker to share referral details and determine whether the matter would be handled in person, in court, or by phone.

221.    Defendant also knew before Plaintiff's amended request that continuous courtroom presence could impair, rather than improve, PRDU coverage. For example, on November 10, 2025, union delegate Kim Wirt told Defendants Almanzar, Quigley, and Burt, as well as Lorraine McEvilley (Director of PRDU), that Plaintiff and Verano Diaz missed critical client calls, supervisor outreach, and attorney Teams referrals while stationed in L2 because of poor cell service.

222.    Wirt also told them that ALJs and officers limited attorney-social worker communication in court and that referral statistics had increased without a physical morning presence requirement.

223.    Moreover, Defendant's assertion that extended courthouse presence was already a required job function was contradicted by Defendant's later communications to the PRDU unit.

224.    On or about March 2, 2026, Lorraine McEvilley, Director of PRDU, emailed the PRDU unit and notified employees that the court-presence mandate for social workers would begin on March 2, 2026.

225.    McEvilley's announcement confirmed that the court-presence mandate was not a generally applicable PRDU-wide requirement during the period when Defendant Legal Aid

Society asserted the same requirement against Plaintiff in response to her accommodation request.

### Plaintiff's Disability and Its Impact

226.    Prior to August 2025, Plaintiff had developed a chronic condition, ankylosing spondylitis, requiring ongoing treatment and accommodation, including limitations on unnecessary or excessive exposure to infections. Plaintiff's condition substantially limited major bodily functions, including immune-system function, and required medically necessary limits on prolonged exposure to infectious environments.

227.    Plaintiff's treating provider recommended workplace modifications that would reduce prolonged time in courthouse/courtroom environments while maintaining Plaintiff's full availability to provide court-coverage support, including working from Defendant's nearby office location and attending court when her physical presence was needed for specific client matters or upon request.

228.    The medical documentation Plaintiff's healthcare provider prepared detailed the specific nature of her condition, its expected duration, the functional limitations it imposed, and the clinical rationale for recommending workplace modifications that would enable Plaintiff to continue performing her essential job functions while managing her health condition appropriately.

### Formal Accommodation Request Process

229.    On or about November 24, 2025, after Defendant began asserting a new expectation that Plaintiff be physically present in court for lengthy blocks of time during court-coverage days, Plaintiff submitted updated medical documentation and an updated accommodation request to safeguard her health. On or about December 9, 2025, after further

consultation with her healthcare provider and careful consideration of how to maintain her effectiveness as a forensic social worker while managing her medical condition, Plaintiff submitted a comprehensive amended accommodation request to Defendant with detailed medical documentation and a concrete proposal for a temporary workplace modification.

230.    In her December 9, 2025 amended request, Plaintiff specifically requested an interim accommodation that would allow her to work from The Legal Aid Society office during onsite court coverage shifts, maintaining full availability and responsiveness to all court coverage needs while only traveling to the physical courthouse when attorneys or supervisors specifically called upon her, rather than maintaining continuous physical presence in court for up to seven hours per day regardless of whether her services required an actual physical presence.

231.    Plaintiff's requested accommodation was narrow. Plaintiff did not ask to work fully remotely, did not ask to avoid all in-person work, did not ask to avoid court when her presence was needed, and did not ask to be relieved of court coverage. Plaintiff asked only to avoid unnecessary prolonged courthouse exposure when no client-specific, attorney-specific, hearing-specific, or emergency social-work need required her physical presence in court.

232.    Plaintiff carefully designed her requested accommodation to ensure that all essential functions of her position would continue at the same high level of quality and responsiveness, with the modification simply changing the location from which she provided immediate availability and support during court coverage shifts, allowing her to remain at The Legal Aid Society office, across the street from the courthouse, where she could continue working on case files, reports, and other forensic social work tasks while remaining instantly accessible via phone, email, and other communication methods.

47

233.    Plaintiff's proposed office-based court-coverage accommodation also would have allowed her to continue using disability-related accommodations Defendant had already processed or approved, including ergonomic seating with lumbar support, screen-related accommodation, and the safer office environment Defendant had identified during the accommodation process. By requiring prolonged courthouse presence when Plaintiff's physical presence was not actually needed, Defendant deprived Plaintiff of access to existing disability-related supports available in the LAS office.

234.    Defendant Legal Aid Society and Matrix also knew that Plaintiff's proposed office-based court-coverage accommodation would allow Plaintiff to work from an already modified LAS workspace. In the January 2026 Matrix request for additional information, Defendant identified that when Plaintiff sat in her LAS office, she had an ergonomic chair and an air purifier.

235.    Defendant therefore knew that Plaintiff's requested accommodation was not merely a preference for a different location. It would have allowed Plaintiff to remain available to attorneys and clients from a nearby Legal Aid Society office that Defendant itself recognized already contained disability-related equipment and environmental protections not available in the courthouse.

236.    Defendant knew that Plaintiff's provider had documented Plaintiff's need for lumbar support because of ankylosing spondylitis and chronic low back pain. By requiring Plaintiff to remain in court for prolonged periods instead of permitting her to perform coverage from the LAS office when her physical presence was not needed, Defendant deprived Plaintiff of access to the very disability-related equipment Defendant had already recognized she needed -- an ergonomic chair with lumbar support and a screen protector.

237. Defendant therefore did more than deny Plaintiff's infection-risk accommodation. Defendant also forced Plaintiff to perform work in a location where she could not reliably use her existing disability accommodations, even though Plaintiff could have remained available to attorneys and clients from the nearby LAS office where those accommodations were available.

238. The comprehensive medical documentation Plaintiff provided in support of her December 9, 2025 amended accommodation request included detailed clinical assessments from her treating healthcare provider, specific functional limitations directly related to her medical condition, duration estimates for the needed accommodation, and professional medical recommendations for workplace modifications that would enable Plaintiff to continue performing her job duties effectively while properly managing her health condition.

239. On or about December 22, 2025, recognizing that Defendant had not yet provided any interim accommodation or a substantive response despite the passage of time and Plaintiff's imminent court-coverage obligations, Plaintiff followed up in writing regarding the status of her request, expressly stating that it was her scheduled court-coverage date (and that she was also scheduled for court coverage on December 29 and December 30), explaining that Defendant's suggestion -- made late on the prior Friday -- to consult her specialist on short notice was not feasible, and reiterating that she would follow her treating provider's documented orders to avoid hospitalization.

240. Defendant Legal Aid Society was on notice from Plaintiff's medical documentation that infections posed a risk of severe outcomes, including hospitalization, and that Plaintiff required medically necessary limits on prolonged exposure to infectious environments. Nonetheless, from Plaintiff's November 24, 2025, request (and again from her

December 9, 2025, amended request) through Defendant's January 20, 2026, denial, Defendant provided no interim accommodation while Plaintiff had imminent court-coverage shifts.

241.    On December 10, 2025, Plaintiff again emphasized the need for interim accommodation in writing to Walsh, Matrix, Employee Relations, and union representatives. Plaintiff stated that she had submitted the amended accommodation request eleven business days earlier, that her doctor had warned that court appearances outside her outlined court-coverage requirements increased the risk of serious illness and potential hospitalization, and that since submitting the request she had gone to court five times, only one of which involved an active client. Plaintiff again confirmed that she remained able and willing to go to court for active clients, client emergencies, and hearings, and asked whether she could follow her doctor's medical advice while management continued reviewing the request.

242.    Defendant's refusal to provide interim protection in late 2025 also departed from Defendant's own prior handling of Plaintiff's disability accommodations. When Plaintiff returned from short-term disability leave on or about November 8, 2024, Defendant granted Plaintiff an immediate interim accommodation permitting her to work from home three days per week while Defendant continued processing the accommodation permanently. By contrast, after Plaintiff submitted updated medical documentation in November and December 2025 seeking a narrower interim modification to reduce unnecessary courthouse exposure, Defendant refused to provide any interim measure while it demanded additional documentation and asserted a disputed court-presence requirement.

243.    After Plaintiff submitted her November 24, 2025 accommodation request, Defendant continued requiring Plaintiff to appear in courthouse environments without granting an interim accommodation, even though Plaintiff had requested a reasonable modification that

would have allowed her to remain fully available for court coverage from Defendant's nearby office and to report to court whenever her physical presence was actually needed for a client, hearing, attorney request, or emergency social work intervention.

244. During the relevant period, Plaintiff continued to perform client-related work and did not refuse to attend court when her physical presence was actually needed. Plaintiff appeared in court on November 25, 2025, for a client, on December 2, 2025, after an attorney requested that she wait for a client who had not yet been produced, and on December 16, 2025, for a hearing.

245. Plaintiff's accommodation request was directed to a different problem: Defendant's insistence that she remain physically present in the courthouse for prolonged periods even when no client-specific, attorney-specific, hearing-specific, or emergency social-work need required her presence.

246. Upon information and belief, there were multiple court-coverage dates after Plaintiff requested interim protection, during which there was no court referral, no documented client-specific court request, no documented attorney-specific court request, no hearing-specific need, and/or no emergency social-work need requiring her continuous physical presence in the courthouse.

247. Upon information and belief, those dates included at least December 1, December 9, and December 22, 2025.

248. Upon information and belief, Plaintiff had no court-specific need requiring continuous courthouse presence on any of these dates but was required to be physically present in court.

249. Upon information and belief, on at least these dates, Plaintiff had no court referral, client-specific court request, hearing-specific need, attorney-specific court request, and/or emergency social-work need requiring her continuous physical presence in the courthouse.

250. On these dates, Plaintiff could have performed court coverage from Defendant's nearby office while remaining immediately available to report to court if a client, attorney, hearing, or emergency social-work need required her physical presence.

251. That was the precise interim accommodation Plaintiff requested.

252. The distinction was not theoretical.

253. Plaintiff's work depended on responsiveness to actual attorney and client needs, not passive waiting in a crowded courthouse. Requiring Plaintiff to remain in the courthouse when no documented court-specific need existed added disability-related exposure risk without improving client service, attorney support, or court coverage.

254. Plaintiff does not allege that every court appearance during this period was unnecessary. She alleges that Defendant required unnecessary and excessive courthouse presence beyond what client service required, despite knowing that Plaintiff was immunocompromised and despite the availability of an office-based interim accommodation that preserved her ability to attend court when needed.

255. On December 3, 2025, Plaintiff became ill and used a personal day because she was attempting to preserve her limited sick leave.

256. Plaintiff worked remotely on December 4, 2025, which allowed her to continue working without using additional sick time. Plaintiff was at that time advised by her medical team that continued symptoms could require emergency care.

257. Defendant's refusal to grant interim protection forced Plaintiff to continue unnecessary or excessive exposure in crowded courthouse environments while her accommodation request remained pending.

258. Plaintiff became ill again on December 22, 2025, while her accommodation request remained unresolved and while she was still being required to perform court coverage without effective modification. At approximately 1:34 p.m. that day, Plaintiff messaged Defendant Quigley asking to go home because she felt sick, and Plaintiff took a half sick day. Plaintiff was scheduled to work remotely on December 23 and December 26, 2025, and therefore did not call out sick on those dates because she was attempting to preserve her limited sick leave.

259. Plaintiff was then out sick from December 29, 2025 through January 2, 2026 with a doctor's note.

260. Plaintiff continued working remotely when she could because she was trying to preserve sick leave, not because Defendant's refusal to accommodate had caused no injury. Plaintiff's subsequent need for medically supported sick leave from December 29, 2025 through January 2, 2026 confirms that her illness continued beyond the half day she took on December 22, 2025.

261. Upon information and belief, Defendant's refusal to provide the requested accommodation or any interim accommodation materially increased Plaintiff's risk of infection and may have materially contributed to the illnesses and medical deterioration that followed.

262. Plaintiff alleges that Defendant required unnecessary and excessive courthouse exposure beyond what was needed for client service, despite knowing that Plaintiff was

immunocompromised, and despite the availability of a reasonable modification that would have preserved her ability to perform the essential functions of her position.

263.    That Plaintiff wore a mask in court does not defeat Plaintiff's accommodation claim. Plaintiff's requested accommodation was based on reducing unnecessary duration of exposure in high-risk indoor environments, not on the position that PPE provides no protection.

264.    Masking reduced some risk, but it did not eliminate the medically documented danger posed by prolonged exposure in crowded courthouse environments while Plaintiff was immunocompromised.

265.    Plaintiff reiterated these points in a December 22, 2025 follow-up  on a scheduled court-coverage day -- with additional court-coverage days scheduled for December 29 and December 30 -- again explaining that Defendant Legal Aid Society's last-minute suggestion to consult her specialist on short notice was not feasible and reiterating that she would follow her provider's documented orders to avoid hospitalization.

266.    Even after these documented harms, Defendant Legal Aid Society continued to refuse temporary protective measures.

267.    Defendant Legal Aid Society acted with deliberate indifference to Plaintiff's federally protected rights. Defendant had actual knowledge of Plaintiff's disability, her medical need to limit unnecessary courthouse exposure, the availability of the nearby Defendant Legal Aid Society office as a workable alternative, the union's objections to Defendant's job-duty framing, and the medical risks posed by continued unnecessary exposure. Despite that knowledge, Defendant refused interim protection, continued to enforce the disputed courthouse-presence requirement, demanded additional medical information, and denied the accommodation request based on the same disputed job-function theory.

**Union Involvement and Advocacy Efforts**

268.    Plaintiff was a bargaining-unit employee represented by 1199 SEIU United Healthcare Workers East ("1199 SEIU"), the recognized collective bargaining representative for certain Legal Aid Society employees.

269.    On December 15, 2025, Defendant Walsh emailed Plaintiff and Defendant Quigley stating that, after discussions with Plaintiff's supervisory group, management had clarified that there was not an hour requirement to be onsite or at court per coverage shift.

270.    In the same email, however, Defendant Walsh asserted that the expectation was and always had been for social workers, during court coverage, to be onsite and present in court for however long client, case, and other job tasks required them.

271.    Plaintiff responded the same day that she was "genuinely confused" because there had been ongoing conversations since August 2025 about Bronx PRDU social workers being mandated to go to court even when they had no client need or court-coverage need. Plaintiff explained that if management was now saying the mandate was no longer in effect and she was only needed in court when there was a client need, she would not go to court unless she had a client need.

272.    On December 16, 2025, after union representatives challenged the court-presence requirement, Defendant Burt responded for management that Defendant Legal Aid Society took the position that it retained discretion to implement, refine, or enhance social-work practices in response to evolving client needs and court practices. Defendant Burt also stated that PRDU Forensic Social Workers were expected to be in court on designated coverage days and stated that Plaintiff should speak with Defendant Walsh about her accommodation.

273.    Thus, Defendant Legal Aid Society described the court-coverage practice as changing while simultaneously treating the change as an established essential function during the accommodation process.

274.    On or about December 19, 2025, following meetings and communications in which Defendant maintained that it was Plaintiff's job to be physically in court during court-coverage days, for periods now being described as up to seven hours, even when not actively assisting clients, a 1199 SEIU delegate filed a Step 3 grievance on Plaintiff's behalf.

275.    The grievance challenged Defendant Legal Aid Society's disability-related treatment and delay in the accommodation process, its refusal to provide an interim accommodation, the disputed redefinition of Plaintiff's job duties, and its disparate treatment of Plaintiff in comparison to other PRDU social workers. It also challenged Defendant Legal Aid Society's position as a disputed change in job expectations not consistent with the established court-coverage model and not resolved through bargaining or the grievance procedure.

276.    That same day, the grievance and related concerns were escalated to senior management, including Defendant Legal Aid Society's Chief Human Resources Officer (Defendant Park), and Defendant acknowledged receipt and indicated it would propose dates after early January 2026.

277.    In short, Defendant Legal Aid Society had escalated the purported court-presence requirement during the accommodation process by recasting it as an essential function of Plaintiff's position, notwithstanding the absence of any written policy or prior practice requiring PRDU Forensic Social Workers to remain in court for an entire coverage day when they were not needed by attorneys, clients, or the court.

278. The grievance further alleged Defendant's management had mischaracterized the court-presence mandate and Plaintiff's essential job functions to Human Resources, and that this mischaracterization contributed to the denial of Plaintiff's accommodation request.

279. On December 26, 2025, Defendant Almanzar, questioned whether Plaintiff was maintaining individual digital case files for each client and asked Plaintiff to send a link or identify where she was keeping complete digital case files. This demand came shortly after Plaintiff requested an accommodation, filed a grievance, and opposed the court-presence requirement, and it contributed to Plaintiff's reasonable belief that management was building a performance record against her because she pursued disability-accommodation rights.

280. Upon information and belief, Defendant Almanzar questioned Plaintiff's work because of Plaintiff's protected accommodations requests and/or opposition to the denial of her accommodation requests.

281. On December 26, 2025, Defendant Walsh required Plaintiff to meet again about the accommodation request while Plaintiff's primary union delegate was unavailable. During that meeting, Defendant Walsh maintained that being in court all day was part of Plaintiff's job, asked Plaintiff how she protected herself socially outside work, asked Plaintiff to quantify how long she could be in the office, and questioned why Plaintiff needed an accommodation by pointing to Quigley's court-coverage emails, which did not expressly require all-day courthouse presence. In doing so, Defendant Walsh simultaneously treated extended courthouse presence as required while using the absence of a written court-presence mandate to challenge the need for accommodation. Defendant Walsh offered only PPE, despite Plaintiff explaining that she already wore appropriate PPE.

282. PPE and regular breaks were not effective accommodations for Plaintiff's documented limitations. Plaintiff already wore appropriate PPE, and PPE did not eliminate the risk created by prolonged exposure in crowded courthouse environments while Plaintiff was immunocompromised. Breaks also did not actually address the core limitation because they did not reduce the total duration of unnecessary courthouse exposure and did not permit Plaintiff to work from the LAS office where existing disability-related supports were available.

283. These questions and positions reflected an adversarial and predetermined process, and internally inconsistent positions on the in-person requirement that made the cooperative dialogue process unnecessarily difficult and/or intentionally challenging, rather than reflecting a good-faith cooperative dialogue.

284. On December 30, 2025, Defendant Walsh sent Plaintiff a written communication stating that Plaintiff was required to be in court up to seven hours per day, two days per week. In the same December 30, 2025 communication, Defendant Walsh initiated a new thread including Matrix for the accommodation process. This December 30, 2025 communication marked the point at which Defendant Legal Aid Society's position had escalated from an asserted one-hour court-presence expectation into a written requirement that Plaintiff was required to be in court up to seven hours per day, twice weekly, while her accommodation request and grievance remained unresolved.

285. On January 2, 2026, Matrix emailed Plaintiff under claim number A-2024-212636 stating that Defendant required additional medical information. Matrix demanded this additional provider information within fifteen days.

286.   Plaintiff promptly advised that her treating provider had no availability within that window and reiterated that the accommodation dispute and job-duty assertions were already the subject of the pending Step 3 grievance.

287.   On January 6, 2026, the union issued a cease-and-desist communication objecting to Defendant's mischaracterization of job duties and the burden-shifting demand that Plaintiff's healthcare provider propose alternative accommodations.

288.    On January 6, 2026, Defendant Park responded that HR needed additional time to review and evaluate the grievance and Requests for Information, which she characterized as voluminous.  Defendant Park did not, however, agree to cease enforcement of the disputed court-presence requirement while the grievance remained pending, did not agree to provide interim protection consistent with Plaintiff's medical restrictions, and did not withdraw the disputed job-function framing that had been sent through the accommodation process.

289.   On January 9, 2026, the union sent a communication objecting to Defendant Legal Aid Society's assertion of conclusions about the grievance before it was heard and warning that continued enforcement of disputed requirements would be viewed as retaliation.

290.   Upon information and belief, communications concerning Plaintiff's accommodation request circulated among Plaintiff's union representatives -- including 1199 delegate Kim Wirt -- and Defendant Legal Aid Society personnel, including Chief Human Resources Officer Connie Park (Defendant Park), Senior Employee Relations Specialist (Defendant Walsh), and Staff Attorneys Olga Karounos and Katherine Pecore, who were also recipients and/or copied.

291.   In these communications, union representatives consistently relied on Plaintiff's treating-provider documentation and reiterated that Plaintiff's requested interim

modification was designed to preserve full availability during court coverage while reducing the disability-related harm caused by prolonged, continuous courtroom presence. Union representatives further objected that Defendant's approach -- characterizing continuous courthouse presence as an "essential function" while demanding additional medical "discovery" on a compressed timetable and asking Plaintiff's provider to design alternate accommodations -- was contrary to the employer's obligations in the interactive process.

**Defendant Legal Aid Society Refuses Plaintiff's Reasonable Accommodation**

292.    On or about January 20, 2026, after more than *five weeks* without any interim accommodation or other individualized determination granting Plaintiff's requested temporary modification -- and despite Plaintiff's ongoing dangerous unnecessary additional exposure in the courthouse -- Defendant summarily denied Plaintiff's interim accommodation request through an email communication that reflected a predetermined outcome and a failure to engage in the interactive process required by federal law.

293.    In its denial communication, Defendant Legal Aid Society made the conclusory and unsupported assertion that it remained management's position that in-person/onsite court coverage was an essential function of the PRDU social worker role. The email contained no analysis of whether Plaintiff's proposed accommodation would interfere with this function or consideration of whether the function could be performed through alternative means that would accommodate Plaintiff's disability-related needs.

294.    Defendant further stated that PRDU Forensic Social Workers are expected to be present in court up to 7 hours/day during their scheduled in-person court workdays, depending on client needs, treating this administrative preference as an inflexible requirement,

rather than analyzing whether the essential function of providing forensic social work support could be accomplished through Plaintiff's proposed accommodation approach.

295. This stated requirement for PRDU Forensic Social Workers had never been the prior practice of The Legal Aid Society for PRDU FSWs before Plaintiff's accommodation request.

296. Plaintiff had previously done her work for several years by being in court only when actually needed for in-person client support.

297. Defendant issued its denial despite the fact that Plaintiff could have performed the actual essential functions of her position with her requested reasonable accommodation, because the proposed modification would have maintained her full availability and responsiveness during court coverage, while changing only the physical location from which she provided support when not directly assisting clients -- i.e., an office in which she could also simultaneously work on her additional cases as opposed to a courtroom in which she could not simultaneously work on other cases.

298. The demanded unnecessary in-court-presence was also ineffective because Plaintiff typically was not permitted to speak in court, including with The Legal Aid Society staff, during proceedings. Her presence in court, instead of her office, therefore, did not improve service when actual court-based support was unnecessary.

299. On January 20, 2026, at approximately 9:53 p.m., union representative Taleisha Reid emailed Defendant's management representatives (including Defendant Park) and copied Plaintiff and others to object to the denial, to cite the medical documentation already provided, and to demand that Defendant Legal Aid Society proceed through the required disability accommodation interactive process rather than treating its position as fixed.

61

300.    In their evening email on January 20, 2026, union representatives specifically stated that "the medical documentation already provided by [Plaintiff's] healthcare provider" appeared "sufficient to substantiate the need for interim accommodations," directly challenging Defendant Legal Aid Society's apparent dismissal of the clinical evidence supporting Plaintiff's request.

301.    The union further stated that management had chosen to disregard the substance of the medical documentation, highlighting Defendant Legal Aid Society's failure to engage meaningfully with the evidence rather than conducting the individualized assessment required by the ADA.

302.    In the early morning hours of January 21, 2026, the union circulated an additional message in the same thread underscoring the urgency of providing interim relief and reiterating that the ADA did not permit an employer to delay reasonable accommodation where the need is evident and the employee has provided adequate medical support.

303.    In their January 21, 2026, email, union representatives specifically stated that they expected this matter to be resolved through the interactive process in good faith, emphasizing Defendant Legal Aid Society's failure to comply with one of the most fundamental requirements of accommodation law.

304.    The union further characterized "management's response" as reflecting "an inflexible position that fails to meaningfully engage with the medical guidance provided and places the burden entirely back on the employee."

305.    Union representatives further asserted that Defendant's approach "undermines the purpose of the accommodation process and raises serious concerns about compliance and

equity," highlighting the broader implications of Defendant's conduct for other employees who might require accommodations.

306.   The union specifically noted that "the continued imposition of additional responsibilities and denial of temporary relief sets a troubling precedent and exacerbates the very health concerns that prompted the accommodation request."

307.   In providing legal support for their position, union representatives stated that the ADA does not permit employers to demand unnecessary or overly burdensome medical detail or delay reasonable accommodation where the need is already evident directly addressing Defendant's apparent misunderstanding of accommodation law requirements.

308.   The union further asserted that the failure to provide interim relief, despite known medical risks, exposed Plaintiff to ongoing harm and undermined the stated purpose of the ADA's accommodation framework.

309.   After denying the requested interim accommodation, Defendant Legal Aid Society further failed to provide information needed to test its asserted job-function rationale.

310.   On January 27, 2026, 1199 Vice President Taleisha Reid sent Defendant Park a final request for information concerning the December 19 grievance, stating that management had not provided the requested documents or met the January 23 deadline and warning of NLRB escalation given the obstruction of the review of the asserted factual basis for Defendant Legal Aid Society's position.

### Defendant Legal Aid Society's Failure to Engage in the Required Good Faith Interactive Process or Cooperative Dialogue

311.   Throughout the period from Plaintiff's disclosure of her disability and submission of updated documentation through Defendant's denial on January 20, 2026, denial, Defendant Legal Aid Society did not engage in the timely, individualized, good-faith

interactive process required by the Rehabilitation Act or the good-faith cooperative dialogue required by the NYCHRL.

312. Although Defendant held meetings and exchanged communications regarding Plaintiff's request, it approached the process with a predetermined conclusion that Plaintiff must remain continuously in the courthouse on court-coverage days and refused to implement any interim modification while it purported to evaluate the request.

313. Defendant failed to conduct a good faith individualized assessment of whether Plaintiff could provide effective court-coverage support from Defendant's office -- remaining fully available and responsive to attorneys and clients -- and travel to court when her physical presence was needed for specific matters, as she had already done successfully for several years. Defendant also failed to meaningfully evaluate whether the asserted "continuous courthouse presence" requirement was operationally necessary, in light of actual practices and the availability of alternative modes of providing coverage and consultation.

314. Defendant did not identify any specific undue hardship, staffing problem, client-service disruption, attorney-coverage problem, hearing-delay risk, or operational burden that would result from allowing Plaintiff to remain available from the nearby Legal Aid Society office when her physical presence was not actually needed in court. Defendant also did not identify any court-coverage function that Plaintiff could not perform from the LAS office until called to court for a client, hearing, attorney request, or emergency social-work need.

315. Defendant also failed to consider less restrictive alternatives to continuous courthouse presence, including office-based availability, Teams contact with intake attorneys, phone and email referrals, scheduled court appearances when needed, supervisor check-ins

from the office, and temporary interim coverage while the accommodation request remained pending.

316.    Instead of collaboratively exploring reasonable options, Defendant Legal Aid Society treated the request as a binary proposition: either Plaintiff complied with the disputed courthouse-presence requirement for extended periods, or Defendant would deny the accommodation. Defendant escalated the matter to its third-party administrator (Matrix), demanded additional information from Plaintiff's treating provider on a compressed timetable, and improperly shifted the burden to Plaintiff and her provider of proposing alternative accommodations, rather than engaging in cooperative dialogue and employer-driven problem-solving as the law requires.

317.    During the pendency of this process, Defendant refused to provide interim protective measures -- such as permitting Plaintiff to at least temporarily remain in the office when not actively needed in court -- despite Plaintiff's imminent court-coverage obligations, her supporting medical documentation, and the disability-related health impacts Plaintiff experienced during the period of delay.

318.    Defendant Legal Aid Society treated its disputed continuous courthouse-presence requirement as unnecessarily fixed, failed to assess whether Plaintiff could provide effective court coverage from the nearby office as she had done for years, and failed to consider interim or alternative accommodations limiting unnecessary public exposure. Defendant thereby tested only whether Plaintiff could satisfy its preferred model, not whether she could perform the actual essential functions of her job with reasonable accommodation.

319.    Defendant's delays, refusal to provide interim relief, and failure to engage in a collaborative and individualized interactive process or cooperative dialogue deprived Plaintiff

of the opportunity to obtain a reasonable accommodation and respectively violated the Rehabilitation Act and the NYCHRL.

**Defendant Legal Aid Society's Adverse Actions and Continuing Requirements**

320. Despite having denied Plaintiff's accommodation request on January 20, 2026, and despite knowing that requiring her to continue performing disputed in-person courthouse duties posed medically documented risks to her health, Defendants nevertheless required Plaintiff to continue working scheduled in-person court-coverage shifts without effective modification.

321. On January 20, 2026, in the same communication denying Plaintiff's accommodation request, Defendant Park directed Plaintiff that, on January 21, 2026, she would "arrive to the Legal Aid Society office at her usual time" and "should be in court by 10:00 am," without any specific need to be in-person in court at that time.

322. Defendant Park's direction that Plaintiff "should be in court by 10:00am," without an identified actual specific in-person need, required her to comply with the exact same schedule and physical presence requirements that her healthcare provider had identified as problematic for her medical condition.

323. Defendant Park specifically instructed that Plaintiff would "meet with the prelim attorneys, attorneys on shift, and attorneys who have scheduled hearings to review client cases," requiring her to perform duties that could easily be accomplished from The Legal Aid Society office through phone, email, and other electronic communication methods.

324. Defendant Park stated that Plaintiff "will assess the support she can provide," acknowledging that Plaintiff's essential function involved assessing and providing support

rather than maintaining physical presence in a particular location, yet refusing to allow her to perform this function from a location that would accommodate her disability.

325. Defendant Park instructed that once Plaintiff completed this assessment, "before leaving court, [Plaintiff] should contact Jackie Quigley and Rebekah Almanzar to review the cases," requiring her to remain in the courthouse environment even after completing her substantive work duties for the day.

326. Most troublingly, Defendant Park explicitly stated that Plaintiff "can expect this to be the expectation for her in-person court workdays until the accommodation is resolved," indicating that Defendants intended to continue exposing Plaintiff to conditions that potentially exacerbated her medical condition indefinitely, without any timeline for resolution or consideration of interim relief measures.

327. By requiring Plaintiff to continue performing in-person court coverage duties without any accommodation whatsoever, despite having clear medical documentation indicating that such requirements were problematic for her health condition, Defendants deliberately exposed Plaintiff to the very conditions that her treating healthcare provider had identified as medically contraindicated

328. Defendants later unnecessarily required Plaintiff to attend court in-person.

329. On January 28, 2026, after being instructed to appear in court to meet with a client, the client told Plaintiff, he was not requesting her assistance and, in sum and substance, stated: "I'm shocked you would pull me out of my cell to talk about this."

330. This January 28, 2026 incident demonstrated that Defendants' insistence on Plaintiff's in-person court appearance was not tied to an individualized client need. Plaintiff was required to appear despite the absence of any actual request for her assistance.

331. The client's reaction confirmed that Defendants' asserted need for her physical presence was unnecessary.

332. All of this occurred, despite the fact that for years, PRDU court coverage operated through a referral-based workflow: attorneys requested social work assistance through established channels, Plaintiff coordinated directly with the requesting attorney, met with the client (whether in the community or incarcerated), provided assessment and support as needed for the hearing, and then returned to the office ready and available for additional emergent needs -- without any requirement to "canvass" attorneys in person or to provide supervisory "summaries" as a condition of completing court coverage.

333. Beginning in or about late 2025, however, Plaintiff's supervisors abruptly announced a new practice for her -- purportedly as an "alternative accommodation" -- under which they would review referrals and direct Plaintiff to approach attorneys in person to ask whether they needed social work assistance, and further insisted that Plaintiff send email summaries to supervisors to "confirm" that court coverage was completed.

334. This new practice had not been part of Plaintiff's job duties since she began in PRDU, departed from longstanding past practice reflected in weekly court-coverage guidance communications, and -- critically -- was imposed on Plaintiff uniquely, while similarly situated employees were not subjected to the same requirements -- evidencing retaliation and interference with Plaintiff's exercise of accommodation rights.

335. For example, a January 2, 2026 PRDU referral further confirmed that Plaintiff's essential work depended on responsiveness to attorney and client needs, not continuous courthouse presence. On that date, Quigley forwarded Plaintiff a social-work referral and asked Plaintiff to proactively schedule a VTC for January 6 or later, then touch base with the

requesting attorney to determine whether further mitigation remained necessary. This workflow showed that PRDU social-work support could be initiated, coordinated, and triaged through referral, attorney communication, and VTC without requiring Plaintiff to remain continuously present in court when no attorney or client required her physical presence.

**Plaintiff Is Forced to Take FMLA Leave to Protect Her Health Because of Defendants' Denial of Her Accommodation Request**

336. As a result of her denied accommodation, and to avoid the serious threat to her health caused by Defendants' denial, on January 28, 2026, Plaintiff notified Defendant of her need to take an FMLA medical leave and began her protected FMLA leave as of February 2, 2026.

337. Plaintiff's medical leave was not voluntary in any meaningful sense. Defendant Legal Aid Society's denial of her requested accommodation and continued enforcement of the disputed court-presence requirement left Plaintiff with no safe way to continue working without risking serious medical deterioration.

338. A reasonable person in Plaintiff's position would have felt compelled to stop working because Defendant denied the requested accommodation, refused interim protection, maintained a medically dangerous work-location requirement, and left Plaintiff to choose between following medical guidance and risking discipline for noncompliance with the disputed court-presence requirement.

339. Plaintiff's forced leave, continuing inability to return under Defendants' unaccommodated requirements, and loss of wages and benefits were the foreseeable result of Defendants' denial of a reasonable accommodation, retaliation, and interference with Plaintiff's disability rights.

340.    Defendants' purported "alternative accommodation" proposals were not effective accommodations but an attempt to rewrite Plaintiff's job and impose unprecedented, retaliatory micromanagement.

**Defendants Admit that the In-Court Presence Requirement Had Not Actually Been Organizational Policy When Applied to Plaintiff**

341.    As noted above, while Plaintiff remained on medical leave, on or about March 2, 2026, and months after only Plaintiff had been told she had to be in court for up to seven hours a day,  Lorraine McEvilley, Director of PRDU, emailed the PRDU unit and notified employees that a new  court-presence mandate for social workers would begin on March 2, 2026.

342.    Lorraine McEvilley's announcement confirmed that the court-presence mandate was not a generally applicable PRDU-wide requirement during the period when Defendant Legal Aid Society asserted the same requirement against Plaintiff in response to her accommodation request.

343.    Defendant's later communications also described PRDU as still implementing, rather than already operating under, a new pairing model for court coverage between forensic social workers and intake attorneys. In a January 2026 social-work newsletter, Defendant stated that "PRDU is in the process of implementing a pairing model of our court coverage with our FSWs and intake attorneys."

344.     Defendants' asserted court-coverage model was still being developed after Defendant had already represented, during Plaintiff's accommodation process, that extended in-person courthouse presence was a current job requirement.

345.    Similarly, shortly thereafter, on March 6, 2026, while Plaintiff remained on medical leave, and months after Plaintiff alone had been told she had to be in court for up to

seven hours a day, Defendant Walsh emailed Plaintiff concerning the PRDU court-coverage protocol.

346.    Defendant Walsh stated that PRDU Forensic Social Workers had been "preparing to roll out a new protocol for court coverage days," that the "specifics of this protocol" were new, that the January 29, 2026 proposal sent to Plaintiff was "an earlier version of the protocol," and that the updated protocol had been shared with the rest of the team *only the prior* week.

347.    The email did not explain why this asserted "new protocol" had been uniquely applied to Plaintiff months earlier during a period when it operated as a policy applicable to only one Legal Aid Society employee -- Plaintiff -- a disabled employee seeking a disability-based accommodation.

348.    Defendant had also already acknowledged the still-developing status of that model before the denial.

349.    On December 9, 2025, Defendant Almanzar had advised union representatives and PRDU leadership that management would inform staff of the structure of pairing court-coverage social workers with intake attorneys at an upcoming all-staff meeting and that the pairing would be implemented in the future -- undermining Defendants claim that the same model was already an existing essential function of Plaintiff's job in December 2025 and January 2026.

350.    Yet, before March 2, 2026, Defendant applied the disputed court-presence requirement to only Plaintiff while representing to Plaintiff, her union, Matrix, and/or Plaintiff's healthcare provider that extended courthouse presence was already part of Plaintiff's job duties or essential functions.

351.    The timing of Lorraine McEvilley's announcement supports an inference that Defendant retroactively recharacterized Plaintiff's job duties during the accommodation process to attempt to make Plaintiff's requested accommodation appear inconsistent with her role.

352.    The timing of Lorraine McEvilley's announcement further supports an inference that Defendants treated Plaintiff less well than similarly situated PRDU social workers because of her disability, accommodation request, and protected opposition to Defendants' accommodation practices.

353.    Defendant Walsh's March 6, 2026 email also further confirmed that Defendants could have accommodated Plaintiff without requiring unnecessary in-court presence.

354.    Beyond the concession that Defendant Legal Aid Society's standard policy *had not previously required continuous in-court presence* as asserted by Defendants -- at least for everyone other than Plaintiff --  Defendant Walsh proposed that, instead of going to court at approximately 10:00 a.m. to contact intake attorneys in person, Plaintiff could send Teams messages to the intake attorneys, prioritize any needs identified by those attorneys, remain available during the court-coverage day, and enter court only when needed to meet client needs.

355.    Defendants' March 6, 2026 proposal substantially mirrored the accommodation Plaintiff, and her union had requested for months: that Plaintiff remain available and responsive for court-coverage needs while avoiding unnecessary courthouse exposure when no attorney or client actually required her physical presence in court.

356.    Defendants' belated proposal therefore undermined Defendants' prior insistence that extended courthouse presence was an existing essential function of Plaintiff's position.

357.    Because Defendant Legal Aid Society later proposed that Plaintiff could use Teams messages to contact intake attorneys, prioritize identified needs, remain available during court coverage, and enter court when needed, Defendant Legal Aid Society necessarily could have also provided the same or substantially similar accommodation in December 2025 or January 2026 as an interim measure while the accommodation request remained pending.

358.    The proposal came only after Plaintiff had already been subjected to disputed courthouse exposure without interim protection and after her health had significantly deteriorated. Upon information and belief, Defendants' refusal to provide a timely accommodation or interim protection materially increased Plaintiff's risk of infection while immunocompromised and may have contributed to her illness, disability-related aggravation, and functional decline.

359.    Nonetheless, Defendants' March 6, 2026 proposal still preserved unnecessary and retaliatory micromanagement by requiring Plaintiff to include supervisors in Teams communications with intake attorneys and to provide supervisory summaries after court-coverage work. Those requirements had not been part of Plaintiff's historical PRDU court-coverage duties and were imposed after Plaintiff sought disability accommodations and complained about discrimination and retaliation.

### Plaintiff's Illness and Medical Deterioration Stemming from the Unnecessary, In-Person Court Time Required Her to Extend Her Medical Leave

360.    On or about March 26, 2026, Plaintiff submitted a physician's note advising that Plaintiff should not return to work on the previously anticipated return date of April 17, 2026. It stated that Plaintiff remained under treatment for ankylosing spondylosis, was being managed with immunosuppressive therapy, and was experiencing flaring symptoms, ongoing medication adjustments, setbacks in clinical progress, and new debilitating symptoms that had

left her nearly entirely bed bound.  At that time, Plaintiff's treating medical provider had determined that Plaintiff required continued medical leave to adequately recover and stabilize her condition, with an estimated return-to-work date of June 17, 2026.

361.    On or about May 6, 2026, Plaintiff's treating physician issued updated medical documentation stating that Plaintiff remained under medical care for Ankylosing Spondylosis and was being managed with immunosuppressive therapy. Her treating physician further documented that Plaintiff's medical course had been complicated by debilitating autonomic dysfunction, that Plaintiff was experiencing flaring symptoms, continued to require medication adjustments, had suffered setbacks in clinical progress, and had developed new debilitating symptoms that left her nearly entirely bed bound. Her treating physician concluded that Plaintiff required a continued medical leave of absence to recover and stabilize her condition, advised that Plaintiff should not return to work on the previously anticipated return date of June 17, 2026, and recommended continued leave with an anticipated return date of December 17, 2026.

362.    As described above, Plaintiff's medical condition has deteriorated significantly. Plaintiff alleges that Defendant's refusal to accommodate her by limiting court visits to those actually necessary materially increased her risk of infection while immunocompromised and may have contributed to the illnesses and disability-related deterioration that followed.

363.    Plaintiff remains under active medical treatment and continues to seek stabilization sufficient to return to work if and when medically able. Plaintiff intends to return to her position, or to an equivalent position, if Defendant provides reasonable accommodations and ceases the unlawful accommodation practices alleged in this Complaint.

364.    If Plaintiff becomes medically able to return, she will require Defendant Legal Aid Society to evaluate any return-to-work restrictions through a lawful, timely, individualized accommodation process. Plaintiff seeks prospective relief to ensure that Defendant does not again delay, demand unnecessary medical documentation, deny interim measures, or recharacterize job duties to defeat reasonable accommodation.

**Plaintiff's Requested Accommodation Was Reasonable**

365.    Plaintiff's requested accommodation would have allowed her to remain completely available and fully responsive to all court coverage needs during her scheduled work hours, with the only modification being that she would provide this availability from The Legal Aid Society office rather than from a courthouse waiting area or courtroom -- as she had done  successfully for several years working for Defendant Legal Aid Society.

366.    Plaintiff already worked remotely three days per week as an approved disability accommodation and worked in person two days per week. Her amended request therefore concerned only the portion of her in-person court-coverage days when she was not actually needed in court. The requested modification would have preserved Plaintiff's in-person availability for client meetings, hearings, emergencies, and attorney requests, while allowing her to perform other PRDU work from the nearby LAS office instead of waiting in the courthouse without an identified need for her presence.

367.    Under Plaintiff's proposed accommodation, she would have worked from The Legal Aid Society office with full access to phone, email, computer systems, client files, and all other resources necessary to provide immediate forensic social work consultation and support, enabling her to respond instantly to any requests from attorneys or court personnel, and to provide in-person client support in court across the street when actually needed.

368.    The proposed accommodation would not have prevented Plaintiff from performing any essential functions of her position, including conducting client assessments, providing clinical consultation, reviewing case materials, communicating with attorneys, preparing written reports, or traveling to court when her physical presence was specifically needed for particular clients or hearings.

369.    Plaintiff's requested accommodation would not have created any undue hardship for Defendant Legal Aid Society, as it required no additional staffing, no additional resources, no modifications to physical facilities, and no changes to scheduling or workflow that would disrupt operations or impose costs on the organization.

370.    The accommodation would have required minimal if any adjustment to Defendant's operations, as Plaintiff would have remained fully available during all scheduled work hours to respond to court coverage needs, with improved efficiency resulting from her ability to continue working on case files and other forensic social work tasks while maintaining availability for court-related requests.

371.    Moreover, the feasibility of Plaintiff's proposed accommodation was further demonstrated by the fact that many of her essential forensic social work functions -- including case file review, report writing, treatment planning, and consultation with attorneys -- could be performed *more effectively* in an office environment with access to comprehensive resources than in a courthouse waiting area with limited facilities.

372.    Indeed, it would have required nothing other than continuing to work the same way she had done successfully for several years in her role working for Defendant Legal Aid Society.

**Harmful Impacts on Plaintiff**

373.    As a direct and proximate result of Defendants' denial of her accommodation request and the continuing requirement that she perform in-person court coverage without any modifications, Plaintiff has suffered and continues to suffer significant emotional, and upon information and belief potential physical harm, that could have potentially been avoided through provision of the reasonable accommodation she requested.

374.    Plaintiff has experienced substantial emotional distress as a result of Defendants' discriminatory conduct, including anxiety about her job security, frustration with the organization's disregard for her medical needs, and stress related to the ongoing uncertainty about her ability to continue working in a field where she has built her professional career.

375.    Plaintiff has suffered ongoing mental anguish related to Defendant's refusal to provide reasonable accommodations for her disability, including feelings of devaluation as an employee, concern about retaliation for asserting her legal rights, and distress caused by the organization's apparent willingness to jeopardize her health rather than implement simple workplace modifications.

376.    Plaintiff has been forced to continue working under conditions that her treating healthcare provider specifically identified as problematic for her medical condition and exposed her to increased risk of illness because of additional required in-court presence that, upon information and belief, may have caused or contributed to the exacerbation of her disability.

377.    Plaintiff has suffered financial harm as a result of Defendants' discriminatory conduct, including inappropriate workplace conditions, lost wages and benefits resulting from her inability to continue working under those conditions.

378.    Defendants' conduct has caused Plaintiff to be unable to work in a manner that properly accommodates her disability-related needs, forcing her to choose between her health and her livelihood in a situation where reasonable accommodation was readily available.

**The Legal Aid Society Made and Insisted on Retaliatory and/or Otherwise Illegal Medical Inquiries in Response to Plaintiff's Disability Accommodation Request**

379.    Defendants requested unnecessary additional medical documents that they were not entitled to request regarding Plaintiff's request for a reasonable accommodation.

380.    By the time Defendants, including through its vendor Matrix, demanded "additional information" from Plaintiff's medical provider, Plaintiff had already provided sufficient medical documentation establishing both (a) her covered disability/impairment and (b) the functional limitation and accommodation need at issue -- namely, that because Plaintiff is on immunosuppressive therapy and at increased risk of severe infection, her "Court interaction" should be limited to those instances when she is actually required to assist an active client with an open case, speak on the record during a hearing, and/or provide emergency social work intervention during her court coverage days, in order to mitigate the risk of serious illness and potential hospitalization.

381.    Nevertheless, Defendants -- rather than implementing that medically-directed limitation -- repeatedly demanded duplicative and unnecessary medical documentation and responses, including by requiring Plaintiff to obtain a provider-signed Matrix form to (i) "quantify" what "limited" court interaction meant (including whether Plaintiff could be onsite in the courthouse two days per week for up to seven hours per day); (ii) specify "precautions" beyond the reasonable, task-based limitation already provided by Plaintiff's physician; and (iii) propose "alternative accommodations" that would permit increased onsite courthouse presence.

382.   These continued demands for more documentation -- after Plaintiff had already provided medical information sufficient to substantiate disability and need to keep court presence to the minimum amount necessary -- were not job-related or consistent with business necessity, and instead, operated to obstruct and delay the accommodation process and to retaliate against and/or interfere with Plaintiff for requesting and pursuing a reasonable accommodation.

383.   Defendants ceased requesting additional, unnecessary, duplicative medical information -- unsupported by business necessity and/or not job-related -- only after Plaintiff's attorney contacted Defendant Legal Aid Society's general counsel and, citing EEOC guidance,[3] asserted that the requests for further medical documentation were illegal.

384.   Defendants' additional medical-documentation demands caused concrete harm by delaying the accommodation process, requiring Plaintiff to expend time and effort obtaining further provider involvement, prolonging exposure to the disputed courthouse-presence

---

[3]   *See U.S. Equal Emp. Opportunity Comm'n, Enforcement Guidance on Disability-Related Inquiries and Medical Examinations of Employees Under the ADA, Notice No. 915.002 (July 26, 2000) Question 11* ("continued efforts by the employer to require that the individual provide more documentation and/or submit to a medical examination could be considered retaliation," where the employee has provided sufficient evidence of disability and need); *id.* at n.54 (July 26, 2000) ("The employer, however, cannot ask again for documentation that the employee has an ADA disability where the medical information the employee provided in support of his first reasonable accommodation request established the existence of a long-term impairment that substantially limits a major life activity."); *U.S. Equal Emp. Opportunity Comm'n, Enforcement Guidance on Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act (Oct. 17, 2002) (OLC Control No. EEOC-CVG-2003-1), Q. 8, Example A* (explaining that where an employee submits a treating-physician note describing diabetes, the risk of hyperglycemic reaction, and the need for three or four 10-minute breaks per day to test blood sugar and, if necessary, take insulin, the note is sufficient documentation establishing disability and need for accommodation and the employer cannot request additional documentation).

requirement, and burdening Plaintiff's exercise of accommodation rights after she had already provided medical support for her disability and requested accommodation.

## CLASS ACTION ALLEGATIONS

385.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a), Rule 23(b)(2), Rule 23(c)(4), on behalf of herself and all other similarly situated current employees of Defendant Legal Aid Society.

386.    Plaintiff seeks, pursuant to Rule 23(b)(2), (c)(4), certification of the following classes:

(a) The "**Location-Based Accommodation Class**": All current employees of Defendant Legal Aid Society who worked in New York City at any time from May 11, 2023 through the date of final judgment (the "Class Period"), who submitted, renewed, appealed, or supplemented a disability-based request, in writing, to reduce, modify, temporarily be relieved from, or receive interim protection from an in-person work requirement, including requests concerning remote work, hybrid work, courthouse or courtroom presence, public-facing exposure, remote participation in work functions, reporting location, commute timing, work schedule, including temporary interim relief, who submitted medical documentation in support of the disability-based request, and whose request was denied, or partially denied;

(b) The "**Post-Request Job-Duty Recharacterization Class**": All current employees of Defendant Legal Aid Society who worked in New York City at any time during the Class Period, who submitted, renewed, appealed, or supplemented their own disability-based accommodation request, in writing, and who, within seventy-five

days of that request, renewal, appeal, or supplementation, were subjected to a documented change, attempted change, new enforcement, or recharacterization of an asserted job duty, essential function, in-person work requirement, reporting-location requirement, schedule requirement, public-facing duty, court-coverage obligation, productivity expectation, availability requirement, or similar work requirement;

(c) The "**NYCHRL Accommodation Delay Class**": All current employees of Defendant Legal Aid Society who worked in New York City at any time during the Class Period, and who submitted, renewed, supplemented, or appealed a disability-based reasonable-accommodation request, in writing, and did not receive, within forty-five days of the request, renewal, supplementation, appeal, or submission of supporting medical documentation, a written final determination, an implemented accommodation, a written interim accommodation, or a written individualized denial of interim relief.

(d) The "**Additional Medical Documentation Class**": All current employees of Defendant Legal Aid Society who worked in New York City at any time during the Class Period, had a previously documented long-term, permanent, and/or chronic disability, and were required to provide additional medical documentation concerning the same disability or same previously documented functional limitation as a condition of continuing, modifying, renewing, supplementing, implementing, appealing, or obtaining a disability-based accommodation or interim accommodation.

387.    Plaintiff is a member of each proposed class.

81

388.    Plaintiff is in the Location-Based Accommodation Class because she requested a medically supported modification of an in-person courthouse-presence requirement and Defendant denied or partially denied that request.

389.    Plaintiff is a member of the Post-Request Job-Duty Recharacterization Class because, after her accommodation request, Defendant recharacterized extended courthouse presence as an essential function or mandatory job requirement.

390.    Plaintiff is a member of the NYCHRL Accommodation Delay Class because Defendant delayed approximately fifty-seven days after Plaintiff's November 24, 2025 updated accommodation request before denying interim relief on or about January 20, 2026. During that period, Defendant did not provide a final determination, implemented accommodation, written interim accommodation, or individualized denial of interim relief, despite Plaintiff's medical documentation, repeated follow-ups, scheduled court-coverage days, and continued exposure to the disputed courthouse-presence requirement.

391.    Plaintiff is a member of the Additional Medical Documentation Class because, by January 2, 2026, Defendant already had sufficient information to evaluate her request. Defendant had approved her work-from-home and equipment accommodations, received July 14, 2025 documentation supporting reduced illness exposure, and received her November 24, 2025 restriction limiting unnecessary courthouse exposure. Defendant nevertheless required more provider documentation about the same disability and restriction, asking whether Plaintiff could be onsite in court two days per week for up to seven hours per day with PPE or breaks.

392.    Upon information and belief, members of the Location-Based Accommodation Class and Additional Medical Documentation Class were qualified employees who could

perform the essential functions of their positions with or without reasonable accommodation. Accordingly, Defendant was required to provide them a timely, individualized process to determine whether an effective accommodation or interim accommodation was available.

393.    Members of the NYCHRL Accommodation Delay Class were persons employed by Defendant who requested disability-based accommodations for whom Defendant had notice may require such accommodation.

394.    Members of the Post-Request Job-Duty Recharacterization Class were persons who engaged in the protected activity of requesting a disability-based accommodation.

395.    Plaintiff does not seek certification of any class requiring the Court to decide, at class identification, whether each absent class member was ultimately entitled to the precise accommodation requested.

396.    Excluded from the Class are Defendants; Defendant Legal Aid Society's officers, senior executives, directors, and managers, any entity in which Defendant Legal Aid Society has a controlling interest, and the Judge(s) assigned to this action and their immediate family members.

397.    The Class Period runs from May 11, 2023, through the resolution of this litigation.

398.    Upon information and belief, the Class is so numerous that joinder of all members is impracticable.

399.    Before filing, Plaintiff has identified numerous employees with related disability-accommodation, retaliation, discipline, job-duty redefinition, or disability-discrimination concerns at Defendant Legal Aid Society.[4]

---

[4]    *See supra* ¶ 27.

400.    The number of affected employees is likely higher because Defendant Legal Aid Society maintains centralized accommodation, Human Resources, Employee Relations, Matrix, leave, and personnel records that will identify additional class members through discovery.

401.    Defendant Legal Aid Society is a large, citywide employer with multiple practice areas and work sites, and uses centralized accommodation decisionmakers and processes that affect numerous employees who request disability accommodations.

402.    Defendant Legal Aid Society is one of New York City's largest legal services employers.

403.    Upon information and belief, Defendant Legal Aid Society has approximately 2,449 employees.[5]

404.    Public disability-employment data supports a reasonable inference that the proposed classes are numerous.

405.    The New York City Comptroller has reported that 277,747 New York City residents ages 25 to 55, or 7.6 percent of that age cohort, have a disability.[6]

406.    Applying that rate to Defendant Legal Aid Society's workforce yields an estimated 186 employees with disabilities.  A conservative national workforce cross-check

---

[5]    The Legal Aid Soc'y, Return of Organization Exempt from Income Tax (Form 990), pt. I, line 5 (2023) (reporting 2,449 total individuals employed in calendar year 2023), available at https://legalaidnyc.org/wp-content/uploads/2025/05/2023-The-Legal-Aid-Society-990-Executed-Public-Disclosure-Copy.pdf.

[6]    N.Y.C. Comptroller, Spotlight: Disability and Employment in New York City (July 9, 2024), Table 1, at https://comptroller.nyc.gov/reports/spotlight-disability-and-employment-in-new-york-city/.

reaches a similar result: Bureau of Labor Statistics data reflects that employed persons with disabilities comprised approximately 4.9 percent of the employed civilian workforce in 2025,[7] which would yield approximately 120 Legal Aid Society employees with disabilities.

407.    Published research further supports that accommodation disputes are common among disabled workers: 70.2 percent of workers with disabilities reported requesting accommodations, and 50.0 percent reported that their most recent requested accommodation was only partially made or not made.[8]

408.    Applying those benchmarks to the conservative estimate of 120 Legal Aid Society employees with disabilities supports a reasonable estimate of approximately 42 affected employees who were denied or partially denied an accommodation request with respect to the Location-Based Accommodation Class.

409.    In addition, the additional classes, which do not require outright denial of accommodations as a prerequisite to membership, likely have many more members than the Location-Based Accommodation Class, which does.

410.    Class members may also be members of more than one of the classes.

411.    Numerosity is further supported by the nature of the relief sought. Plaintiff seeks class-wide declaratory and injunctive relief directed at Defendant Legal Aid Society's centralized accommodation process, including its medical-documentation demands, interim-

---

[7]    *See* U.S. Bureau of Lab. Stat., People with a Disability: Labor Force Characteristics 2025, USDL-26-0364, tbl. A (Mar. 3, 2026), at https://www.bls.gov/news.release/disabl.htm.

[8]    *See* Yana van der Meulen Rodgers, Lisa Schur, Flora M. Hammond, Renee Edwards, Jennifer Cohen & Douglas Kruse, Disability, Job Satisfaction, and Workplace Accommodations: Evidence from the Healthcare Industry, J. Occupational Rehab. 6 Table 3 (published online July 28, 2025), https://link.springer.com/article/10.1007/s10926-025-10316-0.

accommodation practices, job-function framing, Matrix administration, delay practices, and written accommodation determinations.

412. Joinder is impracticable even if discovery shows that one or more subclasses contain fewer than forty presently identified employees. The challenged practices affect current employees who have requested accommodations and employees who may request accommodations during the Class Period. Many affected employees remain employed by Defendant Legal Aid Society and depend on it for wages, health insurance, accommodations, leave administration, references, and future work assignments. They may reasonably fear retaliation, heightened scrutiny, loss or denial of accommodations, discipline, or other workplace consequences if forced to sue individually. Many also lack the financial ability to bring separate actions. Under these circumstances, class treatment is necessary because class-wide declaratory and injunctive relief can resolve common accommodation-process defects in one proceeding, rather than requiring repetitive individual lawsuits against the same employer over the same centralized policies, practices, and procedures.

413. Because the proposed classes consist of current employees, the challenged practices present ongoing risk. Class members remain subject to Defendant Legal Aid Society's accommodation process, Matrix administration, medical-documentation demands, interim-measure practices, and job-duty framing whenever they seek, renew, supplement, or appeal disability accommodations.

414. Defendant Legal Aid Society's own workforce structure further supports numerosity because the challenged practices were administered through centralized channels rather than through isolated, office-specific decisions. Plaintiff alleges that Human Resources, Employee Relations, Matrix, supervisors, and senior management coordinated accommodation

requests, documentation demands, interim-accommodation decisions, and asserted job-function descriptions. Defendant Legal Aid Society's centralized records therefore likely identify additional employees affected by the same practices.

415.    Class membership can be identified through objective criteria and Defendant Legal Aid Society's records, including accommodation request files, HR/Employee Relations files, third-party administrator records (including Reliance Matrix records), and related correspondence.

416.    Upon information and belief, Defendant Legal Aid Society's own records can identify class members by request date, requested accommodation type, supporting medical-documentation date, assigned accommodation administrator, Reliance Matrix or Matrix claim number, additional-documentation demand, written determination date, interim-measure status, asserted essential function, and outcome. These objective fields permit class identification without resolving whether each class member was ultimately entitled to the precise accommodation requested.

417.    Defendant Legal Aid Society's records will also show whether, and when, Defendant provided interim accommodations while requests remained pending, whether Defendant requested additional medical documentation after receiving provider support, whether Defendant asserted new or revised essential-function descriptions during the accommodation process, and whether Defendant issued a written final determination.

418.    These records allow the proposed classes and subclasses to be identified through objective evidence without resolving the merits of each employee's underlying accommodation entitlement.

419.    The same centralized records will provide common proof of Defendant Legal Aid Society's challenged practices, including request dates, medical-documentation demands, Matrix involvement, interim-measure decisions, asserted job-function descriptions, written determinations, delay periods, and outcomes. These common records permit classwide evaluation of Defendant's practices without requiring individualized mini-trials at the class-identification stage.

420.    This action presents questions of law and fact common to the classes, including, but not limited to:

(1)     whether Defendant Legal Aid Society maintains and applies policies, practices, and/or standard operating procedures of denying, partially denying, and/or delaying location-based disability-based accommodation requests;

(2)     whether Defendant Legal Aid Society maintains and applies policies, practices, and/or standard operating procedures of denying interim measures while disability-based accommodation requests are pending without an individualized assessment of the request;

(3)     whether Defendant Legal Aid Society has a policy, practice, and/or standard operating procedure of failing to engage in the interactive process and/or cooperative dialogue in good faith, including by engaging in a process pr-textually designed to deny as opposed to fairly evaluate accommodation requests, imposing burdensome "medical discovery" demands, failing to consider interim measures, and maintaining predetermined positions on asserted "essential functions" rather than conducting individualized assessments;

(4)     whether Defendant Legal Aid Society has a policy, practice, and/or standard operating procedure of making unnecessary requests for additional medical documents in response to disability accommodation requests;

(5)     whether Defendant Legal Aid Society's delay in processing disability-based accommodation requests for forty-five days or more violates the NYCHRL, including, but not limited to, with respect to the required cooperative dialogue process;

(6)     whether Defendant Legal Aid Society had a policy, practice, and/or standard operating procedure of taking materially adverse actions against the classes because of their requests for disability-based accommodations;

(7)     whether Defendant Legal Aid Society had a policy, practice, and/or standard operating procedure of interfering with the disability rights of the classes through its policies, practices, and/or standard operating procedures;

(8)     whether Defendant Legal Aid Society's disability accommodation denial practices, retaliatory practices, and/or interference with rights policies, practices, and/or standard operating procedures resulted in willful, wanton, reckless, and/or in conscious disregard of the rights of its employees;

(9)     whether Defendant Legal Aid Society created a retaliation-based hostile work environment;

(10)    whether class-wide declaratory relief is warranted, and if so, the appropriate scope of such relief; and

(11)    whether class-wide injunctive relief is warranted, and if so, the appropriate scope of such class-wide injunctive relief.

421.    These common questions are capable of common answers because they turn on Defendant Legal Aid Society's centralized accommodation records, Matrix communications, HR practices, written determinations, medical-documentation demands, interim-measure practices, and job-function descriptions. Resolving those questions will materially advance the litigation for all proposed classes.

422.    Plaintiff's claims are typical of the claims of the Classes because Plaintiff, like other Class members, requested reasonable accommodations and was subjected to Defendant Legal Aid Society's centralized practices of delay/denial, failure to provide interim measures, failure to engage in good-faith interactive/cooperative dialogue, and retaliation and/or intimidation when she asserted her rights.

423.    Plaintiff's claims are typical of each proposed class because Plaintiff was subjected to the same types of centralized accommodation practices challenged on behalf of the classes. Defendant denied or partially denied Plaintiff's location-based accommodation,

89

recharacterized her job duties after her request, delayed interim relief and final determination, and demanded additional medical documentation after receiving provider support.

424.    Plaintiff will fairly and adequately protect the interests of the Classes.

425.    Plaintiff's interests are aligned with those of the Classes and she has no conflicts with Class members.

426.    Plaintiff's counsel is experienced in employment discrimination class actions, will fairly and adequately represent the Classes, and will vigorously prosecute this action.

427.    Plaintiff requests that her counsel be appointed as Class Counsel pursuant to Rule 23(g).

428.    Defendant Legal Aid Society has acted or refused to act on grounds generally applicable to the Classes, making final declaratory and injunctive relief appropriate with respect to the Classes as a whole, including relief requiring Defendant Legal Aid Society to adopt and implement lawful accommodation policies and procedures, provide prompt interim accommodations where warranted, engage in good-faith interactive/cooperative dialogue, issue timely written determinations, and implement training and monitoring to prevent recurrence.

429.    Plaintiff seeks certification of the proposed classes for declaratory and injunctive relief directed to Defendant Legal Aid Society's generally applicable accommodation policies, practices, and procedures. Plaintiff does not seek certification under Rule 23(b)(2) of individualized compensatory damages, back pay, front pay, emotional distress damages, or medical damages for absent class members. Plaintiff seeks individualized monetary relief for herself and seeks only certification of whether Defendant Legal Aid

Society's conduct towards the classes was willful, wanton, reckless, and/or in conscious disregard of the rights of its employees, pursuant to Rule 23(c)(4) and Rule 23(b)(2).

430.    The requested class-wide relief can be ordered without determining whether every absent class member was entitled to the exact accommodation requested. Plaintiff seeks policies and procedures requiring timely, individualized evaluation, good-faith dialogue, narrowly tailored medical-documentation requests, written determinations, and interim measures where warranted.

431.    Resolution of whether Defendant Legal Aid Society's policies, practices and/or standard operating procedures toward the Classes were willful, wanton, reckless, and/or in conscious disregard of their rights would promote judicial economy if resolved as an issues class pursuant to Fed. R. Civ. P. 23(c)(4).

432.    Class certification of whether Defendant Legal Aid Society's treatment of the classes was willful, wanton, reckless, and/or in conscious disregard of the rights of its employees pursuant to Fed. R. Civ. P. 23(c)(4), because the resolution of this common issue would reduce the range of issues in dispute and promote judicial economy.

433.    Plaintiff does not seek certification of the amount of any punitive damages to be awarded, only whether the standard for punitive damages has been established with respect to the treatment of the Classes as a whole, including but not limited to, whether Defendant Legal Aid Society has done so by creating a retaliation-based and/or interference-based hostile work environment for employees who have requested disability accommodations.

434.    Plaintiff reserves the right to amend the class definition(s) and to seek certification of additional subclasses consistent with the evidence developed in discovery.

## FIRST CAUSE OF ACTION

### Rehabilitation Act - Failure to Reasonably Accommodate

### 29 U.S.C. § 794(a), (d), incorporating 42 U.S.C. § 12112(b)(5)(A)

### (By Plaintiff and the Location-Based Accommodation Class Against Defendant Legal Aid Society)

435. Plaintiff re-alleges and incorporates by reference all allegations in the preceding paragraphs.

436. Plaintiff has a disability within the meaning of the Rehabilitation Act, including a chronic medical condition requiring ongoing treatment and including limitations on unnecessary or excessive exposure to infections, that substantially limits one or more major life activities including but not limited to the operation of major bodily functions such as immune-system function and respiratory function, and that requires medically necessary limits on unnecessary or excessive exposure to infections.

437. Plaintiff disclosed her disability to Defendant Legal Aid Society and provided medical documentation from her healthcare provider substantiating her disability and need for accommodations.

438. Defendant Legal Aid Society knew of Plaintiff's disability and need for workplace accommodation no later than November 8, 2024, and knew no later than July 14, 2025 that Plaintiff's disability-related limitations included the need to reduce exposure to illnesses. Defendant Legal Aid Society knew or should have known that Plaintiff had a disability requiring workplace accommodations based on the medical documentation Plaintiff provided to it.

439. Defendant violated Section 504 by refusing to provide an accommodation that would have allowed Plaintiff to safely perform the essential functions of her position. Plaintiff

was qualified to perform those functions with an accommodation. She sought medically necessary limits on unnecessary courthouse exposure, not exemption from client advocacy, court work, or attorney collaboration. Defendant delayed or denied effective accommodation, refused interim protection, and imposed a nonessential method of work that exposed Plaintiff to medically contraindicated risk.

440.     On or about December 9, 2025, Plaintiff requested a reasonable accommodation to work from Defendant Legal Aid Society's office during onsite court coverage shifts and only attend court when called or needed for in-court presence for a specific matter, rather than maintaining physical presence in court for up to seven hours per day.

441.     Plaintiff's requested accommodation was reasonable and would have enabled her to perform all essential functions of her position as a PRDU Forensic Social Worker.

442.     Plaintiff's requested accommodation would not have prevented her from performing any essential functions of her position, including providing forensic social work services, conducting client assessments, meeting with attorneys, and providing court coverage support.

443.     Plaintiff's requested accommodation would not have imposed an undue hardship on Defendant Legal Aid Society.

444.     The requested accommodation would have required minimal if any adjustment to Defendant Legal Aid Society's operations, as Plaintiff would have remained fully available during her scheduled work hours to respond to court coverage needs.

445.     Plaintiff's requested accommodation essentially requested to continue working in the same manner she had worked for years.

446.    On January 20, 2026, Defendant Legal Aid Society denied Plaintiff's reasonable accommodation request.

447.    Before the January 20, 2026 denial, Defendant Legal Aid Society also failed to provide Plaintiff with any effective interim accommodation while her request remained pending, despite medical documentation, imminent court-coverage obligations, and repeated requests for guidance and protection.

448.    That failure was itself a failure to reasonably accommodate Plaintiff because it left her subject to the disputed courthouse-presence requirement while Defendant delayed, evaluated, and then denied the requested accommodation.

449.    Defendant Legal Aid Society failed to provide Plaintiff with any reasonable accommodation for her disability.

450.    Defendant Legal Aid Society also failed to reasonably accommodate Plaintiff by requiring prolonged courthouse presence that deprived Plaintiff of access to disability-related equipment Defendant had already processed or approved, including lumbar-support seating and screen-related accommodation, even though Plaintiff could have performed court coverage from the Legal Aid Society office when her physical presence in court was not actually needed.

451.    Defendant Legal Aid Society failed to engage in a good faith interactive process with Plaintiff concerning her disability and accommodation needs.

452.    Defendant Legal aid Society placed the entire burden on Plaintiff to justify her accommodation request rather than engaging cooperatively to identify reasonable solutions as required by 42 U.S.C. § 12112(b)(5)(A).

453.    The interactive process is a continuing duty under the Rehabilitation Act that requires both parties to communicate in good faith to identify reasonable accommodations. Defendant Legal Aid Society failed to conduct an individualized assessment of Plaintiff's limitations and capabilities, failed to meaningfully consider the medical documentation Plaintiff provided, and denied Plaintiff's request without any meaningful discussion of alternative accommodations or interim measures. Defendant Legal Aid Society's failure to engage in a timely, good-faith interactive process is evidence of and contributed to its failure to reasonably accommodate Plaintiff's known disability-related limitations, including by foreclosing the identification and implementation of effective accommodations.

454.    Defendant Legal Aid Society discriminated against Plaintiff by failing to reasonably accommodate her disability in violation of the Rehabilitation Act.

455.    Defendant Legal Aid Society's policy, practice, and/or procedure was to similarly deny disability-based reasonable accommodation requests to the Location-Based Accommodation Class without conducting a good faith individualized evaluation of the request.

456.    Defendant Legal Aid Society had a standard operating procedure of presumptive denial and/or delay of requests for disability-based accommodations by the Location-Based Accommodation Class.

457.    Plaintiff, and upon information and belief, the Location-Based Accommodation Class, suffered damages as a result of Defendant Legal Aid Society's failures to accommodate their disabilities.

458. The Location-Based Accommodation Class seeks declaratory relief, injunctive relief including requiring Defendant Legal Aid Society to provide reasonable accommodations, statutory attorney's fees, and costs.

459. As a result of Defendant Legal Aid Society's failure to accommodate, Plaintiff seeks back pay, front pay and/or reinstatement, declaratory relief, injunctive relief including requiring Defendant Legal Aid Society to provide reasonable accommodations, nominal damages, actual damages, statutory attorney's fees, and costs.

## SECOND CAUSE OF ACTION

**Rehabilitation Act - Retaliation**

**29 U.S.C. § 794(a), (d), incorporating 42 U.S.C. § 12203(a)**

**(By Plaintiff, the Post-Request Job-Duty Recharacterization Class, and the Additional Medical Documentation Class Against Defendant Legal Aid Society)**

460. Plaintiff re-alleges and incorporates by reference all allegations in the preceding paragraphs.

461. Plaintiff engaged in protected activity under the Rehabilitation Act by requesting a reasonable accommodation for her disability on or about November 24, 2025, and again in late November 2025, and by engaging in subsequent follow-up communications regarding the need for timely interim relief. Plaintiff submitted a comprehensive amended accommodation request to Defendant Legal Aid Society on or about December 9, 2025.

462. Plaintiff also engaged in protected activity by opposing disability discrimination and failure to accommodate, including by pursuing a formal written grievance on or about December 19, 2025, and by supporting the union's advocacy objecting to Defendant Legal Aid Society's handling of the accommodation process and Defendant Legal

Aid Society's disputed job-duty assertions, including the union's January 6, 2026 cease-and-desist communication and related written objections.

463. Defendant Legal Aid Society knew that Plaintiff engaged in protected activity.

464. Defendant Legal Aid Society knew of Plaintiff's November 24, 2025 accommodation request and subsequent November 2025 request.

465. Defendant Legal Aid Society knew of Plaintiff's December 9, 2025 accommodation request.

466. Defendant Legal Aid Society knew of Plaintiff's protected grievance activity and the January 6, 2026 cease-and-desist communication copied Defendant Legal Aid Society's management and Employee Relations personnel.

467. Defendant Legal Aid Society knew of the union's advocacy on Plaintiff's behalf regarding her disability accommodation.

468. Defendant Legal Aid Society took materially adverse actions against Plaintiff within two months of her requested disability accommodations and engaged in related protected activity, including but not limited to the following: (a) refusing to provide any interim accommodation or interim protective measures pending review of her accommodation request, including after the Step 3 grievance filed on or about December 19, 2025 and the union's cease-and-desist communication on or about January 5 or 6, 2026, thereby forcing Plaintiff to continue working without interim relief and to choose between risking her health and risking discipline; (b) requesting unnecessary, duplicative, overbroad, and invasive additional medical information concerning her disability accommodation request, including but not limited to causing Matrix to issue a January 2, 2026 demand for additional provider information with a fifteen-day deadline after Defendant Legal Aid Society had already received medical support

for Plaintiff's restrictions and while framing the request around Defendant Legal Aid Society's disputed assertion that Plaintiff was required to be onsite in court up to seven hours per day, twice weekly; (c) changing, attempting to change, asserting changes to, and pretextually reconstituting Plaintiff's job duties during the accommodation process and while a grievance was pending in an effort to support a refusal to accommodate based on new asserted job requirements, including by recasting extended courthouse presence as an essential function despite prior practice, written court-coverage descriptions, and inconsistent application across PRDU offices; (d) forcing Plaintiff to continue extended courthouse presence during court coverage, up to seven hours per day, twice weekly, which requirement was not an organization-wide policy, despite known medical risks and Plaintiff's pending accommodation request; (e) shifting and escalating Defendant Legal Aid Society's asserted essential-function and court-coverage requirements after Plaintiff and the union challenged those requirements; (f) denying, refusing to grant, or failing to act on Plaintiff's interim accommodation request on or about January 20, 2026, and thereafter continuing to enforce the disputed courthouse-presence expectation; (g) singling Plaintiff out for heightened scrutiny, micromanagement, and file demands after she requested accommodation and sought union assistance, including demands for client files and case materials outside ordinary practice and without adequate explanation; and (h) escalating the disputed court-coverage requirement by requiring Plaintiff to appear in court at a specified time, meet with attorneys, and conduct case review with supervisors while remaining in court.

469.    Defendant Legal Aid Society's retaliatory attempted job duty changes followed particularly closely to each of her protected accommodation requests: (1) Plaintiff requested an accommodation on November 24, 2025, and within approximately 25 days, by December

98

19, 2025, Defendant Legal Aid Society asserted that Plaintiff's role required her to remain in court during court-coverage days for up to seven hours, despite the prior court-coverage model and the absence of any written continuous-presence policy; (2) Plaintiff submitted an amended accommodation request on December 9, 2025, and within approximately 10 days, Defendant Legal Aid Society again asserted the expanded court-presence requirement while refusing interim relief. Within approximately 21 to 24 days of that request, Defendant Legal Aid Society and/or Matrix transmitted the disputed "current job function" description to Plaintiff's provider, stating that Plaintiff was expected to be onsite in the courthouse twice per week for up to seven hours per day; (3) after the December 19, 2025 grievance, Matrix issued the additional provider-information demand within approximately 14 days; and (4) after the union's January 6, 2026 cease-and-desist communication, Defendant Legal Aid Society denied Plaintiff's accommodation request within 14 days, on January 20, 2026. This sequence readily supports an inference that Defendant Legal Aid Society retaliated against Plaintiff and interfered with her protected rights by recharacterizing, expanding, and enforcing asserted job requirements shortly after each protected accommodation request, grievance, and union objection.

470.    Defendant Legal Aid Society's retaliatory materially adverse actions followed closely on the heels of Plaintiff's protected activity -- including the November 24, 2025 accommodation request, subsequent November 2025 request, December 9, 2025 accommodation request, December 19, 2025 grievance and/or the union's January 6, 2026 cease-and-desist communication -- and culminated in the January 20, 2026 denial fourteen days after the cease-and-desist letter and within approximately six weeks of the accommodation request.

471.    Plaintiff engaged in protected activity by requesting accommodation, objecting to Defendant's refusal to provide interim relief, participating in union and HR accommodation meetings, and opposing Defendant's inaccurate description of her duties to Matrix and her provider. Defendant knew of this activity. Defendant then denied interim accommodation, enforced prolonged courthouse presence, demanded duplicative medical information, asked invasive questions, applied heightened scrutiny, and demanded files. These actions arose directly from Plaintiff's accommodation request and objections.

472.    A causal connection existed between Plaintiff's protected activity and Defendant Legal Aid Society's materially adverse actions.

473.    The close temporal proximity and pattern of escalating burdens and scrutiny establish a causal connection.

474.    A reasonable employee would have found Defendant Legal Aid Society's retaliatory conduct materially adverse.

475.    Defendant Legal Aid Society maintained a policy, pattern, practice, custom, or regular procedure of retaliating against members of the Post-Request Job-Duty Recharacterization Class after they requested disability accommodations by post hoc recharacterizing their jobs. After employees engaged in this protected activity, Defendant Legal Aid Society asserted new, expanded, or materially different job duties, job requirements, role expectations, physical-presence requirements, productivity expectations, or "essential functions" that had not previously been applied to them in the same manner.

476.    Defendant Legal Aid Society used those retaliatory recharacterizations to manufacture asserted conflicts between employees' disabilities and their positions, to deny or delay reasonable accommodations, to impose additional documentation and process burdens,

to threaten or impose discipline, and to deter reasonable employees from requesting or continuing to pursue disability accommodations.

477. Defendant Legal Aid Society maintained a policy, pattern, practice, custom, or regular procedure of retaliating against members of the Additional Medical Documentation Class by requesting unnecessary and/or duplicative medical documents in support of their requests for disability accommodations that were not job-related and/or not supported by business necessity.

478. Plaintiff engaged in protected activity when she complained about and opposed Defendant Legal Aid Society's disability accommodation practices, objected to unnecessary infection exposure, sought union assistance, supported the Step 3 grievance filed on or about December 19, 2025, opposed the disputed courthouse-presence requirement, and supported the union's cease-and-desist communication on or about January 5 or 6, 2026.

479. Defendant Legal Aid Society knew of Plaintiff's protected complaints and opposition when it took the adverse actions alleged herein. Plaintiff's complaints were communicated to Defendant Legal Aid Society's Human Resources personnel, management, supervisors, and accommodation representatives.

480. Within approximately fourteen days of the December 19, 2025 Step 3 grievance, Defendant Legal Aid Society caused Matrix to issue a January 2, 2026 demand for additional provider information with a fifteen-day deadline, after Defendant Legal Aid Society had already received medical support for Plaintiff's restrictions. Defendant Legal Aid Society framed that demand around its disputed assertion that Plaintiff had to be onsite in court up to seven hours per day, twice weekly.

481.   Within approximately fourteen to fifteen days of the union's January 5 or 6, 2026 cease-and-desist communication, Defendant Legal Aid Society denied, refused to grant, or failed to act on Plaintiff's request for interim protection on or about January 20, 2026, forcing Plaintiff to continue working without interim relief and to choose between risking her health and risking discipline.

482.   Within approximately thirty-two days of the December 19, 2025 grievance, and within approximately fourteen to fifteen days of the January 5 or 6, 2026 cease-and-desist communication, Defendant Legal Aid Society continued requiring Plaintiff to perform extended courthouse presence during court coverage, up to seven hours per day, twice weekly, despite her medical restrictions and the unresolved grievance.

483.   Within approximately twenty-five to twenty-seven days of the December 19, 2025 grievance, Defendant Legal Aid Society singled Plaintiff out for heightened scrutiny, micromanagement, and file demands, including renewed demands on or about January 13 and January 15, 2026 for client files and case materials outside ordinary practice and without adequate explanation.

484.   Defendant Legal Aid Society also changed, asserted changes to, and pretextually reconstituted Plaintiff's job duties after Plaintiff and the union challenged the disputed courthouse-presence requirement, including by recasting extended courthouse presence as an essential function despite prior practice, written court-coverage descriptions, and inconsistent application across PRDU offices.

485.   The timing, sequence, and escalation of Defendant Legal Aid Society's actions support a causal connection between Plaintiff's protected complaints and opposition and the adverse actions alleged herein. Defendant Legal Aid Society's conduct would dissuade a

102

reasonable employee from complaining about disability discrimination, opposing unlawful accommodation practices, seeking union assistance, supporting a grievance, or objecting to unnecessary disability-related health risks.

486.    Plaintiff, and upon information and belief, the Post-Request Job-Duty Recharacterization Class and Additional Medical Documentation Class, suffered damages as a result of Defendant Legal Aid Society's retaliation.

487.    The Post-Request Job-Duty Recharacterization Class seeks declaratory relief, injunctive relief including requiring Defendant Legal Aid Society to provide reasonable accommodations and/or retract job modifications, statutory attorney's fees, and costs.

488.    The Additional Medical Documentation Class seeks declaratory and injunctive relief requiring Defendant Legal Aid Society to cease retaliatory and unnecessary medical-documentation demands after employees have provided sufficient medical support for disability and accommodation need, together with attorney's fees and costs.

489.    As a result of Defendant Legal Aid Society's retaliation, Plaintiff seeks back pay, front pay and/or reinstatement, approval of her requested accommodation, nominal damages, actual damages, declaratory relief, injunctive relief, attorney's fees, and costs.

## THIRD CAUSE OF ACTION

**Rehabilitation Act - Interference, Coercion, Threats, and Intimidation**

**29 U.S.C. § 794(a), (d), incorporating 42 U.S.C. § 12203(b)**

**(By Plaintiff, the Additional Medical Documentation Class, and the Post-Request Job-Duty Recharacterization Class Against Defendant Legal Aid Society)**

490.    Plaintiff re-alleges and incorporates by reference all allegations in the preceding paragraphs.

491. Plaintiff exercised and attempted to exercise rights protected by the Rehabilitation Act, including by disclosing her disability, requesting reasonable accommodations, and opposing disability-based discrimination in the workplace.

492. Defendant Legal Aid Society interfered with Plaintiff's exercise and enjoyment of rights secured by the Rehabilitation Act, and coerced, intimidated, and threatened Plaintiff in connection with her pursuit of accommodations, including, but not limited to, by: (a) demanding duplicative, unnecessary, and overbroad medical records and provider information after Plaintiff had already submitted medical documentation sufficient to support her requested accommodation, (b) using requests for additional medical information to delay and burden the accommodation process rather than promptly assess whether Plaintiff could perform her actual duties with reasonable limits on unnecessary courthouse exposure, (c) refusing to grant interim protection after Plaintiff provided medical documentation supporting limits on unnecessary courthouse exposure, (d) requiring Plaintiff to continue the very exposure she sought to avoid while the Legal Aid Society and Matrix demanded additional medical records and provider information within a compressed 15-day period, (e) framing the request to Plaintiff's healthcare provider around the Legal Aid Society's newly asserted requirement that Plaintiff be onsite in the courthouse twice per week for up to seven hours per day, rather than asking whether Plaintiff could perform her actual duties with reasonable limits on unnecessary exposure, (f) treating PPE and breaks as the only meaningful alternatives while disregarding Plaintiff's request to remain available from the nearby the Legal Aid Society office except when an attorney, client meeting, hearing, or other specific court-related need required her presence, (g) using the accommodation process to recharacterize "court coverage" into extended courthouse presence even though continuous courthouse sitting had not previously

104

been treated as an essential duty, (h) escalating scrutiny and demands for Plaintiff's files after she sought accommodations and union support in a manner reasonably likely to chill Plaintiff and similarly situated employees from pursuing protected accommodation rights; and (i) imposing unnecessary demands for additional medical documentation to support accommodation requests and imposing unnecessary short deadlines on the submission of the same.

493.    Defendant Legal Aid Society's policy, practice, and/or standard operating procedure was to interfere with the disability rights of the Additional Medical Documentation Class by demanding duplicative, unnecessary, and/or overbroad medical records and provider information after Plaintiff had already submitted medical documentation sufficient to support her requested accommodation, using requests for additional medical information to delay and burden the accommodation process rather than promptly assess whether the employee could perform the essential functions of their role with their requested reasonable accommodation, and/or imposing artificially short deadlines on the submission of the same.

494.    This conduct constituted threats, coercion, interference, and/or intimidation of the Additional Medical Documentation Class.

495.    Defendant Legal Aid Society maintained a policy, pattern, practice, custom, or regular procedure of interference with the disability accommodation rights of members of the Post-Request Job-Duty Recharacterization Class after they requested disability accommodations by post hoc recharacterizing their jobs.

496.    After employees engaged in this protected activity, Defendant Legal Aid Society asserted new, expanded, or materially different job duties, job requirements, role

105

expectations, physical-presence requirements, productivity expectations, or "essential functions" that had not previously been applied to them in the same manner.

497. Defendant Legal Aid Society used those retaliatory recharacterizations to manufacture asserted conflicts between employees' disabilities and their positions, to deny or delay reasonable accommodations, to impose additional documentation and process burdens, to threaten or impose discipline, and to deter reasonable employees from requesting or continuing to pursue disability accommodations.

498. This conduct constituted threats, coercion, interference, and/or intimidation of the Job-Duty Recharacterization Class

499. Defendant Legal Aid Society's actions were materially adverse and would deter a reasonable employee from exercising rights protected by the Rehabilitation Act, including requesting accommodations and pursuing the Rehabilitation Act accommodation process in good faith.

500. Defendant Legal Aid Society's conduct, under all the existing circumstances, had a reasonable tendency to coerce or intimidate employees, regardless of whether they are actually coerced.

501. As a direct and proximate result of Defendant Legal Aid Society's interference, coercion, and intimidation, Plaintiff suffered damages.

502. Upon information and belief, the Additional Medical Documentation Class and the Post-Request Job-Duty Recharacterization Class suffered damages as a result of Defendant Legal Aid Society's interference.

503. The Additional Medical Documentation Class and the Post-Request Job-Duty Recharacterization Class seek injunctive relief including requiring Defendant Legal Aid

Society to provide reasonable accommodations and/or retract retaliatory job modifications, statutory attorney's fees, and costs.

504.    As a result of Defendant Legal Aid Society's interference, coercion, and intimidation, Plaintiff seeks back pay, front pay and/or reinstatement, approval of her requested accommodation, actual damages, nominal damages, declaratory relief, injunctive relief, attorney's fees, and costs.

**FOURTH CAUSE OF ACTION**

**Rehabilitation Act - Medical Inquiry Violation**

**29 U.S.C. § 794(a), (d), incorporating 42 U.S.C. § 12112(d)(4)(A)**

**(By Plaintiff and the Additional Medical Documentation Class Against Defendant Legal Aid Society)**

505.    Plaintiff re-alleges and incorporates by reference all allegations in the preceding paragraphs as though fully set forth herein.

506.    The Rehabilitation Act prohibits an employer from requiring medical examinations or making disability-related inquiries about an employee as to whether the employee has a disability, or as to the nature or severity of the disability, unless such examination or inquiry is job-related and consistent with business necessity.

507.    Defendant Legal Aid Society violated the Rehabilitation Act by repeatedly demanding and/or requiring Plaintiff to provide additional medical information beyond what was necessary to evaluate Plaintiff's ability to perform the essential functions of her position and/or to evaluate Plaintiff's reasonable accommodation request.

508.    Defendant Legal Aid Society further violated the Rehabilitation Act by seeking additional medical documents concerning the existence of Plaintiff's long-term disability.

107

509. Defendant Legal Aid Society further violated the Rehabilitation Act by seeking additional medical for which the requests were not supported by business necessity and were not job-related.

510. Plaintiff had already provided medical documentation establishing her long-term impairment, her immunosuppressive treatment, and the functional limitation and accommodation need at issue -- namely that she should limit courthouse exposure to circumstances when she was actually required to assist an active client with an open case, speak on the record during a hearing, and/or provide emergency social work intervention in order to mitigate the risk of severe infection -- Defendant Legal Aid Society nonetheless continued to demand duplicative medical information, documentation, and provider certifications.

511. Defendant Legal Aid Society (including through its vendor/agent Matrix) insisted that Plaintiff obtain additional provider-signed responses that were not necessary to evaluate the accommodation request, including but not limited to, demands that Plaintiff's physician: (i) "quantify" or otherwise translate a task-based limitation ("limited court interaction") into a fixed number of hours in the courthouse (including whether Plaintiff could be onsite two days per week for up to seven hours per day); (ii) specify "precautions" beyond the reasonable, functional limitation already provided; and (iii) propose "alternative accommodations" that would permit increased onsite courthouse presence, notwithstanding that Plaintiff's treating provider had already articulated the limitation, the risk being mitigated, and the work tasks Plaintiff would continue to perform when required.

512. These continued medical-documentation demands were not job-related or consistent with business necessity -- and were not actually tailored to assessing Plaintiff's ability to perform essential job functions with a reasonable accommodation.

513. Instead, they operated to obstruct and delay the accommodation process, to attempt to manufacture purported ambiguity in an otherwise clear medical directive, and to pressure Plaintiff to accept Defendant Legal Aid Society's preferred in-court presence requirements rather than implement an effective accommodation.

514. Defendant Legal Aid Society's continued demands for additional medical documentation after Plaintiff had provided sufficient information to establish disability and need violated the medical inquiry protections of the Rehabilitation Act.

515. As a direct and proximate result of Defendant Legal Aid Society's unlawful medical inquiries and documentation demands, Plaintiff has suffered and continues to suffer damages, including but not limited to actual damages and nominal damages and additional medical burdens and costs associated with responding to duplicative demands, and harms flowing from Defendant Legal Aid Society's delay, obstruction, and denial of effective accommodation.

516. Defendant Legal Aid Society has a policy, practice, and/or standard operating procedure of similarly engaging in unlawful medical inquiries, by requesting duplicative and unnecessary additional medical documents concerning disability-based accommodation requests, in violation of the Rehabilitation Act.

517. As a direct and proximate result of Defendant Legal Aid Society's medical inquiry violations, Plaintiff suffered damages.

518. Upon information and belief, the Additional Medical Documentation Class suffered damages as a result of Defendant Legal Aid Society's medical inquiry violations.

519. The Additional Medical Documentation Class seeks injunctive relief including requiring Defendant Legal Aid Society to provide reasonable accommodations, not engage in

illegal medical inquiries, and retract illegal pending medical inquiries, as well as statutory attorney's fees, and costs.

520.    As a result of Defendant Legal Aid Society's medical inquiry violations, Plaintiff seeks back pay, front pay and/or reinstatement, approval of her requested accommodation, actual damages, nominal damages, declaratory relief, injunctive relief, attorney's fees, and costs.

## FIFTH CAUSE OF ACTION

### Rehabilitation Act - Unlawful Qualification Standards and Selection Criteria, Screening Out

### 29 U.S.C. § 794(a), (d), incorporating 42 U.S.C. § 12112(b)(6)

### (By Plaintiff and the Location-Based Accommodation Class Against Defendant Legal Aid Society)

521.    Plaintiff re-alleges and incorporates by reference all allegations in the preceding paragraphs.

522.    The Rehabilitation Act, through the standards of Title I of the ADA, prohibits covered employers from using qualification standards, employment tests, selection criteria, job requirements, or other standards that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities, unless the standard, test, criterion, or requirement is job-related and consistent with business necessity.

523.    Defendant Legal Aid Society used and applied a qualification standard, selection criterion, job requirement, or employment practice that screened out or tended to screen out Plaintiff and disabled employees who needed disability-based accommodations concerning  unnecessary in-person, onsite, courthouse, courtroom, or public-facing exposure.

110

524. Specifically, Defendant Legal Aid Society asserted and applied a requirement that PRDU Forensic Social Workers, including Plaintiff, remain continuously present in the courthouse or courtroom for extended periods during court-coverage days, sometimes described as up to seven hours per day, even when no client-specific or attorney-specific need required immediate in-court social work services.

525. Defendant Legal Aid Society treated that asserted continuous courthouse-presence requirement as an essential function or mandatory job requirement during Plaintiff's accommodation process.

526. That asserted requirement screened out or tended to screen out Plaintiff because Plaintiff's disability required medically necessary limits on unnecessary or excessive exposure to infectious courthouse environments, while Plaintiff remained able to perform all essential court-coverage functions by remaining available and responsive from Defendant Legal Aid Society's nearby office and appearing in court when her physical presence was actually needed.

527. Defendant Legal Aid Society's asserted continuous courthouse-presence requirement was not job-related or consistent with business necessity as applied to Plaintiff and, upon information and belief, the Location-Based Accommodation Class.

528. Defendant Legal Aid Society's own written materials, past practices, weekly coverage guidance, virtual Friday coverage, referral-based workflows, and later PRDU rollout communications showed that court coverage required availability, responsiveness, attorney and client support, and in-person attendance when needed, not continuous courthouse presence when no attorney or client required Plaintiff's physical presence.

111

529. Defendant Legal Aid Society could have achieved its legitimate court-coverage objectives through less discriminatory means, including allowing Plaintiff to remain available from Defendant Legal Aid Society's nearby office, respond by phone, email, Teams, or other channels, and appear in court when called or when a client-specific, attorney-specific, hearing-specific, or emergency social-work need required physical presence.

530. Defendant Legal Aid Society nevertheless applied the asserted continuous courthouse-presence requirement to deny, delay, burden, or restrict Plaintiff's requested accommodation.

531. Defendant Legal Aid Society also used the asserted requirement during the accommodation process to reframe Plaintiff's job duties in a manner that made her requested accommodation appear inconsistent with her position, even though the requirement was not reflected in prior written job materials or longstanding PRDU practice.

532. The asserted requirement also screened out or tended to screen out the Location-Based Accommodation Class because employees who required disability-based remote work, hybrid work, reduced in-person presence, reduced public-facing exposure, modified work location, or similar location-based accommodations are disadvantaged or excluded when Defendant Legal Aid Society treats unnecessary in-person presence as categorically required without individualized assessment.

533. Defendant Legal Aid Society's use of that screening standard violated the Rehabilitation Act.

534. Plaintiff and the Location-Based Accommodation Class suffered harm as a result of Defendant Legal Aid Society's unlawful screening standard, including but not limited

to, denial or delay of reasonable accommodations, loss of equal employment opportunity, and forced leave.

535.    The Location-Based Accommodation Class seeks declaratory and injunctive relief requiring Defendant Legal Aid Society to cease using qualification standards, selection criteria, job requirements, or asserted essential-function descriptions that screen out or tend to screen out disabled employees.

536.    Plaintiff seeks all available relief under the Rehabilitation Act, including declaratory relief, injunctive relief, approval of her requested accommodation, back pay, front pay and/or reinstatement, nominal damages, actual damages, attorney's fees, and costs.

## SIXTH CAUSE OF ACTION

**New York City Human Rights Law – Failure to Provide Reasonable Accommodation**

**N.Y.C. Admin. Code § 8-107(15)(a)**

**(By Plaintiff and the Location-Based Accommodation Class Against Defendant Legal Aid Society)**

**(By Plaintiff Against Individual Defendants Walsh, Quigley, Almanzar, and Park)**

537.    Plaintiff re-alleges and incorporates by reference all allegations in the preceding paragraphs.

538.    Plaintiff is a person with a disability within the meaning of the NYCHRL.

539.    Defendant Legal Aid Society and individual Defendants Walsh, Quigley, Almanzar, and Park knew or should have known of Plaintiff's disability and her need for accommodation.

540.    At all times relevant, Plaintiff could perform the essential functions of her job with or without a reasonable accommodation.

113

541. Defendant Legal Aid Society and individual Defendants Walsh, Quigley, Almanzar, and Park failed to provide Plaintiff with a reasonable accommodation.

542. They refused to implement Plaintiff's request to work from the nearby Legal Aid Society office during court-coverage shifts when her physical presence in court was not actually needed, while remaining available to attend court for client matters, hearings, attorney requests, emergencies, and other specific court-related needs.

543. They also failed to provide any effective interim accommodation while Plaintiff's request remained pending, despite medical documentation, imminent court-coverage dates, and known disability-related risk.

544. The requested accommodation was reasonable, would have allowed Plaintiff to perform the essential functions of her position, and would not have imposed an undue hardship.

545. Defendant Legal Aid Society's and/or individual Defendants Walsh, Quigley, Almanzar, and Park's failure to accommodate was willful, wanton, reckless, and/or in conscious disregard of Plaintiff's and the Location-Based Accommodation Class's rights.

546. Defendant Legal Aid Society's policy, practice, and/or standard operating procedure was to deny, partially deny, and/or delay disability-based accommodation requests regarding requests by the Location-Based Accommodation Class for work location-based disability accommodations.

547. Defendant Legal Aid Society's policy, practice, and/or procedure was to similarly deny disability-based reasonable accommodation requests to the Location-Based Accommodation Class without conducting a good faith individualized evaluation of the request.

548. Defendant Legal Aid Society had a standard operating procedure of presumptive denial and/or delay of requests for disability-based accommodation requests by the Location-Based Accommodation Class.

549. Plaintiff, and upon information and belief, the Location-Based Accommodation Class, suffered damages as a result of Defendant Legal Aid Society's failures to accommodate their disabilities.

550. As a direct and proximate result of the unlawful conduct of Defendant Legal Aid Society and the individual Defendants Walsh, Quigley, Almanzar, and Park, Plaintiff and, upon information and belief, the Location-Based Accommodation Class, suffered damages.

551. The Location-Based Accommodation Class seeks declaratory relief, injunctive relief, attorney's fees, expert fees, and costs, including a declaration that Defendant Legal Aid Society's conduct amounted to willful or wanton negligence, recklessness, conscious disregard of the rights of Plaintiff and members of the Classes, or conduct so reckless as to amount to such disregard.

552. As a result of Defendant Legal Aid Society's and the individual Defendants Walsh, Quigley, Almanzar, and Park's NYCHRL violations, Plaintiff seeks back pay, front pay and/or reinstatement, compensatory damages, approval of her requested accommodation, punitive damages, declaratory relief, injunctive relief, attorney's fees, expert fees, and costs.

**SEVENTH CAUSE OF ACTION**

**New York City Human Rights Law - Retaliation**

**N.Y.C. Admin. Code § 8-107(7)**

**(By Plaintiff, the Post-Request Job-Duty Recharacterization Class, and the Additional Medical Documentation Class Against Defendant Legal Aid Society)**

**(By Plaintiff Against Individual Defendants Walsh, Quigley, Almanzar, and Park)**

553.    Plaintiff re-alleges and incorporates by reference all allegations in the preceding paragraphs.

554.    Plaintiff engaged in protected activity under the NYCHRL, including requesting reasonable accommodations, opposing disability discrimination, and participating in protected advocacy regarding the handling of Plaintiff's accommodation request by Defendant Legal Aid Society and individual Defendants Walsh, Quigley, Almanzar, and Park.

555.    Defendant Legal Aid Society and individual Defendants Walsh, Quigley, Almanzar, and Park knew of Plaintiff's protected activity.

556.    Defendant Legal Aid Society took adverse actions against Plaintiff, within two months of her requested disability accommodations and engaged in related protected activity, including but not limited to the following: (a) refusing to provide any interim accommodation or interim protective measures pending review of her accommodation request, including after the Step 3 grievance filed on or about December 19, 2025 and the union's cease-and-desist communication on or about January 5 or 6, 2026, thereby forcing Plaintiff to continue working without interim relief and to choose between risking her health and risking discipline; (b) requesting unnecessary, duplicative, overbroad, and invasive additional medical information concerning her disability accommodation request, including but not limited to causing Matrix to issue a January 2, 2026 demand for additional provider information with a fifteen-day

116

deadline after Defendant Legal Aid Society had already received medical support for Plaintiff's restrictions and while framing the request around Defendant Legal Aid Society's disputed assertion that Plaintiff was required to be onsite in court up to seven hours per day, twice weekly; (c) changing, attempting to change, asserting changes to, and pretextually reconstituting Plaintiff's job duties during the accommodation process and while a grievance was pending in an effort to support a refusal to accommodate based on new asserted job requirements, including by recasting extended courthouse presence as an essential function despite prior practice, written court-coverage descriptions, and inconsistent application across PRDU offices; (d) forcing Plaintiff to continue extended courthouse presence during court coverage, up to seven hours per day, twice weekly, which requirement was not an organization-wide policy, despite known medical risks and Plaintiff's pending accommodation request; (e) shifting and escalating Defendant Legal Aid Society asserted essential-function and court-coverage requirements after Plaintiff and the union challenged those requirements; (f) denying, refusing to grant, or failing to act on Plaintiff's interim accommodation request on or about January 20, 2026, and thereafter continuing to enforce the disputed courthouse-presence expectation; (g) singling Plaintiff out for heightened scrutiny, micromanagement, and file demands after she requested accommodation and sought union assistance, including demands for client files and case materials outside ordinary practice and without adequate explanation; and (h) escalating the disputed court-coverage requirement by requiring Plaintiff to appear in court at a specified time, meet with attorneys, and conduct case review with supervisors while remaining in court.

557.    Defendant Legal Aid Society's retaliatory attempted job duty changes followed particularly closely to each of her protected activities: (1) Plaintiff requested an

117

accommodation on November 24, 2025, and within approximately 25 days, by December 19, 2025, Defendant Legal Aid Society asserted that Plaintiff's role required her to remain in court during court-coverage days for up to seven hours, despite the prior court-coverage model and the absence of any written continuous-presence policy; (2) Plaintiff submitted an amended accommodation request on December 9, 2025, and within approximately 10 days, Defendant Legal Aid Society again asserted the expanded court-presence requirement while refusing interim relief. Within approximately 21 to 24 days of that request Defendant Legal Aid Society and/or Matrix transmitted the disputed "current job function" description to Plaintiff's provider, stating that Plaintiff was expected to be onsite in the courthouse twice per week for up to seven hours per day; (3) after the December 19, 2025 grievance, Matrix issued the additional provider-information demand within approximately 14 days; and (4) after the union's January 6, 2026 cease-and-desist communication, Defendant Legal Aid Society denied Plaintiff's accommodation request within 14 days, on January 20, 2026. This sequence readily supports an inference that Defendant Legal Aid Society retaliated against Plaintiff and interfered with her protected rights by recharacterizing, expanding, and enforcing asserted job requirements shortly after each protected accommodation request, grievance, and union objection.

558. Defendant Legal Aid Society's retaliatory adverse actions followed closely on the heels of Plaintiff's protected activity -- including the November 24, 2025 accommodation request, subsequent November 2025 request, December 9, 2025 accommodation request, December 19, 2025 grievance and/or the union's January 6, 2026 cease-and-desist communication -- and culminated in the January 20, 2026 denial fourteen days after the cease-and-desist letter and within approximately six weeks of the accommodation request.

559.     Plaintiff engaged in protected activity when she complained about and opposed Defendant Legal Aid Society's disability accommodation practices, objected to unnecessary infection exposure, sought union assistance, supported the Step 3 grievance filed on or about December 19, 2025, opposed the disputed courthouse-presence requirement, and supported the union's cease-and-desist communication on or about January 5 or 6, 2026.

560.     Defendant Legal Aid Society knew of Plaintiff's protected complaints and opposition when it took the adverse actions alleged herein. Plaintiff's complaints were communicated to Defendant Legal Aid Society's Human Resources personnel, management, supervisors, and accommodation representatives.

561.     Within approximately fourteen days of the December 19, 2025 Step 3 grievance, Defendant Legal Aid Society caused Matrix to issue a January 2, 2026 demand for additional provider information with a fifteen-day deadline, after Defendant Legal Aid Society had already received medical support for Plaintiff's restrictions. Defendant Legal Aid Society framed that demand around its disputed assertion that Plaintiff had to be onsite in court up to seven hours per day, twice weekly.

562.     Within approximately fourteen to fifteen days of the union's January 5 or 6, 2026 cease-and-desist communication, Defendant Legal Aid Society denied, refused to grant, or failed to act on Plaintiff's request for interim protection on or about January 20, 2026, forcing Plaintiff to continue working without interim relief and to choose between risking her health and risking discipline.

563.     Within approximately thirty-two days of the December 19, 2025 grievance, and within approximately fourteen to fifteen days of the January 5 or 6, 2026 cease-and-desist communication, Defendant Legal Aid Society continued requiring Plaintiff to perform

extended courthouse presence during court coverage, up to seven hours per day, twice weekly, despite her medical restrictions and the unresolved grievance.

564. Within approximately twenty-five to twenty-seven days of the December 19, 2025 grievance, Defendant Legal Aid Society singled Plaintiff out for heightened scrutiny, micromanagement, and file demands, including renewed demands on or about January 13 and January 15, 2026 for client files and case materials outside ordinary practice and without adequate explanation.

565. Defendant Legal Aid Society also changed, asserted changes to, and pretextually reconstituted Plaintiff's job duties after Plaintiff and the union challenged the disputed courthouse-presence requirement, including by recasting extended courthouse presence as an essential function despite prior practice, written court-coverage descriptions, and inconsistent application across PRDU offices.

566. The timing, sequence, and escalation of Defendant Legal Aid Society's actions support a causal connection between Plaintiff's protected complaints and opposition and the adverse actions alleged herein. Defendant Legal Aid Society's conduct would dissuade a reasonable employee from complaining about disability discrimination, opposing unlawful accommodation practices, seeking union assistance, supporting a grievance, or objecting to unnecessary disability-related health risk.

567. A causal connection existed between Plaintiff's protected activity and Defendant Legal Aid Society's adverse actions.

568. Defendant Legal Aid Society and individual Defendants Walsh, Quigley, Almanzar, and Park retaliated against Plaintiff by engaging in adverse conduct that was reasonably likely to deter a person from engaging in protected activity, including, but not

120

limited to, denying her accommodation request, escalating burdens and scrutiny, and maintaining workplace requirements that may have exacerbated her disability-related condition.

569.    There is a causal connection between Plaintiff's protected activity and Defendant Legal Aid Society's and individual Defendants Walsh, Quigley, Almanzar, and Park's retaliatory conduct.

570.    Retaliation in response to requests for disability-based accommodations was Defendant Legal Aid Society's policy, practice, and/or standard operating procedure.

571.    As a direct and proximate result of Defendant Legal Aid Society's and individual Defendants Walsh, Quigley, Almanzar, and Park's retaliation, Plaintiff suffered damages including emotional distress, mental anguish, potential exacerbation of her medical condition, financial harm, and other compensable injuries.

572.    Defendant Legal Aid Society's policy, practice, and/or standard operating procedure was to retaliate against employees who requested disability-based accommodations including by pretextually modifying their positions and/or subjecting them to and creating a class-wide retaliation-based hostile work environment.

573.    Defendant Legal Aid Society maintained a policy, pattern, practice, custom, or regular procedure of retaliating against members of the Medical Documentation Class by requesting unnecessary and/or duplicative medical documents in support of their requests for disability accommodations that were not job-related and/or supported by business necessity.

574.    Defendant Legal Aid Society's policy, practice, and/or standard operating procedure was to retaliate against employees who requested disability-based accommodations and thereby subjected them to a retaliation-based hostile work environment.

575.    Defendant Legal Aid Society's and individual Defendants Walsh, Quigley, Almanzar, and Park's retaliation was willful, wanton, reckless, and/or in conscious disregard of Plaintiff's and the Post-Request Job-Duty Recharacterization Class's rights.

576.    Upon information and belief, the Post-Request Job-Duty Recharacterization Class has suffered damages as a result of Defendant Legal Aid Society's retaliation.

577.    As a result of Defendant Legal Aid Society's retaliation, the Post-Request Job-Duty Recharacterization Class seeks declaratory relief, injunctive relief, attorney's fees, expert fees, and costs, including a declaration that Defendant Legal Aid Society's conduct amounted to willful or wanton negligence, recklessness, conscious disregard of the rights of Plaintiff and members of the Classes, or conduct so reckless as to amount to such disregard.

578.    As a result of Defendant Legal Aid Society's and individual Defendants Walsh, Quigley, Almanzar, and Park's retaliation, Plaintiff seeks back pay, front pay and/or reinstatement, approval of her requested accommodation, compensatory damages, punitive damages, declaratory relief, injunctive relief, attorney's fees, expert fees, and costs.

## EIGHTH CAUSE OF ACTION

**New York City Human Rights Law -- Failure to Engage in Cooperative Dialogue**

**N.Y.C. Admin. Code § 8-107(28)**

**(By Plaintiff, the NYCHRL Accommodation Delay Class, and the Additional Medical Documentation Class Against Defendant Legal Aid Society)**

**(By Plaintiff Against Individual Defendants Walsh and Park)**

579.    Plaintiff re-alleges and incorporates by reference all allegations in the preceding paragraphs.

122

580. Plaintiff requested an accommodation related to her disability, and Defendant Legal Aid Society and individual Defendants Walsh and Park had notice that Plaintiff required such an accommodation.

581. Under N.Y.C. Admin. Code § 8-107(28), Defendant Legal Aid Society and individual Defendants Walsh and Park were obligated to engage Plaintiff in a cooperative dialogue -- i.e., a good-faith written or oral dialogue -- concerning Plaintiff's accommodation needs; potential accommodations that may address those needs, including alternatives to Plaintiff's requested accommodation; and any difficulties such potential accommodations may pose for Defendant Legal Aid Society.

582. Defendant Legal Aid Society and individual Defendants Walsh and Park refused or otherwise failed to engage in such cooperative dialogue within a reasonable time and in good faith. Among other things, Defendant Legal Aid Society and individual Defendants Walsh and Park: (1) delayed for approximately eight weeks, from Plaintiff's November 24, 2025 updated accommodation request through at least the January 20, 2026 meeting at which Plaintiff again sought interim protection and received no decision, while Plaintiff remained subject to the disputed courthouse-presence requirement without interim protective measures; (2) failed to meaningfully consider Plaintiff's requested interim accommodation and the medical documentation supporting it; (3) treated the process as a foregone conclusion by maintaining an inflexible and predetermined position that Plaintiff must remain continuously in the courthouse on court-coverage days; (4) improperly shifted to Plaintiff and her treating provider the burden of proposing and justifying alternative accommodations; (5) engaged in a pretextual bad faith process with a goal of denial, as opposed to the reasonable grant, of the requested accommodation; and (6) refused to explore or consider alternatives or interim

123

measures -- including permitting Plaintiff to work from Defendant Legal Aid Society's nearby office location and attend court only when called or when her physical presence was needed.

583.    Defendant Legal Aid Society and individual Defendants Walsh and Park did not engage in a timely or good-faith cooperative dialogue. Instead, Defendant Legal Aid Society held meetings, routed Ms. Kubicki through Matrix, and left her without interim protection while she remained exposed to the exact courthouse conditions her medical provider sought to limit.

584.    During that delay, Defendant Legal Aid Society demanded additional medical information on a compressed timeline, treated its disputed and newly asserted court-presence requirement as nonnegotiable, and then denied the accommodation on that same basis. Defendant Legal Aid Society's process was not an individualized search for an effective accommodation, but was instead, a delayed, non-protective, and predetermined path to denial.

585.    Defendant Legal Aid Society's and individual Defendants Walsh and Park's January 20, 2026, denial email -- issued only after that unreasonable delay and reflecting a predetermined outcome -- did not satisfy, and cannot cure, their statutory obligation to engage in a cooperative dialogue in good faith. Defendant Legal Aid Society's and individual Defendants Walsh and Park's failure to engage in a good faith cooperative dialogue independently violated the NYCHRL and caused Plaintiff harm, including by delaying and obstructing the provision of effective accommodations and thereby potentially exacerbating Plaintiff's disability-related condition.

586.    The January 20, 2026 denial did not follow a completed good-faith cooperative dialogue and did not reflect an individualized written determination after such dialogue. It did not meaningfully identify the accommodations considered, any specific difficulty Plaintiff's

124

requested accommodation posed, or why interim office-based court coverage was unavailable while Plaintiff remained able to attend court when needed.

587. Defendant Legal Aid Society engaged in bad faith cooperative dialogues with the NYCHRL Accommodation Delay Class intended to deny and evade disability accommodation requests instead of a good faith process to individually evaluate them.

588. Defendant Legal Aid Society violated the cooperative dialogue rights of the NYCHRL Accommodation Delay Class by unreasonably delaying the cooperative dialogue process for a period of at least forty-five days.

589. Defendant Legal Aid Society violated the cooperative dialogue rights of the NYCHRL Accommodation Delay Class by unreasonably delaying evaluation of and/or  a determination on their disability accommodation requests, for a period of forty-five days or more.

590. Defendant Legal Aid Society violated the cooperative dialogue rights of the NYCHRL Accommodation Delay Class by making bad faith requests for additional unnecessary and/or duplicative medical documents in response to their requests for disability accommodations.

591. Defendant Legal Aid Society's cooperative dialogue process and/or participation was designed to identify grounds to attempt to deny, limit, and/or delay disability-based accommodation requests, instead of attempting to evaluate these requests in good faith

592. Defendant Legal Aid Society's and individual Defendants Walsh and Park's cooperative dialogues were predetermined and designed to delay and/or deny or to attempt to delay and/or deny accommodation requests.

593. Defendant Legal Aid Society's and individual Defendants Walsh and Park's failure to engage in a good faith cooperative dialogue was willful, wanton, reckless, and/or in conscious disregard of Plaintiff's and the NYCHRL Accommodation Delay Class's rights.

594. Defendant Legal Aid Society's and individual Defendants Walsh and Park's cooperative dialogue process unnecessarily requested additional duplicative and/or unnecessary medical documents from employees requesting disability accommodations.

595. It was Defendant Legal Aid Society's policy, practice, and/or standard operating procedure to engage in bad faith cooperative dialogues with the NYCHRL Accommodation Delay Class.

596. As a result of Defendant Legal Aid Society's unlawful conduct, the Additional Medical Documentation Class and NYCHRL Accommodation Delay Class seek declaratory and injunctive relief, attorney's fees, expert fees, and costs, including a declaration that Defendant Legal Aid Society's conduct amounted to willful or wanton negligence, recklessness, conscious disregard of the rights of Plaintiff and members of the Classes, or conduct so reckless as to amount to such disregard.

597. The Additional Medical Documentation Class also seeks declaratory and injunctive relief requiring Defendant Legal Aid Society to stop using duplicative, unnecessary, overbroad, or bad-faith medical-documentation demands as part of the cooperative-dialogue process, and to proceed based on medical documentation already provided unless additional information is actually necessary and narrowly tailored.

598. Defendant failed to engage in a good faith cooperative dialogue under the NYCHRL. Defendant did not timely identify Plaintiff's essential functions, assess whether continuous courthouse presence was essential, provide a written good-faith determination,

126

grant interim measures, or consider safer alternatives preserving client service. Instead, Defendant insisted on a preselected outcome and used Matrix to pressure Plaintiff's provider to fit Plaintiff into Defendant's disputed courthouse-presence requirement.

599. As a result of Defendant Legal Aid Society's and individual Defendants Walsh and Park's unlawful conduct, Plaintiff seeks back pay, front pay and/or reinstatement, approval of her requested accommodation, compensatory damages, punitive damages, declaratory relief, injunctive relief, attorney's fees, expert fees, and costs.

## NINTH CAUSE OF ACTION

**New York City Human Rights Law - Coercion, Intimidation, Threat, and Interference
and
Attempted Coercion, Intimidation, Threat, and Interference**

**N.Y.C. Admin. Code § 8-107(19)**

**(By Plaintiff, the Additional Medical Documentation Class, and the Post-Request Job-Duty Recharacterization Class Against Defendant Legal Aid Society)**

**(By Plaintiff Against Individual Defendants Park, Walsh, Almanzar, and Quigley)**

600. Plaintiff re-alleges and incorporates by reference all allegations in the preceding paragraphs.

601. Plaintiff had, and continues to have, disabilities within the meaning of the NYCHRL.

602. At all times relevant to the Complaint, Plaintiff exercised and/or attempted to exercise rights protected by the NYCHRL, including, but not limited to: (1) the right to request, engage in good-faith consideration of, and obtain a reasonable accommodation for a disability; (2) the right to a good-faith cooperative dialogue concerning a requested disability-based accommodation; and (3) the right to be free from retaliation, coercion, intimidation, threats, and interference in connection with seeking or using NYCHRL-protected rights.

603.    Upon information and belief, at all times relevant to the Complaint, the Additional Medical Documentation Class and the Post-Request Job-Duty Recharacterization Class had disabilities within the meaning of the NYCHRL and/or were subjected to disability-related discrimination, denial or delay of reasonable accommodations, retaliation, coercion, intimidation, threats, and/or interference on the basis of disability and/or because they sought disability accommodations and related protected rights.

604.    Defendant Legal Aid Society and individual Defendants Park, Walsh, Almanzar, and Quigley coerced, intimidated, threatened, and/or interfered with Plaintiff's exercise or enjoyment of, and/or on account of her having exercised or enjoyed, her NYCHRL rights, and/or attempted to coerce, intimidate, threaten, and/or interfere with Plaintiff's exercise and/or enjoyment of her NYCHRL rights, including, but not limited to, by:

a.  failing and refusing to engage in the required cooperative dialogue process in good faith, including by conducting the "dialogue" as an adversarial, coercive process designed to extract concessions, obtain unnecessary medical detail, and/or force Plaintiff to abandon or narrow her accommodation request;

b.  delaying and obstructing consideration of Plaintiff's accommodation request(s), including by imposing unreasonable delays, moving deadlines, and serial documentation demands, while continuing to enforce disputed and/or newly asserted in-person and/or court-presence requirements against Plaintiff;

c.  refusing to implement reasonable interim or temporary measures while Plaintiff's accommodation request(s) and/or related grievance processes were pending, despite actual knowledge of Plaintiff's disability-related limitations and health risks;

d. asserting, manufacturing, exaggerating, and/or shifting purported "essential functions," "operational needs," and/or "business needs" to defeat or chill Plaintiff's accommodation request, including by asserting that extended in-person court presence (including remaining in-court for a minimum duration regardless of client need) was mandatory and/or essential, contrary to longstanding practice and/or job expectations as actually performed;

e. requesting additional and unnecessary medical documentation beyond that required to evaluate Plaintiff's request, including repeatedly deeming Plaintiff's documentation "incomplete" and demanding further "discovery," clarification, or supplementation as a pretext to delay, deny, close, or narrow her accommodation request;

f. coercing Plaintiff and/or attempting to coerce Plaintiff by demanding that Plaintiff's healthcare provider propose "alternative accommodations" that would permit Defendant Legal Aid Society's and individual Defendants Park, Walsh, Almanzar, and Quigley's preferred outcome (continued in-person and/or in-court presence) rather than evaluating the accommodation Plaintiff requested and/or any reasonable alternatives in good faith;

g. threatening Plaintiff -- expressly and/or implicitly -- that failure to comply with Defendant Legal Aid Society's and individual Defendants Park, Walsh, Almanzar, and Quigley's documentation demands and/or compressed deadlines would harm her accommodation determination, including by threatening closure, denial, and/or adverse consequences if she did not comply within short timeframes;

129

h.  seeking to contact, contacting, and/or attempting to contact Plaintiff's healthcare provider(s) directly (including through third-party administrators), and using that contact (or threatened contact) to pressure Plaintiff and/or her providers to deviate from medical recommendations and/or to support Defendant Legal Aid Society's and individual Defendants Park, Walsh, Almanzar, and Quigley's preferred "alternative accommodations," thereby interfering with Plaintiff's protected rights;

i.  conducting retaliatory, invasive, and/or interrogatory "interactive" meetings and inquiries about Plaintiff's disability, medical care, restrictions, and/or private health information -- beyond what was necessary to evaluate accommodations -- in a manner reasonably likely to deter a person from requesting accommodations;

j.  escalating scrutiny, surveillance, micromanagement, and differential enforcement of workplace expectations against Plaintiff because she requested accommodations and pursued protected rights, including by subjecting Plaintiff to standards, monitoring, and demands not imposed on similarly situated colleagues who did not request accommodations;

k.  retaliating against Plaintiff and/or creating a hostile work environment to punish, intimidate, and deter Plaintiff from continuing to request accommodations and to deter others from doing so, including through pretextual "performance" demands, "coaching," warnings, and/or threats of discipline linked temporally and substantively to Plaintiff's accommodation request and protected activity; and

130

l.   using demands for production and/or access to Plaintiff's client files, case notes, and/or related work product -- outside ordinary practice and/or in a selectively enforced manner -- as a mechanism of intimidation, pretext creation, and retaliation, thereby interfering with Plaintiff's exercise and enjoyment of NYCHRL-protected rights.

605.    Defendant Legal Aid Society's and individual Defendants Park, Walsh, Almanzar, and Quigley's coercion, intimidation, threats, and/or interference (and/or attempts at the same) were materially adverse and were reasonably likely to deter a person from engaging in protected activity, including requesting accommodations, insisting on cooperative dialogue, seeking interim measures pending a decision, and/or pursuing grievance and/or union-supported enforcement of accommodation rights.

606.    Upon information and belief, Defendant Legal Aid Society, acting through HR/Employee Relations, management, supervisors, agents, and/or third-party vendors administering accommodations -- maintained and/or executed a policy, practice, procedure, and/or custom of coercing, intimidating, threatening, and/or interfering (and/or attempting to do so) with Plaintiff's exercise, and the Additional Medical Documentation Class's and the Post-Request Job-Duty Recharacterization Class's exercise or enjoyment of, and/or on account of them having exercised or enjoyed, their NYCHRL rights, including, but not limited to, by:

a.   using delay, serial documentation demands, and "incomplete" determinations as a routine practice to obstruct accommodation requests;

b.   imposing short, coercive deadlines and threatening adverse outcomes if employees or health care providers do not respond promptly;

131

c.  pressuring employees to accept only employer-preferred "alternatives" and/or to withdraw or narrow accommodation requests, rather than engaging in individualized, good-faith cooperative dialogue;

d.  relying on pretextual and/or shifting assertions of "essential functions" and "operational needs" to deny, close, or effectively deny accommodations, including telecommuting/hybrid accommodations and/or limitations on in-person presence;

e.  requiring submission of additional unnecessary and/or duplicative medical documentation to support disability-based accommodation requests; and

f.  retaliating against employees who request accommodations by escalating scrutiny, hostile treatment, threats of discipline, investigations, and/or other adverse actions.

607.  Upon information and belief, Defendant Legal Aid Society's and Individual Defendants Park, Walsh, Almanzar, and Quigley's coercion, intimidation, threats, and/or interference (and/or attempts at the same) were willful, wanton, reckless, and/or in conscious disregard of Plaintiff's protected rights and the and the protected rights of the Additional Medical Documentation Class and the Post-Request Job-Duty Recharacterization Class.

608.  Defendants' conduct, under all the existing circumstances, had a reasonable tendency to coerce or intimidate employees, regardless of whether they are actually coerced.

609.  The Additional Medical Documentation Class and the Post-Request Job-Duty Recharacterization Class seek declaratory relief, injunctive relief, attorney's fees, expert fees, and costs pursuant to N.Y.C. Admin. Code § 8-502(a), including a declaration that Defendant

Legal Aid Society's conduct was willful, wanton, reckless, and/or in conscious disregard of the Classes' rights.

610.    As a result of Defendant Legal Aid Society's and individual Defendants Park, Walsh, Almanzar, and Quigley's  coercion, intimidation, threats, and/or interference (and/or attempts at the same), Plaintiff is entitled to damages, including, but not limited to, back pay, front pay and/or reinstatement, approval of her requested accommodation, compensatory damages, punitive damages, declaratory relief, injunctive relief, attorney's fees, expert fees, and costs pursuant to N.Y.C. Admin. Code § 8-502(a).

611.    Upon information and belief, Defendant Legal Aid Society's and individual Defendants Park, Walsh, Almanzar, and Quigley's coercion, intimidation, threats, and/or interference (and/or attempts at the same) were willful, wanton, reckless, and/or in conscious disregard of Plaintiff's, the Additional Medical Documentation Class's, and the Post-Request Job-Duty Recharacterization Class's putative class members' protected rights.

612.    Defendants' conduct communicated and/or attempted to communicate, that accommodation requests may lead to repeated medical demands, pressure to disclose unnecessary health information, denial of interim relief, altered job expectations, heightened scrutiny, and threats of noncompliance.

613.    Defendants' conduct, under all the existing circumstances, had a reasonable tendency to coerce or intimidate employees, regardless of whether they are actually coerced.

614.    The Additional Medical Documentation Class and the Post-Request Job-Duty Recharacterization Class seek declaratory relief, injunctive relief, attorney's fees, expert fees, and costs pursuant to N.Y.C. Admin. Code § 8-502(a), including a declaration that Defendant Legal Aid Society's conduct amounted to willful or wanton negligence, recklessness,

133

conscious disregard of the rights of Plaintiff and members of the Classes, or conduct so reckless as to amount to such disregard.

615.    As a result of Defendant Legal Aid Society's and individual Defendants Park, Walsh, Almanzar, and Quigley's  coercion, intimidation, threats, and/or interference (and/or attempts at the same), Plaintiff is entitled to damages, including, but not limited to, back pay, front pay and/or reinstatement, approval of her requested accommodation, compensatory damages, punitive damages, declaratory relief, injunctive relief, attorney's fees, expert fees, and costs, pursuant to N.Y.C. Admin. Code § 8-502(a).

**TENTH CAUSE OF ACTION**

**New York City Human Rights Law – Aiding and Abetting**

**N.Y.C. Admin. Code § 8-107(6)**

**(By Plaintiff Against Individual Defendants Park, Walsh, Almanzar, Quigley, and Burt)**

617.    Plaintiff re-alleges and incorporates by reference all allegations in the preceding paragraphs as though fully set forth herein.

618.    Defendant Legal Aid Society violated the NYCHRL as alleged above, including by discriminating against Plaintiff because of her disability, failing to provide her with a reasonable accommodation, failing to engage in a good-faith cooperative dialogue, retaliating against Plaintiff for protected activity, making illegal medical inquiries, and coercing, intimidating, threatening, and interfering with Plaintiff's exercise and enjoyment of NYCHRL-protected rights.

619.    At all relevant times, all of the individual Defendants were employees, agents, supervisors, managers, and/or persons acting on behalf of Defendant Legal Aid Society within the meaning of the NYCHRL.

134

620.    All of the individual Defendants each actually participated in, aided, abetted, incited, compelled, coerced, or attempted to aid, abet, incite, compel, or coerce the NYCHRL violations alleged herein.

621.    Defendant Park aided and abetted the NYCHRL violations of Defendant Legal Aid Society and other individual Defendants by, among other ways, using her senior Human Resources authority to participate in, approve, ratify, administer, and/or fail to correct the challenged accommodation process, the refusal to provide an interim accommodation, the disputed characterization of extended courthouse presence as an essential function, and the continued enforcement of the court-presence requirement after Plaintiff and her union objected that the requirement conflicted with Plaintiff's disability-related restrictions and longstanding PRDU practice.

622.    Defendant Walsh aided and abetted the NYCHRL violations of Defendant Legal Aid Society and the other individual Defendants by, among other ways, administering and materially influencing Plaintiff's accommodation process, communicating and maintaining the disputed position that extended courthouse presence was part of Plaintiff's job duties, participating in requests for additional medical information, proposing employer-preferred alternatives that preserved unnecessary court-presence and micromanagement requirements, and failing to correct the denial, delay, and interference with Plaintiff's accommodation rights.

623.    Defendant Almanzar aided and abetted the NYCHRL violations of Defendant

624.    Legal Aid Society and the other individual Defendants by, among other ways, participating in, approving, maintaining, and/or enforcing the challenged court-presence requirement, treating extended courthouse presence as part of Plaintiff's role despite Plaintiff's

disability-related restrictions and accommodation request, and participating in or ratifying the altered court-coverage expectations and supervisory reporting requirements imposed on Plaintiff after she sought accommodations and engaged in protected activity.

625. Defendant Quigley aided and abetted the NYCHRL violations of Defendant Legal Aid Society and the other individual Defendants by, among other ways, instructing

626. Plaintiff that she was required to sit in court during court-coverage shifts even when there was no identified client-specific or attorney-specific need, participating in or maintaining the disputed court-presence requirement, and subjecting Plaintiff to heightened scrutiny, including case-file demands and reporting expectations that departed from ordinary practice after Plaintiff requested accommodations and engaged in protected activity.

627. Defendant Burt aided and abetted the NYCHRL violations of Defendant Legal Aid Society and the other individual Defendants by, among other ways, participating in the December 2025 meeting concerning the challenged PRDU court-presence expectation, receiving notice that Plaintiff and her union disputed the requirement as inconsistent with past practice and in conflict with Plaintiff's disability-related restrictions, and thereafter approving, ratifying, administering, and/or failing to correct the continued enforcement of the disputed court-presence requirement within her managerial authority over Criminal Defense Practice social-work operations.

628. Individual Defendants Park, Walsh, Almanzar, Quigley, and Burt knew or should have known that Plaintiff had requested disability accommodations, that Plaintiff and her union objected to the disputed court-presence requirement, and that the continued enforcement of that requirement, the refusal to provide interim protection, the medical-

documentation demands, and the retaliatory micromanagement alleged herein violated Plaintiff's NYCHRL-protected rights.

629.    Individual Defendants Park, Walsh, Almanzar, Quigley, and Burt substantially assisted and encouraged Defendant Legal Aid Society and/or each other's NYCHRL violations as set forth in this Complaint, and failed to stop, modify, correct, or prevent those NYCHRL violations, despite having authority, practical ability, or influence to do so.

630.    To the extent any Individual Defendant is not directly liable under the NYCHRL for a particular violation alleged above, that Individual Defendant is liable for aiding and abetting, inciting, compelling, or coercing the NYCHRL violations of Defendant Legal Aid Society or the other individual Defendants, or for attempting to do so.

631.    The aiding-and-abetting conduct of each of the individual Defendants was willful, wanton, reckless, and/or in conscious disregard of Plaintiff's protected rights.

632.    As a direct and proximate result of the aiding-and-abetting conduct of the individual Defendants, Plaintiff suffered damages, including emotional distress, mental anguish, potential exacerbation of her medical condition, lost wages and benefits, out-of-pocket losses, impairment of her ability to work, and other compensable injuries.

633.    Plaintiff is entitled to all available relief under the NYCHRL against individual Defendants Park, Walsh, Almanzar, Quigley, and Burt, including compensatory damages, punitive damages, attorney's fees, expert fees, costs, pre-judgment and post-judgment interest, and such other relief as the Court deems just and proper.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants, and grant the following relief:

137

A.    An order certifying the proposed Location-Based Accommodation Class, the Post-Request Job-Duty Recharacterization Class, the NYCHRL Accommodation Delay Class, and the Additional Medical Documentation Class and any other appropriate subclasses pursuant to Fed. R. Civ. P. 23, appointing Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel pursuant to Rule 23(g);

B.    A declaratory judgment, on a class-wide basis, that Defendant Legal Aid Society's policies, practices, and/or standard operating procedures violate the Rehabilitation Act and the NYCHRL, and that Defendant's conduct toward the Classes was willful, wanton, reckless, and/or in conscious disregard of protected rights under the NYCHRL;

C.    Class-wide injunctive relief requiring Defendant Legal Aid Society to, *inter alia* (i) cease its unlawful accommodation denials, retaliation, and interference, and untimely accommodation procedures, including prompt interim measures while requests are pending, (ii) cease retaliatory job change and bad-faith interactive dialogues and cooperative dialogues; (iii) cease illegal medical inquiries; and (iv) require prompt written determinations, training, monitoring, and other forward-looking relief necessary to prevent recurrence;

D.    Injunctive relief requiring Defendant Legal Aid Society to provide Plaintiff and the proposed Location-Based Accommodation Class, NYCHRL Accommodation Delay Class, and Additional Medical Documentation Class with good faith individualized reasonable accommodation evaluations and to engage in good-faith interactive dialogues and cooperative dialogues;

E.    Back pay and front pay including lost wages, salary, and employment benefits from the date of the unlawful conduct through judgment for Plaintiff;

F.    Reinstatement to Plaintiff's position and/or the grant of her requested reasonable accommodation;

G.    Compensatory damages for emotional distress, pain and suffering, and other non-economic harm for Plaintiff;

H.    Punitive damages for Plaintiff pursuant to the NYCHRL;

I.    Reasonable attorneys' fees, expert fees, and costs;

J.    Pre-judgment and post-judgment interest as allowed by law;

K.    Nominal damages for Plaintiff;

L.       Actual damages for Plaintiff;

M.      Such other and further relief as the Court deems just and proper.

## **DEMAND FOR TRIAL BY JURY**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a

trial by jury on all questions of fact this Complaint raises.

Dated:  Long Island City, New York
         May 11, 2026

Respectfully submitted,

By: _____/s/ Cyrus E. Dugger_____
       Cyrus E. Dugger

**The Dugger Law Firm, PLLC**
**Gotham Center**
**28-07 Jackson Ave., 5th Fl.**
**Long Island City, NY 11101**
**cd@theduggerlawfirm.com**
**Tel: (646) 560-3208**
**Fax: (646) 390-4524**

***Attorneys for Plaintiff Marissa Kubicki and***
***the Putative Classes***