**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **MARISSA KUBICKI, individually, and on behalf of all others similarly situated,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**THE LEGAL AID SOCIETY, MATRIX ABSENCE MANAGEMENT, INC., CONNIE PARK, in her individual capacity, LAURA WALSH, in her individual capacity, REBEKAH ALMANZAR, in her individual capacity, JACKIE QUIGLEY, in her individual capacity, and YONZEL BURT, in her individual capacity,**<br><br>**Defendants.** | **Case No. 1:26-cv-03882-VSB**<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**Demand for Trial by Jury** |

Plaintiff Marissa Kubicki ("Plaintiff"), by and through her undersigned counsel, The Dugger Law Firm, PLLC, makes the following allegations against Defendants: (1) The Legal Aid Society ("The Legal Aid Society," "LAS," or "Defendant Legal Aid Society");[1] (2) Matrix Absence Management, Inc. ("Matrix" or "Defendant Matrix"); (3) Connie Park ("Park" or "Defendant Park") in her individual capacity; (4) Laura Walsh ("Walsh" or "Defendant Walsh") in her individual capacity; (5) Rebekah Almanzar ("Almanzar" or "Defendant Almanzar") in her individual capacity; (6) Jackie Quigley ("Quigley" or "Defendant Quigley") in her individual capacity; and (7) Yonzel Burt ("Burt" or "Defendant Burt") in her individual capacity (collectively, "Defendants").

[1] References to "Defendant" in the singular mean Defendant Legal Aid Society unless the context indicates otherwise. References to actions by Defendant Legal Aid Society include actions by its employees or agents including Defendant Matrix. References to "Defendants" mean two or more of the pleaded defendants.

# INTRODUCTION

1. This action challenges Defendant Legal Aid Society's denial or partial denial of disability-based accommodation requests to modify in-person work requirements, delays and failures to provide interim protection during the accommodation process, repeated demands for unnecessary additional medical documentation, and retaliation following disability-accommodation requests including post-request recharacterizations of asserted job duties.

2. Plaintiff brings this class action on behalf of all current employees of Defendant Legal Aid Society who worked in New York City at any time within the applicable class period, who submitted, renewed, appealed, or supplemented a written disability-based request to reduce, modify, temporarily be relieved from, or receive interim protection from an in-person work requirement, including a request concerning remote work, hybrid work, courthouse or courtroom presence, public-facing exposure, remote participation, reporting location, commute timing, or work schedule, submitted medical documentation supporting the request, and had the request denied or partially denied (the "**Location-Based Accommodation Class**").

3. Plaintiff brings this class action on behalf of all current employees of Defendant Legal Aid Society who worked in New York City within the applicable class period, submitted, renewed, appealed, or supplemented their own written disability-based accommodation request, and within sixty days were subjected to a documented change, attempted change, new enforcement, or recharacterization of an asserted job duty, essential function, in-person work requirement, reporting-location requirement, schedule requirement, public-facing duty, court-coverage obligation, productivity expectation, availability requirement, or similar work requirement (the "**Post-Request Job-Duty Recharacterization Class**").

4. Plaintiff brings this class action on behalf of all current employees of Defendant Legal Aid Society who worked in New York City within the applicable class period, submitted,

renewed, supplemented, or appealed a written disability-based accommodation request, and did not receive within fifty-five days of the request, renewal, supplementation, appeal, or supporting medical documentation a written final determination, an implemented accommodation, or a written determination granting or denying interim relief (the "**NYCHRL Accommodation Delay Class**").

5. Plaintiff brings this class action on behalf of all current employees of Defendant Legal Aid Society who worked in New York City within the applicable class period, had a previously documented long-term, permanent, and/or chronic disability, and were required to provide additional medical documentation concerning the same disability or previously documented functional limitation as a condition of continuing, modifying, renewing, supplementing, implementing, appealing, or obtaining an accommodation or interim accommodation (the "**Additional Medical Documentation Class**").

6. The above-defined classes are collectively referred to as the Classes.

7. The class period begins on May 11, 2023, for each Class and continues through the date of final judgment.

8. On behalf of the proposed Classes, Plaintiff seeks certification pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(c)(4), and class-wide declaratory and injunctive relief requiring Defendant Legal Aid Society to cease the challenged policies and practices and to implement lawful, individualized reasonable-accommodation and cooperative-dialogue procedures, including effective interim measures while requests are pending.

9. Plaintiff also seeks certification pursuant to Fed. R. Civ. P. 23(c)(4) of the common issue whether Defendant Legal Aid Society engaged against members of the Classes with willful or wanton negligence, recklessness, conscious disregard of their rights, or conduct so reckless as to amount to such disregard, thereby satisfying the NYCHRL standard for punitive damages.

Plaintiff does not seek certification of the amount of punitive damages recoverable by any Class member.

10. As reflective of these policies, Plaintiff has also identified numerous other LAS employees whose experiences reflect the challenged accommodation practices. Upon information and belief, Defendant Legal Aid Society engaged in the following illustrative conduct:

a. Partially denied and delayed an employee's temporary post-surgical telecommuting accommodation after the employee returned from medical leave following hip surgery and was still recovering from mobility limitations. The employee requested to work remotely except when essential job functions required in-person work, explaining that she had only recently begun walking without a cane, that commuting three days per week was not realistic during recovery, and that requiring her to report onsite for work that consisted largely of phone calls, Teams meetings, emails, and virtual appearances would over-exert her for the sake of strict compliance rather than job-related necessity. Although The Legal Aid Society processed an accommodation through Matrix, it approved only two remote-work days per week from April 13, 2026 through August 11, 2026, and left additional remote-work flexibility to supervisor-by-supervisor discretion. When the employee asked whether she could appeal and why she had not been approved to work remotely except for essential in-person functions, The Legal Aid Society's Senior Employee Relations Specialist, Defendant Walsh, responded that she did not view the matter as being at the appeal stage, stated that the practice generally defined the role as requiring attorneys to be onsite approximately three days per week, and suggested a further collaborative conversation with supervisors about onsite expectations. The employee reasonably understood this response as discouraging an appeal and leaving her dependent on discretionary approval rather than a clear accommodation matching her medical limitations and actual job duties;

b. Denied an employee's request to return to work fully remotely, for an employee working in a unit relying significantly on remote work, after a disability-based leave, and forcing the employee to remain out of work (unpaid) until the request as originally made was withdrawn and the employee agreed to an ineffective alternative accommodation (at a risk to the employee's health), when the employee's economic situation became untenable on an extended unpaid leave. In this case, HR repeatedly sought additional duplicative unnecessary medical information from the employee regarding their disability accommodation request;

c. Harassed, discriminated against, and retaliated against an employee after she disclosed a high-risk pregnancy, with respect to which she, upon information and belief, had an impairment of her reproductive system constituting a covered disability under the NYCHRL and requested accommodations of not going to Rikers and scheduling flexibility, by subjecting her to pretextual "coaching and counseling" (disciplinary) sessions for using medically necessary sick time, pressuring her to take unpaid FMLA

instead of providing reasonable workplace flexibility, and making demeaning and inappropriate comments, including about her weight. Upon information and belief, after the employee disclosed her high-risk pregnancy and sought accommodations, The Legal Aid Society escalated scrutiny of her time and attendance and treated protected, medically necessitated absences as a performance/discipline issue – calling her into "coaching and counseling" sessions and attempting to force her onto leave rather than accommodating her condition. In addition, The Legal Aid Society conflated protected leave categories with non-protected absences in documenting "attendance" concerns, and mischaracterized pregnancy-related medical limitations and restrictions (including limitations on assignments) as mere "requests." Ultimately, the conduct became so severe that, upon information and belief, the employee filed a hostile work environment complaint with HR in or about May 2025, which Human Resources declined to substantiate after failing to interview identified collateral witnesses;

d. Denied disability accommodation requests from several Defendant Legal Aid Society employees, including Plaintiff, with serious post-COVID chronic conditions who requested flexible scheduling and/or additional telecommuting days to recuperate from constant fatigue and preserve their health. These denials were based on The Legal Aid Society's knee-jerk, unexplained, non-individualized repeated response of the mantra that "the essential functions of the job" required in-person presence – without provision of a single example of how this could not be navigated with a remote hybrid schedule.

e. Failed to respond to or meaningfully respond to requests for disability-based accommodations for two months or longer (in one case more than five months without a substantive response), without interim accommodation approvals (resulting in effective denials) even where the request was eventually partially or belatedly approved;

f. Engaged in a bad-faith interactive process and/or cooperative dialogue process in which employees requesting disability-based accommodation were subjected to a repeated campaign of bad faith and/or harassing meetings, the purpose of which was not to engage in good faith cooperative dialogue, but to instead, filibuster, justify denial or delay, and/or find new grounds to deny the disability accommodation request. In turn, employees were exhausted and worn down by these bad faith meetings, each of which further delayed the approval of their requested disability accommodation (often without the grant of an interim accommodation), and were in turn accused of refusing to participate in the interactive process and/or cooperative dialogue;

g. Responded to requests for disability-based accommodation requests, including Plaintiff's request, with retaliation and interference, by attempting to re-define the role to make the role's essential functions retroactively incompatible with the requested disability accommodation. These backhanded denials, designed to circumvent accommodations rights, through job redefinition, impose exhausting costs on The Legal Aid Society employees already burdened with the underlying medical condition on which their disability accommodation was based. These employees were then forced to seek and legally qualify for disability-based accommodations -- an evermoving

target of evolving job duties being re-made to make their requested disability accommodation appear less reasonable and workable for accommodation than it was at the time of the disability accommodation request;

h. Denied a medically supported full-time remote-work request by an employee whose duties were substantially remote-capable and who remained willing to attend court and other events when needed. LAS relied on generalized physical-presence assertions without explaining why a tailored schedule would not permit the employee to perform the actual functions;

i. Initiated a Human Resources accommodation discussion without including the employee after receiving a late arrival notice due to accidental dislodgement of insulin pump tubing, and subsequently retaliated, following concerns raised by the employee and their union alongside a resulting union grievance, by means of increased attendance and telework scrutiny, significantly increased caseload, disparate concentration of exceptionally serious cases, and disparate frequency of case assignments;

j. Twelve days after a probationary employee disclosed disabilities and accommodation needs, LAS announced a 90-day probation extension without identifying the alleged performance concerns underlying that decision. At a probation-extension meeting held on October 15, 2025, LAS alleged attendance and performance concerns that had not previously been brought to her attention and that corresponded to the disability-related limitations and accommodation needs she had already disclosed. During that same meeting, management acknowledged that the alleged concerns were disability-related and conditioned successful completion of probation on performance with accommodations in place. LAS continued disciplining and evaluating her while accommodations remained unresolved and after interim measures were revoked without replacement. LAS ultimately granted only partial relief that did not address the documented limitations underlying the cited concerns, imposed heightened expectations carrying termination consequences, and terminated the employee before the accommodation process meaningfully addressed those limitations;

k. Delayed for more than four months a staff attorney's disability-based accommodation requests, supported by provider documentation, to avoid night court and to work remotely two days per week, when possible, provided no effective interim relief, and attempted to restart the process through another multi-party call; and

l. Delayed assistive-technology and process accommodations for an attorney with an information-processing disability, treated limitations the requested supports were intended to address as performance deficiencies, restricted assignments, issued warnings, and proposed a transfer while requested litigation and hearing supports remained incomplete.

11. Plaintiff also brings claims on an individual basis against Defendants for: (1) disability discrimination and less-well treatment; (2) failure to provide reasonable

accommodations and effective interim measures; (3) retaliation; (4) failure to engage in a cooperative dialogue; (5) interference, coercion, threats, and intimidation and attempts at the same; (6) medical inquiry violations; (7) use of unlawful qualification standards and methods of administration; and/or (8) aiding and abetting, in violation of Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794 ("Rehabilitation Act"), and/or the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 et seq. ("NYCHRL"). Plaintiff seeks individual monetary and equitable relief on her own behalf, including back pay, front pay, lost employment benefits, nominal and actual economic damages, compensatory damages, punitive damages, as well as an effective reasonable accommodation, reinstatement, and/or an equivalent position, and declaratory and injunctive relief, attorneys' fees, expert fees and costs, pre- and post-judgment interest, and such other relief as the Court deems just and proper.

12. Defendant The Legal Aid Society is a New York City nonprofit legal services organization that relies on skilled professionals to carry out its mission of serving indigent clients in criminal court.

13. Plaintiff is one of those professionals: a Forensic Social Worker who devoted years of her career to serving Defendant's clients and supporting Defendant's attorneys in court.

14. Plaintiff has ankylosing spondylitis, a chronic inflammatory autoimmune condition associated with chronic low-back pain. By late 2025, treatment with an injected immunosuppressive biologic rendered her immunocompromised and heightened her susceptibility to infection.

15. From at least March 2023 until August 2025, a period of approximately two and a half years, Plaintiff supported Defendant Legal Aid Society's staff and clients under an established office-based coverage model: she worked from the Legal Aid Society office across the street from

the Bronx courthouse and entered court when a scheduled client meeting, court appearance, attorney request, or other specific court-related need required her presence (the "Prior Office-Based Coverage Practice"). That practice reduced avoidable courthouse exposure and allowed Plaintiff to continue case and administrative work whenever she was not actually needed in court.

16. Beginning in August 2025, however, LAS management directed Plaintiff and the one other Bronx PRDU Forensic Social Worker to spend approximately one hour in court on designated coverage days even when no client, attorney, hearing, or emergency required their presence, initially describing the purpose as building relationships with attorneys (the "One-Hour Courthouse-Presence Directive").

17. On November 24, 2025, after she had begun treatment with an injected immunosuppressive biologic that rendered her immunocompromised and heightened her susceptibility to infection, Plaintiff requested a disability accommodation, in the form of an exception to the new policy, that would permit her to remain immediately available from the nearby LAS office and enter court whenever an identified need arose (the "Office-Based Coverage Accommodation"), as she had done prior to the new August 2025 instruction, for two and a half years since at least March 2023. While Plaintiff's medical provider advised her, on account of her immunosuppressive biologic rendering her immunocompromised, to limit unnecessary courthouse exposure, Plaintiff remained willing and able to perform every client-facing and court-related duty.

18. During the accommodation process, Defendant progressively transformed the One-Hour Courthouse-Presence Directive into a Plaintiff-specific requirement that she remain in the courthouse for up to seven hours per day twice weekly even when no identified task required her physical presence (the "Extended Courthouse-Presence Standard"). Plaintiff challenges that

separate location-and-duration requirement, not client-facing work, attorney support, hearings, assessments, or advocacy in court.

19. From Plaintiff's November 24, 2025 disability accommodation request, through January 20, 2026, when Defendant denied the request, Defendant provided no effective interim protection and required Plaintiff to report under the challenged courthouse-presence requirements even on days when she had no identified client or attorney task to perform there. Plaintiff became ill twice in December during this unaccommodated period and used leave while the request remained unprotected.

20. The second, prolonged illness began December 22, 2025, and required Plaintiff to interrupt her immunosuppressive medication. The illness produced two separate post-viral conditions, Postural Orthostatic Tachycardia Syndrome and dysautonomia, each with separate symptoms and distinct from Plaintiff's ankylosing spondylitis, and the interruption of her immunosuppressive treatment produced an ensuing inflammatory flare. Together, the autonomic dysfunction, inflammatory flare, syncope, loss of mobility, and wheelchair dependence caused a profound deterioration in her health and ultimately required extended medical leave.

21. Plaintiff alleges that Defendant required avoidable courthouse exposure while she was immunocompromised, materially increasing a medically documented risk of infection and, upon information and belief, causing or contributing to her illness. Separately, treating-provider records document that the prolonged late-December illness and resulting interruption of immunosuppressive treatment materially caused, precipitated, or aggravated the severe health decline that followed.

22. On January 20, 2026, Defendant issued a written denial stating that the requested interim accommodation "was denied and remains so." Defendant directed Plaintiff to report under the disputed court-presence requirement the next morning.

23. On January 29, 2026, only after Plaintiff notified Defendant she was taking FMLA leave, which she did as a result of the failure to accommodate, medically advised leave, recurrent infections, and her already declining health as a result of her December illness, Defendant communicated a slightly less onerous, yet still ineffective, proposed accommodation, that it described both as a proposed alternative and as approved for six months.

24. That still-ineffective proposal required Plaintiff, on each court-coverage day, to unnecessarily, report to and move through the courthouse by 10:00 a.m., locate and approach the assigned preliminary-hearing or recognizance attorneys, ask whether they wanted a social-work assessment, determine whether any hearing was imminent -- rather than permitting her to perform those same coordination and availability functions electronically through Teams from the Legal Aid office across the street, as she had previously done for two and a half years, and enter court only when a client, attorney, hearing, assessment, or other identified need actually required her presence.

25. It would be over a month later, on March 6, 2026, while Plaintiff remained on FMLA leave, after Plaintiff was forced to obtain employment counsel, and more than three months after her November 2025 disability accommodation request, that Defendant belatedly proposed an accommodation substantially similar to the accommodation proposed by Plaintiff in November 2025, albeit with slightly more onerous terms.

26. Plaintiff brings this action individually and on behalf of all others similarly situated under the Rehabilitation Act and the NYCHRL. Plaintiff challenges Defendant Legal Aid

Society's failures to provide timely and effective accommodations and interim measures, failure to engage in good-faith dialogue, disability discrimination and less-well treatment, retaliation, interference, medical inquiry violations, and use of management-supplied location and duration requirements as qualification standards.

27. Defendant Legal Aid Society administered these practices through Human Resources, Employee Relations, supervisors, and/or Matrix using standardized forms, compressed deadlines, repeated meetings, delayed determinations, employment-consequence warnings, and retaliatory post-request job-duty modifications.

28. Plaintiff also brings individual NYCHRL claims against Matrix for failure to accommodate, failure to engage in a good-faith cooperative dialogue, interference with disability rights, and aiding and abetting.

29. Plaintiff seeks declaratory and injunctive relief for herself and the proposed classes, including lawful accommodation procedures and effective interim measures while requests are pending, together with attorney's fees, expert fees, and costs, as well as a declaration that Defendant's conduct supports a class-wide finding of willful or wanton negligence, recklessness, conscious disregard of rights, or conduct so reckless as to amount to such disregard, thereby satisfying the NYCHRL standard for punitive damages. Plaintiff also seeks the individual economic, nominal, actual, compensatory, and punitive relief available under the Rehabilitation Act and the NYCHRL.

30. Plaintiff remains employed and, under her currently approved medical-leave extension, has a return-to-work date of December 17, 2026. She intends to return to active work when medically able. As her condition has changed she will require a new disability accommodation upon her return to work. In addition, or in the alternative, Defendant's March 6,

2026, accommodation proposal was approved for a period of six months upon her return and so extension of this proposed accommodation beyond that time-period has not been yet been granted by Defendant and Plaintiff will continue to be subject to the policies and/or practices of denial, delay, partial grant of disability accommodation requests, and related retaliation, alleged herein.

31. Plaintiff's experience was not isolated. Upon information and belief, other LAS employees have been subjected to the same or related centralized practices, including denied, delayed, and/or partial decisions on location-based accommodations, prolonged processes without effective interim relief, repeated demands for medical documentation concerning previously documented conditions, generalized assertions of in-person requirements, and retaliatory changes to asserted job duties following accommodation requests.

**JURISDICTION AND VENUE**

32. The Court has subject matter jurisdiction over Plaintiff's Rehabilitation Act claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the related NYCHRL claims pursuant to 28 U.S.C. § 1367(a).

33. This Court has personal jurisdiction over Defendant Legal Aid Society because it maintains its principal place of business in New York and employed Plaintiff in New York City. The Court has personal jurisdiction over Defendants Park, Walsh, Almanzar, Quigley, and Burt because each acted in New York City as an employee, supervisor, manager, Human Resources representative, or agent of Defendant Legal Aid Society and participated in the challenged practices affecting Plaintiff's New York City employment.

34. This Court has personal jurisdiction over Defendant Matrix because Matrix purposefully directed accommodation-administration activities toward Plaintiff in New York City, communicated with Plaintiff and Defendant Legal Aid Society concerning her New York City

employment, exercised delegated authority over her accommodation process, and committed the challenged acts and omissions in connection with her employment in this District.

35. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims occurred in this District.

## PARTIES

### Plaintiff Marissa Kubicki

36. Plaintiff is an adult resident of the Bronx who has worked for Defendant Legal Aid Society in New York City since 2019 and transferred to PRDU as a Forensic Social Worker on or about March 1, 2023.

37. Plaintiff's work included assessments, client and collateral interviews, reports, treatment and reentry planning, case consultation, crisis intervention, referrals, documentation, and court support when an identified need required her presence. She disputes only the separate requirement of extended courthouse presence when no client, attorney, hearing, or emergency required it.

38. Before the dispute, Plaintiff's supervisors consistently recognized her strong performance, organization, client rapport, timely work, case tracking, attorney collaboration, and training contributions. Her March 2025 evaluation identified no supervisor, attorney, or client concern.

39. Plaintiff has disabilities within the meaning of the Rehabilitation Act and NYCHRL. Defendant knew of her disability and accommodation needs no later than November 8, 2024, knew by July 14, 2025, that her limitations included reducing exposure to illness, and knew by November 24, 2025, that immunosuppressive treatment required limits on unnecessary

courthouse exposure. Plaintiff was at all times qualified to perform the position's essential functions with and/or without a reasonable accommodation.

40. Plaintiff has ankylosing spondylitis with documented enthesitis and sacroiliitis, a chronic autoimmune or autoinflammatory condition that substantially limits major life activities and bodily functions. Even before the later deterioration alleged below, the condition caused chronic pain and limited range of motion in her spine and other joints, substantially limited musculoskeletal function, and restricted the manner and duration in which she could walk, stand, sit for prolonged periods, lift, bend, and ambulate frequently. Prolonged sitting or standing, heavy lifting, frequent ambulation, and high-impact activity increased her pain, injury risk, and functional limitations.

41. By late 2025, and before her November 24, 2025 accommodation request, her physicians were treating the condition with Hyrimoz, also known as adalimumab-adaz, an injected immunosuppressive biologic. At that time, the condition substantially limited musculoskeletal function and restricted the manner and duration in which she could walk, stand, sit for prolonged periods, lift, bend, and ambulate frequently. Hyrimoz suppressed and substantially limited her immune function, heightened her susceptibility to infection, and created an additional disability-related need to limit unnecessary exposure to illness. After Plaintiff's December 2025 illness and subsequent medical decline, her limitations became substantially more severe, including difficulty getting out of bed, inability to stand or walk safely for sustained periods, wheelchair dependence, and the need for substantial assistance with basic activities of daily living.

42. Plaintiff's actual work history demonstrated that she could perform the essential functions of her position with the requested accommodation. Plaintiff successfully performed her PRDU duties under an approved schedule of three remote workdays and two in-person workdays,

received strong evaluations with no identified performance concerns, and historically provided court coverage by remaining available from Defendant Legal Aid Society's office across the street from the courthouse and entering court when an attorney, client, hearing, meeting, or other identified need required her physical presence -- as her November 24, 2025 disability accommodation request sought for her to be able to continue to do. PRDU also used virtual Friday coverage.

43. On March 6, 2026, Defendant Legal Aid Society proposed a substantially similar structure as Plaintiff had proposed continue on November 24, 2025, that similarly used Teams outreach, continued availability, prioritization of identified needs, and entry into court when needed.

44. Plaintiff's requested accommodation changed only the location from which she remained available between actual court needs and eliminated no essential job function. Her physician's note in support of her November 24, 2025, disability accommodation specified that Plaintiff would attend court when required to assist an active client with an open case, speak on the record during a hearing, or provide emergency social-work intervention. Plaintiff remained willing and able to interview clients, consult with attorneys, respond to referrals and emergencies, attend hearings and meetings, and enter court whenever her physical presence was needed. The PPE and breaks proposed by Defendant Legal Aid Society did not reduce the duration of unnecessary infection exposure or provide access to the air purifier and disability-related equipment available in Plaintiff's office. Leave prevented Plaintiff from working. The requested office-based arrangement directly addressed Plaintiff's documented limitation while preserving all client-service and court-response duties.

45. Defendant Legal Aid Society did not identify any actual task that required Plaintiff to remain in the courthouse for, as it eventually stated was required, up to seven hours, when no attorney or client needed her. Its stated rationales referred generally to interdisciplinary collaboration, early client engagement, and mission-consistent outcomes, without explaining why referrals, Teams, telephone contact, scheduled meetings, or prompt travel from the nearby office could not accomplish those objectives. The PRDU job posting, weekly coverage guidance, prior office-based practice, virtual Friday coverage, and later rollout communications were consistent with availability and responsive client service, not continuous courthouse presence without an identified need. Defendant Legal Aid Society also identified no specific cost, staffing, scheduling, response-time, confidentiality, supervision, or other operational hardship created by Plaintiff's requested arrangement.

46. Plaintiff's actual work history and Defendant Legal Aid Society's own practices demonstrate that she could perform the essential functions of her position with the requested accommodation. First, from her March 2023 transfer into PRDU until the August 2025 change in court-coverage expectations, Plaintiff successfully provided court coverage from Defendant Legal Aid Society's office across the street from the Bronx courthouse and entered court whenever an attorney, client, hearing, assessment, meeting, emergency, or other identified need required her physical presence. Second, when Plaintiff requested the accommodation, she was successfully performing her PRDU duties under an approved schedule of three remote workdays and two in-person workdays, had received strong evaluations with no identified performance deficiency, was providing support in the very same way her disability accommodation suggested she continue to support regarding in court work, and she worked in a unit that also used virtual Friday coverage. Third, on March 6, 2026, Defendant Legal Aid Society itself proposed a substantially similar

structure using Teams outreach, supervisory screening and prioritization, continued availability, and courthouse entry when an identified need arose. Taken together, those facts demonstrate that Plaintiff could perform every essential function without remaining continuously inside the courthouse, whether for an hour, or up to seven hours, when no actual work required her in-person court presence.

47. The disability-related limitation Plaintiff asked Defendant Legal Aid Society to accommodate was prolonged and unnecessary exposure to crowded courthouse conditions while her immune function was suppressed, not the performance of client-facing, attorney-support, hearing, assessment, emergency, or other court-related work when needed. Defendant's proposed PPE and ordinary breaks did not reduce the duration of that exposure or provide access to the air purifier and other disability-related equipment in Plaintiff's office. The ineffective January 29, 2026 proposal likewise did not address the limitation because it still required Plaintiff to unnecessarily enter the courthouse before determining whether any court-related need existed. Similarly, leave prevented Plaintiff from working rather than enabling her to perform her position. The later March 6, 2026 proposal was never implemented as Plaintiff remained on leave and did not remedy the completed several month denial period. By contrast, Plaintiff's requested November 24, 2025 disability accommodation request directly addressed her limitations by permitting her to remain in the fully equipped LAS office across the street between identified court needs while preserving both in-person workdays and requiring immediate courthouse entry whenever her physical presence was needed. Plaintiff sought no elimination of an essential function, reduction in client service, transfer, or different position. She sought only an effective modification of the location in which she waited and performed other work between actual court needs.

48. Upon information and belief, before denying Plaintiff's request, Defendant Legal Aid Society did not conduct a task-specific, individualized assessment of whether continuous courthouse presence was an essential function or whether Plaintiff's proposed arrangement would create hardship. Defendant identified no actual essential task requiring Plaintiff to remain in the courthouse for up to seven hours when no client or attorney needed her, how much time Plaintiff spent performing any task that supposedly required continuous presence, any consequence of completing her other duties from the office across the street, any missed or delayed referral, hearing, assessment, or emergency, or any specific response-time, staffing, supervision, confidentiality, client-service, cost, or operational problem. Instead, Defendant relied on generalized references to interdisciplinary collaboration, early client engagement, and generalized mission-consistent outcomes. Those generalizations were inconsistent with the PRDU job posting and weekly coverage guidance, which identified substantive client-service and advocacy duties but not passive courthouse waiting, Plaintiff's strong performance evaluations, years of successful office-based coverage, PRDU's use of virtual Friday coverage, and Defendant's later March 2026 proposed reliance on the same nearby office, Teams communications, screening, prioritization, and prompt-return methods. Defendant thus treated its preferred waiting location as an essential function without assessing, or meaningfully assessing, Plaintiff's actual duties, the actual operation of her proposed accommodation, and/or the basis of an actual concrete undue hardship.

**Defendant The Legal Aid Society**

49. Defendant The Legal Aid Society is a New York nonprofit legal-services organization with its principal place of business at 199 Water Street, New York, New York 10038. It operates PRDU and employed Plaintiff during the relevant period. At all times during the period beginning twelve months before the start of each unlawful discriminatory practice alleged herein

and continuing through the present, The Legal Aid Society had at least four persons in its employ. The Legal Aid Society is an employer within the meaning of the Rehabilitation Act and the NYCHRL.

50. Defendant is a program or activity receiving federal financial assistance within 29 U.S.C. § 794. Its publicly available financial statements for the fiscal year ended June 30, 2024 reported $13,697,629 in federal financial assistance. It is therefore subject to Section 504 of the Rehabilitation Act and the employment standards incorporated through 29 U.S.C. § 794(d).[2]

51. Defendant selected Matrix to administer employee leave and disability-accommodation requests as part of its Human Resources process. It authorized Matrix to communicate with employees and providers, collect medical information, transmit asserted job functions and proposed alternatives, impose deadlines, and coordinate process steps for Defendant's benefit.

52. Plaintiff did not select Matrix. Defendant's written materials identified Matrix as the administrator of its disability and leave programs, and Matrix communications identified it as acting for or with Defendant's Human Resources Department. Matrix was integrated into Defendant's centralized process and its conduct within delegated authority is attributable to Defendant.

53. Defendant Legal Aid Society authorized and used the response-deadline process as part of its centralized accommodation administration. It supplied Matrix with the disputed seven-hour courthouse premise, authorized Matrix to seek provider information and impose response periods, continued the disputed courthouse requirement after receiving notice that Plaintiff's

---

2 *See* The Legal Aid Society, Financial Report: June 30, 2024, at 10 (reporting $13,697,629 in federal financial assistance); *see also* The Legal Aid Society, Financial Report: June 30, 2025, at 7, and The Legal Aid Society, Financial Report: June 30, 2023, at 8.

specialist was unavailable within the fifteen-day period, and provided no effective interim protection. In May and June 2026, Defendant Legal Aid Society's Human Resources personnel further instructed Plaintiff to complete Matrix's standard certification packet as necessary to preserve job protection even though Defendant Legal Aid Society and Matrix already possessed a signed provider letter that Matrix later accepted as sufficient.

**Defendant Connie Park**

54. Defendant Connie Park is sued in her individual capacity. At all relevant times, Park was Defendant's Chief Human Resources Officer and exercised senior authority over Employee Relations, accommodations, interim measures, medical demands, work-location determinations, leave, return to work, and related employment communications.

55. Park received the December 19, 2025 grievance and related union requests. She participated in the January 20, 2026 meeting, reaffirmed that Plaintiff was expected to remain in court up to seven hours per day, added attorney-contact and supervisory-review duties, and approved, ratified, administered, or failed to correct the denial and continued enforcement despite notice of Plaintiff's restrictions and request for interim protection.

56. Through that authority and conduct, Park wielded and exercised the actual and practical ability to dictate or administer Plaintiff's terms, conditions, and privileges of employment, including Plaintiff's work location, court-presence requirements, job duties, accommodation and interim-accommodation status, medical-documentation obligations, leave status, and conditions for continued work.

57. Park personally maintained the asymmetric deadline process after receiving notice of Plaintiff's objections and specialist unavailability. When the union challenged the provider demand, Park stated that Defendant Legal Aid Society needed additional time to review the

grievance and requests for information and treated an extension for Defendant Legal Aid Society as assumed, while Human Resources continued awaiting Plaintiff's provider response under Matrix's fifteen-day deadline. Park did not narrow the information sought, communicate a corresponding extension for Plaintiff, suspend the disputed courthouse requirement, or provide interim protection. On January 20, 2026, Park instead directed Plaintiff to comply with the disputed courthouse requirement the following morning while the purported interactive process remained unresolved.

58. Upon information and belief, Park is no longer employed by Defendant Legal Aid Society and ceased serving as its Chief Human Resources Officer in or around June 2026, shortly after Plaintiff filed this action on May 11, 2026.

**Defendant Laura Walsh**

59. Defendant Laura Walsh is sued in her individual capacity. At all relevant times, Walsh was a Senior Employee Relations Specialist who exercised actual and/or delegated authority over Plaintiff's accommodation process, Matrix communications, medical-documentation demands, asserted functions, alternatives, interim measures, and work-location conditions.

60. Walsh administered Plaintiff's request, transmitted the seven-hour courthouse formulation, sought additional medical information, asked unnecessarily intrusive questions, proposed PPE and breaks, withheld interim protection, and later communicated the January 29 structure and March 6 protocol. She continued relying on the asserted requirement despite contrary job materials, established practice, and union-supported objections.

61. During the relevant period, Defendant Legal Aid Society publicly described the duties of its Senior Employee Relations Specialist position as including implementation and

enforcement of telecommuting and time-and-attendance policies, coordination of ADA accommodation requests and resolutions, timely communication with employees, supervisors, and Matrix, coordination of approved accommodation-related purchases and services, and guidance to other Employee Relations personnel concerning the accommodation process.

62. Defendant Walsh held the title of Senior Employee Relations Specialist and exercised those functions in communications concerning Plaintiff's request and the requests of other employees.

63. Defendant Legal Aid Society's public description of its Employee Relations Specialist position likewise states that Employee Relations coordinates ADA accommodation requests and resolutions and must ensure timely communications among employees, supervisors, and Matrix to facilitate resolution. These publicly assigned responsibilities confirm that disability-accommodation administration, communication, implementation, and resolution were centralized Employee Relations functions and were not delegated exclusively to individual unit supervisors or Matrix.

64. Through that delegated authority and conduct, Walsh had and exercised the actual and practical ability to dictate or administer Plaintiff's accommodation status, medical-documentation obligations, interim protections, work-location conditions, and other terms, conditions, and privileges of employment.

65. Walsh created immediate and inflexible time pressure within the accommodation process. At approximately 5:30 p.m. on Friday, December 19, 2025, she directed Plaintiff to comply with the disputed courthouse requirement (the "Extended Courthouse-Presence Standard") on Monday, suggested that Plaintiff consult her provider, and deferred consideration of alternatives until the following week. Plaintiff immediately explained that the provider's office was closed and

that the provider did not work weekends, but Walsh did not suspend the directive or provide interim protection. Walsh thereafter maintained and transmitted the seven-hour job requirement premise that Matrix substantially reproduced in its fifteen-day provider demand.

**Defendant Rebekah Almanzar**

66. Defendant Rebekah Almanzar is sued in her individual capacity. At all relevant times, Almanzar was a Social Work Supervisor with authority over Plaintiff's assignments, court coverage, supervision, performance expectations, files, and reporting.

67. Almanzar participated in, approved, maintained, or defended the Extended Courthouse-Presence Standard requirement, including when no identified need required Plaintiff's presence. After Plaintiff sought accommodation and union assistance, Almanzar in retaliation for Plaintiff's protected activities, also questioned Plaintiff's file practices, demanded complete digital files in a manner that departed from ordinary practice, and participated in the reporting model later used to support the challenged requirement.

68. Through that supervisory authority and conduct, Almanzar had and exercised the actual and practical ability to dictate or administer Plaintiff's work assignments, work location, court-coverage obligations, file and reporting requirements, performance expectations, and other terms, conditions, and privileges of employment.

**Defendant Jackie Quigley**

69. Defendant Jackie Quigley is sued in her individual capacity. At all relevant times, Quigley was an Assistant Social Work Supervisor with authority over Plaintiff's day-to-day work, court coverage, assignments, file review, and performance expectations.

70. Quigley initially directed Plaintiff to spend approximately one hour in court without an identified client need and later participated in a process treating Plaintiff as subject to up to

seven hours per day in the courthouse twice weekly (the Extended Courthouse-Presence Standard). After Plaintiff sought an accommodation and union assistance, Quigley renewed demands for files and participated in heightened reporting expectations without a consistent explanation.

71. By directing Plaintiff's court attendance and exercising supervisory authority over her day-to-day assignments, files, reporting, and performance expectations, Quigley had and exercised the actual and practical ability to dictate or administer Plaintiff's work location, court-coverage obligations, and other terms, conditions, and privileges of employment.

72. Quigley increased the practical pressure created by the medical-documentation process by continuing to enforce or participate in enforcement of the disputed courthouse requirement (the Extended Courthouse-Presence Standard) while the provider response remained pending. She also renewed file-access demands and participated in heightened reporting expectations after Plaintiff sought accommodation and objected to the medical demands. Her conduct left Plaintiff subject to the challenged work condition and increased scrutiny during the period in which Plaintiff and her provider were required to respond to the compressed process.

**Defendant Yonzel Burt**

73. Defendant Yonzel Burt is sued in her individual capacity. At all relevant times, Burt was Director of Social Work for Defendant's Criminal Defense Practice and exercised managerial authority over social-work operations, supervisors, job duties, court coverage, work assignments, and accommodation-related work-location issues.

74. Burt participated in the December 2025 meeting after receiving notice that Plaintiff and her union disputed the new court-presence requirement as inconsistent with past practice, disparately applied, and in conflict with medical restrictions. Burt maintained that PRDU Forensic

Social Workers were expected in court on coverage days and approved, ratified, administered, or failed to correct the continued enforcement despite authority to modify the practice.

75. Through this managerial authority and her maintenance and defense of the challenged court-presence requirements, including what became the Extended Courthouse-Presence Standard applied to Plaintiff, Burt had and exercised the actual and practical ability to dictate or administer Plaintiff's work location, court-coverage obligations, job duties, work assignments, and other terms, conditions, and privileges of employment.

**Defendant Matrix Absence Management, Inc.**

76. Defendant Matrix Absence Management, Inc. is a corporation and a "person" under N.Y.C. Admin. Code § 8-102. It conducts business in New York City by administering leave and disability-accommodation processes for Defendant and its New York City employees.

77. Defendant selected Matrix and placed Plaintiff's requests into its process. Matrix acted as Defendant's agent and exercised delegated authority over accommodation communications, provider demands, response deadlines, job-function framing, leave administration, and process next steps.

78. Matrix had actual notice of Plaintiff's disability, requested office-based arrangement, and willingness to enter court when needed. On January 2, 2026, it transmitted Defendant's seven-hour courthouse formulation (or in the alternative independently formulated it), identified PPE and breaks, asked the provider for alternatives preserving courthouse presence, imposed a fifteen-day deadline, and warned that nonresponse could affect the decision without evaluating the nearby-office proposal.

79. On May 29, 2026, Matrix issued a standard certification packet and warned of closure and possible discipline. Only days later, on June 3, 2026, Matrix reversed course and

acknowledged that the provider letter already in its possession was sufficient, and on June 5, 2026, it communicated Defendant's approval and issued the written leave determination.

80. Matrix itself thus could, upon information and belief, also determine what documentation was required, whether it sufficed, and when the determination issued.

81. In the alternative, Matrix functioned purely as Legal Aid's agent and implemented its instructions.

82. Matrix is alleged to be directly liable under N.Y.C. Admin. Code §§ 8-107(15)(a), 8-107(19), and 8-107(28)(a), and liable for aiding and abetting under § 8-107(6).

83. Defendant Matrix publicly describes its Workforce Accommodations service as ADA administration integrated with leave management. Matrix identifies its accommodation-administration functions as including early identification and exploration of options, medical and vocational investigation, consistent tracking and audit trails, integration with leave administration, communications, return-to-work support, and case-level administration of both workplace adjustments and leaves of absence.

84. Matrix further publicly identifies Matrix Absence Management, Inc. as the entity providing its absence services. Matrix's publicly described functions are consistent with the functions it exercised in Plaintiff's accommodation process, including communicating with Plaintiff and her provider, transmitting asserted job duties, requesting additional medical information, imposing response deadlines, determining whether submitted documentation was sufficient, controlling request status and closure, monitoring the accommodation, and communicating decisions attributed to Defendant Legal Aid Society.

85. Matrix administered documentation deadlines and threatened consequences as substantive components of the accommodation process rather than merely transmitting

communications. On January 2, 2026, Matrix imposed a fifteen-calendar-day provider deadline and warned that nonresponse could affect the accommodation decision without identifying a specific missing medical fact or evaluating Plaintiff's nearby-office proposal. As noted above, on May 29, 2026, after Matrix and Defendant Legal Aid Society had received a signed provider letter supporting continued leave, Matrix issued a standard certification packet warning that nonresponse would result in closure of Plaintiff's request and could result in disciplinary or other employment action by Defendant Legal Aid Society. Matrix later acknowledged that the existing provider note was sufficient and communicated approval of the extension without Plaintiff completing the new packet. That sequence supports the inference that Matrix issued the warning and response period before making an individualized determination that the additional requested medical information was unnecessary. Matrix's representatives, including Christine Struzzi and, upon information and belief, Maia Raspberry, communicated Matrix's demands for additional medical information and records.

**Direct Liability, Individual Liability, and Legal Aid Society's Statutory Liability Under the NYCHRL**

86. At all relevant times, Park, Walsh, Almanzar, Quigley, and Burt were Defendant's employees or agents, and each individual Defendant and Matrix was a "person" within the applicable NYCHRL provisions. Each exercised managerial, supervisory, Human Resources, agency, and/or practical authority and participated in, approved, ratified, administered, substantially assisted, or failed to correct the challenged conduct after notice.

87. The individual Defendants' participation included originating or enforcing the court-presence requirements, supplying or adopting the disputed function description, controlling interim relief and medical demands, imposing new supervision or file requirements, and

implementing and ratifying the practice including after notice of its conflict with Plaintiff's restrictions.

88. Defendant Legal Aid Society is directly liable for its own conduct pursuant to N.Y.C. Admin. Code § 8-107(1) as an "employer," and pursuant to N.Y.C. Admin. Code §§ 8-107 (6)-(7), (15), (19), and (28) as a "person."

89. Defendant Matrix is directly liable for its own conduct pursuant to N.Y.C. Admin. Code §§ 8-107(6)-(7), (15), (19), and (28) as a "person."

90. Defendants Park, Walsh, Almanzar, and Quigley are each directly liable pursuant to N.Y.C. Admin. Code § 8-107(1) as an "employee" of Defendant Legal Aid Society.

91. Defendants Park, Walsh, Almanzar, and Quigley are each directly liable pursuant to N.Y.C. Admin. Code §§ 8-107(6)-(7), (15), (19), and (28) as a "person."

92. Defendant Burt is directly liable pursuant to N.Y.C. Admin. Code § 8-107(6) as a "person."

93. Defendant Legal Aid Society is liable pursuant to N.Y.C. Admin. Code § 8-107(13)(a) for the conduct of Park, Walsh, Almanzar, Quigley, and Burt with respect to retaliation, failure to accommodate, failure to engage in a cooperative dialogue, interference, and aiding and abetting because they were employees of the Legal Aid Society at all times relevant to the Complaint.

94. Defendant Legal Aid Society is liable pursuant to N.Y.C. Admin. Code § 8-107(13)(a) for the conduct of Matrix with respect to retaliation, failure to accommodate, failure to engage in a cooperative dialogue, interference, and aiding and abetting because Matrix was an agent of Defendant Legal Aid Society.

95. Defendant Legal Aid Society is liable pursuant to N.Y.C. Admin. Code § 8-107(13)(b) for the conduct of Park, Walsh, Almanzar, Quigley, and Burt with respect to disability discrimination because they exercised managerial and/or supervisory responsibility at all times relevant to the Complaint, including with respect to Plaintiff.

96. Defendant Legal Aid Society is liable pursuant to N.Y.C. Admin. Code § 8-107(13)(b) for the conduct of Park, Walsh, Almanzar, Quigley, and Burt with respect to disability discrimination because it knew of their discriminatory conduct and acquiesced in that conduct or failed to take immediate and appropriate corrective action. Each of Park, Walsh, Almanzar, Quigley, and Burt engaged in conduct known to at least one other individual Defendant and, upon information and belief, to additional employees or agents who exercised managerial or supervisory responsibility.

97. Defendant Legal Aid Society is liable under N.Y.C. Admin. Code § 8-107(13)(b) for unlawful conduct by managerial employees and agents that it knew of and acquiesced to or failed to correct.

98. If Matrix is found to be an independent contractor, Defendant is alternatively liable under § 8-107(13)(c) for conduct in furtherance of its business that it knew of and acquiesced in.

99. Matrix is liable pursuant to N.Y.C. Admin. Code § 8-107(13)(a) for the conduct of its employees and agents with respect to failure to accommodate, failure to engage in a cooperative dialogue, interference, and aiding and abetting.

100. Matrix's direct and aiding-and-abetting liability does not displace Defendant Legal Aid Society's liability. Defendant Legal Aid Society's liability does not displace the direct or aiding-and-abetting liability of the individual Defendants or Matrix.

## FACTUAL ALLEGATIONS

### Plaintiff's Employment History and Performance

101. Plaintiff transferred to PRDU as a Forensic Social Worker on or about March 1, 2023, after an internal hiring process that included interviews, reference checks, and verification of her qualifications and licensure.

102. Her responsibilities included forensic social-work assessments, client and collateral interviews, reports concerning client history and mitigation, treatment and reentry planning, case consultation with attorneys, client support, court-related advocacy, case documentation, and scheduled court coverage when in-person support was needed.

103. The PRDU posting identified the role's primary purpose as gathering client life history and mitigating circumstances, advocating for alternatives to detention or incarceration, evaluating treatment needs, facilitating program acceptance, counseling clients, and providing essential information to attorneys. The posting required the ability to interface with judges, prosecutors, and correctional personnel, but did not identify continuous courthouse presence or passive courtroom waiting as a duty.

104. Plaintiff's court work was integrated with substantial office-based work. She needed access to records, client files, electronic systems, confidential communications, and an environment in which she could draft reports and consult with attorneys. When she was not needed in court, working from the office allowed her to advance other clients' matters rather than remain unable to speak or work effectively during proceedings.

105. Plaintiff performed these duties successfully. Almanzar's March 2024 evaluation rated Plaintiff as fully meeting all standards, praised her rapid mastery of PRDU practice, interviewing and collaboration skills, dependable teamwork, organization, electronic case

tracking, timely work product, and accurate statistics, and called her an invaluable member of the team. Quigley's March 3, 2025 evaluation continued that positive assessment, rated Plaintiff as exceeding standards in client and family relationships, praised her rapport, mitigation work, attorney consultation, training contributions, and leadership, and stated that no supervisor, attorney, or client had raised concerns about her work.

**Court Coverage and Essential Functions**

106. From approximately 2021, when in-office client support resumed following the 2020 COVID-19 lockdown period during which LAS operated fully remotely, and as to Plaintiff from her March 2023 transfer into PRDU, through the period preceding the August 2025 One-Hour Courthouse-Presence Directive, PRDU Forensic Social Workers followed an office-based model: they worked from Legal Aid Society offices and went to court when an attorney requested them, when they needed to meet a client, or when another identified court-related need arose (the "Prior Office-Based Coverage Practice"). The Bronx office was across the street from the courthouse, approximately a two-minute walk away, allowing immediate response without continuous courthouse presence or passive courtroom waiting when no social-work service was needed there. Attorney requests under that model were typically made the day before or the same day.

107. Other PRDU practices reflected the same referral-based model. Upon information and belief, Manhattan PRDU social workers traveled to Brooklyn court as needed, without a required or substantial courthouse presence absent a specific client, court, or attorney in-person need, while Bronx PRDU social workers worked from the nearby office and crossed to court when needed. Weekly schedules also provided virtual Friday coverage, with one Forensic Social Worker covering calls for both courts.

108. Defendant's PRDU job posting described interviewing clients and collateral contacts, gathering life history, advocating for alternatives, evaluating treatment needs, completing referral paperwork, counseling clients, and providing essential information to attorneys. Defendant's management-authored PRDU training required attorneys to submit referrals, recognized that assessments could occur by telephone, video conference, in court, or in the office, instructed attorneys to communicate specific needs and to state expressly when a social worker was needed at a court appearance, and recognized that social workers might use morning time to finalize mitigation or referral materials. Those materials described a referral-and-response workflow and did not require continuous courthouse presence when no client, attorney, hearing, or emergency required it.

109. Luca Verano Diaz ("Verano Diaz"), the other Bronx PRDU Forensic Social Worker, had been trained during approximately two and one-half years at the Legal Aid Society that emergency court coverage did not require remaining in court for up to seven hours. When no in-court intervention or support was needed, Forensic Social Workers worked from Room 704 on written mitigation, client and family meetings, referrals, and other assigned matters. When a coverage request arrived, they prioritized the request, conferred with the attorney, and provided the requested intervention. A seven-hour courthouse requirement was not part of Plaintiff's or Verano Diaz's training or hiring job description. That workflow allowed attorneys to obtain prompt support while social workers continued productive client work between requests.

**Defendants Impose a New Courthouse Presence Standard**

110. Beginning in August 2025, LAS management directed Plaintiff and Verano Diaz to spend approximately one hour in court on designated coverage days even when no client,

attorney, hearing, or emergency required their physical presence (the "One-Hour Courthouse-Presence Directive").

111. The instruction began without any attempt to characterize it as an essential function of the position. In August 2025, Quigley told Plaintiff and Verano Diaz, in separate supervision meetings, that they were expected to spend approximately one hour in court on coverage days even without a client need. On August 22, Verano Diaz reported that Quigley had described the purpose as requiring them to remain in court for at least one hour to "build relationships" with attorneys, and union delegate Kim Wirt sought a meeting with Quigley and Almanzar. Plaintiff independently documented the same instruction that day, which was that Quigley had imposed a new requirement that she spend at least one hour in court during coverage days to "build relationships with the attorneys." Plaintiff contemporaneously objected that the attorneys already knew the social workers, regularly contacted them when assistance was needed, and that the new directive appeared in neither the PRDU Forensic Social Worker job description nor existing court-coverage guidance.

112. On September 4, 2025, Quigley provided a written response expressly on behalf of herself and Almanzar explaining management's rationale. Quigley stated that court presence was intended "to facilitate case work, build relationships with attorneys, and ensure timely and effective services" and that, "[i]n order to achieve this goal," management was requesting that Forensic Social Workers be present in court. The communication did not state that continuous courthouse presence, passive waiting in court, or remaining in court for up to seven hours without an identified client or attorney need was an essential function of the position.

113. LAS management's subsequent written explanation continued to describe increased courthouse presence as a means of promoting connection with attorneys and attorney referrals.

Almanzar stated that management sought to increase social-work presence in the Bronx courthouse to strengthen communication with attorneys, improve referrals, and support timely PRDU intakes. LAS management directed the Forensic Social Workers to connect in court with intake attorneys to discuss possible new referrals and described that procedure as providing structure for attorney contact and building consistent communication regarding referrals.

114. Despite these instructions, Legal Aid attorneys did not need in-person contact with social workers in court to be made aware of the services they provided or to make referrals to them. Similarly, connections between Legal Aid social workers and attorneys could have been established equally as effectively, if not more effectively, through interactions, communications, team building, and/or training outside of court or during active court proceedings. In addition, upon information and belief, from August 2025-March 2026 Legal Aid attorneys did even know social workers were being instructed to be present in court as a new protocol.

115. LAS management produced no written continuous-presence policy. Plaintiff and Verano Diaz involved the union because the long-established model required availability and responsiveness, not sitting in court without a referral or identified need.

116. Union representatives met with Quigley and Almanzar on or about September 15, 2025. LAS management maintained the One-Hour Courthouse-Presence Directive, but no written PRDU policy or negotiated rule was produced.

117. After Almanzar circulated notes from the September meeting on October 10, 2025, management declined the delegates' request for a follow-up meeting. Wirt renewed the request on November 10, 2025, and asked that a union organizer and vice president attend. By then, Almanzar, Quigley, Burt, and PRDU Director Lorraine McEvilley had repeated notice that

employees and the union viewed the one-hour instruction as a departure from longstanding practice and as inconsistently applied across boroughs, yet the dispute remained unresolved.

118. Defendant knew that continuous courthouse presence could impair coverage. On November 10, 2025, union delegate Kim Wirt advised Almanzar, Quigley, Burt, and PRDU Director Lorraine McEvilley that Plaintiff and another Bronx Forensic Social Worker missed client calls, supervisory outreach, and Teams referrals while stationed in the courthouse because of poor cell service, that court personnel limited attorney-social-worker communication during proceedings, and that referrals had increased without a physical morning-presence requirement.

119. Kim Wirt, a Legal Aid Society Forensic Social Worker and 1199SEIU delegate, worked from the Bronx Legal Aid Society office from March 2022 through June 2024 and thereafter from the Brooklyn office. Wirt's work in those offices and direct participation in meetings, correspondence, and union advocacy concerning Plaintiff gave Wirt firsthand familiarity with PRDU operations in multiple boroughs and with the court-coverage practices challenged here.

120. Upon information and belief, on November 21, 2025, after Verano Diaz repeatedly opposed the changed court-presence practice in both an employee and union-delegate capacity, management retaliated by subjecting Verano Diaz to coaching and counseling. Wirt attended the coaching-and-counseling session as Verano Diaz's union representative, was told that Weingarten rights did not apply, and was not permitted to ask follow-up questions.

121. Upon information and belief, Bronx PRDU social-work case numbers were low for reasons unrelated to the Forensic Social Workers' performance or the work location on which Legal Aid attempted to attribute as impacting numbers, including the volume and content of attorney referrals, judicial receptivity to social-work intervention, and supervisory assignment decisions. Defendant Legal Aid Society, which monitored case numbers by office in connection

with workload and funder resources, nevertheless directed scrutiny toward the Bronx Forensic Social Workers rather than toward those actual causes, and changed how Bronx Forensic Social Workers they worked to solve a problem they had not created.

122. In addition, LAS management stated that, because a new attorney class had arrived and case numbers were low, Plaintiff and Verano Diaz should spend at least one hour in court to "build relationships." That premise ignored Plaintiff's documented strong performance, attorney collaboration, accurate and timely statistical reporting, and the absence of any identified performance deficiency. It also ignored that attorneys generated PRDU matters by identifying a social-work need, submitting a Law Manager referral with supporting information, and communicating the requested work before a supervisor assigned the matter; additional courthouse face time could not itself create a referral or assignment.

123. By November 10, 2025, LAS management had been advised that referral statistics had increased after the return of an ALJ who was more receptive to social-work intervention, without any demonstrated causal connection between that increase and the physical morning-presence requirement. LAS management was also advised that courthouse placement impaired the receipt of client calls, supervisory outreach, and Teams referrals, and that attorneys had diverted some matters to an outside provider.

124. The courthouse-presence directive did not increase her assigned cases. Plaintiff received five new client assignments in January 2025, two in February, three in March, five in April, one in May, two in June, and five in July 2025. After the August 2025 directive, her new assignments remained at comparable or lower levels: one in August 2025, two in September, six in October, three in November, two in December 2025, and three in January 2026.

125. Defendant nevertheless maintained and later escalated the requirement. Given Defendant Legal Aid Society's regular monitoring of social-worker caseloads by office and its funder contracts tied to workload and resources, these facts support an inference that the directive functioned as a visible and/or performative managerial response to the low case numbers and scapegoated the Bronx social workers for factors outside their control, rather than addressing the referral, judicial, and supervisory processes that actually controlled assigned caseloads.

**Plaintiff's Disability and Accommodation Request in Response to the New One-Hour Courthouse-Presence Directive**

126. Plaintiff has ankylosing spondylitis with documented enthesitis and sacroiliitis, a chronic autoimmune or autoinflammatory condition that substantially limits major life activities and bodily functions. Even before the later deterioration alleged below, the condition caused chronic pain and limited range of motion in her spine and other joints, substantially limited musculoskeletal function, and restricted the manner and duration in which she could walk, stand, sit for prolonged periods, lift, bend, and ambulate frequently. Prolonged sitting or standing, heavy lifting, frequent ambulation, and high-impact activity increased her pain, injury risk, and functional limitations.

127. Defendant had previously granted Plaintiff a three-day remote-work accommodation, implemented on an interim basis in November 2024 and made permanent effective May 2, 2025, and in early 2025 processed equipment accommodations for Plaintiff, including ergonomic seating with lumbar support, blue screen protectors on both of her computer screens, and an air purifier. Those accommodations gave Defendant actual notice of Plaintiff's chronic disability and also meant that the nearby office contained disability-related supports unavailable in the courthouse.

128. On January 6, 2025, Quigley acknowledged Plaintiff's accommodation in writing. On July 14, 2025, Plaintiff's provider again documented treatment and monitoring for an autoimmune or autoinflammatory condition, chronic pain and mobility limitations, and a need to reduce exposure to illness. Those records confirmed that Defendant knew of the relevant limitations months before Plaintiff's November 24, 2025 accommodation request.

129. By late 2025, and before her November 24, 2025 accommodation request, her physicians were treating the condition with Hyrimoz, also known as adalimumab-adaz, an injected immunosuppressive biologic. At that time, the condition substantially limited musculoskeletal function and restricted the manner and duration in which she could walk, stand, sit for prolonged periods, lift, bend, and ambulate frequently. Hyrimoz suppressed and substantially limited her immune function, heightened her susceptibility to infection, and created an additional disability-related need to limit unnecessary exposure to illness.

130. On November 24, 2025, Plaintiff submitted updated medical documentation and requested a permanent amendment to her existing accommodation. The requested Office-Based Coverage Accommodation requested that Plaintiff, as she had done for two and half years, remain in the nearby LAS office during onsite coverage shifts and limit courthouse interactions to identified court-related needs, including client meetings, appearances on the record, attorney requests, and client emergencies, thereby reducing unnecessary exposure while she received immunosuppressive treatment.

131. Plaintiff would not have disclosed details of her immunosuppressive treatment but for the newly asserted requirement. Her provider documentation identified the condition, treatment, expected duration, functional restriction, risk of severe infection and hospitalization, and the work tasks Plaintiff could continue performing. At her provider's request, the letter also

described how Plaintiff was already performing court coverage, in the same referral-based manner described in Quigley's weekly unit-wide emails, to demonstrate that Plaintiff remained willing and able to perform her job but could not remain in court all day under the newly asserted job description because of infection risk. The request was therefore supported by both medical history, including an explicit diagnosis, already known to Defendant and current functional information tailored to the disputed exposure.

132. The provider did not direct Plaintiff to avoid all public activity or all in-person work. The restriction was task-based and workplace-specific. Plaintiff could attend court for active client matters, hearings, emergency intervention, and other identified needs, but should avoid unnecessary or prolonged exposure that added risk without serving a client function. Plaintiff also took her own steps to reduce unnecessary exposure: on approximately one in-office day each week, Verano Diaz drove Plaintiff to and from work so that Plaintiff could limit her exposure on public transit.

133. This distinction matters because Defendant and Matrix subsequently repeatedly framed the issue as whether Plaintiff could be physically present in court *at all*, rather than whether continuous presence was necessary. Plaintiff's position consistently preserved actual court duties and challenged only the duration and location of waiting time.

134. Through the Office-Based Coverage Accommodation, Plaintiff asked to work from Defendant Legal Aid Society's nearby office during onsite court-coverage shifts and to go to court when called or needed for a client, attorney, hearing, meeting, or emergency. She did not ask to work fully remotely, avoid in-person work, avoid court when needed, or be relieved of court coverage. She sought only to avoid prolonged courthouse presence when no specific need required it.

135. The request preserved every essential function. From the nearby office, Plaintiff could remain immediately available by phone, email, Teams, and other channels, continue case work and documentation, use her approved equipment and environmental supports, and cross the street to court whenever her physical presence was needed. This was exactly how Plaintiff and her co-worker had worked for years.

136. Plaintiff did not request transfer to a different position, creation of a new job, displacement of another employee, or relief from court coverage. She would remain a PRDU Forensic Social Worker in the same title and unit, with the same supervisors, caseload, scheduled onsite days, and responsibility to enter court whenever a client, attorney, hearing, or emergency required her presence. The requested accommodation changed only the location from which she awaited an actual court need.

137. Defendant already allocated and prioritized referrals, paired social workers and attorneys, used virtual Friday coverage, and communicated through Teams, email, telephone, and text. Plaintiff's proposal used those existing assignment and communication practices rather than creating a new position or eliminating a duty.

138. PPE and breaks were ineffective because neither reduced the duration of unnecessary courthouse exposure. Plaintiff in fact wore appropriate PPE, including a KN95 mask, in shared spaces and in court, and nevertheless became ill twice in December 2025. Leave was ineffective as a work accommodation because it prevented Plaintiff from continuing to work and replaced regular wages with partial and finite disability benefits and will result in private health insurance cancellation on or about September 8, 2026.

139. Plaintiff received no referral, client request, attorney request, hearing, or emergency requiring her physical presence in court on November 24, 2025, and was required to spend

approximately one unnecessary hour in the courthouse under the One-Hour Courthouse-Presence Directive.

140. During a November 25, 2025 meeting with Defendant Walsh, Plaintiff explained that she remained able and willing to address onsite court needs but requested permission to wait in the nearby LAS office when no identified matter required her presence in the courthouse .

**December 2025: Continued Exposure and Escalation**

141. On December 1, 2025, Defendant Walsh confirmed the narrow substance of Plaintiff's request in writing: "Per our discussion, I will move forward with next steps as it relates to court coverage days/assignments and the requirement to sit in court for 1 hour during that shift when not scheduled to meet with clients. You are sharing that you are still readily available to manage that onsite need but would ask to 'wait' from your office." This contemporaneous description confirmed that Plaintiff sought only a different waiting location while preserving onsite availability, and that, as of this date, Walsh then understood the disputed expectation as one hour rather than seven. Walsh stated that she would move forward with "next steps" but provided no interim protection.

142. Walsh's December 1, 2025 description reflected LAS management's contemporaneous understanding that Plaintiff's proposal preserved court coverage and changed only the location from which she awaited an actual court need.

143. Upon information and belief, on December 1, 2025, Plaintiff met an out-of-custody client in the LAS office and had no identified court referral or specific in-court need. Defendant nevertheless required her to spend approximately one hour in the courthouse under the One-Hour Courthouse-Presence Directive.

144. On December 2, 2025, Plaintiff entered court at a new attorney's request to await a client who had not yet been produced and remained there for almost two hours. That appearance reflected Plaintiff's continuing willingness to enter court whenever an attorney or client need was identified.

145. On December 3, 2025, Plaintiff became ill and used a personal day rather than sick leave because her available sick leave was limited. She worked remotely on December 4 to conserve sick leave after her medical team advised that continued symptoms could require emergency-room care.

146. Upon information and belief, on December 8, 2025, and/or December 9, 2025, there was no referral, client request, attorney request, hearing, or emergency requiring Plaintiff's physical presence in court was identified, but Plaintiff nevertheless remained subject to the One-Hour Courthouse-Presence Directive.

147. On December 9, 2025, while Plaintiff's permanent request remained unresolved, her union delegate, Kim Wirt, separately requested an interim accommodation on Plaintiff's behalf. Wirt asked Defendant to permit Plaintiff to avoid unnecessary courthouse time outside the established job duties while management considered the permanent request.

148. Plaintiff repeatedly requested interim protection. On December 10, 2025, after eleven business days without protection, she advised Walsh, Matrix, Employee Relations, and union representatives that unnecessary court exposure created an increased risk of "serious illness and/or potential hospitalization." She stated that Defendant had required her to enter court five times since the request, only one of which involved an active client, and asked: "I am wondering why I am actively being put in a situation to not follow my doctor's orders." Plaintiff again confirmed that she would attend for active clients, emergencies, and hearings, and asked whether

she could "follow my doctor's medical advice while management is still reviewing and discussing." Walsh did not approve interim protection. She responded only: "I discussed an interim accommodation with your supervisory group today and hope to have an update for you by the end of the week," while recognizing that Plaintiff remained scheduled for additional court-coverage days.

149. Plaintiff's prior accommodation concerned her weekly work schedule, not where she worked during an in-person day. When Plaintiff returned from disability leave in November 2024, Defendant permitted her, initially on an interim basis, to work from home three days per week and in person two days per week. Defendant later designated that schedule a permanent accommodation, effective May 2, 2025, and subject to periodic review. That history showed that Defendant could implement an accommodation while permanent review remained pending, although the earlier interim measure did not address courthouse location.

150. Plaintiff's November 24, 2025 disability accommodation request did not seek additional remote-work days or reduce her existing two in-person workdays. It sought to add a medically necessary limitation on unnecessary courthouse exposure during those in-person days, while preserving court attendance for client meetings, appearances on the record, client emergencies, and other identified court-related needs.

151. Defendant never explained why the office-based measure could not be used temporarily while the parties disputed whether continuous court presence was essential. It instead exposed Plaintiff to the disputed conditions first and deferred any protection until after the merits decision.

152. Plaintiff's allegations do not depend on proving that a particular courthouse exposure caused a particular infection. The accommodation injury includes Defendant's refusal to

reduce a medically documented risk, denial of equal employment opportunity, the burden of working without protection, and the medically advised leave that followed. Plaintiff pleads physical causation separately and only to the extent supported by medical proof.

153. Plaintiff does not allege that every court appearance was unnecessary. She alleges that Defendant required courthouse exposure beyond what client service required while knowing that she was immunocompromised and while an office-based interim measure would have preserved her ability to attend court when needed.

154. On December 15, 2025, Walsh wrote that "there isn't an hour requirement to be onsite/at court per coverage/shift" but that social workers were expected "to be onsite and present in court for however long the client/case needs and other job tasks require." Walsh then stated that Plaintiff's request "wouldn't be applicable" because court coverage, as management had described it, was an essential function.

155. Plaintiff responded: "I am genuinely confused." She explained that management had been enforcing a mandate since August even when no client or court-coverage need existed and stated that, if the mandate no longer existed, she would continue going to court whenever an actual client need arose. On December 16, 2025, Walsh again wrote: "Based on this information you have shared, it sounds like the expectation for your role is to be onsite in court-on-court coverage days." Walsh deferred further discussion rather than approving any interim measure.

156. On December 16, 2025, Burt acknowledged "the concerns shared regarding clarity, consistency, accessibility, and implementation" of the court-presence practice. Burt stated that management retained discretion to "implement, refine, or enhance social work practices in response to evolving client needs and court practices," while simultaneously asserting: "Our expectation remains that all PRDU FSW's are to be in court on their designated court coverage

days." Burt's communication confirmed that management was still addressing and refining the practice when Defendants later characterized prolonged courthouse presence as a settled essential function of Plaintiff's existing job.

157. Plaintiff continued performing every identified court-related task including attending court on December 16, 2025, for a hearing, and remained subject to the One-Hour Courthouse-Presence Directive while working onsite.

158. On or about December 18, 2025, Plaintiff, union delegates, a union organizer and vice president, Quigley, Almanzar, Burt, and McEvilley met concerning the requirement. Union representatives maintained that management had changed the job expectation without bargaining and that the Bronx practice was inconsistent with other locations. LAS management did not produce any preexisting written policy requiring courthouse presence absent an identified client, attorney, hearing, or emergency need.

159. On December 19, 2025, Walsh met with Plaintiff and a union delegate and, for the first time, maintained that court presence for up to seven hours was part of Plaintiff's job despite Quigley's written guidance not describing coverage that way. This Plaintiff-specific location-and-duration requirement is the "Extended Courthouse-Presence Standard." That Friday, Walsh wrote, "The end of the day is approaching," and directed that, for Monday, "all PRDU FSW's are to be in court on their designated court coverage days." Rather than provide temporary protection for Monday, Walsh proposed reconvening the following week and suggested that Plaintiff consult her provider, even though Plaintiff's request had already been pending for almost a month and Defendant identified no additional medical fact needed to evaluate it.

160. This request for additional medical consultation and/or information from her medical provider was unnecessary, untethered to any additional needed information for

consideration of her disability accommodation request that had already been pending for almost a month.

161. This request was not job-related and/or supported by business necessity.

162. Plaintiff responded minutes later that, "given it is 5:36pm on a Friday," she could not speak to her doctor because the office was closed and her doctor did not work weekends. She asked what alternative accommodation would protect her on Monday and wrote: "Therefore I do not have a lot of time to figure out a plan and safeguard me since my supervisors are saying I have to be in court on Monday." Defendant provided no interim measure for the impending shift. The Step 3 grievance followed that day.

163. On December 19, 2025, a union delegate filed a Step 3 grievance challenging the delay and lack of interim protection, the disputed redefinition of Plaintiff's duties, disparate treatment, and the asserted change in court-coverage expectations. The grievance was escalated to senior management, including Park, and alleged that management had mischaracterized Plaintiff's essential functions to Human Resources.

164. The grievance also sought information needed to test the asserted job-function rationale, including communications and policies concerning court coverage.

165. On December 22, 2025, Plaintiff again requested interim protection. She advised Defendant that she was scheduled for court coverage that day and again on December 29 and December 30, explained that Defendant's late-Friday suggestion that she consult her specialist was not feasible, and stated that she would follow her existing provider instructions to safeguard her health and avoid hospitalization. Notwithstanding that statement, Plaintiff continued to report as directed, including for court coverage that day, while renewing her request that Defendant provide interim protection consistent with her provider's instructions. Plaintiff again confirmed that she

remained ready, willing, and able to cross the street whenever an actual client, attorney, hearing, or emergency need required her presence.

166. On December 22, 2025, Plaintiff was scheduled for coverage, but no referral, client request, attorney request, hearing, or emergency requiring her presence in court was identified. Defendant nevertheless continued the courthouse-presence requirement while Plaintiff was immunocompromised.

167. Later during December 22, 2025, Plaintiff again became ill, asked Quigley at approximately 1:34 p.m. for permission to go home, and took a half day. She was scheduled to work remotely on December 23 and December 26 and did not call out sick in order to conserve leave while her symptoms continued.

168. On December 23, 2025, after Plaintiff supplied the case-note chart she ordinarily provided before planned absences, Defendant Quigley additionally requested Plaintiff's OneDrive link. Plaintiff asked whether anything beyond the client chart was required and explained that she had provided the same link she ordinarily supplied before vacation.

169. On December 26, 2025, Defendant Almanzar clarified and expanded the request, seeking access to the locations where Plaintiff maintained client files, including HIPAA authorizations, assessments, medical records, and other case materials, questioning whether Plaintiff maintained separate individual digital files for each client, and asking Plaintiff to provide a link or identify where those complete files were maintained.

170. Also on December 26, 2025, Walsh required another accommodation meeting while Plaintiff's primary delegate was unavailable. Walsh maintained that all-day court presence was part of the job, asked how Plaintiff protected herself socially outside work, asked her to quantify how long she could be in the office, relied on the absence of an express all-day mandate

in Quigley's emails to question the need for accommodation, and offered PPE even though Plaintiff already used appropriate PPE. Breaks and PPE did not reduce the total duration of unnecessary exposure or provide access to the supports in Plaintiff's office.

171. Walsh's positions were internally inconsistent. She treated prolonged court presence as mandatory when demanding provider information while invoking the absence of an express written all-day mandate to question why Plaintiff needed accommodation. That inconsistency, together with the failure to evaluate the Office-Based Coverage Accommodation, supports an inference that the process was structured around defending a predetermined courthouse-presence outcome rather than identifying an effective accommodation.

172. Plaintiff also repeatedly sent Walsh copies of Quigley's weekly emails to the entire PRDU unit describing what court coverage was and how it worked. Those unit-wide emails did not state that Forensic Social Workers would be in court all day; they described a referral-based process in which attorneys were to contact the Forensic Social Worker to conference a case. Walsh refused to acknowledge those emails.

173. This inconsistency, circular reasoning, and attempted pre-determined outcome was not a good faith cooperative dialogue, was a failure to engage in an interactive process, was a failure to accommodate, and interfered with Plaintiff's disability accommodation rights.

174. The prolonged illness beginning in late December 2025 is the "December 2025 Illness." Plaintiff's December 29 urgent-care record documented that the illness had continued for approximately one week. After Plaintiff reported continuing symptoms, a physician advised her not to work on December 29 and 30 and authorized her return on January 2, 2026.

175. On December 30, 2025, in a written communication sent to Plaintiff and Matrix representatives that set out what LAS wanted to ask Plaintiff's health care provider, Walsh stated

that Plaintiff was required to be in court up to seven hours per day twice weekly and initiated a new accommodation thread with Matrix. The position had thereby escalated from an asserted one-hour expectation applicable to two Bronx employees to a written, Plaintiff-specific requirement of up to seven hours twice weekly while the request and grievance remained unresolved: "The current job function, twice a week the employee is scheduled for court coverage and during this coverage they are expected to be onsite/in the court house- by doing this we intend to strengthen interdisciplinary collaboration, improve early client engagement, and achieve outcomes consistent with our mission and professional standards. The expectation remains that all PRDU FSW's are to be in court on their designated court coverage days. . . . The employee did not want to go against your medical recommendations, therefore we wanted to reach out to understand if there are any other alternative accommodations that LAS can consider that would allow this employee to be onsite in the court house, as it stands *2x per week and up to 7 hours per day*. The employee currently has an accommodation to [work] from home 3x per week" (emphasis added).

176. By December 30, the asserted rationale and duration had materially shifted. Before Plaintiff requested accommodation, LAS management described the One-Hour Courthouse-Presence Directive principally as a method of building attorney relationships, increasing referrals, strengthening communication, and supporting timely intakes. During the accommodation process, LAS management transformed that developing practice into Plaintiff's seven-hour "current job function" and an asserted essential function without explaining why those goals had to be pursued through prolonged presence during active court proceedings rather than communication, team building, or training outside court.

177. After Plaintiff requested protection from unnecessary courthouse exposure on November 24, 2025, Defendant progressively recast the developing practice as a role requirement,

then as Plaintiff's seven-hour "current job function," and ultimately as an "essential function," characterizations that it used to deny the requested accommodation. The change in both the duration of the asserted requirement and the explanation offered for it supports Plaintiff's allegations of pretext, retaliation, and post-accommodation request recharacterization of her job duties.

178. The escalation was also Plaintiff-specific. Both Plaintiff and Verano Diaz were Bronx PRDU Forensic Social Workers subject to the One-Hour Courthouse-Presence Directive, but only after Plaintiff disclosed a disability-related need to limit exposure did LAS management transform the shared directive into the more onerous Extended Courthouse-Presence Standard on her, together with attorney-canvassing and supervisory-review duties. LAS management did not apply the same seven-hour formulation to Verano Diaz, who had not requested disability accommodation or opposed the practice change based on an eligible disability. Plaintiff alleges that the differential escalation was retaliatory, interfered with her rights, and supports pretext.

179. The requirement was not applied uniformly across PRDU locations. Upon information and belief, the courthouse-presence mandate was not imposed on Manhattan PRDU Forensic Social Workers: Manhattan-based staff traveling to Brooklyn used courthouse or nearby Legal Aid Society office space and went to court only as needed. Although Bronx staff had an office directly across the street, Defendant applied the most restrictive continuous-presence formulation to Plaintiff while Manhattan-based staff, who often traveled farther between offices and courthouses, were not subjected to a stated requirement of up to seven hours of continuous daily court presence.

**January 2026: Matrix's Demand, the Written Denial, and Leave**

180. December 31, 2025 was a preplanned vacation day for Plaintiff, January 1, 2026 was an office holiday, and Plaintiff returned to remote work on January 2, 2026.

181. On January 2, 2026, Matrix substantially repeated LAS's same stated requirements in a "More Discovery Needed" letter. Matrix informed Plaintiff that LAS required additional provider information, repeated that Plaintiff was expected to remain onsite "2x per week and up to 7 hours per day," and requested alternatives "that would allow this employee to be onsite in the court house." The only possibilities identified in the letter, which attributed those suggestions to LAS, were "PPE and regular breaks throughout the workday." Matrix imposed a fifteen-calendar-day deadline and warned: "Failure to return the requested information within 15 calendar days from the date of this letter could impact the decision of your accommodation."

182. Before issuing the additional-information demand, Defendants identified no new symptom, changed restriction, inconsistency, or unanswered functional limitation in Plaintiff's submissions. The remaining dispute concerned where Plaintiff could wait while remaining immediately available, which was an operational question for Defendant Legal Aid Society rather than a medical question for her provider.

183. Neither Walsh's communication nor Matrix's substantially identical letter asked whether Plaintiff's proposed nearby-office arrangement would permit her to perform the underlying client, attorney-support, hearing, emergency, and collaboration functions. Instead, both communications assumed the disputed courthouse-presence requirement and asked Plaintiff's provider to identify how Plaintiff could remain onsite under that requirement. Neither identified a specific client, attorney request, hearing, referral, emergency, or other operational need requiring Plaintiff to remain in the courthouse throughout the workday, or explained why the asserted collaboration could not occur through referrals, Teams, telephone contact, scheduled meetings, or Plaintiff's immediate availability from the LAS office across the street.

184. Plaintiff never refused reasonably necessary medical clarification. She objected only to requiring her provider to sign employer-drafted language treating the disputed seven-hour courthouse requirement as an established job function and asked Defendants to identify the precise medical information still needed without embedding that contested employment premise.

185. Plaintiff promptly advised that her specialist had no availability within the deadline and that the asserted job-duty issue was already the subject of a grievance. On January 6, 2026, the union issued a cease-and-desist communication objecting to Defendant's job-duty characterization and the demand that Plaintiff's provider design alternatives. Park responded: "We need additional time to review and evaluate the grievance and RFIs, which are very voluminous," and assumed an extension for Defendant's response. Park separately stated that Human Resources was "waiting for additional information from Marissa's healthcare provider." Defendant therefore claimed additional time for its own review while maintaining a fifteen-day provider deadline and continuing the disputed requirement without interim protection.

186. The fifteen-day deadline was particularly burdensome because it began during the year-end holiday period and required a specialist response to questions Defendant formulated around its disputed job premise. Plaintiff did not control provider availability and had already supplied functional information adequate to evaluate the office-based proposal.

187. Defendant's response to the cease-and-desist request illustrates the asymmetry of the process. Human Resources claimed it needed more time to review management records and the grievance, while Plaintiff and her provider were given a compressed deadline and Plaintiff remained exposed to the challenged requirement without interim relief.

188. On January 9, 2026, the union objected that Defendant was asserting conclusions before the grievance had been heard, warned that continued enforcement would be treated as

retaliation, and challenged Defendant's use of the seven-hour formulation and additional medical "discovery."

189. On January 12, 2026, Plaintiff responded directly to Defendants' suggestion that additional "interactive process" was needed. She explained that Walsh had drafted provider-facing language characterizing courthouse presence "2x per week and up to 7 hours per day" as Plaintiff's "current job function," and that Matrix had reproduced that language essentially verbatim in a form to be completed and signed by Plaintiff's provider. Plaintiff's provider was not responsible for determining Plaintiff's essential job duties. The problem was that the form presented LAS's disputed description of those duties as an established premise, rather than separating LAS's job-function determination from the medical information sought. It asked the provider only to identify alternatives that would permit Plaintiff to remain onsite under the asserted requirement and placed spaces for the provider's name, signature, specialty, and completion date directly beneath the employer-drafted narrative. A response on that form therefore placed Plaintiff's provider in the position of signing a document framed around LAS's contested job-function conclusion and risked creating the appearance that the provider had accepted or medically endorsed that premise. Plaintiff objected that the form would "box me into this change of job description" and asked: "How can I in good faith have this signed?" She requested a precise statement of the medical information actually sought "that does not include signing a letter that was drafted by Laura Walsh."

190. Meanwhile, as the medical-documentation dispute remained pending, Defendant's prior retaliatory irregular file-access demands continued into January 2026. On January 13, 2026, Quigley initially stated that Plaintiff could provide files before her planned February absence. On January 15, 2026, Defendant Quigley requested general access in advance in case questions arose

outside the anticipated absence. Plaintiff asked whether the request encompassed old mitigation materials and all matters dating to the beginning of her PRDU tenure, explained that ordinary practice was to provide current materials immediately before planned leave, and asked whether full-file sharing had become a new protocol for all staff. During the January 15, 2026 exchange, Plaintiff also asked Quigley directly whether other staff in the unit were being asked to provide the same access; Quigley never responded. LAS management provided no substantive policy explanation.

191. Plaintiff's prior evaluations had specifically praised her electronic case tracking, file management, timeliness, and accurate statistics. The post-request file inquiry therefore contrasted with Defendant's documented pre-request assessment and supported an inference of retaliatory scrutiny.

192. Plaintiff alleges that these requests were because of, or in part because of, her protected activity of requesting disability accommodations and/or opposing denials and/or delays of the same.

193. Later on during January 20, 2026, 57 days after Plaintiff's initial accommodation request, Park memorialized an express *denial* of the precise requested office-based interim arrangement. Park framed the question as: "What is the status of the interim accommodation request to work from the LAS office during the employee's onsite court coverage shift/work days and go to court only when called?" Park answered: "This interim accommodation was *denied* and *remains so* because it remains management's position that in-person/onsite court coverage is an essential function of the PRDU social worker role." (emphasis added).

194. She added: "PRDU FSWs are expected to be present in court *up to 7 hours/day* during their scheduled in-person court workdays, depending on client needs." (emphasis added).

195. Park separately reiterated: "While the interim measure of being excused from onsite court coverage is denied, we do encourage Marissa to continue to engage in the interactive process." The same communication therefore stated the denial twice.

196. Park then answered the separate question, "What is Marissa's schedule tomorrow, Wed, Jan 21.?" Park wrote: "She should be in court by 10:00am." After requiring Plaintiff to meet with the preliminary-hearing attorneys, attorneys on shift, and attorneys with scheduled hearings, Park stated: "This assessment of cases is expected to take no more than 1 hour. At that point, Rebekah/Jackie will provide more guidance on what needs to occur at court for the day." Park concluded: "Marissa can expect this to be the expectation for her in-person court workdays until the accommodation is resolved (until we have moved through the next step in the interactive process)." The email therefore did not leave the office-based arrangement awaiting approval while protecting Plaintiff. It denied the interim measure and imposed the disputed courthouse requirement the next morning.

197. Defendant provided no effective interim protection from the disputed courthouse exposure during the 57-day period between the November 24, 2025 request and the January 20, 2026 denial, despite imminent court-coverage dates and known medical risk. Plaintiff remained subject to the challenged requirement throughout.[3] Defendant's refusal also departed from its prior handling of Plaintiff's disability. When she returned from short-term disability leave in November 2024, Defendant immediately provided an interim three-day remote-work arrangement while processing the permanent request.

---

3 *See* U.S. Equal Emp. Opportunity Comm'n, Enforcement Guidance on Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act, Notice No. 915.002, Question 10, Example A & n.38 (Oct. 17, 2002) (two months delay constituted a violation)

**Failure to Engage in an Individualized Process**

198. The events culminating in the January 20 denial did not reflect a timely, individualized, good-faith interactive process or cooperative dialogue. Although the process included meetings, information requests, and written communications, Defendants treated the Extended Courthouse-Presence Standard as a fixed premise and focused on how Plaintiff could be made to remain in the courthouse, not whether unnecessary prolonged presence could be reduced while preserving client and attorney service. Plaintiff proposed a concrete alternative that preserved timely social-work support for clients and attorneys from the fully equipped LAS office across the street, with prompt courthouse entry whenever a client, attorney, hearing, emergency, or other specific court-related need required her physical presence. Defendants did not test response times, conduct a temporary trial, identify any missed or delayed referral, or gather evidence that the proposal impaired client service or court operations.

199. Defendants identified no staffing problem, client-service disruption, risk of delayed court proceedings, cost, or other operational hardship that prevented Plaintiff from remaining available in the nearby LAS office, communicating through Teams or telephone, attending scheduled appearances, and checking in with a supervisor while her request remained pending. LAS's later proposal of substantially the same office-based availability and communication methods supports the inference that Defendants could have tested those measures on a temporary basis while the request was under review.

200. Instead, LAS referred the matter to Matrix, demanded additional provider information on a compressed deadline, and required Plaintiff and her provider to design alternatives around the disputed courthouse premise. Matrix repeated LAS's characterization that Plaintiff was expected to remain onsite in the courthouse twice per week for up to seven hours per

day and asked for alternatives that would allow her to satisfy that expectation. Neither Matrix's request nor the January 20 denial reflected any separate evaluation of the office-based proposal. The January 20 denial did not identify the accommodations considered, any specific operational difficulty posed by Plaintiff's proposal, or any reason interim office-based coverage was unavailable.

201. Through the January 20, 2026 denial, Defendants considered only measures that preserved the Extended Courthouse-Presence Standard, including PPE and breaks, even after Plaintiff explained that prolonged unnecessary courthouse exposure was itself the disability-related limitation. Plaintiff did not withdraw from the dialogue and remained willing to consider any effective arrangement that preserved attendance whenever needed while limiting unnecessary exposure.

202. Defendants therefore effectively presented their courthouse-centered model on a take-it-or-leave-it basis rather than engaging in a good-faith search for an effective accommodation.

203. Defendant was not willing to reconsider any proposal that did not essentially conform to its pre-determined new policy of continuous courthouse presence as a new essential function of the role.

**Adverse Actions and Continuing Requirements**

204. The same January 20, 2026 communication immediately enforced the denial. Park directed: "Marissa will arrive to the LAS office at her usual time. She should be in court by 10:00am." Park required Plaintiff to canvass attorneys, assess support, and contact Quigley and Almanzar before leaving court. Park further stated: "Marissa can expect this to be the expectation for her in-person court workdays until the accommodation is resolved (until we have moved

through the next step in the interactive process)." Defendant therefore did not merely continue discussing the request. It denied the requested protection, imposed the disputed condition the next morning, and declared that the condition would remain in force throughout the continuing process.

205. Defendants changed the conditions under which Plaintiff worked independently of the accommodation denial itself. They expanded her court-presence obligation, added attorney canvassing and supervisory permission before leaving court, broadened file-access demands despite favorable evaluations, imposed heightened reporting, and maintained those conditions until medically advised leave reduced her compensation and depleted accrued leave.

206. Park's directive acknowledged that Plaintiff's substantive task was to assess and provide support yet required the assessment to occur through physical canvassing rather than the communication channels used in the referral model. It also conditioned leaving court on supervisory review even after substantive court needs were complete, increasing exposure without identifying a client-service benefit.

207. Those instructions required tasks that could be coordinated from the nearby office, added supervisory reporting and attorney-canvassing requirements not previously part of Plaintiff's court-coverage practice, and required Plaintiff to remain in the environment her provider sought to limit.

208. On January 28, 2026, while the January 20, 2026 denial remained in force, Plaintiff emailed PRDU Supervising Attorney Juni Ozzengett at 10:46 a.m.: "If anything is needed for prelims today, feel free to let me know!" Plaintiff sent that email on one of her scheduled in-person days, while she remained subject to, and was complying with, the post-denial court-coverage directives; the email affirmatively solicited any actual court need. At 11:37 a.m., Ozzengett replied: "I'm not aware of any particular case. I believe Jackie touched base with Abby on a case

earlier, but just in case, I recommend sending an inquiry on the Bronx Teams chat to see if there are any other SW needs." Plaintiff thus affirmatively sought court work, and PRDU used email and Teams to identify and triage actual social-work needs. The exchange did not identify the client, provide referral details, or state that an in-person social-work meeting had been requested or was necessary.

209. Defendant nevertheless directed Plaintiff to court later that day to meet a client.

210. The client told Plaintiff that he had not requested social-work assistance and, in sum and substance, stated: "I'm shocked you would pull me out of my cell to talk about this." The sequence departed from PRDU's written referral guidance, which instructed attorneys and social workers to exchange referral details and determine whether an assessment should occur in person, in court, or by telephone. It provided a concrete post-denial example in which Plaintiff affirmatively sought and remained available for work through email and Teams but was required to enter court without an individualized reason for physical presence and for an encounter the client had not requested.

211. The same-day sequence occurred after the denial and while Defendant insisted that extended courthouse presence was essential. It supported Plaintiff's position that PRDU could identify and triage actual needs through Teams and that Defendant nevertheless required in-person attendance even where the purported recipient had not requested social-work assistance.

212. Defendant also applied a new pairing, canvassing, and supervisory-summary model to Plaintiff. Historically, attorneys requested assistance through established channels, Plaintiff coordinated with the requesting attorney, met the client as needed, provided assessment and support, and returned to the office while remaining available. After Plaintiff sought accommodation, supervisors directed her to approach attorneys in person and provide summaries

confirming completion of coverage. Upon information and belief, similarly situated employees were not subjected to the same requirements at that time.

213. A January 2, 2026 referral illustrated the existing model. Quigley forwarded Plaintiff a referral, asked her to schedule a video conference for January 6 or later, and directed her to consult the attorney about whether further mitigation was needed. The work was initiated, triaged, and coordinated without continuous courthouse presence.

214. Weekly guidance likewise instructed attorneys to communicate referral details and determine the appropriate mode of contact. That structure relied on actual needs and professional judgment. The new canvassing requirement instead required Plaintiff to search for work in person and document the search to supervisors, adding burdens unrelated to the substantive quality of her services.

**Completed Denial and Medically Compelled Leave**

215. On January 28, 2026, eight days after the written denial and contact by Plaintiff's employment counsel, and while the requirement remained in force, Plaintiff notified Defendant that her provider had advised her to take a disability-based leave beginning February 2, 2026. Earlier that same day, Plaintiff continued offering to perform court-related work, advising a supervising attorney, "If anything is needed for prelims today, feel free to let me know." Before the provider-directed leave, Plaintiff had sought to continue working under the requested office-based arrangement rather than cease working. Plaintiff alleges that the continuing denial and court-presence directive left her without an arrangement that both complied with her provider's restrictions and permitted her to remain actively at work.

216. The next day, on January 29, 2026, nine days after the denial and one day after Plaintiff requested leave, Walsh acknowledged: "It is my understanding that you will not be

providing additional medical clarification, as requested." Walsh continued: "In light of this," Defendant "would like to propose" an alternative arrangement. The arrangement permitted Plaintiff, when a hearing was not immediate, to remain "either in the court office on the 5th floor or across the street at our main office" and return when contacted through "text/Teams/email." Walsh concluded: "To start, the accommodation is approved for 6 months." Thus, after demanding additional medical clarification as necessary to move forward, Defendant authorized the core nearby-office mechanism without receiving that clarification.

217. The January 29 arrangement did not make courthouse entry contingent on an identified client or attorney need. It required Plaintiff to report to the courthouse at 10:00 a.m., approach the assigned attorneys in person to determine whether they wanted assessments performed for prioritized clients, complete any approved assessments, and then return to those attorneys in court to communicate assessment information and determine the timing of any hearing. Plaintiff did not object to entering court to perform an identified assessment, support an identified hearing, meet with a client, or address another actual court-related need. The unresolved defect was that Defendant required her to enter the courthouse to determine whether any such need existed. Those screening, authorization, and follow-up communications had previously been conducted, and could be conducted, through Teams, email, telephone, or other electronic means. The January 29 arrangement therefore permitted office-based waiting only after the medically risky exposure had already occurred. It preserved a court-first, need-second sequence rather than the need-first, court-second structure Plaintiff requested.

218. Defendant did not remove that central defect until March 6, 2026, when it permitted supervisory screening and Teams communications to identify a client or attorney need before Plaintiff entered the courthouse.

219. The March 6, 2026, also confirmed that the initial in-person canvassing required by the ineffective January 29, 2026, was not necessary to identify and coordinate actual court-related work.

220. In addition, the courthouse-office component of the proposed arrangement was ineffective. The fifth-floor court office is a shared workspace used by public defenders from across the Bronx, so waiting there would have increased rather than reduced Plaintiff's exposure risk, in contrast to her own office, which she occupied alone or with only Verano Diaz, who also followed masking protocols. The fifth-floor office also lacked the equipment accommodations available in Plaintiff's own office, including her ergonomic chair and blue screen protectors.

**February-March 2026: Leave and Later Court-Coverage Arrangements**

221. Beginning February 2, 2026, Plaintiff began her provider-directed disability leave, which her provider, Dr. Graber, documented as necessary due to recurrent infections, and stopped active work because she could not continue working under the unaccommodated requirement.

222. Verano Diaz resigned from the Legal Aid Society effective February 6, 2026.

223. Defendant's communications confirmed that the purported essential function was still developing. Almanzar stated in December that the pairing structure would be announced and implemented in the future. A January newsletter stated that PRDU was "in the process of implementing" a pairing model. McEvilley's March 2, 2026 announcement stated that the intake-coordination process would begin that day. Upon information and belief, PRDU attorneys first learned of the new continuous court-presence and referral process from McEvilley's March 2026 communication, meaning that from August 2025 through March 2026 the attorneys with whom the Forensic Social Workers were purportedly building relationships were unaware of the new process.

224. On March 6, 2026, while Plaintiff remained on leave, Walsh described a "new protocol for court coverage days," called the January 29 communication an earlier version, and stated that updated specifics had been shared with the team only the prior week. The protocol allowed Teams outreach, prioritization of identified needs, continued availability, and entry into court when needed. The email also provide for the accommodation of an exception to the stated new policy substantially similar to Plaintiff's November 24, 2025 disability accommodation request made when the requirement was not yet rolled out organization-wide as occurred on or about March 6, 2026.

225. Laura Walsh wrote to Plaintiff:

> Hi Marissa,
>
> I hope you are doing well. I removed Kim Wirt from the email correspondence as I added your personal email address and did not want to share that information without your permission. You are more than welcome to add them back to the email correspondence.
>
> I wanted to pass along an update from the practice, but no action is needed on your part at this time—I know you are out on leave, and certainly understand if you want to hold off until you are preparing for your return.
>
> As you are aware, the PRDU FSWs have been *preparing to roll out a new protocol* for court coverage days to ensure client needs are being met--- while the expectation that you work with clients in-court on court coverage days in order to meet client needs is not new, the specifics of this protocol are. It's my understanding that the team has been discussing this *transition* for a number of months. The proposal I sent on behalf of the practice on *January 29 was an earlier version of the protocol* that has been tweaked slightly since then. Attached is the version of the protocol that was shared with *the rest of the team* last week. In order to be compatible with the medical documentation you provided, the practice is proposing the following modifications to this protocol as an accommodation- the bullet points in black are the court coverage protocol Jackie sent to the team, and the bullet points in blue are the proposed accommodation:

- Lorraine will send preliminary and recognizance intake paperwork to Rebekah and Jackie the night before a shift for review.

- For the first few weeks of implementation, Rebekah and Jackie will review VORRs to identify which clients might benefit from social work intervention, based off findings in the documentation provided. We will be reviewing for mention of mental health diagnoses, substance use history, program mandates not being met, clients who are on the registry, housing concerns, clients with multiple violations, etc. Rebekah and/or Jackie will send summaries to the FSW on court coverage for review prior to connecting with intake attorneys around 10am in court. The goal is that FSWs will get comfortable with reviewing documents themselves to identify who they anticipate assessing by the end of March.

  - This expectation would be the same for you, with the understanding that the timeline will be shifted because you are on leave (the first few weeks of implementation would begin at the point you return from leave)

- Upon reviewing emails from Jackie and/or Rebekah (or after reviewing documents independently in the future), touch base with the intake atty around 10am in court and discuss appropriateness of meeting client together or meeting to assess client, if deemed appropriate, afterwards.

- If no needs are identified by the intake atty on prelims, follow up in the same model above with the intake atty on recogs. FSWs will still remain available for other attys and SW needs raised. FSWs will use their clinical judgement in determining how to prioritize requests if multiple clients are identified. If assistance is needed, FSWs can reach out to Jackie to discuss.

  - In order to ensure we are minimizing your in-court time to only the time needed to meet client needs, the practice proposes that instead of going to court at around 10am to touch base with the intake attorneys in-person, you would send Teams messages at around 10am to both the intake attorneys on prelims and on recogs. They'd ask that you include the supervisor on the messages in case the supervisor needs to help with in-person follow-up to reach the attorneys. You would then follow the same model as described above—prioritizing any needs identified by the intake attorney on prelims, then turning to needs identified by the attorney on recogs, and remaining available for other needs as they may come up during the court coverage day.

> - Upon conclusion of work with intake attys, we request that a brief summary be sent via email of the outcome of communication with atty, client, or ultimate referral. This can be sent at the end of the shift or the next day and will continue even when FSWs are independently screening the VORRs.
>
> As before, the practice is proposing this accommodation for 6 months (starting whenever you return). As noted in my last email, since your medical documentation speaks to the ongoing need for an accommodation, at the end of the duration and assuming it is working for you, *I would review the recommendation again with your supervisory group*. As always and with any accommodation approval, if there are any issues with the accommodation prior to the end of the 6 month period, I would ask that you reach out to me to review/discuss and so we can address any of those concerns.
>
> Please let me know if you have any questions or want to discuss at any point. I also remain available to discuss alternative accommodations, including ways we can support you in taking the precautions referenced in the medical letter for when you will need to be in-person in court, if you are interested.

(emphasis added).

226. Defendant identified no intervening technological, staffing, scheduling, medical, or courthouse fact that changed between the January 20, 2026 denial, January 29, 2026 proposal, and March 6, 2026 protocol. Plaintiff had the same nearby office, communication systems, ability to cross the street, and willingness to attend court when needed throughout. The later structures corroborate feasibility but do not convert the earlier denial into timely compliance.

227. Fifty-seven days elapsed between Plaintiff's initial accommodation request and the January 20, 2026 written denial. On January 29, 2026, 66 days after the initial request and nine days after the denial, Defendant communicated an arrangement described as both proposed and approved for six months. On March 6, 2026, 102 days after Plaintiff's initial accommodation request and 45 days after the denial, Defendant described a *new* unit protocol.

228. The decisive difference among Plaintiff's November 24, 2025 request, the January 29, 2026 proposal, and the March 6, 2026 proposal concerned the sequence and method by which a court-related need would be identified. Plaintiff did not request exemption from court coverage, elimination of client-facing responsibilities, or permission to avoid court when a client, attorney, hearing, assessment, emergency, or other identified court-related need required her presence. Instead, Plaintiff requested that an identified need come first and that courthouse entry follow. Under Plaintiff's proposed arrangement, she would remain available from the nearby Legal Aid Society office, continue case and administrative work, and promptly enter court when an actual client or attorney need arose.

229. The January 29, 2026 proposal did not provide the accommodation Plaintiff requested. Instead, it required a different sequence: Plaintiff was required to report to court first and then engage in a prescribed process to determine whether a court-related need existed. Under that arrangement, Quigley and Almanzar would screen intake matters, identify matters for prioritization, and Plaintiff would report to court, approach attorneys regarding potential social-work needs, seek confirmation regarding assessments, complete approved assessments, communicate information back to attorneys, determine hearing timing, and remain available for imminent hearings. Only after completing that courthouse-first process could Plaintiff wait at the courthouse office or the Legal Aid Society office across the street and return when contacted through text, Teams, or email.

230. The January 29, 2026 proposal therefore differed materially from Plaintiff's requested accommodation. Plaintiff requested that courthouse entry be triggered by an identified need. The January 29, 2026, arrangement required courthouse entry before the existence of such a need was determined. It adopted the concept of nearby office-based availability only after

imposing an initial courthouse-presence requirement, affirmative attorney outreach, supervisory screening, prioritization procedures, follow-up obligations, and daily reporting requirements. The arrangement was also limited to six months.

231. On March 6, 2026, Walsh communicated that PRDU had been preparing to implement a "new protocol for court coverage days," that updated specifics had recently been shared with the team, and that the January 29 arrangement provided to Plaintiff had been "an earlier version" of that protocol. The March 6, 2026 communication therefore concerned both a newly communicated unit protocol and its application to Plaintiff.

232. As applied to Plaintiff, the March 6, 2026 modification eliminated the most significant January 29, 2026 requirement: the automatic initial courthouse trip. Plaintiff would no longer be required to report to court before determining whether a client or attorney need existed. Instead, Almanzar and Quigley would review VORRs and identify potential needs, and Plaintiff would communicate with intake attorneys through Teams to determine whether referrals or other client needs existed before entering court. March 6 therefore changed the sequence from court first, need second, to need first, court second.

233. The March 6 modification, however, also imposed additional communication restrictions not present in Plaintiff's prior practice. Plaintiff was required to communicate with intake attorneys through Teams with Almanzar and Quigley copied on the communication thread. Before this modification, Plaintiff had communicated directly with attorneys regarding client needs without requiring supervisory personnel to be included in those communications. Thus, while March 6 removed the automatic initial physical-entry requirement, it also added a more formalized and supervised communication structure.

234. The March 6, 2026 communication did not establish a permanent accommodation, did not restore Plaintiff's prior work arrangement during the period before leave, and did not compensate Plaintiff for injuries allegedly caused by the earlier denial and delay.

235. The chronology therefore does not reflect a single accommodation request that Defendant ultimately granted. Instead, it reflects distinct stages. Plaintiff requested office-based availability with courthouse entry when an identified need arose. Defendant denied that request and enforced a courthouse-first process. Defendant later proposed a temporary individualized arrangement that allowed office-based waiting only after mandatory courthouse presence and additional procedural requirements. Defendant then modified that arrangement by removing the automatic courthouse-first requirement while adding a Teams-based screening process and supervisory communication requirements.

236. The later January 29 and March 6 structures support the inference that Defendant could satisfy its asserted court-coverage objectives through office-based availability, electronic communications, attorney contact, prioritization, supervision, and prompt courthouse entry when an identified need existed. Those later structures did not, however, retroactively cure the period when Plaintiff alleges Defendant denied interim protection, required unnecessary courthouse presence, failed to provide the requested accommodation, caused Plaintiff to remain out of work, or failed to provide a presently binding accommodation governing her return from medical leave.

**May-June 2026: Post-Filing Leave-Extension Process and Continuing Risk**

237. On May 3, 2026, Plaintiff's short-term disability period ended. Defendant Legal Aid Society's Human Resources personnel had advised Plaintiff to complete the paperwork required for long-term disability benefits. Plaintiff completed that process and was approved for long-term disability benefits.

238. On May 6, 2026, Plaintiff notified Defendant Legal Aid Society's Human Resources Benefits and leave personnel, as well as Matrix's claims channel, that her medical provider had extended her leave and that her anticipated return-to-work date was December 17, 2026. Plaintiff provided the available provider documentation, stated that she would forward the signed letter when received, and asked whether her provider needed to update any long-term disability materials.

239. On May 11, 2026, Plaintiff filed the original Class Action Complaint in this action.

240. On May 11, 2026, the same date on which Plaintiff filed this action, Plaintiff sent Defendant Legal Aid Society and Matrix the signed provider letter supporting continued medical leave through an anticipated return-to-work date of December 17, 2026. Plaintiff expressly asked Defendants to advise her if they needed anything further.

241. Neither Defendant Legal Aid Society nor Defendant Matrix advised Plaintiff at that time that she was required to obtain a separate Matrix Accommodation Certification Form, that the signed provider letter was insufficient to support her leave extension, or that her continued job protection could depend on completing a separate certification packet within a later-imposed deadline.

242. On May 29, 2026, eighteen days after Plaintiff filed this action, Defendant Matrix sent Plaintiff a notice under Accommodation Event A-2026-281283 stating that her existing leave-as-an-accommodation period would end on June 16, 2026. Matrix enclosed a four-page Accommodation Certification Form and instructed Plaintiff to submit supporting documentation to Matrix if she required continued leave.

243. Matrix's May 29, 2026 notice warned: "Failure to return the required documents will result in the closure of your request for additional accommodation and may result in

*disciplinary* or other employment action by The Legal Aid Society." (emphasis added). Matrix issued that warning even though Defendant Legal Aid Society and Matrix already possessed Plaintiff's signed provider letter supporting leave through an anticipated December 17, 2026 return date and knew that Plaintiff had been approved for long-term disability benefits.

244. Plaintiff responded on May 29, 2026. She informed Matrix and Defendant Legal Aid Society that she had been approved for long-term disability benefits, attached the provider letter again, explained that Defendant Legal Aid Society's Human Resources Benefits personnel already possessed the letter, and asked whether she was nevertheless required to complete the separate accommodation packet.

245. Neither Defendant Legal Aid Society nor Matrix provided a substantive response to Plaintiff's May 29, 2026 request for clarification before Plaintiff followed up again on June 3, 2026. Plaintiff explained that Matrix's stated June 16 expiration date was approaching and asked what accommodation Matrix claimed was ending and whether additional accommodation paperwork was required notwithstanding her approved long-term disability benefits and the provider documentation already submitted.

246. On June 3, 2026, Defendant Legal Aid Society's Human Resources Leave Specialist instructed Plaintiff to continue completing the Matrix accommodation paperwork and return it to Matrix. Human Resources stated that the accommodation request was what provided Plaintiff with job protection while she remained on leave and that long-term disability benefits alone did not provide job protection or guarantee that Defendant Legal Aid Society would hold Plaintiff's position during her absence.

247. This was the first time Plaintiff was clearly informed that Defendant Legal Aid Society considered her continued job protection dependent on a separate Matrix accommodation

process. Plaintiff responded that she had not been required to complete the newly issued certification packet during the leave that began in February 2026, that she had continuously provided medical documentation to both Defendant Legal Aid Society and Matrix, and that a detailed provider letter had previously been treated as sufficient. Plaintiff further explained that only approximately seven business days remained before the June 16 deadline and that she was concerned her provider could not complete the newly issued packet within that compressed period.

248. Defendant Legal Aid Society's Human Resources personnel then apologized to Plaintiff for the confusion, forwarded Plaintiff's existing provider note to Matrix, copied Employee Relations personnel including Defendant Walsh, and requested that Employee Relations assist Plaintiff with the Matrix accommodation process.

249. Later on June 3, 2026, Matrix acknowledged: "The accommodation packet sent to you are standard forms that get sent however, I can use the doctors note." Matrix thus confirmed that the separate certification packet which Legal Aid Human Resources had instructed Plaintiff to complete as a condition of job protection was not required to evaluate the leave extension. Plaintiff did not submit the packet before Defendant approved the extension.

250. Plaintiff did not submit the newly issued Accommodation Certification Form before her leave extension was approved. Matrix instead accepted the provider documentation that Plaintiff had already supplied to both Defendants before Matrix issued the May 29 warning.

251. On June 5, 2026, Defendant Matrix informed Plaintiff that Defendant Legal Aid Society had approved her ADA leave extension. Matrix then issued a written determination stating that Defendant Legal Aid Society had granted Plaintiff a temporary accommodation consisting of continuous leave from June 17, 2026 through December 16, 2026, consistent with Plaintiff's anticipated return to work on December 17, 2026.

252. Matrix's written determination stated that Matrix would continue to follow up with Plaintiff and Defendant Legal Aid Society periodically to determine whether the accommodation remained necessary, appropriate, and effective. The determination also directed Plaintiff to contact Matrix no later than fifteen days before the accommodation's end date if she required another extension.

253. Defendant Legal Aid Society told Plaintiff that compliance with Matrix's accommodation process controlled her continued job protection. Matrix, in turn, set the documentation demands, deadlines, and warnings, decided whether Plaintiff's documentation sufficed, controlled whether her request remained open, and monitored her accommodation, yet attributed the ultimate approval decision to Defendant Legal Aid Society. Authority over Plaintiff's job protection was thus divided between the two Defendants, with each pointing to the other.

254. The May and June 2026 sequence repeated, after this action was filed, the same practices challenged in it: Matrix issued standardized provider forms despite existing medical support, gave inconsistent and untimely instructions, imposed compressed response periods, warned of request closure and possible employment action, and withdrew the purported documentation requirement only after Plaintiff repeatedly objected. Plaintiff remains subject to Defendant Legal Aid Society's and Matrix's accommodation process for any further leave extension and for any accommodation required when she becomes medically able to return to work.

255. In a 2026 public job posting issued after Plaintiff commenced this action, Defendant Legal Aid Society advertised a PRDU Forensic Social Worker position as a "court-based Forensic Social Worker" and identified an essential duty as interviewing clients "in court." Upon

information and belief, Defendant issued that altered description as a result of this litigation. Defendant's September 27, 2024 posting for the same PRDU Forensic Social Worker title did not describe the position as "court-based" and identified client interviewing without requiring that the interview occur *in court*.

256. Both the 2024 and 2026 postings otherwise described a position involving a combination of location-dependent and location-independent functions, including interviewing collateral contacts, requesting and analyzing records, preparing written reports, developing casework and treatment plans, making referrals, communicating with attorneys, and providing advocacy in court. Neither posting stated that a PRDU Forensic Social Worker was required to remain continuously inside a courthouse for up to seven hours twice per week when no identified client, attorney, hearing, assessment, or other matter required the employee's physical presence.

257. The timing and content of the revised 2026 posting are consistent with Plaintiff's allegation that Defendant formalized or expanded the disputed courthouse-presence requirement during or after Plaintiff's accommodation dispute. The difference between the pre-dispute and post-filing descriptions, considered together with the position's historical operation, Defendant's prior written coverage instructions, and Defendant's March 2026 announcement of a unit-wide court-presence requirement, supports a reasonable inference that continuous, full-day courthouse presence was not a previously documented essential function.

**Plaintiff's Requested Accommodation Was Reasonable**

258. Plaintiff had successfully performed the essential functions of her position under a hybrid arrangement that included three remote-work days per week. On her remaining workdays, Plaintiff historically worked from Defendant Legal Aid Society's office across the street from the Bronx courthouse and entered the courthouse when a client, attorney, hearing, assessment, or other identified matter required her physical presence. Defendant's eventual approval of a substantially

similar office-based arrangement further demonstrated that Plaintiff could perform the essential functions of her position without remaining continuously inside the courthouse when no actual work required her presence.

259. Plaintiff's request would have left her completely available and responsive during scheduled coverage while changing only where she worked when no in-court need existed. It preserved attendance for client meetings, hearings, emergencies, attorney requests, and other actual court needs.

260. The arrangement required no added staffing, resources, physical modification, schedule change, or cost. Plaintiff would have worked from an existing office across the street with access to phone, email, computer systems, client files, ergonomic seating, an air purifier, and other supports, and could have crossed to court immediately when needed.

261. The requested arrangement would have improved Plaintiff's ability to complete case review, reports, treatment planning, documentation, and attorney consultation while preserving court support. Defendant's prior practice, virtual Friday coverage, referral workflows, January 29, 2026 communication, and March 6, 2026 protocol confirmed its feasibility.

262. The nearby office also provided a private and technologically reliable setting for confidential work, while courthouse proceedings often prevented Plaintiff from speaking with attorneys and poor service interfered with calls and Teams messages. The requested location therefore aligned with both disability needs and efficient case work. Plaintiff did not bring her laptop into the courthouse because she knew from experience that there was no usable service there: her work cell phone did not function in the courthouse, calls could not be made or received, text messages were missed, and Teams messages and emails did not go through, a problem attorneys themselves repeatedly raised. Doing so would have also added weight to Plaintiff's bag

and been painful for her to carry back and forth from court due to her ankylosing spondylitis disability.

263. The requested accommodation did not eliminate any scheduled in-person day. Plaintiff would still report onsite twice weekly, remain within immediate walking distance of the courthouse, and respond to every actual client, attorney, hearing, or emergency need.

264. Defendant identified no undue hardship. The request was substantially the same manner in which Plaintiff had successfully performed her work for years.

**Plaintiff's Damages and Continuing Harms**

265. Plaintiff has ankylosing spondylitis with documented enthesitis and sacroiliitis, a chronic autoimmune or autoinflammatory condition that substantially limits mobility and other major life activities. By late 2025, her physicians were treating the condition with Hyrimoz, also known as adalimumab-adaz, an immunosuppressive biologic medication administered by injection.

266. Before the December 2025 Illness, Plaintiff remained capable of working under her hybrid schedule. Her treating rheumatologist documented meaningful improvement after adalimumab injections, including substantially improved energy and periods of feeling significantly better, although chronic pain and intermittent flares continued.

267. In November 2025, Plaintiff's rheumatologist documented that Plaintiff worked in courthouses and prisons, that she masked in those settings, and that more frequent infection screening was warranted because of her work environments and immunosuppressive treatment.

268. On December 29, 2025, NYU Langone Virtual Urgent Care documented that the December 2025 Illness had begun approximately one week earlier and included congestion, rhinorrhea, sore throat, headache, fatigue, dry cough, and flu-like symptoms. Plaintiff reported negative influenza and COVID-19 testing.

269. The December 29, 2025 medical record identified Plaintiff as immunosuppressed and receiving Hyrimoz. It documented that she had been unable to take her scheduled injection because she remained ill.

270. At a January 2026 rheumatology evaluation, the treating physician documented that Plaintiff had skipped a Hyrimoz dose because of the respiratory illness and thereafter experienced increased inflammatory symptoms, including severe neck-pain flares that triggered migraines and vomiting. The same history recorded that Plaintiff's requested work accommodation was not being allowed and that she had begun treatment for palpitations and tachycardia.

271. Plaintiff had experienced intermittent palpitations before December 2025, including after a 2021 COVID-19 infection. Her prior cardiac testing, however, had not identified structural heart disease or a significant arrhythmia. A 2024 echocardiogram showed normal ventricular function with an ejection fraction of 65 percent, and ambulatory monitoring showed predominantly sinus rhythm with only rare ectopy.

272. The records do not describe any pre-December autonomic impairment approaching the severity that developed after the December 2025 Illness. Before the illness, Plaintiff continued working despite chronic musculoskeletal limitations. Afterward, she developed tachycardia with ordinary activities, severe light sensitivity, nausea, sweating, temperature dysregulation, dizziness, presyncope, syncope, and inability to stand or walk safely for sustained periods.

273. By February 2026, Plaintiff's rheumatologist documented severe autonomic symptoms, difficulty getting out of bed, light sensitivity, nausea, sweating, racing heart, and inability to regulate body temperature. The physician expressly considered whether Plaintiff was experiencing a flare related to the recent illness.

274. Plaintiff's inflammatory treatment also became unstable after the December 2025 Illness. Hyrimoz was interrupted, replacement medications were attempted, and multiple therapies were ineffective or produced adverse effects. This instability coincided with escalating inflammatory pain, dysautonomia or autonomic dysfunction symptoms, and functional loss.

275. On March 13 and 14, 2026, Plaintiff required emergency-department evaluation after two witnessed episodes of syncope. She had experienced dizziness and heart rates in the 120s at home. Her initial emergency-department heart rate was 134 beats per minute, and an electrocardiogram documented sinus tachycardia at 126 beats per minute. She received intravenous fluids and required continuing cardiology follow-up.

276. On March 26, 2026, Plaintiff submitted a provider note extending her medically necessary leave from the previously anticipated April 17 return date through an anticipated June 17 return date because of continuing flares, treatment adjustments, clinical setbacks, and debilitating functional limitations.

277. An April 21, 2026 cardiology history recorded that Plaintiff had experienced a prolonged upper respiratory illness in December 2025 and thereafter developed tachycardia during basic daily activities, including bathing and cleaning. The same history documented progressive symptoms, heart rates of 120 to 130 beats per minute at home, and syncope.

278. By April 29, 2026, Plaintiff's treating provider had diagnosed Postural Orthostatic Tachycardia Syndrome, a post-viral condition that developed following the December 2025 Illness and is distinct from Plaintiff's ankylosing spondylitis. The provider documented dizziness, lightheadedness, fatigue, presyncope, exercise intolerance, marked symptoms with walking more than approximately 500 feet, increased fall risk, and the medical necessity of a wheelchair.

279. In May 2026, Plaintiff's rheumatologist described debilitating autonomic dysfunction, continuing inflammatory flares, repeated medication adjustments, clinical setbacks, and new symptoms that left Plaintiff nearly entirely bedbound. The physician extended Plaintiff's medical leave through an anticipated December 17, 2026 return date.

280. A June 18, 2026 primary-care evaluation again recorded that Plaintiff experienced a common cold in December 2025 followed by tachycardia, light sensitivity, and inability to regulate body temperature. The physician further documented disability leave since February 2026, wheelchair dependence, ability to transfer only between chair and bed, Plaintiff's need for full-time care, and her reliance on Plaintiff's spouse as her current full-time caregiver.

281. Plaintiff's rheumatologist, cardiologist, and primary-care physician each documented the same sequence: the prolonged December 2025 Illness forced Plaintiff to interrupt Hyrimoz; her inflammatory symptoms then increased; post-viral tachycardia and autonomic dysfunction, arising from the viral illness itself rather than from her ankylosing spondylitis, began or substantially worsened; and syncope, inability to ambulate safely, wheelchair dependence, near-total confinement to bed, and prolonged medical leave followed.

282. Treating notes from Dr. Graber, Dr. Patel, and Dr. Chao each documented that Plaintiff contracted an upper respiratory infection in December 2025 and thereafter developed post-viral conditions. Dr. Graber's notes further documented that LAS was not providing Plaintiff her requested accommodation.

283. Based on the documented temporal sequence, treating-provider observations, treatment interruption, and absence of comparable pre-December 2025 functional impairment, Plaintiff alleges that the December 2025 Illness, which she contracted during the period in which Defendant denied her interim accommodation protection and required avoidable courthouse

exposure while her accommodation request remained undecided, materially precipitated or aggravated her autonomic dysfunction, inflammatory flares, and loss of mobility.

284. Plaintiff further alleges that interruption and subsequent instability of her ankylosing-spondylitis treatment compounded the effects of the December 2025 Illness and contributed to the severity and duration of her decline.

285. Plaintiff alleges two causal connections. First, by requiring unnecessary courthouse exposure while Plaintiff was immunocompromised, Defendant materially increased her medically documented risk of infection and, upon information and belief, caused or contributed to the December 2025 Illness. Second, the December 2025 Illness and the resulting interruption of Plaintiff's immunosuppressive treatment caused, precipitated, or aggravated the severe medical decline that followed, as documented by her treating providers and the temporal sequence.

286. As a direct and foreseeable result of the decline, Plaintiff required emergency treatment, repeated cardiology, neurology, rheumatology, and primary-care evaluations, multiple medication changes, extended medical leave, mobility aids, a wheelchair, other durable medical equipment that she was required to purchase and on which she relies, including a shower chair and a bedside commode, full-time care, and substantial assistance with basic activities of daily living.

287. As a direct and proximate result of the challenged conduct, Plaintiff has suffered physical pain; loss of mobility and independence; substantial emotional distress—including anxiety concerning her health and job security, mental anguish, isolation, and depression—arising in part from her abrupt loss of independence and uncertainty concerning recovery and employment; medical expenses; depletion of paid leave; reduced compensation while receiving partial disability benefits; lost wages and benefits including forthcoming loss of health insurance on or about September 8, 2026; repeated burdens and expenses associated with obtaining provider

documentation; medically necessary leave after Defendant failed to provide a means by which Plaintiff could continue working safely; impairment of her ability to work; and other economic and noneconomic harm. Defendant left Plaintiff to choose between her health and livelihood even though a workable accommodation was available. Plaintiff seeks recovery for physical aggravation only to the extent supported by medical and expert evidence.

288. Independently of her request for prospective relief, Plaintiff has suffered completed, concrete, particularized, and redressable injuries that no later proposal or protocol has remedied. Those completed injuries include the denial and delay of accommodation and the absence of interim protection, in addition to the physical, economic, and noneconomic harms described above. Neither the ineffective January 29, 2026 proposal nor the March 6, 2026 proposal restored Plaintiff's compensation or paid leave, reimbursed her expenses, compensated her injuries, or otherwise made her whole. Those injuries are fairly traceable to the challenged conduct and are redressable through monetary, nominal, declaratory, and appropriate equitable relief.

289. Even if Plaintiff's medical condition ultimately delays or prevents her return, that later medical development would affect the form or amount of available relief rather than erase the completed violations or injuries. Plaintiff would continue to possess a personal stake in recovering back pay, lost benefits, compensation for depleted leave, actual damages, compensatory damages, nominal damages, and any front-pay or loss-of-earning-capacity relief supported by the evidence and applicable law.

290. By the time Defendants demanded further provider information, Plaintiff had already documented her chronic disability, immunosuppressive treatment, infection risk, functional limitation, and requested task-based restriction. The documentation explained that court

interaction should be limited to circumstances requiring assistance to an active client, participation in a hearing, or emergency social-work intervention.

291. Defendants nevertheless required further provider-signed responses asking Plaintiff's physician to *quantify* "limited" court interaction, state whether Plaintiff could remain onsite up to seven hours twice weekly, specify precautions beyond those already provided, and propose alternatives permitting more courthouse presence. Plaintiff alleges that those demands were duplicative, unnecessary, not job-related, and not consistent with business necessity.

292. The additional demands caused concrete harm by requiring additional provider involvement, delaying the accommodation process, burdening Plaintiff and her provider, prolonging Plaintiff's exposure to the disputed courthouse requirement, and burdening Plaintiff's exercise of protected rights after she had already supplied sufficient support. They also attempted to convert a clear functional limitation into ambiguity supporting Defendant's preferred outcome.

293. Defendant approved only a temporary leave accommodation through December 16, 2026. That determination addressed Plaintiff's absence from work, not the location, exposure limits, or court-coverage conditions that will govern her anticipated return on December 17, 2026, based on her accommodation needs at that time and/or six months after her return when the current March 6, 2026 proposal will expire.

294. As of the filing of this Amended Complaint, Defendants continued to assert in this action that in-person court coverage is an essential function and relied on the January 29 and March 6 communications as having granted Plaintiff's request. Defendants have not issued a current written determination expressly withdrawing the January 20 denial, disavowing the seven-hour formulation, or confirming that the nearby-office arrangement will govern Plaintiff's return beyond six months after her return.

295. Plaintiff remains employed by Defendant Legal Aid Society and, at the commencement of this action and continuously since, has intended to return to active employment as a PRDU Forensic Social Worker when medically able. Plaintiff has not resigned, abandoned her position, or disclaimed an intent to return. Her provider documentation most recently identifies December 17, 2026 as her anticipated return-to-work date, subject to medical reassessment. Plaintiff presently intends to seek medical clearance and return on or about that date with effective reasonable accommodations. Upon her return, Plaintiff intends to perform the essential functions of her position, including attending court whenever an identified client, attorney, hearing, or emergency need requires her physical presence. Her medical condition and the absence of a current written return-to-work accommodation leave her subject to the same Legal Aid Society and Matrix accommodation processes and/or policies challenged in this action, preserving an ongoing need for prospective accommodation-process relief.

296. Plaintiff does not presently have a binding written individual accommodation that Defendant has committed to honor upon her return beyond an initial six-month period that is explicitly subject to re-evaluation. The March 6, 2026 proposal did not guarantee that the office-based mechanism would be available to Plaintiff upon her return beyond a six month period, or eliminate Defendant Legal Aid Society's and Matrix's claimed absolute "discretion" concerning a continuous court presence of up to seven hours, additional medical demands, interim protection, asserted new essential functions, approval duration, closure of requests, and threatened employment consequences.

297. Plaintiff therefore faces a real and immediate risk that, when she seeks medical clearance and accommodation to return, Defendants will again subject her to the challenged

accommodation process and practices and/or further retaliate against her, including by asserting yet new essential functions.

298. That risk is reinforced by Defendants' conduct during Plaintiff's current leave. After this action was filed, Matrix imposed another documentation deadline and warned that noncompliance could result in closure of the request and disciplinary or other employment action, even though Defendant Legal Aid Society and Matrix already possessed a provider letter supporting leave through December 17, 2026. Defendant Legal Aid Society then advised Plaintiff that her continued job protection depended on the accommodation process and that approval for disability benefits alone did not guarantee that Defendant would hold her position. Plaintiff remains subject to Defendants' continuing authority over her accommodations, return to work, and employment status.

299. The risk of recurrence is further supported by the pattern and practice alleged throughout this Amended Complaint. Plaintiff alleges that Defendant Legal Aid Society, through its centralized Human Resources, Employee Relations, supervisory, and Matrix processes, has repeatedly responded to accommodation requests and related protected activity by heightening scrutiny, imposing additional medical and procedural burdens, recharacterizing existing positions to add new or expanded "essential functions," narrowing or delaying accommodations, and threatening or imposing adverse employment consequences. The pleaded examples include employees who were removed from teams after seeking accommodations, subjected to belated performance accusations or heightened attendance scrutiny, kept out of work on unpaid leave until they accepted a narrowed alternative, or placed under increased supervisory control. That alleged institutional pattern mirrors Plaintiff's experience, in which an approximately one-hour court-presence instruction was expanded in response to her accommodation into an asserted requirement

of up to seven hours per day, accompanied by newly asserted duties, additional medical demands, heightened scrutiny, and employment-consequence warnings. Because the same centralized actors and procedures remain in place and will govern Plaintiff's return, the alleged pattern makes renewed job-duty recharacterization, accommodation obstruction, heightened scrutiny, and retaliation a real and immediate risk rather than speculation.

## CLASS ACTION ALLEGATIONS

300. Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23(a), Rule 23(b)(2), and Rule 23(c)(4) on behalf of the Location-Based Accommodation Class, Post-Request Job-Duty Recharacterization Class, NYCHRL Accommodation Delay Class, and Additional Medical Documentation Class (collectively, the "Classes"), as defined above *see infra* ¶¶ 2-5.

301. Excluded from the proposed classes are Defendants, Defendant Legal Aid Society's officers, senior executives, directors, and managers, any entity in which Defendant Legal Aid Society has a controlling interest, and the assigned Judge or Judges and their immediate families.

302. Class membership is ascertainable through objective criteria and Defendant's records, including request dates and types, medical-documentation dates, assigned administrators and Matrix claim numbers, additional-documentation demands, asserted essential functions, interim-measure status, written-determination dates, and outcomes. Those records permit identification without deciding each employee's ultimate accommodation entitlement.

303. Defendant's records will also show whether and when interim measures were provided, whether additional documentation was requested after provider support, whether management supplied new or revised essential-function descriptions during the process, and whether a final written determination issued. Those objective records avoid individualized merits inquiries at the class-identification stage.

304. Plaintiff does not seek a class-identification determination that every absent class member was ultimately entitled to the precise accommodation requested.

305. Plaintiff reserves the right to amend the class definitions and seek additional subclasses consistent with evidence developed in discovery.

306. Common questions include whether Defendant maintained or applied policies, practices, standards, criteria, or methods of administration that: (1) denied, partially denied, or delayed location-based accommodation requests; (2) withheld interim accommodation measures without individualized assessment; (3) failed to engage in a good-faith interactive process or cooperative dialogue; (4) imposed unnecessary or duplicative medical-documentation demands; (5) failed to provide a written final determination, an implemented accommodation, or a written interim determination within fifty-six days (eight weeks); (6) recharacterized asserted duties after accommodation requests; (7) used location or presence standards that screen out or tend to screen out disabled employees; (8) retaliated against employees who requested accommodations; (9) interfered with protected rights, and (10) acted willfully, wantonly, recklessly, or in conscious disregard of employee rights. Common questions also include whether class-wide declaratory and injunctive relief is warranted and its appropriate scope.

307. Those questions are capable of common answers because they turn on centralized policies, records, communications, templates, documentation demands, interim-measure practices, job-function descriptions, and written determinations. Their resolution will materially advance the claims of all proposed classes.

308. A finding that Defendant used a standard process of withholding interim protection, requiring repeat medical documentation, treating management-supplied location requirements as disqualifying standards, or accepting post-request job descriptions without validation would apply

across the relevant class. Individual variation in disability, requested accommodation, or remedy does not prevent common adjudication of those process questions.

309. Plaintiff is a member of each proposed class. Defendant denied or partially denied her medically supported location-based request, recharacterized extended courthouse presence as an essential function after her request, delayed approximately fifty-seven days from November 24, 2025 to January 20, 2026 without implementing an accommodation or individualized interim determination, and required additional provider documentation concerning a disability and limitation Defendant had already documented.

310. For the Location-Based Accommodation Class, Plaintiff requested a modification of a courthouse-presence requirement supported by medical documentation and received a denial.

311. For the Post-Request Job-Duty Recharacterization Class, Defendant escalated an asserted one-hour in court on designated coverage days practice into a seven-hour essential-function position after the request.

312. For the NYCHRL Accommodation Delay Class, Defendant did not provide, within fifty-six days of her November 24, 2025 accommodation request, a written final determination, an implemented accommodation, or a written determination granting or denying interim relief; its first written determination issued on day 57.

313. For the Additional Medical Documentation Class, Defendant sought new provider responses concerning the same chronic condition and infection-risk limitation already documented.

314. Upon information and belief, members of the Location-Based Accommodation Class and Additional Medical Documentation Class were qualified employees capable of performing their positions with or without reasonable accommodation. Members of the NYCHRL

Accommodation Delay Class were employees for whom Defendant had notice of a possible accommodation need. Members of the Post-Request Job-Duty Recharacterization Class engaged in protected activity by requesting a disability accommodation.

315. Plaintiff's claims are typical because she was subjected to the same kinds of centralized practices challenged for the classes. Defendant denied or partially denied her location-based request, recharacterized her duties after the request, delayed interim relief and final determination, and required additional medical documentation after receiving provider support.

316. Class adjudication can determine whether Defendant used unlawful documentation, delay, interim-measure, and post-request job-duty practices, while any individualized monetary issues remain confined to Plaintiff or later proceedings authorized by the Court.

317. The defenses likely to be asserted against Plaintiff are also representative of the common disputes, including but not limited to, whether asserted physical-presence requirements were genuine essential functions, whether the process was individualized, whether the medical information already supplied was sufficient, whether interim protection was considered, and whether later job description changes were used to justify earlier denials.

318. The proposed classes are sufficiently numerous that joinder is impracticable. Before filing, Plaintiff identified numerous employees with related accommodation, retaliation, discipline, job-duty redefinition, or disability-discrimination concerns. Defendant's centralized Human Resources, Employee Relations, Matrix, leave, accommodation, and personnel records are likely to identify additional members.

319. Numerosity does not depend solely on a statistical estimate. Defendant's citywide workforce, recurring accommodation requests, centralized third-party administration, multiple

identified examples, and objective electronic records together support the inference that the classes include enough current employees to make joinder impracticable.

320. As reflective of these alleged polices, Plaintiff identified numerous employees whose experiences reflect the challenged accommodation practices. Upon information and belief, Defendant Legal Aid Society engaged in the following illustrative conduct *see infra* ¶ 10.

321. These examples include employees subjected to temporary-telework denials after surgery, removal from a team following an accommodation request, prolonged unpaid leave while a remote-work request remained unresolved, pregnancy-related scrutiny, repeated documentation demands, delayed determinations, and post-request changes in asserted duties. They support numerosity and commonality without limiting the proposed Classes to the identified employees.

322. Although the employees held different positions and requested different accommodations, their experiences share recurring procedural features, including delayed determinations, ineffective or absent interim relief, generalized physical-presence assertions, repeated medical-documentation demands, and changes to asserted job requirements after protected requests. These recurring features were administered through Defendant Legal Aid Society's centralized Human Resources, Employee Relations, management, and Matrix processes.

323. Defendant Legal Aid Society's 2023 Form 990 reported approximately 2,449 employees. Combined with the identified examples, recurring use of centralized Human Resources and Matrix processes, and objective accommodation records, that workforce size supports a reasonable inference that the proposed classes are sufficiently numerous. Plaintiff does not rely on generalized population statistics to identify class members. Defendant's own records will identify them.[4]

---

[4] *See* The Legal Aid Soc'y, Return of Organization Exempt from Income Tax (Form 990), pt. I, line 5 (2023) (reporting 2,449 employees).

324. Joinder is also impracticable because the proposed classes consist of current employees who remain economically dependent on Defendant Legal Aid Society for wages, health insurance, accommodations, leave administration, references, and assignments and may reasonably fear retaliation or heightened scrutiny if required to sue individually. The challenged practices present an ongoing risk whenever employees request, renew, supplement, or appeal accommodations.

325. Individual actions would also be inefficient because each employee would seek access to the same centralized policies, templates, Matrix records, decisionmaker communications, processing-time data, and training materials. Class treatment permits one determination of whether those common systems are lawful and one injunction governing future operation.

326. Plaintiff alleges that Defendant Legal Aid Society maintained a policy, practice, and/or standard operating procedure of failing to engage in the required individualized accommodation evaluation and instead applying generalized, across-the-board, and/or presumptive grounds for denial or delay of disability accommodation requests untethered to the merits of each request, including an intentional policy or practice of failing to make a good-faith individualized inquiry.

327. The same centralized records provide common proof concerning Defendant's accommodation processes, Matrix administration, documentation demands, interim-measure decisions, job-function descriptions, delays, written determinations, and outcomes.

328. Common proof includes, but is not limited to, accommodation request-related database exports and data, accommodation-system data and documents, Matrix workflow and audit records, standard forms and provider questionnaires, template communications, interim-measure records, job descriptions, leave and discipline records, and communications among

Human Resources, managers, and Matrix. Those records can show whether the challenged acts arose from centralized procedures rather than isolated decisions.

329. The same proof can show who supplied asserted essential functions, whether descriptions changed after requests, whether standard "More Discovery Needed" communications issued, whether deadlines and interim measures were administered consistently, and whether location requirements were used as retaliatory, qualification, or return-to-work gates.

330. Those questions concern how Defendant's process operated. They do not require the Court to decide at class certification whether every employee was entitled to the exact accommodation requested or the amount of any individual damages.

331. Plaintiff will fairly and adequately protect the class interests. Her interests are aligned with those of the classes and she has no known conflict.

332. Plaintiff's counsel is experienced in employment-discrimination class actions and will vigorously prosecute the action.

333. Plaintiff requests appointment of her counsel as Class Counsel pursuant to Rule 23(g).

334. Plaintiff seeks the same prospective reforms that would benefit absent members and does not seek to compromise any class member's individual monetary claim. Her continued employment and anticipated future return give her a concrete interest in ensuring that the challenged process is corrected.

335. Defendant Legal Aid Society acted or refused to act on grounds generally applicable to the proposed classes, making declaratory and injunctive relief appropriate under Rule 23(b)(2). The requested relief includes lawful accommodation policies, timely individualized review, prompt interim measures where warranted, good-faith dialogue, narrowly tailored medical

requests, accurate job-function descriptions, written determinations, training, monitoring, and other measures preventing recurrence.

336. The requested relief can be framed without deciding whether every absent member was entitled to the exact accommodation requested. It would require process reforms while preserving individualized assessment and any legally available undue-hardship defense.

337. Plaintiff does not seek certification under Rule 23(b)(2) of individualized compensatory damages, back pay, front pay, emotional-distress damages, or medical damages for absent class members. She seeks individualized monetary relief only for herself.

338. Plaintiff seeks certification under Rule 23(c)(4) of the common issue whether Defendant's treatment of the classes was willful, wanton, reckless, or in conscious disregard of employee rights. She does not seek certification of the amount of any class member's punitive damages. Resolving the common liability standard once will narrow the disputed issues and promote judicial economy.

339. The Rule 23(c)(4) issue includes whether Defendant knowingly maintained a process that withheld interim protection, demanded duplicative medical information, treated changing job requirements as fixed essential functions, and used accommodation requests as triggers for heightened scrutiny. The issue is separable from any individualized assessment of compensatory damages.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Rehabilitation Act - Failure to Reasonably Accommodate

**29 U.S.C. § 794(a), (d), incorporating 42 U.S.C. § 12112(b)(5)(A)**
**(By Plaintiff and the Location-Based Accommodation Class**
**Against Defendant Legal Aid Society)**

340. Plaintiff re-alleges and incorporates all preceding allegations.

341. Plaintiff has a disability within the meaning of the Rehabilitation Act, was qualified to perform the essential functions of her position with and/or without a reasonable accommodation, disclosed her disability and functional limitations, and supplied medical documentation. Defendant Legal Aid Society knew of her disability and accommodation needs before November 24, 2025, and knew by that date that immunosuppressive treatment required limits on unnecessary courthouse exposure.

342. Plaintiff is an individual with a disability within the meaning of the Rehabilitation Act because she has physical impairments that substantially limit one or more major life activities and major bodily functions. 29 U.S.C. §§ 705(20)(B), 794(d), 42 U.S.C. § 12102(1)-(2). Major life activities include walking, standing, sitting, lifting, and bending, and major bodily functions include immune and musculoskeletal functions. 42 U.S.C. § 12102(2), 29 C.F.R. § 1630.2(h)-(i). Plaintiff's ankylosing spondylitis caused chronic pain and restricted range of motion in her spine and other joints, limiting the condition, manner, and duration in which she could walk, stand, sit for prolonged periods, lift, bend, and ambulate. The non-ameliorative effects of her medically necessary immunosuppressive treatment also suppressed immune function, increased her susceptibility to infection, and created an additional disability-related limitation on unnecessary or prolonged exposure to infectious environments. Following the subsequent deterioration alleged

herein, those limitations became substantially more severe, including inability to stand or walk safely for sustained periods, wheelchair dependence, and substantial limitations in caring for herself.

343. Additionally, and in the alternative, Plaintiff had a record of a substantially limiting impairment because Defendant had received medical documentation of her chronic condition and functional limitations and had previously provided disability accommodations on that basis. 42 U.S.C. § 12102(1)(B), 29 C.F.R. § 1630.2(k).

344. Before and during the relevant period, Plaintiff successfully performed the essential functions of her Forensic Social Worker position under Defendant's approved hybrid arrangement, including three remote-work days each week. On scheduled in-person court-coverage days, Plaintiff historically worked from Defendant's Bronx office across the street from the courthouse and entered court whenever a client, attorney, hearing, assessment, emergency, or other identified need required her physical presence. Her evaluations documented strong performance, timely work, organization, case tracking, attorney collaboration, and client service, and stated that no supervisor, attorney, or client had raised concerns about her work

345. Defendant's own practices further showed that Plaintiff could perform the position through office-based availability. PRDU used virtual Friday coverage referrals, Teams, telephone, and email to identify and coordinate actual needs, and its management-authored procedures recognized that assessments could occur by telephone, video conference, in the office, or in court.

346. Plaintiff requested only a modified work-location assignment within her existing Forensic Social Worker position. She did not seek a transfer, a new position, fewer in-person workdays, a reduced schedule, or elimination of any essential function. She would remain onsite, electronically available, and able to enter court promptly whenever an actual need arose. The

requested accommodation changed only where Plaintiff performed productive work between actual court needs, required no additional staffing, equipment, cost, or schedule change, and imposed no undue hardship

347. Plaintiff's actual disability-related limitation was prolonged unnecessary exposure in a crowded courthouse while immunocompromised. PPE and breaks did not reduce the duration of that exposure. Leave did not enable Plaintiff to continue performing her job and replaced her regular wages with partial and finite disability benefits. Those measures therefore did not effectively address Plaintiff's limitation, while the requested office-based arrangement directly addressed it and preserved every essential function

348. Defendant failed to accommodate Plaintiff by withholding effective interim protection during the fifty-seven-day period from her November 24, 2025 accommodation request through the January 20, 2026 denial of accommodation, expressly stating that the requested Office-Based Coverage Accommodation "was denied and remains so," and directing Plaintiff to report under the Extended Courthouse-Presence Standard the next morning. Defendant supplied no effective alternative: PPE and breaks did not reduce the duration of unnecessary exposure, and leave prevented Plaintiff from continuing to work at regular pay. The March 6, 2026 proposal corroborated the requested mechanism's feasibility but did not retroactively cure the completed accommodation delay, denial of accommodation, enforcement, leave, wage loss, depletion of benefits, or other harm.

349. Defendant acted with deliberate indifference after senior Human Resources officials received Plaintiff's medical documentation, requests for interim accommodation protection, union objections, grievance, and cease-and-desist communication, yet continued the disputed exposure despite authority to implement a readily available temporary measure.

350. Upon information and belief, Defendant maintained a policy, practice, or standard procedure of denying, partially denying, or delaying location-based accommodation requests without timely individualized evaluation or effective interim protection. As a direct and proximate result, Plaintiff suffered medically compelled leave, lost wages and benefits, depletion of leave, impaired ability to work, and other legally cognizable harm. Plaintiff and the Location-Based Accommodation Class seek the relief stated in the Prayer for Relief.

## SECOND CAUSE OF ACTION

### Rehabilitation Act – Retaliation

**29 U.S.C. § 794(a), (d), incorporating 42 U.S.C. § 12203(a)**
**(By Plaintiff, the Post-Request Job-Duty Recharacterization Class, and the Additional Medical Documentation Class Against Defendant Legal Aid Society)**

351. Plaintiff re-alleges and incorporates all preceding allegations.

352. Plaintiff engaged in protected activity by requesting accommodation on November 24 and December 9, 2025, seeking interim accommodation protection, opposing disability discrimination and unnecessary infection exposure, participating in accommodation meetings, supporting the December 19 grievance and January 6 cease-and-desist communication, and objecting to Defendant's description of her duties to Matrix and her provider. Defendant knew of each activity.

353. Before each challenged act, the relevant actor knew of Plaintiff's protected activity. Walsh knew of Plaintiff's November 24, 2025 accommodation request, and before supplying the seven-hour courthouse premise transmitted to Matrix. Quigley and Almanzar knew that Plaintiff had requested a disability accommodation and sought union assistance before the post-grievance file, supervision, and reporting demands. Park received the December 19, 2025 grievance and January 6, 2026 cease-and-desist communication before the January 20 denial of accommodation

and January 21, 2026 enforcement directive. Matrix knew by January 2, 2026 of Plaintiff's disability-related restriction, requested nearby-office arrangement, and continued willingness to enter court whenever a client, attorney, hearing, assessment, or emergency actually required her presence.

354. Defendant subjected Plaintiff to acts that, separately or together, could dissuade a reasonable employee from requesting accommodation or opposing disability discrimination and that would not have occurred in the same manner but for her protected activity. Those acts included the Plaintiff-specific seven-hour escalation, expanded file demands, intrusive questioning, repeated and burdensome meetings, additional provider demands, repeated demands for medical documentation concerning the same previously documented disability, compressed deadlines and warnings, denial of interim accommodation protection, next-day enforcement, attorney-canvassing duties, supervisory review, and heightened reporting requirements.

355. After Plaintiff requested accommodation on November 24, 2025, Defendant asserted on December 19, 2025 that she could be required to remain in court up to seven hours per day twice weekly. That escalation occurred twenty-five and ten days after the respective accommodation requests and transformed the shared approximately one-hour relationship-building instruction into a materially more onerous Plaintiff-specific condition.

356. After Plaintiff supported the December 19, 2025 grievance, Quigley requested an additional OneDrive link four days later, Almanzar expanded the file demand seven days later, Walsh required another accommodation meeting seven days later while Plaintiff's primary delegate was unavailable, and Quigley renewed broader file-access requests on January 13 and January 15, 2026. The timing, expanded scope, and departure from Plaintiff's favorable pre-request evaluations support an inference of retaliatory scrutiny.

357. Eleven days after the grievance, on December 30, 2025, Walsh formally stated in writing the premise that Plaintiff's job required her to be in court up to seven hours per day twice weekly. Fourteen days after the grievance, on January 2, 2026, Matrix demanded additional provider information within fifteen calendar days, warned that nonresponse could affect the decision, and required Plaintiff's provider to propose alternatives within the disputed job description. Those demands increased the burden and risk of continuing protected activity.

358. After the January 6, 2026 cease-and-desist communication, the January 9, 2026 union objection, and Plaintiff's January 12 objection, Defendant denied the requested interim accommodation arrangement on January 20, 2026, added attorney-canvassing and supervisory-review duties, and enforced the disputed condition one day later. Plaintiff notified Defendant of provider-directed leave eight days after the denial of accommodation, and the leave began on February 2, 2026, thirteen days after the January 20, 2026 accommodation denial and enforcement directive. Plaintiff alleges the reduced-pay leave as a consequence of the retaliatory sequence.

359. Retaliatory causation is further supported by the close timing, Defendant's knowledge, the departure from prior practice, the Plaintiff-specific application of the seven-hour formulation, the absence of that requirement from prior evaluations and written duties, shifting explanations, differential treatment, and Defendant's later use of the office-based mechanism it had denied Plaintiff as an accommodation.

360. Upon information and belief, Defendant maintained retaliatory policies or regular practices affecting the Post-Request Job-Duty Recharacterization Class through new or newly enforced duties after accommodation requests and affecting the Additional Medical Documentation Class through unnecessary or duplicative medical-documentation demands.

Plaintiff suffered economic and other legally cognizable harm. Plaintiff and the classes seek the relief stated in the Prayer for Relief.

**THIRD CAUSE OF ACTION**

**Rehabilitation Act - Interference, Coercion, Threats, and Intimidation**

**29 U.S.C. § 794(a), (d), incorporating 42 U.S.C. § 12203(b)**

**(By Plaintiff, the Additional Medical Documentation Class, and the Post-Request Job-Duty Recharacterization Class Against Defendant Legal Aid Society)**

361. Plaintiff re-alleges and incorporates all preceding allegations. She exercised and attempted to exercise Rehabilitation Act rights by disclosing her disability, requesting a disability accommodation and interim accommodation protection, and opposing disability discrimination and/or retaliation.

362. Defendant interfered with those rights and coerced, intimidated, or threatened Plaintiff by transforming the One-Hour Courthouse-Presence Directive into the Extended Courthouse-Presence Standard, treating the disputed seven-hour requirement as fixed, withholding interim protection, continuing the disputed exposure, demanding duplicative or overbroad medical information, imposing a short provider deadline with a warning that noncompliance could affect the decision, limiting alternatives to employer-preferred measures, recharacterizing court coverage after the accommodation request, and escalating file scrutiny, monitoring, and reporting after protected activity.

363. The coercive effect was heightened because Plaintiff remained subject to supervisory directives and was placed between following her provider's restrictions and risking employment consequences. The May 29, 2026 requested additional documents and warning, followed by Matrix's acknowledgment that the existing provider note was already sufficient,

further illustrate how standardized demands and threatened consequences interfered with protected rights.

364. Upon information and belief, Defendant subjected the Additional Medical Documentation Class and Post-Request Job-Duty Recharacterization Class to the same or similar practices. Plaintiff suffered legally cognizable harm. Plaintiff and the classes seek the relief stated in the Prayer for Relief.

**FOURTH CAUSE OF ACTION**

**Rehabilitation Act - Medical Inquiry Violation**
**29 U.S.C. § 794(a), (d), incorporating 42 U.S.C. § 12112(d)(4)(A)**

**(By Plaintiff and the Additional Medical Documentation Class Against Defendant Legal Aid Society)**

365. Plaintiff re-alleges and incorporates all preceding allegations. The Rehabilitation Act prohibits disability-related inquiries concerning an employee's disability or its nature or severity unless the inquiry is job-related and consistent with business necessity.

366. Plaintiff had already documented her chronic disability, immunosuppressive treatment, infection risk, functional limitation, prior accommodations, and ability to attend court for active client, attorney, hearing, assessment, and emergency needs. Defendant nevertheless required further provider responses concerning the same disability and limitation.

367. Through Matrix, Defendant demanded that Plaintiff's provider quantify "limited" court interaction, state whether Plaintiff could remain in court up to seven hours twice weekly, identify additional precautions, and propose alternatives permitting increased courthouse presence. Those questions were not narrowly tailored to an unknown functional limitation and were not job-related or consistent with business necessity as alleged. They instead sought provider support for Defendant's disputed seven-hour position.

368. Matrix's May 29, 2026 additional document request and employment-consequence warning, followed by its June 3, 2026 acknowledgment that the existing provider note could be used, further support Plaintiff's allegation of standardized repeat-documentation practices. The class theory is limited to repeated documentation concerning the same chronic disability or previously documented limitation and does not challenge narrowly tailored questions addressing a genuinely new restriction or changed condition.

369. The challenged inquiries burdened Plaintiff and her provider, delayed accommodation, prolonged exposure to the disputed requirement, and burdened the exercise of protected rights. Plaintiff and the Additional Medical Documentation Class seek the relief stated in the Prayer for Relief.

## FIFTH CAUSE OF ACTION

**Rehabilitation Act - Qualification Standard and Methods of Administration**
**29 U.S.C. § 794(a), (d), incorporating 42 U.S.C. § 12112(b)(3)(A), (b)(6)**

**(By Plaintiff and the Location-Based Accommodation Class Against Defendant Legal Aid Society)**

370. Plaintiff re-alleges and incorporates all preceding allegations.

371. Plaintiff challenges the Extended Courthouse-Presence Standard and Defendant's method of treating management-supplied location requirements as fixed continued-employment and return-to-work qualifications before determining whether the actual job functions could be performed through a modified location.

372. The challenged standard required up to seven hours of courthouse presence even when no court task existed, transmitted that location-and-duration requirement to Matrix and Plaintiff's provider as her "current job function," and confined the accommodation inquiry to alternatives preserving that requirement. The standard was distinct from the substantive functions

of interviewing clients, conducting assessments, supporting attorneys, attending hearings, providing advocacy, and responding to emergencies, all of which Plaintiff remained qualified to perform.

373. Defendant used the standard to deny Plaintiff's office-based accommodation request, enforce the disputed condition, require work under a medically contraindicated circumstance, and screen Plaintiff out of continued active employment on equal terms. Plaintiff then entered medically advised leave with reduced compensation and remains subject to a future return-to-work determination.

374. As applied to Plaintiff, the Extended Courthouse-Presence Standard was not job-related or consistent with business necessity. The written job posting, years of successful Prior Office-Based Coverage Practice, virtual coverage, referral workflows, nearby Bronx office, electronic communications, and documented courthouse communication problems showed that Defendant's legitimate objectives were availability, responsiveness, and client service—not passive courthouse waiting when no identified need existed. Defendant's January 29, 2026 structure and March 6, 2026 protocol relied on resources already available when Plaintiff initially requested an accommodation and showed that every essential function could be performed through the requested location modification.

375. In addition, or in the alternative, even if some amount of courthouse attendance is job-related, consistent with business necessity, or an essential function, Plaintiff does not seek to eliminate that function. She challenges the separate location-and-duration prerequisite requiring up to seven hours of courthouse presence when no client, attorney, hearing, assessment, or emergency required her presence. Plaintiff could perform every substantive court-coverage function through office-based availability and prompt entry into court when needed, using the

same nearby-office, text, Teams, email, screening, prioritization, and prompt-return procedures Defendant later adopted in the January 29 structure and March 6 protocol. Defendant's application of the Extended Courthouse-Presence Standard therefore screened Plaintiff out, or tended to screen her out, of active work on equal terms by making compliance with a medically contraindicated condition a prerequisite to continued work and return from leave. The screening alleged here does not depend on formal discharge, demotion, denial of promotion, or removal from PRDU because Defendant actually used the standard to deny equal active-employment terms, resulting in medically advised leave, reduced compensation, and a continuing return-to-work barrier. Defendant's later approval of a modified arrangement did not erase those completed effects or, as alleged, eliminate the standard as a future return-to-work condition.

376. Upon information and belief, Defendant applied the same centralized method to members of the Location-Based Accommodation Class by accepting management-supplied location requirements as fixed and denying or partially denying accommodation requests without evaluating whether actual functions could be performed through a modified location.

377. Upon information and belief, Defendant applied the same or substantially similar qualification standard and method of administration to members of the Location-Based Accommodation Class by treating management-supplied work-location requirements as fixed qualifications before determining whether each employee's substantive duties could be performed through a reasonable location modification. Defendant's centralized process required or permitted decisionmakers to focus on preserving the asserted location requirement rather than assessing the employee's actual functions, historical work practices, available technology, nearby alternative worksites, response-time needs, and other individualized circumstances. That standard and method were not job-related or consistent with business necessity to the extent they required presence at a

particular location even when no essential function required continuous presence there, and they screened out or tended to screen out employees whose disabilities limited exposure to, access to, or work within particular environments even though those employees remained able to perform the substantive functions of their positions with a reasonable accommodation.

378. Plaintiff and the Location-Based Accommodation Class seek the relief stated in the Prayer for Relief.

**SIXTH CAUSE OF ACTION**

**New York City Human Rights Law - Failure to Provide Reasonable Accommodation N.Y.C. Admin. Code § 8-107(15)(a)**

**(By Plaintiff and the Location-Based Accommodation Class Against Defendant Legal Aid Society)**

**(By Plaintiff Against Matrix Absence Management, Inc. and Individual Defendants Walsh, Quigley, Almanzar, and Park)**

379. Plaintiff re-alleges and incorporates all preceding allegations.

380. Plaintiff's ankylosing spondylitis and treatment-related immunocompromised condition are physical and medical impairments affecting her musculoskeletal and immune systems and constitute a disability under N.Y.C. Admin. Code § 8-102. The Defendants named in this count knew or should have known of her disability or accommodation need.

381. Plaintiff could satisfy the essential requisites of her position with the Office-Based Coverage Accommodation. Her qualification is supported by favorable evaluations, successful performance under her hybrid schedule and Prior Office-Based Coverage Practice, PRDU's referral and virtual-coverage practices, and Defendant's later use of the same core office-based mechanism

382. Defendants Legal Aid Society, Matrix, Walsh, Quigley, Almanzar, and Park failed to provide the reasonable office-based arrangement Plaintiff requested, withheld effective interim

protection throughout the Unprotected Request Period, expressly denied the requested interim accommodation on January 20, 2026, and directed continued compliance the next morning. Plaintiff's request preserved all actual job functions and imposed no undue hardship.

383. Quigley originated and enforced the court-presence instruction. Almanzar approved and defended it as Plaintiff's supervisor. Walsh converted the instruction into the Human Resources and Matrix accommodation process, maintained the seven-hour formulation, pursued additional medical-documentation demands, and offered ineffective alternatives. Park exercised senior authority, maintained or ratified the accommodation denial, and directed continued court presence and added reporting duties.

384. Matrix is directly liable for its own acts and omissions, separate from and in addition to any liability imputed to Defendant Legal Aid Society through agency. Matrix did not merely transmit a final accommodation decision made elsewhere. Within the accommodation functions it undertook, Matrix exercised actual and practical control over material components of Plaintiff's accommodation process, including provider communications, medical-information demands, response deadlines, documentation sufficiency, accommodation-request status and closure, process next steps, monitoring, and communication of determinations. With actual notice of Plaintiff's disability, requested office-based arrangement, and willingness to enter court whenever needed, Matrix used the disputed up-to-seven-hour courthouse requirement as the premise of its review, required Plaintiff's provider to propose alternatives that preserved courthouse presence, imposed a fifteen-calendar-day deadline with threatened decisional consequences, and failed to evaluate, recommend, or communicate effective interim office-based protection. Upon information and belief, Matrix possessed authority within the process it administered to determine whether documentation was sufficient, whether the accommodation

request advanced, remained pending, or closed, and when and how accommodation determinations were communicated. Matrix's later issuance of a closure and potential-discipline warning, followed by its determination that Plaintiff's existing provider note was sufficient, further confirmed that its role was substantive rather than ministerial. Matrix's own acts and omissions independently prolonged and materially contributed to the failure to accommodate. Matrix is therefore directly liable under N.Y.C. Admin. Code § 8-107(15)(a) for its own conduct, whether or not it is also found to have acted as Defendant Legal Aid Society's agent.

385. Upon information and belief, Defendant Legal Aid Society maintained policies, practices, or standard procedures of denying, partially denying, or delaying location-based accommodation requests without good-faith individualized evaluation or interim protection.

386. The challenged conduct was willful, wanton, reckless, or in conscious disregard of Plaintiff's rights and, as to Defendant Legal Aid Society, the rights of the Location-Based Accommodation Class. Plaintiff and the class suffered harm and seek the relief stated in the Prayer for Relief.

## SEVENTH CAUSE OF ACTION

**New York City Human Rights Law - Disability Discrimination and Less-Well Treatment N.Y.C. Admin. Code § 8-107(1)(a)**

**(By Plaintiff Against Defendant Legal Aid Society and Individual Defendants Walsh, Quigley, Almanzar, and Park)**

387. Plaintiff re-alleges and incorporates all preceding allegations.

388. Plaintiff is a person with a disability under the NYCHRL, the Defendants named in this count knew of her disability and disability-related need, and Plaintiff was qualified to perform the actual functions of her position with and/or without a reasonable accommodation.

389. Plaintiff had a disability within the meaning of the NYCHRL because her ankylosing spondylitis and treatment-related immunocompromised condition were physical and medical impairments affecting her musculoskeletal and immunological systems, both of which are expressly covered under N.Y.C. Admin. Code § 8-102.

390. Defendants Legal Aid Society, Walsh, Quigley, Almanzar, and Park treated Plaintiff less well, at least in part, because of her disability, including by escalating a One-Hour Courthouse-Presence Directive into a Plaintiff-specific requirement of up to seven hours per day twice weekly, imposing attorney-canvassing and supervisory-review duties, subjecting her files and reporting to heightened scrutiny despite favorable pre-request evaluations, denying equal access to active employment under medically safe conditions, and forcing her to choose among working without effective protection, risking employment consequences, and taking reduced-pay leave.

391. As to Defendant Legal Aid Society, discriminatory motive is further supported by its broader history of responding to disabled employees and disability-accommodation requests with resistance, skepticism, and indifference to documented disability-related limitations. As alleged above, Defendant repeatedly subjected employees seeking medically supported accommodations to prolonged delays without effective interim protection, generalized and non-individualized assertions that physical presence was required, repeated or duplicative medical-documentation demands, retroactive expansion or recharacterization of asserted essential job functions, and heightened performance or disciplinary scrutiny concerning limitations for which employees had sought accommodation. These recurring practices, together with Defendant's treatment of Plaintiff through the same centralized Human Resources and accommodation process, support a reasonable inference that Plaintiff's experience was not an isolated administrative failure

and that Defendant regarded disability-related modifications as obstacles to be resisted, narrowed, or conditioned rather than workplace needs to be addressed on equal terms.

392. As to each of Defendants Legal Aid Society, Walsh, Quigley, Almanzar, and Park, discriminatory motive is further supported by the close timing between Plaintiff's disclosure of her intensified disability-related need and the escalation of the court-presence requirement, the absence of any preexisting seven-hour rule, the departure from Plaintiff's favorable evaluations and prior practice, the failure to apply the same Plaintiff-specific formulation to Verano Diaz, shifting explanations, disability-focused questioning, Defendant's broader treatment of disabled employees and accommodation requests, and Defendant's later use of the same core office-based mechanism it had previously denied Plaintiff.

393. Defendants Legal Aid Society, Walsh, Quigley, Almanzar, and Park created a disability-based and/or accommodation need-based hostile work environment and/or engaged in disability-based and/or accommodation need-based harassment in violation of the NYCHRL.

394. Walsh participated through disability-focused questioning, medical demands, and transmission of the seven-hour court presence premise. Quigley and Almanzar imposed or enforced the intensified requirement and heightened file or reporting expectations. Park maintained the requirement and imposed added attorney-contact and supervisory-review duties.

395. Plaintiff's disability and/or disability-related needs were at least one motivating factor in the challenged treatment by each of Defendants Legal Aid Society, Walsh, Quigley, Almanzar, and Park, which was more than a petty slight or trivial inconvenience.

396. The conduct of each of Defendants Legal Aid Society, Walsh, Quigley, Almanzar, and Park was willful, wanton, reckless, or in conscious disregard of Plaintiff's rights. Plaintiff

suffered economic, emotional, and other compensable harm and seeks the relief stated in the Prayer for Relief.

## EIGHTH CAUSE OF ACTION

**New York City Human Rights Law - Retaliation**
**N.Y.C. Admin. Code § 8-107(7)**

**(By Plaintiff, the Post-Request Job-Duty Recharacterization Class, and the Additional Medical Documentation Class Against Defendant Legal Aid Society)**

**(By Plaintiff Against Individual Defendants Walsh, Quigley, Almanzar, and Park)**

397. Plaintiff re-alleges and incorporates all preceding allegations.

398. Plaintiff's ankylosing spondylitis and treatment-related immunocompromised condition constitute a disability under the NYCHRL. She engaged in protected activity by requesting disability accommodations and interim accommodation protection, opposing disability discrimination and unnecessary infection exposure, seeking union assistance, supporting the grievance and cease-and-desist communication, and objecting to disputed job-duty descriptions. Defendant Legal Aid Society and Walsh, Quigley, Almanzar, and Park knew of that activity.

399. After those protected activities, Defendants Legal Aid Society, Walsh, Quigley, Almanzar, and Park subjected Plaintiff to the Extended Courthouse-Presence Standard, file scrutiny, intrusive questioning, medical demands, compressed deadlines and warnings, denial of interim accommodation protection, next-day enforcement, attorney canvassing, supervisory review, heightened reporting, and resulting reduced-pay leave. Separately and collectively, those acts were reasonably likely to deter continued requests for accommodation and opposition to disability discrimination, retaliation, and failures to accommodate.

400. Walsh administered the medical demands and intrusive process. Quigley and Almanzar imposed or enforced the courthouse requirement and post-grievance file scrutiny. Park

used senior authority to maintain the requirement, deny or ratify denial of interim protection, and direct continued court presence, attorney contact, and supervisory review. Close timing, departure from prior practice, Plaintiff-specific application, shifting explanations, differential treatment, and later adoption of the office-based mechanism support retaliatory motive.

401. Temporal proximity supports causation. Walsh escalated court presence to up to seven hours a day on December 19, 2025, twenty-five days after Plaintiff's November 24, 2025 accommodation request, ten days after her December 9 accommodation request, nine days after her December 10, 2025 interim-accommodation request, and one day after her December 18 opposition. After Plaintiff supported the December 19, 2025 grievance, Quigley demanded her files four days later and Almanzar expanded that demand seven days later. Defendant issued an additional medical-documentation demand with a fifteen-day deadline and warning eleven days after Plaintiff's December 22 renewed interim-accommodation request. Park denied interim accommodation protection and added attorney-canvassing and supervisory-review duties fourteen days after the January 6, 2026 cease-and-desist communication, eleven days after the January 9, 2026 union objection, and eight days after Plaintiff's January 12, 2026 duty objection. Defendants enforced the requirement one day after Plaintiff's January 20, 2026 renewed opposition. Thus, each of these protected activities was followed by challenged conduct within twenty-five days.

402. Upon information and belief, Defendant maintained a policy or regular practice of retaliating against the Post-Request Job-Duty Recharacterization Class through new or altered duties and against the Additional Medical Documentation Class through unnecessary, duplicative, and/or bad faith medical-documentation demands. Those practices communicated that requesting accommodation could trigger an adversarial process, heightened scrutiny, and threatened consequences.

403. The retaliation was willful, wanton, reckless, or in conscious disregard of Plaintiff's and the classes' rights. Plaintiff suffered emotional distress, financial harm, medically compelled leave, impairment of her ability to work, and other injuries. Plaintiff and the classes seek the relief stated in the Prayer for Relief.

## NINTH CAUSE OF ACTION

**New York City Human Rights Law - Failure to Engage in Cooperative Dialogue**
**N.Y.C. Admin. Code § 8-107(28)**

**(By Plaintiff, the NYCHRL Accommodation Delay Class, and the Additional Medical Documentation Class Against Defendant Legal Aid Society)**

**(By Plaintiff Against Defendant Matrix and Individual Defendants Walsh and Park)**

404. Plaintiff re-alleges and incorporates all preceding allegations.

405. Plaintiff requested an accommodation, and Defendant Legal Aid Society, Walsh, Park, and Matrix had notice that she might require it. Each was obligated to engage in a good-faith written or oral dialogue concerning Plaintiff's needs, potential accommodations, alternatives, and any difficulties those accommodations posed.

406. Plaintiff had a disability within the meaning of the NYCHRL because her ankylosing spondylitis and treatment-related immunocompromised condition were physical and medical impairments affecting her musculoskeletal and immunological systems, both of which are expressly covered under N.Y.C. Admin. Code § 8-102.

407. The cooperative-dialogue requirements of N.Y.C. Admin. Code § 8-107(28) applied because Plaintiff requested disability-related accommodations and/or the Defendants named in this count had actual notice that she might or may require them. Those Defendants were therefore required to engage with Plaintiff within a reasonable time in a good-faith written or oral dialogue concerning her accommodation needs, potential accommodations and alternatives, and

any difficulties they might pose. Defendant Legal Aid Society was further required, upon reaching a final determination, to provide Plaintiff with a written determination identifying each accommodation granted or denied.

408. Defendant Legal Aid Society, Walsh, and Park left Plaintiff without effective interim protection throughout the Unprotected Request Period, failed to meaningfully evaluate the office-based arrangement and provider support, treated the seven-hour requirement as fixed, shifted the burden of designing alternatives to Plaintiff and her provider, and issued the January 20, 2026 denial of accommodation without identifying a concrete operational difficulty or reason interim protection was unavailable.

409. Matrix independently failed to engage in a good faith cooperative dialogue including by using a provider questionnaire organized around the disputed requirement, failing to discuss Plaintiff's needs with her, failing to evaluate the office-based proposal or identify a hardship, and asking only how Plaintiff could comply with Defendant Legal Aid Society's preferred outcome. Its later control over documentation sufficiency, warnings, monitoring, and communication of decisions supports its direct and agency liability.

410. Upon information and belief, Defendant Legal Aid Society subjected the NYCHRL Accommodation Delay Class to a failure to provide, within fifty-six days (eight weeks), a written final determination, an implemented accommodation, or a written determination granting or denying interim relief. It subjected the Additional Medical Documentation Class to unnecessary, duplicative, or bad-faith medical-documentation demands within the purported dialogue.

411. Upon information and belief, Defendant Legal Aid Society, including through its centralized Matrix-administered accommodation process, subjected the Additional Medical Documentation Class to unnecessary, duplicative, or outcome-driven medical-documentation

demands, compressed response deadlines, and warnings that nonresponse could adversely affect an accommodation decision, close a request, or lead to disciplinary or other employment consequences, even where existing documentation was sufficient to evaluate the request. Considered together with Defendant's treatment of asserted job requirements as fixed, failure to meaningfully evaluate employee-proposed alternatives, and withholding of effective interim protection, these practices support the allegation that the purported cooperative dialogues were conducted in bad faith and structured around predetermined outcomes.

412. Plaintiff waited fifty-seven days, from November 24, 2025 through January 20, 2026, after submitting her initial medically supported accommodation request, without an implemented accommodation, written grant of interim accommodation, or individualized written determination granting or denying interim relief.

413. The ineffective January 29, 2026 proposal and March 6, 2026 proposal did not cure the preceding violation.

414. The January 20, 2026 communication stated a result but did not memorialize a genuine discussion of Plaintiff's needs, alternatives considered, any operational difficulty, or why the nearby-office arrangement could not be used on an interim or permanent basis.

415. The May and June 2026 leave-extension sequence further supports the allegation that standardized medical-documentation demands can recur despite sufficient existing documentation.

416. The conduct was willful, wanton, reckless, or in conscious disregard of Plaintiff's and the classes' rights. Plaintiff and the classes seek the relief stated in the Prayer for Relief, including timely good-faith dialogue, narrowly tailored documentation requests, reasoned written determinations, and effective interim measures where warranted.

## TENTH CAUSE OF ACTION

**New York City Human Rights Law - Coercion, Intimidation, Threat, and Interference and Attempted Coercion, Intimidation, Threat, and Interference**
**N.Y.C. Admin. Code § 8-107(19)**

**(By Plaintiff, the Additional Medical Documentation Class, and the Post-Request Job-Duty Recharacterization Class Against Defendant Legal Aid Society)**

**(By Plaintiff Against Defendant Matrix, and Individual Defendants Park, Walsh, Almanzar, and Quigley)**

417. Plaintiff re-alleges and incorporates all preceding allegations.

418. Plaintiff exercised and attempted to exercise rights granted and protected by the NYCHRL by requesting and pursuing reasonable accommodation, seeking and participating in a good-faith cooperative dialogue, and opposing disability discrimination and retaliation.

419. Defendant Legal Aid Society and Park, Walsh, Almanzar, and Quigley coerced, intimidated, threatened, and/or interfered with, or attempted to interfere with, those rights by delaying and obstructing the accommodation request, withholding interim protection, asserting and shifting purported essential functions, requiring unnecessary medical information, imposing compressed deadlines with threatened consequences, asking Plaintiff's provider to design employer-preferred alternatives, making invasive inquiries, maintaining medically disputed exposure, escalating file scrutiny, and imposing added monitoring and reporting after protected activity. The conduct also included the May 29, 2026 warning despite an updated provider note.

420. Park used senior Human Resources authority to maintain the requirement and denial of accommodation. Walsh administered the medical demands and predetermined process. Almanzar and Quigley imposed or enforced the requirement, file demands, and heightened supervisory expectations. Upon information and belief, Defendant subjected the Additional Medical Documentation Class and Post-Request Job-Duty Recharacterization Class to similar

medical-documentation demands, warnings, shifting duty assertions, altered requirements, scrutiny, or threatened discipline.

421. Matrix coerced, intimidated, threatened, interfered with, or attempted to interfere with Plaintiff's exercise and enjoyment of those rights, including, but not limited to, on January 2, 2026, by transmitting Defendant Legal Aid Society's disputed premise that Plaintiff was required to remain onsite in the courthouse twice weekly for up to seven hours, asking Plaintiff's provider to identify alternatives that would preserve courthouse presence, imposing a fifteen-calendar-day deadline, and warning that nonresponse could affect the accommodation decision. The communication did not evaluate Plaintiff's nearby-office proposal or identify an operational difficulty with that proposal.

422. On May 29, 2026, after Plaintiff had provided Defendant Legal Aid Society and Matrix with a signed provider letter supporting continued leave through December 2026, Matrix issued a standard Accommodation Certification Form and warned that failure to return the described documents would result in closure of Plaintiff's request for additional accommodation and could result in disciplinary or other employment action by Defendant Legal Aid Society. On June 3, 2026, Matrix stated that the packet consisted of standard forms and that it could use Plaintiff's existing provider note. On June 5, 2026, Matrix communicated Defendant Legal Aid Society's approval of the leave extension.

423. Matrix's May 29, 2026 warning created an impression of impending accommodation-request closure, loss of accommodation, discipline, or other employment injury unless Plaintiff supplied additional documentation through the process Matrix administered. The January 2, 2026 and May 29, 2026 communications were directly tied to Plaintiff's exercise and enjoyment of her accommodation and cooperative-dialogue rights and constitute interference or

attempted interference regardless of whether Plaintiff persisted in pursuing those rights and the leave extension was later approved.

424. Under all the circumstances, the conduct had a reasonable tendency to coerce or intimidate employees regardless of whether each employee abandoned an accommodation request. The conduct was willful, wanton, reckless, or in conscious disregard of Plaintiff's and the classes' rights. Plaintiff and the classes seek the relief stated in the Prayer for Relief.

## ELEVENTH CAUSE OF ACTION

**New York City Human Rights Law - Aiding and Abetting**
**N.Y.C. Admin. Code § 8-107(6)**

**(By Plaintiff Against Matrix Absence Management, Inc., and Individual Defendants Walsh, Quigley, Almanzar, Park, and Burt)**

425. Plaintiff re-alleges and incorporates all preceding allegations.

426. Defendant Legal Aid Society violated the NYCHRL by discriminating because of disability, failing to accommodate, failing to engage in a good-faith cooperative dialogue, retaliating, and coercing, intimidating, threatening, or interfering with protected rights.

427. Defendants Matrix, Park, Walsh, Almanzar, Quigley, and Burt aided and abetted Defendant Legal Aid Society's disability discrimination, failure to provide reasonable accommodations, failure to engage in a good-faith cooperative dialogue, retaliation, and coercion, intimidation, threats, and interference with protected rights, and/or attempted to do so, in violation of N.Y.C. Admin. Code § 8-107(6).

428. Park actually participated in and substantially assisted the violations by using senior Human Resources authority to maintain or ratify the denial of interim protection, adopt the disputed essential-function characterization, and direct continued courthouse presence and added duties after Plaintiff and her union objected.

429. Walsh actually participated in and substantially assisted the violations by administering and materially influencing the accommodation request, maintaining and transmitting the disputed job-duty position, pursuing additional medical demands, proposing alternatives that preserved unnecessary courthouse presence and monitoring, and failing to correct the delay, denial, and interference.

430. Almanzar actually participated in and substantially assisted the violations by approving, maintaining, or enforcing the courthouse requirement and altered supervisory expectations after Plaintiff sought accommodation and engaged in protected activity.

431. Quigley actually participated in and substantially assisted the violations by originating the one-hour court-presence instruction, participating in the later intensified requirement, and imposing or participating in heightened file and reporting demands after protected activity.

432. Burt actually participated in and substantially assisted the violations by receiving notice that the requirement conflicted with past practice and Plaintiff's restrictions, maintaining that PRDU Forensic Social Workers were expected in court on designated days, and approving, ratifying, administering, or failing to correct continued enforcement within her managerial authority.

433. Matrix actually participated in and substantially assisted the violations by transmitting the disputed requirement, imposing a compressed provider deadline, seeking alternatives that preserved Defendant Legal Aid Society's preferred outcome, failing to engage in individualized dialogue, issuing the later standard packet and employment-consequence warning, determining documentation sufficiency, and communicating Defendant Legal Aid Society's decisions.

434. Quigley originated, and Almanzar maintained, the One-Hour Courthouse-Presence Directive. Walsh escalated it by characterizing Plaintiff's job function to Matrix as courthouse presence twice weekly for "up to 7 hours per day." Matrix, through its representative Christine Struzzi, repeated that formulation in its January 2, 2026 letter to Plaintiff's provider, sought provider alternatives that would preserve the disputed courthouse presence, imposed a fifteen-day deadline, and warned that nonresponse could affect the decision. Park then ratified and enforced the Extended Courthouse-Presence Standard on January 20.

435. Each Defendant named in this count knew or should have known of Plaintiff's accommodation requests, medical restrictions, and union-supported objections, and substantially assisted, encouraged, or failed to stop the violations despite authority, practical ability, or influence.

436. Each Defendant named in this count knew of the underlying violation it assisted and, sharing a community of purpose with the primary violator, directly participated in, encouraged, compelled, or substantially assisted that violation.

437. The conduct was willful, wanton, reckless, or in conscious disregard of Plaintiff's rights and caused economic, emotional, and other compensable harm.

438. Plaintiff seeks the relief stated in the Prayer for Relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants and grant the following relief:

A. An order certifying the proposed Location-Based Accommodation Class, Post-Request Job-Duty Recharacterization Class, NYCHRL Accommodation Delay Class, and Additional Medical Documentation Class under Rule 23(b)(2), certifying appropriate

common issues under Rule 23(c)(4), appointing Plaintiff as Class Representative, and appointing her counsel as Class Counsel.

B. A class-wide declaratory judgment that Defendant Legal Aid Society's challenged policies, practices, and standard operating procedures violate the Rehabilitation Act and the NYCHRL.

C. Class-wide injunctive relief requiring Defendant Legal Aid Society to cease unlawful accommodation denials, delays, retaliation, interference, screening criteria, medical inquiries, and bad-faith cooperative-dialogue practices, and to implement lawful policies, prompt interim measures, timely individualized determinations, training, monitoring, and other corrective measures.

D. Injunctive relief requiring Defendant Legal Aid Society and Defendant Matrix to provide Plaintiff a good-faith individualized accommodation process and effective reasonable accommodation upon her return to work.

E. A declaratory judgment that Defendant Matrix violated N.Y.C. Admin. Code §§ 8-107(6), 8-107(15)(a), and 8-107(28)(a).

F. A declaratory judgment that Defendant Legal Aid Society is liable under N.Y.C. Admin. Code § 8-107(13) for the unlawful conduct of its employees, agents, and accommodation administrator.

G. Back pay and front pay, including lost wages, salary, employment benefits, and other compensation, from the date of the unlawful conduct through judgment for Plaintiff.

H. Reinstatement to Plaintiff's position, an equivalent position, and/or the grant of an effective reasonable accommodation upon Plaintiff's return to work when medically appropriate.

I. Compensatory damages for Plaintiff's emotional distress, pain and suffering, and other non-economic harm pursuant to the NYCHRL.

J. Punitive damages for Plaintiff pursuant to the NYCHRL.

K. Reasonable attorney's fees, expert fees, and costs.

L. Pre-judgment and post-judgment interest as allowed by law.

M. Nominal damages and actual economic damages under the Rehabilitation Act and the NYCHRL.

N. Such other and further relief as the Court deems just and proper.

**DEMAND FOR TRIAL BY JURY**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all questions of fact raised by this Complaint.

Dated: Long Island City, New York
August 31, 2026

Respectfully submitted,

By: /s/ Cyrus E. Dugger
Cyrus E. Dugger
The Dugger Law Firm, PLLC
Gotham Center
28-07 Jackson Ave., 5th Fl.
Long Island City, NY 11101
cd@theduggerlawfirm.com
Tel: (646) 560-3208
Fax: (646) 390-4524

*Attorneys for Plaintiff Marissa Kubicki and the Putative Classes*