UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARISSA KUBICKI, individually and on behalf of all others similarly situated,

Plaintiff,

v.

THE LEGAL AID SOCIETY, MATRIX ABSENCE MANAGEMENT, INC., CONNIE PARK, in her individual capacity, LAURA WALSH, in her individual capacity, REBEKAH ALMANZAR, in her individual capacity, JACKIE QUIGLEY, in her individual capacity, and YONZEL BURT, in her individual capacity,

Defendants.

Case No. 1:26-cv-03882-VSB-OTW

DECLARATION OF MARISSA KUBICKI IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

I, Marissa Kubicki, declare as follows:

1. I am the Plaintiff. I make this declaration from personal knowledge in support of my motion for partial summary judgment against The Legal Aid Society ("LAS"). The exhibits cited below are attached to this declaration.

2. I am a Licensed Master Social Worker. I began working for LAS in 2019 as a Forensic Social Worker in the Bronx Criminal Defense Practice and transferred to the Parole Revocation Defense Unit ("PRDU") on or about March 1, 2023.

3. PRDU moved from Water Street to the Bronx in or about February 2024. From then on my office was Room 704 at 260 East 161st Street. The courthouse where I do PRDU work is directly across the street, about a five-minute walk from my desk.

4. My duties were to interview clients and collateral contacts, conduct biopsychosocial assessments, review records, prepare mitigation, plan treatment and reentry, make

referrals, consult with attorneys, document my work, and advocate in court when a client, attorney, hearing, or emergency required me there.

5. From the Bronx move until August 2025, on court-coverage days I worked from Room 704 and crossed the street when an attorney asked for me, a client needed to be seen, or a hearing or emergency required me. Attorneys reached me by telephone, text, email, and Microsoft Teams. I treated court requests as the priority and went. On March 1, 2023, my first day in PRDU, my supervisor Rebekah Almanzar emailed me the slides she used to train PRDU attorneys on working with social workers. That email and the slides are Exhibit A. From March 2023 until the move, when PRDU was at Water Street in Manhattan, I covered Bronx court from the office and traveled to the courthouse when a client, attorney, or hearing required me.

6. In my office I had client files, LAS's systems, reliable telephone and internet service, privacy for confidential calls, and my ergonomic chair and blue screen protectors. While proceedings are underway in court, I often cannot speak, make confidential calls, review records, or write.

7. Each week Assistant Social Work Supervisor Jackie Quigley emailed PRDU the coverage schedule with referral guidance. Those emails are Exhibit B. I provided virtual coverage for both courts only in the afternoon on Friday, December 12, 2025, to cover for Luca Verano Diaz.

8. Exhibits C and D are my March 2024 and March 2025 performance evaluations. Before August 2025, no supervisor told me I had missed a client, hearing, attorney request, or emergency because I was working in my office. Before August 2025, no supervisor told me that working from my office had caused me to miss an assessment.

9. On August 22, 2025, Quigley told me in supervision that I was to spend at least an hour in court on my coverage days to build relationships with attorneys, whether or not anyone needed me there. (Ex. E at 3.) I had never been given a written policy requiring me to stay in the courthouse when no task required it. From then on I generally went to court for about an hour on coverage days even when no one had asked for me.

10. I have ankylosing spondylitis and have been treated by rheumatologists Dr. Paula Rackoff and Dr. Melanie Graber. I experience chronic pain and restricted movement in my spine and other joints, making prolonged sitting or standing and frequent walking difficult, including while working. These symptoms preceded Hyrimoz and continued from November 24, 2025 through January 29, 2026. Dr. Graber prescribed adalimumab (Hyrimoz), which I began on October 31, 2025 and continued into January 2026, except when ill as described below. She told me it increases infection risk and instructed me to hold it and call her if I became ill. I relied on those instructions in seeking to limit unnecessary court time and holding my dose during illness.

11. Since November 2024, and permanently since May 2025, LAS has allowed me to work from home three days a week and in person two days. LAS initially allowed that schedule while reviewing my request when I returned from short-term disability leave in November 2024. Matrix's August 6, 2025 approval is Exhibit F at 2. LAS provided my office's ergonomic chair and blue screen protectors as accommodations; I also had an air purifier. In January 2025, I gave LAS Dr. Rackoff's letter with my chair request. (Ex. F at 1.) Dr. Graber's July 2025 letter, which I received, recommended that schedule to limit painful walking and illness exposure. (Ex. F at 3.) These arrangements remained in place throughout the events below.

12. On November 24, 2025, at 1:47 p.m., I emailed Laura Walsh and Taryn Anderson of LAS Employee Relations and Christine Struzzi of Matrix, which administers LAS's

accommodation requests. I copied my union delegate, Kim Wirt, and Katherine Pecore, and attached a letter from Dr. Graber. My request and the attached letter are Exhibit G at 2–4.

13. Exhibit G at 4 is the letter from Dr. Graber that I received and sent to LAS. I relied on her recommendation to limit unnecessary court exposure in making my accommodation request. The letter states that I was receiving immunosuppressive therapy and was at increased risk of severe infections, and recommends limiting excessive and unnecessary exposure. I supplied it to explain to LAS the medical basis for the limits I requested.

14. On November 25, I met with Walsh by video. I told her I would go to court whenever a client, attorney, hearing, or emergency needed me, and asked to work and wait in my office across the street instead of sitting in court when no one needed me. Walsh's December 1 email confirming our discussion is included in Exhibit G.

15. I did not ask for more work-from-home days, different hours, a new position, additional staff, or for anyone else to take over my clients or court work. I asked to learn of a need through the telephone, email, and Teams channels we already used, and then to go to court.

16. In my December 10, 2025, 3:49 p.m. email, I renewed my interim accommodation request and reported five court visits since submitting my request, only one involving an "active client." (Ex. H at 2–3.) I meant five different days and, by "active client," a client on my caseload or a referral from Quigley or an attorney.

17. Exhibit I contains Walsh's December 15 email about court-presence expectations and my reply. On December 16, after a meeting at which my supervisors maintained that social workers must be in court on coverage days, I again asked Walsh for an interim accommodation. Her response is included in Exhibit I at 3.

18. On Friday, December 19, Wirt and I met with Walsh. Walsh said that my job required me to be in court on my coverage days. During the meeting, I forwarded her Quigley's coverage email for the following week. (Ex. B.) Exhibit I includes Walsh's 5:30 p.m. email directing court presence that Monday and my 5:38 p.m. reply asking what alternative was proposed and explaining that I could not reach my doctor over the weekend. On December 22, I emailed Walsh again, attached Dr. Graber's letter and the coverage guidance, and said that I was ready to go to court when a client need arose and was going to follow my doctor's orders. (Ex. I at 1.) I made that statement out of emotion. No one at LAS told me I had permission to do so.

19. The weekly schedules assigned me in-person Bronx coverage on November 24 and 25 and December 1, 2, 8, 9, 16, 17, and 22, and Bronx coverage for the afternoon of December 11. (Ex. B.) I attended court on November 24, when I went solely because of the court-presence mandate. On December 2, an attorney asked me to go to court around 9:15 a.m. to see a client already on my caseload. Clients were typically produced after 10:00 a.m.; attorneys ordinarily notified us when clients were produced because of long waits in L1, the Department of Correction area for in-custody clients. When I asked Quigley for help, she told me to go anyway. I met with the client and then the attorney. I spent about two hours there, including about 90 minutes waiting for the client. On December 16, I attended court for a hearing. Time in court without a task took me away from casework, calls, and equipment in my office.

20. I had a stomach virus on December 3, took a personal day to preserve my limited sick leave, and worked remotely the next day. On December 22, a coverage day, I became ill at work and asked Quigley by Teams around 1:34 p.m. to go home, taking a half sick day. I worked remotely while sick December 23 and 26 to preserve sick leave. The illness lasted over a week; I was away from the office about two weeks. On December 29, an NYU Langone urgent-care doctor

saw me by video, told me I had an upper respiratory infection, and gave me a return-to-work note for January 2, 2026. I could not take my December 26 Hyrimoz dose because I was ill.

21. On December 26, Walsh called a meeting with me; union delegate Hayley Feldman took notes. Walsh said she had been told that social workers were expected to be in court all day on coverage days, and that my request to work from the office across the street and come to court as needed was being denied. More than once she said that if LAS could not meet my accommodation, I might need to look into other positions. She offered only protective equipment. (Ex. J; Ex. K at 4–5.)

22. Exhibit K at 10 is Walsh's December 30 email setting out what LAS wanted to ask my provider and suggesting protective equipment and breaks. I already wore a mask in court, and breaks would not have shortened my time in the courthouse or given me the equipment in my office. On January 2, 2026, Matrix emailed me the letter reproduced in Exhibit L for my provider's signature. Neither communication asked my provider about my working from my office between court needs. I replied to both that day that I needed to consult Wirt, who was away until January 5, and I told Matrix that my specialist had no appointment available within two weeks. (Ex. K at 1; Ex. L.)

23. On January 6, Wirt emailed LAS requesting confirmation that I could remain in my office until needed in court as an interim accommodation. (Ex. K at 8–9.) On January 12, at 4:28 p.m., Chief Human Resources Officer Connie Park emailed that I must follow supervisors' court-location work schedules on in-person days. She denied the interim office arrangement and stated that LAS lacked enough information to evaluate my request or potential alternatives. (Ex. K at 5–6.)

24. My January 12, 4:52 p.m. reply asked what medical information LAS wanted without requiring my provider to sign Walsh's drafted letter. That reply and Park's January 13 response are Exhibit K at 3–5. I received no answer to my question before January 20.

25. Before January 20, no one at LAS identified to me a client or hearing I had missed, a response time I had not met, or a staffing, cost, technology, or safety problem caused by my waiting in my office.

26. On January 20, I joined a call about my interim request with Park, Walsh, LAS attorney Rebecca Serbin, Wirt, and other union representatives. I said again that I would go to court whenever I was needed. Serbin said that no one had said I was required to be in court seven hours a day. The union asked for a clear answer, and Park said she would respond that day.

27. At 5:51 p.m., Park emailed that my request to work from the LAS office on in-person court-coverage days and go to court only when called remained denied. She cited management's position that in-person court coverage was an essential function of the PRDU social worker role and that social workers were expected in court up to seven hours per scheduled in-person court workday, depending on client needs. (Ex. M at 3.)

28. Park directed me to be in court by 10:00 a.m. on January 21 and meet with prelim attorneys, attorneys on shift, and attorneys with scheduled hearings. These expectations would continue on in-person court workdays until the accommodation was resolved; LAS required a response signed by my provider. (Ex. M at 3.)

29. Before the week of January 26, LAS had not permitted me to remain in my office until called. My supervisors' instructions conveyed by Walsh on December 16, 19, and 30 and Park on January 12 and 20 required court presence on coverage days, leaving me to choose between following my doctor's recommendation and risking discipline. (Exs. I, K, M.) I was

assigned in-person Bronx coverage on January 5, 6, and 12. (Ex. B.) On January 2, Quigley emailed a referral and asked me to schedule a video conference for January 6 or later and then check with the attorney whether more work was needed. On January 5, I received two coverage calls and went to court. For the week of January 26 only, LAS permitted me to work from my office on in-person days and attend court as needed. I worked in person on two days that week, including January 28. During January 20–29, 2026, I remained willing and able to perform my assigned duties, including interviews, assessments, mitigation, referrals, attorney consultation, and court advocacy with my requested arrangement: office work between court needs, existing communications to identify them, and attendance whenever a client, attorney, hearing, or emergency required me.

30. On January 28, at 10:46 a.m., I emailed PRDU Supervising Attorney Juni Ozzengett offering help with that day's preliminary hearings. My email and her 11:37 a.m. reply are Exhibit N. That day I was instructed to go to court to meet with a client. He told me he had not asked for my help and said, in substance, "I'm shocked you would pull me out of my cell to talk about this."

31. I did not send LAS a further response from my provider between January 20 and January 29. On January 28, I asked LAS for medical leave beginning February 2, as Dr. Graber had recommended. (Ex. O.) I did not withdraw my accommodation request.

32. Exhibit P is Walsh's January 29, 5:06 p.m. email proposing an alternative accommodation for six months. It sets out the proposed court-coverage procedure, including when I could wait in the fifth-floor courthouse office or the LAS office and how I would return to court.

33. That was not what I had asked for. It still required me to enter the courthouse at 10:00 a.m. to ask attorneys whether they wanted assessments, and to go back into court to speak

with them afterward. The fifth-floor courthouse office is a shared space used by public defenders from across the Bronx and has none of my equipment. Between November 24, 2025 and January 29, 2026, my job, my office, the courthouse, and our communication tools did not change. On January 30, I replied to Walsh that the proposal did not reflect how the unit had worked and that I had never been required to send my supervisors a summary. (Ex. Q at 3.)

34. I began medical leave on February 2, 2026, on Dr. Graber's recommendation, and have not provided court coverage since. I received LAS's February 9, 2026 "Social Work and Video Mitigation Newsletter January 2026," excerpted in Exhibit R, and PRDU Director Lorraine McEvilley's March 2, 2026 email to the unit, Exhibit S. On March 6, 2026, while I was on leave, Walsh emailed me a revised proposal substituting Teams messages to intake attorneys for the initial in-person court check-in. That proposal, for six months starting upon my return, is Exhibit Q at 1–2.

35. The exhibits are true and correct copies of emails I sent or received (A, B, E, G–S), including attachments reproduced in A, G, L, and Q; my 2024 and 2025 evaluations (C, D; I lack printed page 12 of D); letters I received from Dr. Rackoff, Matrix, and Dr. Graber (F); and LAS's September 2024 internal posting for my position, which I recognize from work (T). Q reproduces Walsh's March 6, 2026 email as received, the earlier chain with my January 30 reply and her January 29 proposal, and the attached February 27 group-supervision recap. R is an excerpt with personal identifiers and other LAS clients' information redacted. The Dr. Graber letter in G at 4 is the one I received and attached to my November 24 and December 22, 2025 emails.

36. Exhibit U is a true and correct copy of the cover and introduction of LAS's Employee Handbook, last edited April 3, 2024, which I recognize from my employment and

records. Its staffing, facilities, workforce, practices, volunteer assistance, and funding descriptions are those in that dated handbook.

37. Exhibits V and W are true and correct excerpts of email chains I received about purchasing my screen protectors and chair. Exhibit V also includes Quigley's January 6, 2025 confirmation of my three remote days and two office days through May 2025.

38. The training and guidance I received describe consultation, referrals, assignment, treatment and mitigation planning, office meetings, communications, court-attendance requests, and follow-up, and provide community-resource guidance. (Ex. A at 11, 13–19; Ex. B at 18.)

39. My March 2025 evaluation documents my ratings and supervisors' comments on clinical and court work, reliability, communication, coverage, documentation, and training. (Ex. D at 1, 3–5, 7–11.)

40. Exhibit X is a true and correct excerpt of my January 2, 2026 referral email chain, with personal identifiers and unrelated client information redacted. Quigley's 12:59 p.m. reply clarified that I should consult the attorney before meeting the client to confirm that the meeting remained needed. I received the account reproduced in Exhibit R at 2 but did not witness the incident.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 12th, 2026, at The Bronx, New York.

Marissa Kubicki