**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MARISSA KUBICKI, individually and on behalf of all others similarly situated,

Plaintiff,

v.

THE LEGAL AID SOCIETY, MATRIX ABSENCE MANAGEMENT, INC., CONNIE PARK, in her individual capacity, LAURA WALSH, in her individual capacity, REBEKAH ALMANZAR, in her individual capacity, JACKIE QUIGLEY, in her individual capacity, and YONZEL BURT, in her individual capacity,

Defendants.

Case No. 1:26-cv-03882-VSB-OTW

**DECLARATION OF CYRUS E. DUGGER**
**IN OPPOSITION TO DEFENDANTS' MOTION TO STAY DISCOVERY**

I, Cyrus E. Dugger, declare as follows:

**Basis of this declaration**

1. I am the principal of The Dugger Law Firm, PLLC, counsel for Plaintiff Marissa Kubicki and the putative classes, and the attorney principally responsible for the prosecution of this action. I submit this declaration in opposition to Defendants' motion to stay discovery (ECF Nos. 76–80). I make it on personal knowledge, except where I state that a matter is on information and belief, in which case I identify the basis. The matters below concern the discovery requests Plaintiff has served, documents in the case record, Defendants' memorandum of law (ECF No. 77), the Declaration of Grace F. Jacobson and its exhibits (ECF No. 78), and the public materials specifically identified below.

2. I have reviewed Plaintiff's First Requests for Production to The Legal Aid Society, dated September 8, 2026 (the "First LAS Requests"); the Second Requests for Production to LAS and First Requests for Production to Matrix Absence Management, Inc., dated September 28, 2026 (the "Data Requests"); and the requests to the Individual Defendants dated September 28, 2026 (the "Individual Requests"). True and correct copies of the three request sets, as served, are attached as Exhibits A, B, and C, respectively. The same three request sets are filed as Exhibits A, D, and E to the Jacobson Declaration. ECF Nos. 78-1, 78-4, 78-5.

3. My descriptions of the requested production concern the requests as written. My descriptions of Matrix's, LAS's, and Dorsey & Whitney LLP's materials identify what those documents display or state. I do not offer an expert estimate of Defendants' collection or review costs, or testimony about an uninspected database configuration.

**The requests exclude substantial categories of work**

4. The First LAS Requests distinguish organizational sources from purely personal sources. Instruction 9 excludes documents from purely personal accounts and purely personally owned devices. It retains responsive documents available from LAS-controlled systems or accounts, LAS-owned or LAS-issued devices, and Matrix sources within LAS's possession, custody, or control. This exclusion applies to that request set; the Individual Requests separately address personal sources. Ex. A at 4–5; Ex. C, Instruction 8.

5. The First LAS Requests identify discrete decisions and files. Requests 2–7 address Plaintiff's accommodation decision file, Matrix records, the January 2 medical-clarification request, the January 20 refusal, and the January 29 and March 6 arrangements.

The requests identify the communications and dates at issue rather than asking Defendants to discover the subject of the individual accommodation dispute anew. Ex. A at 5–8.

6. Data Instruction 2 directs Defendants to use an adequate ordinary-course report or standard export first. A readable, fielded Excel workbook may satisfy both the readable-report and row-level requirements. Duplicate formats are not required. An additional existing report is requested only when needed to supply requested information or necessary context absent from the fielded production. Ex. B at 3.

7. Data Instructions 2 and 3 exclude new substantive calculations, retrospective classifications, new substantive studies, and certifications of admissibility. Instruction 3 permits separate tables linked by existing keys and expressly states that no new cross-system join is required. It requests preservation of maintained values and relationships so the produced information can be interpreted. Ex. B at 3.

8. The employee-status subparts permit a separate table keyed by existing requester identifiers. They do not require a new historical reconstruction, a search of full personnel files, or a payroll dataset. Matrix need not obtain or reconstruct employee-status, office, separation, or historical employment information it does not maintain. Ex. B, LAS Request 31(b) at 6; Matrix Request 1(b) at 11.

9. The Data Requests do not presume that LAS or Matrix uses a particular software module or integration. LAS Request 31 identifies a limited Human Resources or ADP employee-status source only if it holds the requested information and the relevant requesters are retrievable by existing identifiers. The Matrix request likewise identifies sources actually holding responsive records and permits another adequate extraction route. Ex. B at 5, 10–11.

10. The requested business milestones include maintained review, decision, implementation, renewal, closure, and reopening events. The requests do not demand a complete system-edit log or unrelated edit history. The work-requirement subparts do not require a new discipline or job-duty dataset or a search of full disciplinary files. Existing responsive business events remain requested even if their source is labeled an audit log. Ex. B, LAS Request 31(e)–(g) at 7; Matrix Request 1(e)–(g) at 12.

11. The stored-communication subparts do not require separate mailbox or device collection, separate production of underlying emails or attachments, transcription of recordings, manual reconstruction, inference of missing information, new classifications, database backups, or direct system access. They seek responsive communication history and text already stored in the covered accommodation systems. Those limits apply to these subparts and do not narrow other requests. Ex. B, LAS Request 31(h) at 7–9; Matrix Request 1(h) at 12–14.

12. Where complete stored text cannot reasonably be included in a fielded export, those subparts permit linked, searchable case-history or notes reports, bulk text, HTML, or searchable PDF exports, together with reasonably extractable fields not otherwise supplied in usable form. They therefore allow more than one production route while preserving existing entries and their relationship to the relevant matter. Ex. B at 8, 13.

13. The explanation requests seek a nonduplicative set of existing or extraction-generated materials sufficient to understand the actual source coverage, production route, fields, and tables. They do not demand a new system inventory, explanatory memorandum, application source code, security architecture, full audit history, new statistical analysis, or

substantive study. The validation component concerns reasonable validation actually performed. Ex. B, LAS Request 32 at 9–10; Matrix Request 2 at 14–15.

14. The Data Requests permit one Defendant to identify an identical component already produced by the other, by Bates number, filename, or another precise identifier, and adopt that component as its response. Additional responsive information and completeness remain the responsibility of each responding Defendant. Ex. B at 5, 10. Under those provisions, the requirement of separate responses does not require duplicate production of every identical component.

15. For nonparty employees, Data Instruction 4 excludes specified personal identifiers, diagnoses, provider identities, medical attachments, and medical narrative text. It allows consistent replacement identifiers, preserves existing linkage without new identity matching, and provides for conferral where separating mixed narrative or replacing an essential identifier would materially increase burden. The stored-communication subparts direct production of separable, non-objected-to fielded data without awaiting resolution of a narrative-text dispute. Ex. B at 4, 8, 13.

16. Data Instruction 5 calls for a component-specific explanation of claimed inaccessibility or disproportionate work and identifies ordinary reports, a narrower field set, a test query, or consultation with knowledgeable personnel as subjects for conferral. Instruction 7 expressly preserves broader discovery, rejects consent to bifurcation, and does not condition class discovery on summary judgment. These provisions are part of the requests already made. Ex. B at 4–5.

**Existing records and Matrix reporting materials identify actual functions**

17. Plaintiff provided my office with a Matrix leave letter dated January 28, 2026, bearing LAS's letterhead and identifying leave number 8554189, an assigned Integrated Claims Examiner, a February 2, 2026 leave start, FMLA availability, accommodation leave, and a certification procedure, and with a February 9, 2026 determination that uses the same leave number and identifies an approval period, an entitlement calculation, and certification-validity dates. True and correct copies, with Plaintiff's home address redacted, are attached as Exhibit D. Ex. D at 1–6.

18. The February determination directs Plaintiff to the Matrix website or eServices application to check claim status, extend leave, and upload information. Its signature identifies Matrix as acting on behalf of LAS's Human Resources Department. These are case-specific documents containing linked leave administration and correspondence, created before this litigation. Ex. D at 5–6.

19. LAS materials also identify electronic time and human-resources administration. Plaintiff's December 29, 2025 email to Jackie Quigley states that she would enter her sick time in ADP. The employee-handbook passage marked updated March 2023 describes submission of a specified leave category to a supervisor through ADP's WorkForce Manager. Ex. E at 1–2. LAS's own March 18, 2025 posting for a Senior Employee Relations Specialist, filed as Exhibit E to my October 14, 2026 declaration, lists among the position's duties to "[u]se effective interviewing and documentation techniques and utilize the designated online case management tool for tracking" and, for ADA accommodation requests, to "[e]nsure timely communication to supervisors, employees and Matrix to facilitate resolution of the request," and directs applicants to an application page hosted at

myjobs.adp.com. ECF No. 74-5 at 3, 6. I identify those references as evidence of the functions described.

20. Exhibits F and G contain selected transcribed excerpts from Reliance Matrix's public Analytics & Reporting page at https://www.reliancematrix.com/employers/product/workforce-management/analytics-and-reporting and its Workforce Accommodations page at https://www.reliancematrix.com/employers/product/workforce-management/workforce-accommodations. The pages identify Matrix Absence Management, Inc. as the provider of absence services under the Reliance Matrix branding. The exhibit sheets identify the source locations and a research retrieval date of October 17, 2026; they are selected excerpts, not complete page captures.

21. The Analytics & Reporting page describes reporting across absence, disability, ADA, and supplemental-health programs; standard templates and selected-data reports; filters for products, locations, demographics, and timeframes; views of individual entitlements and certifications; real-time data dashboards; and a running history of correspondence among Matrix, the employee, and the employee's physician. Ex. F. The page therefore identifies applicable reporting functions potentially applicable to the actual LAS account.

22. The Workforce Accommodations page describes accommodation administration integrated with leave management, case-level administration for workplace adjustments or leave, a secure administration portal, and tracking with an audit trail. It also states that Matrix collected and analyzed accommodation benchmark information from its business for 2017–2021. Ex. G.

23. While the public descriptions do not identify LAS's purchased features, account permissions, historical configuration, or the cost of a responsive export, the individual leave letters do establish that Matrix generated case-specific administration records for Plaintiff. The requests preserve this distinction by seeking maintained records through adequate available routes without assuming a particular module, integration, or report. Ex. B at 5, 10; Ex. D.

**Personal sources and duplicate production have separate limits**

24. The Individual Requests concern responsive electronic communications maintained on or accessible through personal devices or non-LAS accounts. Unless a request states otherwise, their period is August 1, 2025 through March 31, 2026. They do not make the entire contents of a personal account responsive merely because that account is a potential collection source. Ex. C, Instructions 1 and 8 at 3–4.

25. Individual Instruction 15 permits any reasonable alternative collection and attorney-review method that preserves materially equivalent completeness, fidelity, context, and usability. The Gmail instruction's accompanying note distinguishes collection of a complete mailbox from production of responsive, nonprivileged material. The named applications therefore do not eliminate the expressly permitted alternative methods. Ex. C at 6–7.

26. Individual Instruction 14 permits identification of identical material already produced, provided the prior production preserves materially relevant attachments, context, and source information. Attorney responsiveness and privilege review remains part of the instructions. Their flexibility concerns how responsive material can be collected and produced. Ex. C at 6–7.

**The memorandum identifies scope without measuring the available production routes**

27. At pages 12–16 and 20–21, ECF No. 77 discusses asserted discovery expense and lists collection, technical coordination, legal review, confidentiality, and witness-preparation tasks. Those passages do not state an estimate of responsive records or messages, extraction hours, review hours, or case-specific production cost. Nor do they compare the work under the alternative methods and duplicate-production provisions identified above. The only dollar figure in that discussion, "hundreds of thousands of dollars" at page 13, appears in a parenthetical describing the discovery at issue in another case; it is not an estimate for this action. The sworn support cited for the burden discussion is paragraph 8 of the Jacobson Declaration, which I describe in paragraphs 53–57 below.

28. ECF No. 77 at pages 2–3 and 15 describes Defendants' September 9, 2026 proposal for a "mutual, limited exchange," citing Jacobson paragraph 4 and Exhibit C. The proposal is a September 9, 2026, 5:23 p.m. email from Defendants' counsel to me. ECF No. 78-3 at 2–4. It proposed that LAS produce, by October 19, 2026, Plaintiff's personnel file; her job descriptions and written descriptions of PRDU Forensic Social Worker duties and court-coverage responsibilities; "[d]ocuments and communications concerning Kubicki's accommodation requests, grievance, court-coverage dispute, and leave status from November 2024 through March 2026"; documents sufficient to show her work location and her court-coverage assignments and attendance; and documents concerning the rollout or implementation of any PRDU court-coverage protocol referenced in the Amended Complaint. ECF No. 78-3 at 3. In exchange, it asked Plaintiff to produce, among other things, her "complete medical records and communications with healthcare providers" from January 1, 2020 to the present, her communications with union representatives, coworkers, and

alleged class members, and documents concerning disability-benefit applications and clinical trials. Id. The email conditioned the exchange on mutuality and entry of a protective order and stated: "Defendants will not complete a forensic analysis or review of electronically stored information such as email or other messaging data." ECF No. 78-3 at 3–4. Several of the LAS categories overlap the First LAS Requests. The email proposed a forty-day period for LAS's production and did not describe that production as burdensome. The offer's existence and described categories do not themselves measure the expense of producing them or establish that all requested information was included.

29. ECF No. 77 at page 15 cites Jacobson paragraph 8 in support of the statement that the Data Requests extend beyond Plaintiff's individual matter to workforce records. The requests' population and period are stated in Instruction 1. The same set also contains the production alternatives and exclusions described in paragraphs 6–16 above. Neither ECF No. 77 nor Jacobson paragraph 8 states a record count, a count of employees with accommodation matters in the pleaded period, or the work needed to use those alternatives.

30. ECF No. 77 at page 19 cites Jacobson paragraph 9 for a statement attributed to me about not needing discovery to move for summary judgment. Paragraph 9 attributes the statement to "a September 2026 phone call my colleague had" with me; it does not state that Ms. Jacobson participated in the call, identify the colleague, give the date, or state the question to which the statement responded. ECF No. 78 ¶ 9. I have previously stated to Defendants' counsel that Plaintiff did not need discovery to move for summary judgment, which statement referred to Plaintiff's, now filed, motion for partial summary judgment on LAS's individual NYCHRL failure to accommodate claim as to liability, filed without the benefit of the receipt of a single document from LAS or any Defendant. I did not state that

discovery was unnecessary for the remaining claims, damages, medical causation, or class issues. Plaintiff's notice of motion expressly seeks partial summary judgment as to liability only against LAS on her individual NYCHRL failure-to-accommodate claim, reserves damages and all other remedies, and excludes class certification, class-wide liability, and judgment against other Defendants. ECF No. 68 at 1–2. Plaintiff's Rule 56.1 statement likewise expressly reserves "[d]amages, medical causation, class relief, Plaintiff's other claims, and the liability of the other Defendants." ECF No. 71 at 1. Seeking adjudication of that limited liability issue on the existing record did not concede that discovery was unnecessary for the rest of the case as illustrated by the fact that Plaintiff did not move for summary judgment on the other causes of action prior to receiving discovery.

31. The documents and instructions identified above distinguish several types of work: retrieving Plaintiff's identified decision records; extracting maintained accommodation data; screening stored narrative; collecting responsive personal communications; and preparing witnesses. They also identify work expressly excluded and circumstances in which an identical component need not be produced twice. Those distinctions are present in the actual requests and source materials.

32. I seek continued discovery under the requests as served, subject to their stated limits and the Court's rulings on particular objections.

**Additional Published Capabilities and Cost Inputs**

33. The accompanying exhibit packet supplies the served request sets designated Exhibits A–C; the case materials designated Exhibits D and E; selected transcribed public-source excerpts designated Exhibits F–I and K–N; a conditional arithmetic worksheet designated Exhibit O, prepared by my office; printouts of public web pages designated

Exhibits P–U, V–AA, and EE; correspondence between my office and Defendants' counsel designated Exhibits FF and HH; and pages of court filings obtained from PACER designated Exhibit GG. No exhibits are designated J, BB, CC, or DD. Each public-source sheet or printout identifies its publisher, source location, and a research retrieval date; the retrieval date for Exhibits F–I and K–N is October 17, 2026, the retrieval date for Exhibits P–U is October 28, 2026, the retrieval date for Exhibits V–AA is October 28, 2026, and the retrieval date for Exhibit EE is stated in paragraph 35. Descriptions and limitations are separately labeled. Exhibits F–I and K–N are selected excerpts rather than complete captures of the underlying publications, except Exhibits K and L, which are complete printouts retrieved on October 28, 2026; Exhibits P–U, V–AA, and EE are complete printouts of the pages as displayed on the retrieval date. The source statements below concern what the identified publications, excerpt sheets, or documents say, subject to the limitations stated here.

34. Reliance Matrix's Partnerships page describes resident HCM consultants and external consultants, onboarding assistance, ongoing training, and technical support. Its listed services include data extraction, system configuration and testing, data conversion, and analytics and reporting. Ex. H. The page identifies available categories of technical service.

35. Reliance Matrix's July 26, 2023 product-suite announcement states that its accommodation analysis reviewed more than 28,600 requests collected in 2022 across an employee population of 833,000. Ex. I at 1 (source PDF at 1). This is a published account of aggregate analysis across its business. An earlier case study published by Actuate Corporation, titled "Matrix Gains a Competitive Advantage with an Actuate-Based Customer Self-Service Application," states that Matrix consolidated more than 200 client reports into approximately twenty reports with user-selected parameters, allowed customers to design

and run their own reports, and reduced customer-report turnaround from days to minutes. A copy, retrieved on October 28, 2026, is attached as Exhibit EE. Ex. EE at 2–3. The case study is undated.

36. LAS's currently accessible posting for an HRIS Analyst position is described in paragraph 64 below.

37. Dorsey & Whitney LLP, counsel of record for all Defendants, publishes a page titled "LegalMine Document Review Solutions." Ex. K. The page describes LegalMine as "a state-of-the-art document review service, housed in our Minneapolis headquarters," states that "LegalMine™ is housed on-site in our Minneapolis office," and describes a team of review attorneys, litigation-support staff, and paralegals overseen by a LegalMine manager. It describes culling so that fewer documents require substantive review, automated document analysis, and a secure client collaboration site to which documents are loaded for review by LegalMine, the client, and the Dorsey team. It states that "LegalMine™ charges a fixed cost for the review based on the number of items to be reviewed," and contrasts the in-house facility with fully outsourced or offshore vendors. Ex. K. The publication supplies a described method for determining review cost. The page's FAQ states that first-pass document review "segregates responsive/relevant documents from non-responsive/irrelevant or privileged materials," that "[d]ocuments deemed responsive or privileged are subject to further legal analysis," and that other review flags "can include: confidential, key or 'hot' documents, redaction, and further review." Ex. K.

38. A Nuix publication attributes statements to Dorsey Chief Knowledge and Innovation Officer Caroline Sweeney describing faster processing, checks for personally identifiable and protected health information, and continuous active learning that reduced

documents requiring review. Ex. L. The publication also quotes Ms. Sweeney as stating that Dorsey has "been using the AI enrichment tools in Nuix Discover," that those tools "live[] within our Nuix environment," and that "[o]ur customers' client data is not being used to train any external models." Ex. L. The account describes testing of find-and-redact functionality. Dorsey's website biography of Ms. Sweeney identifies her as Dorsey's Chief Knowledge & Innovation Officer, based in Minneapolis, who is "responsible for the delivery of Dorsey's e-discovery services," including "LegalMine Managed Review services, litigation technology support, and trial technology support," and who is a member of "Dorsey's Electronic Discovery Practice Group," with experience in the "identification, preservation, collection, processing, review and production of electronically stored information." Ex. Q.

39. The City of Walla Walla's February 26, 2020 agenda packet contains a Matrix workers' compensation renewal addendum for March 1, 2020 through March 1, 2022. It lists custom reports requiring programming at $200 per hour. Ex. M (source PDF at 75). This is a historical rate for another client and service context. It is not LAS's contract, a current quoted rate, or a charge for all collection, hosting, review, and production work.

40. Exhibit O applies that historical $200 hourly input to expressly assumed programming periods of 8, 16, and 40 hours, producing $1,600, $3,200, and $8,000, respectively. The hours are hypothetical sensitivity inputs, not measured or predicted work requirements. The calculations exclude legal review and other unpriced components. They supply a transparent illustration of rate multiplied by hours, not an expert opinion or an estimate of total discovery expense. The worksheet separately identifies the source, volume, staffing, rate, and task information needed for an actual budget.

41. Exhibit N identifies the stipulated protective order entered November 5, 2025 in Quirarte v. Ciox Health, LLC, No. 2:24-cv-02896-DC-CKD, ECF 40. Matrix is a defendant. Sections 2.13, 5, and 7 address accommodation and medical information, designation, and restricted access and use. I identify the order's terms, not a finding about production cost or an adjudication of any objection in this action.

42. The Data Requests seek specific categories of information that overlap the functions described in these publications. LAS Request 31(d) and Matrix Request 1(d) seek maintained certification and documentation-event dates and statuses; Matrix describes reporting on individual certifications. Subparts (c) and (e) seek accommodation types, dates, statuses, and decision histories; Matrix describes case-level accommodation administration, tracking, and an audit trail. Subpart (h) seeks stored communication histories and case notes; Matrix describes access to a running correspondence history. Ex. B, LAS Request 31(c)–(e), (h), and Matrix Request 1(c)–(e), (h); Exs. F–G. Instructions 2–3 expressly permit adequate ordinary-course reports, standard exports, and separate tables linked by existing keys, without requiring new substantive calculations, retrospective classifications, or a new cross-system join. Ex. B at 3. Dorsey separately describes an in-house service that screens documents for responsiveness, privilege, confidentiality, and redaction, with review pricing based on the number of items remaining after culling. Ex. K. The portions of ECF No. 77 identified in paragraph 27 and paragraph 8 of the Jacobson Declaration do not explain which requested categories can be retrieved through those reporting methods, which require additional extraction, or what specific obstacle prevents their use. They identify no report or export tested, estimated responsive-record count after applying the requests' exclusions, extraction or review hours, or case-specific cost estimate. Nor do they identify the review

method or document volume underlying the asserted review burden. The publications do not establish LAS's account configuration or the cost of compliance. They identify concrete reporting, extraction, and review functions against which Defendants' personnel could evaluate the particular requests; the cited submissions do not describe such an evaluation.

**Records Bearing on Refusals, Delay, and Interim Protection**

43. The First LAS Requests expressly seek the records of interim protection and the timing of the accommodation decisions. Requests 2–7 seek the decision files, information allegedly missing, provider-question drafts, approvals, and reasons for the January decisions and later changes. Requests 11–14 seek actual coverage events, notice and response times, communication methods, and any missed or delayed work. Requests 17–18 seek contemporaneous feasibility assessments and the alternatives or interim measures considered. These provisions appear in Exhibit A at 5–11. The requested decision records identify what information was said to be missing, when each participant acted, who could approve an interim measure, what instructions LAS gave Matrix, and why a proposed arrangement remained pending or was refused. The chronology, communications, and operational records address the duration and stated reasons for delay, each participant's actions, work performed during the interval, and the asserted difficulty of implementing protection.

44. The Data Requests separately preserve request and documentation dates, interim and final item outcomes, business-event histories, implementation dates, and existing nonmedical reasons. They also seek maintained communication histories and case notes with existing linkage keys. Ex. B, Instructions 2–3; LAS Request 31(c)–(h); Matrix Request 1(c)–(h). A latest-status row would omit the separately requested history if it did not contain those

events. The instructions permit linked tables and existing searchable reports and do not require creation of an unrecorded chronology. The requested distinctions include approval, denial, partial approval, and interim versus final outcomes at the case and item levels. Notice, effective, and implementation dates are separately requested when maintained. Request 32(a)–(c) to LAS and Request 2(a)–(c) to Matrix seek the existing definitions, keys, and source information needed to interpret those distinctions.

45. The FAC identifies November 24, 2025 as the request date, January 12 and January 20, 2026 as refusal dates, January 29 as a later proposal, and March 6 as a revised proposal. FAC ¶¶ 130–142, 181–199, 215–236. Measured by elapsed calendar days from November 24, excluding the starting date and including the ending date, those dates are 49, 57, 66, and 102 days later, respectively, as stated in my October 14, 2026 declaration. ECF No. 74 ¶ 7. The requested histories permit the different periods, measures, and implementation events to be identified separately.

46. The January 29 arrangement permitted office-based waiting but retained mandatory initial courthouse attendance. Plaintiff had to report to court at approximately 10:00 a.m., obtain attorneys' authorization for proposed assessments, complete authorized assessments, and report back to the attorneys in court. If the hearing was not imminent, she could then wait at the LAS office across the street and return at an agreed time or when contacted. FAC ¶¶ 216–217, 229–230. The March 6 proposal replaced that initial courthouse visit with Teams outreach to intake attorneys, with a supervisor included, so that Plaintiff could identify actual needs before entering court. She would remain available from the LAS office and attend court when needed. The proposal contemplated six months beginning upon her return from leave. *Id.* ¶¶ 224–225, 231–233. First LAS Request 7 seeks documents

identifying any fact LAS contends made the January 29 or March 6 arrangements feasible when Plaintiff's earlier request for office-based availability and court attendance as needed allegedly was not. It also seeks documents explaining why the same procedures or safeguards were unavailable earlier. Ex. A at 7–8. These references identify why the drafts, operational instructions, approval dates, and explanations requested in the first LAS set concern separate events. The FAC separately quotes the January 20 statement that the requested interim arrangement "was denied and remains so" and alleges enforcement of the disputed courthouse requirement the next morning. FAC ¶¶ 193–197. The requested records therefore concern an alleged express refusal and its implementation as well as the intervals before the later proposals.

**Records Concerning Core Claims, Common Procedures, and Reserved Issues**

47. The First LAS Requests also identify the operational records needed to compare the asserted courthouse requirement with the work actually assigned. Requests 8–14 seek job-duty and coverage materials, including actual coverage events, notice and response times, communication methods, and any missed or delayed work; Requests 16–18 seek Plaintiff's personnel and performance records, feasibility assessments, and considered alternatives. These materials address the FAC's allegation that office-based waiting preserved attendance whenever an actual court need arose. FAC ¶¶ 258–264, 344–346. The requested records distinguish attendance for an identified assignment from continuous presence between assignments.

48. The FAC asserts the Location-Based Accommodation Class under Count I and the Post-Request Job-Duty Recharacterization Class and Additional Medical Documentation Class under Count II. FAC ¶¶ 340–360. Its class allegations identify common

procedures, records, and maintained fields, including request dates, duties, documentation demands, interim measures, decisionmakers, and outcomes. *Id.* ¶¶ 302–304, 325–330. The corresponding Data Request subparts identify those subjects in maintained records. Ex. B, LAS Request 31(c)–(h); Matrix Request 1(c)–(h). These requests are directed to the operation of the alleged procedures.

49. The requested provider questions, medical-documentation demands, deadlines, job descriptions, changed-duty instructions, and LAS–Matrix communications concern the accommodation and retaliation events as well as the additional theories pleaded in Counts III–V. FAC ¶¶ 344–360; Ex. A, Requests 2–10, 17–23, 29. The communications are identified by their subject and participants, including the people alleged to have administered LAS's process. Their factual role is not limited in the requests to the count asserted against a particular participant.

50. The Data Requests seek maintained dates, requester and decisionmaker identifiers, documentation events, item outcomes, nonmedical reasons, and linked histories that permit the records to be compared. Existing definitions and source information identify what each field represents. Ex. B, LAS Requests 31–32; Matrix Requests 1–2. The comparison concerns when and how the alleged procedures operated, including post-request duty changes and repeated documentation demands. The exclusions, privacy provisions, and alternative production methods described in paragraphs 6–16 remain part of those same requests.

51. The medical-causation and damages issues involve factual questions separate from the liability issue submitted for partial summary judgment. FAC paragraph 285 alleges causal connections including: exposure to the December illness, and the illness and treatment

interruption to later decline. The FAC also alleges resulting losses. Id. ¶¶ 285–291. Records of actual exposure and work requirements, the timing of available protection, and the leave decisions bear on that chronology. The requests encompass proof of medical consequences and losses.

52. As filed on August 31, 2026, the FAC alleges continuing LAS employment, approved leave through December 16, 2026, a medically contingent anticipated December 17 return, unresolved return conditions, and continuing documentation and job-protection issues. FAC ¶¶ 293–299. Earlier this week, Plaintiff requested that her leave be extended through April 2027 as a disability accommodation in light of her current medical condition. First LAS Requests 3, 18, and 29–30 seek Matrix records within LAS's control, considered interim measures, relevant inter-defendant communications, and the May–June 2026 leave-extension decision file. The Data Requests seek maintained decision, renewal, and implementation histories. Those records concern the administration alleged to affect both the completed accommodation events and a future return.

**The Jacobson Declaration Supplies No Estimate of Volume, Time, or Cost**

53. The Jacobson Declaration (ECF No. 78) is three pages and nine paragraphs. Paragraph 1 identifies the declarant as one of the attorneys representing Defendants. Paragraphs 2 through 7 attach the First LAS Requests, LAS's October 8, 2026 objections, the September 9 correspondence, the Data Requests, the Individual Requests, and the deposition notices as Exhibits A through F. Paragraph 8 is the only paragraph that addresses the burden of responding. Paragraph 9 attributes a statement to me. ECF No. 78 ¶¶ 1–9.

54. Paragraph 8 states that Plaintiff's requests "would require substantial effort by multiple individuals and departments across several entities"; that Defendants "would

need to coordinate among outside counsel, in-house counsel, Human Resources personnel, Employee Relations personnel, information-technology personnel, database administrators, and representatives of Matrix"; that "[c]ertain requests also may require consultation with third-party vendors regarding collection and extraction of electronically stored information"; that the requested materials "encompass personnel records, accommodation-related records, medical information, electronic communications, and information maintained in structured databases"; that Defendants "would be required to undertake extensive review" for privilege, work product, confidentiality, employee privacy, medical-information protections, and data-integrity concerns; and that "[t]he time and expense associated with these efforts would be substantial." ECF No. 78 ¶ 8.

55. Paragraph 8 does not state the number of custodians, mailboxes, or devices to be collected; the number of documents, messages, records, rows, or accommodation matters involved; the number of employees who had accommodation matters during the pleaded period; the hours any task would require; any dollar amount; any vendor name or quotation; the name of any system, application, or database in which LAS or Matrix maintains accommodation records; whether any existing report or standard export was examined; whether any test query was run; or that any identified source is not reasonably accessible because of undue burden or cost. It does not identify any LAS or Matrix employee consulted in preparing it. ECF No. 78 ¶ 8. Defendants submitted no declaration from any LAS Human Resources, Employee Relations, information-technology, or database employee, or from any Matrix employee, although paragraph 8 identifies those categories of personnel as the people who would perform the work. ECF No. 78 and exhibits. Dorsey publicly describes LegalMine as an in-house document-review service using dedicated staff and technology to

reduce the volume requiring substantive review, segregate potentially privileged material, and provide predictable review costs as described in paragraphs 37–38 above and 59–62 below. Paragraph 8 does not mention those resources, state whether they were considered, identify the proposed review method, or estimate the volume, time, or cost remaining after any culling or privilege-screening measures. ECF No. 78 ¶ 8.

56. Paragraph 8 does not distinguish among the request sets. It does not separately address Plaintiff's own accommodation and leave decision files (First LAS Requests 2–7 and 30), which concern one employee and the periods November 24, 2025 through March 6, 2026 and May 1 through June 30, 2026; the Data Requests, which permit ordinary-course reports, standard exports, and keyed tables as described in paragraphs 6–16 above; or the Individual Requests, which permit alternative collection methods as described in paragraphs 24–26 above. Ex. A at 5–8, 14–15; Ex. B at 3–5; Ex. C at 6–7.

57. LAS's October 8, 2026 responses to the First LAS Requests (ECF No. 78-2), which I described in my October 14, 2026 declaration (ECF No. 74 ¶ 9 and Ex. G), likewise state no estimate of volume, hours, or cost for any request, identify no custodian count or system, and commit to no production. ECF No. 78-2 at 2–45. The response to Request 2, which seeks Plaintiff's own nonprivileged accommodation and court-coverage decision file for November 24, 2025 through March 6, 2026, objects that the request is "overbroad, unduly burdensome, and disproportionate to the needs of the case" without stating what the file contains, where it is kept, or what producing it would require. ECF No. 78-2 at 10–11.

58. As of the date of this declaration, no Defendant has served responses or objections to the Data Requests or the Individual Requests, for which responses were due October 28, 2026 (Ex. B at 1; Ex. C at 1). Since service of those requests, no Defendant has

proposed a standard report, a narrower field set, a test query, or a conference with knowledgeable business or technical personnel under Data Instruction 5, and no Defendant has identified any specific source, system, or component as inaccessible or disproportionate. On October 7, 2026, at 10:20 a.m., I circulated the Court's Stipulation and Model Protective Order to Defendants' counsel for countersignature; Defendants have not signed it to date. On October 8, 2026, Defendants' counsel stated that Defendants would not produce the three noticed deponents, as described in ECF No. 74 ¶ 9. On October 9, 2026, at 9:50 a.m., Defendants' counsel Briana Al Taqatqa responded, stating, "[t]he legal basis for our objection to these depositions is largely the same as the legal basis for our motion to stay discovery. Next week, Defendants will file motions to dismiss Plaintiff's Amended Complaint in its entirety. Defendants will also file a motion to stay discovery pending resolution of Defendants' motions," while maintaining Defendants' discovery objections. True and correct copies of the October 7 and October 9 emails are attached together as Exhibit FF. Ex. FF at 1–4. Counsel for the parties conferred by telephone on October 26, 2026 regarding Plaintiff's First LAS Requests. In that conference Defendants' counsel, relying primarily on their pending motions to dismiss and to stay, which have been neither granted nor yet opposed, repeatedly stated that Defendants would not produce any documents in response to the First LAS Requests absent a court order compelling them to do so.

**Defendants' Counsel's Published In-House E-Discovery and Document-Review Capability**

59. Dorsey & Whitney LLP appears for all seven Defendants. The notice of motion and memorandum are signed by attorneys in its Minneapolis office at 50 South Sixth Street, Suite 1500. ECF No. 76 at 2; ECF No. 77 at 22. The memorandum states that compliance "would require coordination among counsel, Human Resources, Employee

Relations, information-technology personnel, database personnel, Matrix personnel, and potentially third-party vendors," ECF No. 77 at 15, and the Jacobson Declaration states that certain requests "may require consultation with third-party vendors," ECF No. 78 ¶ 8. Neither document identifies an actual vendor (or even a vendor they "may" have to consult with), states that one has been consulted, or mentions the e-discovery and document-review services that Dorsey describes in the publications identified in paragraphs 37–38 above and 60–61 below or states whether those resources would be used for discovery in this case and, if not, why not given those system's advertised costs savings for Defendants.

60. Dorsey's page titled "The LegalMine Solution" describes LegalMine as "[t]his in-house, dedicated resource," states that "LegalMine™ staff are overseen by Dorsey attorneys, hired and trained specifically for document review," that "[a] senior associate involved in your matter supervises the LegalMine™ review process," and that "[t]he information we examine stays within our walls." It describes a "Litigation: First Pass Legal Review" service followed by "further analysis by the Dorsey trial team," and states: "Both time and cost can be accurately estimated before the review process begins." Ex. P. The page also states that the combination of technology and experienced e-discovery attorneys it describes "reduces review time drastically, thereby cutting legal costs." Ex. P.

61. The Dorsey biography described in paragraph 38 identifies the Minneapolis-based officer responsible for delivering Dorsey's e-discovery services, including LegalMine managed review, litigation-technology support, and trial-technology support, and identifies an Electronic Discovery Practice Group within the firm. Ex. Q. Dorsey's filings in other courts itemize its e-discovery charges. In In re Water Gremlin Co., No. 23-11775 (LSS) (Bankr. D. Del.), an invoice filed by Dorsey on November 19, 2024 lists LegalMine's Nuix

Discover hosting for 329.8 gigabytes at $6 per gigabyte, a charge of $1,978.80, ECF No. 596-4 at 17, and a fee schedule filed on November 21, 2024 lists a LegalMine specialist's hours and hourly rate, ECF No. 608-1 at 2. True and correct copies of those pages, obtained from PACER on October 28, 2026, are attached as Exhibit GG. I identify them because they show that counsel distinguishes services and itemizes volume, time, and expense when they wish to do so.

62. These publications identify an in-house document-review facility at Defendants' counsel's Minneapolis office, review attorneys and litigation-support staff, an e-discovery practice group, fixed per-item review pricing, and a published practice of estimating review time and cost before a review begins. I identify them because ECF Nos. 77 and 78 describe legal review and possible vendor consultation as components of the claimed burden without stating what review method, staffing, volume, or cost was assumed, despite Dorsey's publicly advertised ability to do so for its clients.

**Matrix's and LAS's Published Data-Exchange and Reporting Functions**

63. Reliance Matrix's "MatrixLink®" product page describes a data-integration product that connects absence and employee-benefits data with an employer's human capital management system. It describes eligibility data exchanged by API call or EDI file to verify employment status for absence, disability, and supplemental-health programs; leave and disability statuses, including start, end, and return-to-work dates, partial hours, transition dates, and corrections; and leave data pushed by API on the client's payroll schedule. Ex. R. Reliance Matrix's March 7, 2023 announcement of the product describes MatrixLink as "a purpose-built data integration product established to seamlessly connect absence and employee benefits data with employers' Human Capital Management (HCM) systems," and

quotes its Chief Client Officer: "Throughout the journey, *almost every interaction can be transformed into data* and sent back directly into our clients' HCM, often in real time." Ex. S. (emphasis added). Reliance Matrix's employer page directs employers with "a Matrix Absence (eServices) login" to that portal, the application named in the February 9, 2026 determination described in paragraph 18. Ex. U.

64. LAS's posting for an "HRIS Analyst #24-242," accessible on October 28, 2026 at the public-defender job board identified on the exhibit sheet, states that the position works under LAS's HRIS Operations Manager and that the analyst "[w]rites HR reports to answer questions, provide information, and support operational procedures," "[d]esigns, builds, and maintains data visualization and distribution tools," "[m]aintains documentation of processes, data definitions, business rules, and access rules," and "[s]upports HR and Payroll teams with routine data entry and quality assurance." It lists proficiency with HRIS software "(e.g., ADP, Workday, BambooHR)" and with data-visualization tools "(e.g., Microsoft Power BI, Tableau)" among the position's knowledge, skills, and abilities, and states a salary range of $79,604 to $88,533. Ex. T. The posting identifies a position and its functions; it does not establish current staffing or the systems LAS actually uses.

65. None of the publications identified in paragraphs 20–22, 34–38, and 59–64 supplies this action's record counts, hours, or costs. They identify functions—standard and custom reporting, filtered and dashboard views, API and file-based data exchange with employer systems, an in-house HR reporting position, and an in-house document-review and e-discovery operation at Defendants' counsel—that personnel familiar with the actual LAS and Matrix accounts could use to state what responsive information is maintained, which

existing report or extraction route retrieves it, what screening remains, and what incremental work is required. Defendants' motion papers do not state that any such person was asked.

66. The First LAS Requests were served on September 8, 2026, with responses due October 13, 2026 (Ex. A at 1); LAS served its objections on October 8, 2026 (ECF No. 78-2). The Data Requests and the Individual Requests are dated September 28, 2026 and call for responses by October 28, 2026 (Ex. B at 1; Ex. C at 1); ECF No. 77 at 3 describes them as served September 29, 2026. Defendants filed the motion to stay on October 15, 2026, thirty-seven days after service of the First LAS Requests and sixteen days after the date on which ECF No. 77 states the later sets were served. ECF Nos. 76–78.

**Collection Methods Identified in the Requests, Their Published Prices, and Defendants' In-House Resources**

67. The Individual Requests identify, for each category of personal source, a minimum production method and the application that performs it: for text messages and iMessages on an iPhone, an attorney nonparty review of a production export made with the iMazing application; for text messages on an Android phone, a production export made with the Hearsay application; for WhatsApp messages, an iMazing export or a direct export from the WhatsApp application; for Gmail accounts, "the export of the account via the free Google Takeout tool and an attorney nonparty review of the requested time period" using a review platform; and for Outlook.com, Hotmail, Live, or MSN accounts, an export of the account's emails and attachments in Outlook Data File (.pst) format. Ex. C, Instructions 9–13, at 4–6. The footnotes to those instructions state that iMazing "is available for download for a free trial," that the Hearsay application "is available for $50 per phone," that "Gmail messages may be collected without an export software charge using Google Takeout," and that GoldFynch "lists case plans of $27 per month for up to 3 GB and $76 per month for up to 10

GB, with no additional per-user charge." Ex. C at 5 nn. 1–2, 6 n. 4. Each of those instructions states that a Defendant "may utilize a more sophisticated or costly method of extraction and production," and Instruction 15 states that a decision to use a more expensive collection and review method than those proposed "will be relevant to any subsequent assertion of burden concerning any proportionality analysis." Ex. C at 7.

68. Defendants' memorandum acknowledges that the Individual Requests "prescribe collection protocols involving tools such as iMazing, Hearsay, Google Takeout, Outlook PST exports, and third-party e-discovery platforms, and state that an Individual Defendant's election to use a more expensive collection method will be relevant to any later proportionality objection." ECF No. 77 at 17 (brief p. 14). Neither the memorandum nor the Jacobson Declaration states what any of those tools costs, identifies a more expensive method Defendants intend to use instead, or states why the identified methods would not produce the requested communications. ECF No. 77 at 15–20; ECF No. 78 ¶ 8.

69. On October 28, 2026, my office accessed Hearsay's pricing page at https://portal.usehearsay.com/pricing (the address to which https://usehearsay.com/pricing, cited in the Individual Requests, now redirects). A printout is attached as Exhibit V. The page lists "Pay as you go" pricing, described as "Pay per completed collection," of $100 for "Phone per device," $50 for "Email per account," and $150 for "Managed service per collection"; an "Unlimited collections" plan "Starting at $120/ month"; and states that "Nonprofits get a discount of 30%." It states that every professional account includes a review platform, unlimited team seats, "extraction chain of custody," "certificates of authenticity," and tamper detection. Ex. V.

70. On October 28, 2026, my office also accessed GoldFynch's pricing page at https://goldfynch.com/pricing, a printout of which is attached as Exhibit W, and GoldFynch's support article titled "Requesting a managed review from Legal Outsourcing 2.0 through GoldFynch," marked modified March 12, 2025, at https://support.goldfynch.com/support/solutions/articles/2100050220-requesting-a-managed-review-from-legal-outsourcing-2-0-through-goldfynch, a printout of which is attached as Exhibit X. GoldFynch's case plans are priced by data volume; the pricing page's plan calculator shows, for example, $342 per month to host 50 GB. The pricing page also states that "a 3 GB case is $27/month" and "a 10 GB case is $76/month," that "[t]here is no per-user fee for cases," that OCR "is free, for all our plans," that plans include "Unlimited Free Processing" and "Unlimited Free Productions," and that a free 512 MB trial case is available. Ex. W. The support article describes "outsourced managed document reviews at a discounted rate" through Legal Outsourcing 2.0 at "$25 per hour," on a stated assumption of "50 documents per hour" and "4 pages per document." Ex. X. These are the vendors' published prices and assumptions.

71. The Individual Requests define "Communication Tools" as "LAS email, Microsoft Teams, telephone and text messaging available to communicate work assignments and requests." Ex. C at 2. The FAC describes the requested substitution of Microsoft Teams contact for an initial courthouse visit. FAC ¶¶ 224–236. My February 3, 2026 preservation letter, described in paragraph 77 below, identified "Microsoft 365 platforms" among the enterprise systems in which relevant evidence exists and listed "Teams chats/channel messages, Exchange mailboxes, SharePoint/OneDrive data, structured HR/accommodation databases, and system logs" among the data to be held. Ex. HH at 5. Microsoft's published

"Microsoft Purview service description," marked last updated August 3, 2026, at https://learn.microsoft.com/en-us/office365/servicedescriptions/microsoft-365-service-descriptions/microsoft-365-tenantlevel-services-licensing-guidance/microsoft-purview-service-description, states that eDiscovery (Standard) "lets you associate searches and exports with a case and lets you place an eDiscovery hold on content locations," and its licensing table lists "eDiscovery (Standard) for email" and "eDiscovery (Standard) for sites and files" among the features included in, among other subscriptions, Office 365 E3 and Microsoft 365 E3. A printout is attached as Exhibit Y. Microsoft's nonprofit pricing page lists "Microsoft 365 E3 (Nonprofit Staff Pricing)" at $9.75 per user per month, paid yearly. Ex. Z. I do not know which Microsoft subscription LAS holds. I identify these publications because the Jacobson Declaration describes "collection and extraction of electronically stored information" as work that "may require consultation with third-party vendors," ECF No. 78 ¶ 8, without identifying the systems involved or stating whether the search, hold, and export functions included with LAS's own software were considered.

72. LAS's website describes a Digital Forensics Unit "created in 2013," staffed by "two analysts, two senior analysts, six staff attorneys, one paralegal, and a director," that assists LAS attorneys with "preserving and interpreting evidence from personal computers, mobile devices, cloud storage, and social media accounts." A printout made on October 28, 2026 from https://legalaidnyc.org/programs-projects-units/digital-forensics-unit/ is attached as Exhibit AA. The page describes work performed for LAS's clients in its Criminal Defense, Juvenile Rights, and Civil Practices; it does not state that the unit collects LAS's own records in litigation in which LAS is a party. I identify it because Defendants' papers describe the collection and extraction of electronically stored information from devices and accounts as a

burden that may require outside vendors, without stating that LAS lacks personnel who perform or could perform that work.

**My Office's Estimate of the Cost of Comparable Collection and Production**

73. I have estimated what my office would spend to collect, host, review, and produce material comparable to what the Individual Requests and First LAS Requests 2–7 and 30 seek, using the methods those requests identify. The estimate excludes extraction from the accommodation databases addressed by the Data Requests, deposition preparation, and attorney time spent on objections or motion practice.

74. Using the methods those requests identify and the prices published on the pages identified above, the software and service inputs total $1,402 for the first month: $500 for five phone collections at Hearsay's current $100 per-device price; $250 for five email-account collections at Hearsay's $50 per-account price, although the Google Takeout and Outlook .pst exports the requests identify would cost nothing; no software charge for custodial mailbox search and export using the eDiscovery functions included with a Microsoft 365 E3 subscription; and $652 for one month of a GoldFynch case plan hosting 100 GB of electronic data based on my review of the website on October 28, 2026.

75. In preparing Plaintiff's motion for partial summary judgment, my office collected Plaintiff's own personal email account and text messages. The collection of this electronic discovery cost the firm $50 utilizing iMazing and Google Takeout. Hosting Plaintiff's emails on the Logikcull e-discovery platform costs this firm approximately $250 a month in addition to an approximately $25 fee for each uploaded GB of data. This firm initially used its artificial-intelligence tools to analyze Plaintiff's text messages and identify

the relevant ones, at no additional operational cost to the firm, in addition to conducting a manual review.

76. The estimate is of my office's anticipated expenditure to perform comparable work with the methods the requests identify. It is not an estimate of Defendants' cost, which depends on the number of custodians, the volume of responsive material, the systems and subscriptions LAS and Matrix actually use, and the review method chosen—facts within Defendants' knowledge that their papers do not state. ECF No. 77 at 15–20; ECF No. 78 ¶ 8. The fixed per-item review pricing and pre-review estimating practice that Defendants' counsel publishes, described in paragraphs 37 and 60 above, would permit Defendants to state their review cost before any review begins. I offer the estimate as a transparent, assumption-based comparison, not as an expert opinion.

77. On February 3, 2026, before this action was filed, I sent LAS's in-house counsel Scott A. Rosenberg and Rebecca Serbin a preservation letter by FedEx and email; a true and correct copy is attached as Exhibit HH. The letter identified relevant custodians, personal and business accounts, Microsoft 365 platforms, and Matrix accommodation records; requested platform-level holds and notice to Matrix; and addressed native-format preservation, metadata, and sequestration or forensic copying of key custodians' devices. Ex. HH at 5–6, 20–23. The letter further states that, "based on the documents and correspondence to date, we expect to name at least the following personnel of Defendant, The Legal Aid Society in their individual capacities in connection with Ms. Kubicki's claims," and names Laura Walsh, Rebekah Almanzar, Jackie Quigley, and Connie Park by name and title; it separately identifies Yonzel Burt among the custodians whose records must be preserved. Ex. HH at 6, 24. Defendants' motion and supporting papers do not state what was done in

response to that letter, whether any source was collected, exported, or imaged at that time, or what preservation-related work has already been performed.

**Overlap Between the First LAS Requests and the Individual Failure-to-Accommodate Claim**

78. I have compared each of the thirty requests in the First LAS Requests with the allegations of Plaintiff's individual failure-to-accommodate claim. Twenty-six of the thirty requests, approximately 87 percent by request count, squarely address subjects that the FAC pleads as part of that individual claim. Requests 2–7 concern the decision files, the January 2, 2026 request for additional medical clarification, the January 20 refusal, and the January 29 and March 6 arrangements. Requests 1, 8–16, and 24–25 address the asserted courthouse-presence requirement, actual duties, court-coverage practices, performance, response-time requirements, and the feasibility of the requested accommodation. Requests 17 and 26 address asserted hardship; Request 26 applies only to the extent LAS contends that the requested accommodation imposed or would have imposed a financial or resource-based hardship. Requests 18–22 and 29 seek the alternatives and interim measures considered, the related communications, the identity of the persons who made, communicated, or implemented each decision, and the development and dissemination of the court-coverage protocols. Ex. A at 5–15.

79. The same records bear on the FAC's separate cooperative-dialogue, medical-inquiry, interference, discrimination, and retaliation theories. FAC ¶¶ 362, 366–367, 390–400, 405–409, 419–421. What LAS knew, why it sought additional information, and whether an effective interim accommodation was available are subjects of the decision files, interim-measure records, and communications described in paragraph 78; the requests seek those records for the accommodation claim, and the same records serve the cooperative-dialogue

and medical-inquiry counts. The retaliation and discrimination theories add questions of protected activity, motive, and causation, but the events they concern—the intensified courthouse requirement, the medical-documentation demands, the interim refusals, the additional duties, and the later alternatives—are part of the same accommodation record. The requests identify those records by event, date, and participant and do not seek a separate copy of the same record for each count.

80. The percentage stated in paragraph 78 measures overlapping subject matter by request count. It does not measure production volume or cost, and I do not offer it as an estimate of either. ECF No. 77 states that "if the Court narrows Plaintiff's theories of liability, discovery necessarily narrows with them," that "even a ruling with a partial dismissal will materially affect the proper scope of discovery," and that the Court's rulings on the pending motions "are likely to materially narrow the appropriate custodians, systems, time periods, classes, claims, and discovery subjects." ECF No. 77 at 11, 19 (brief pp. 8, 16). Neither ECF No. 77 nor the Jacobson Declaration identifies any collection, extraction, or review attributable exclusively to a theory that the pending motions might eliminate, or states what portion of the work described in Jacobson paragraph 8 would be avoided if a particular count or theory were dismissed. ECF No. 77 at 10–11, 15, 19 (brief pp. 7–8, 12, 16); ECF No. 78 ¶ 8. Indeed, the vast majority of the evidence required to adjudicate Plaintiff's federal claims, and the theories of NYCHRL liability on which she has not moved for summary judgment, would be required even if every other cause of action were dismissed; the core of discovery will in any event focus on the elements of, and affirmative defenses to, the failure-to-accommodate claims at the heart of this case. The same is true with respect to the class claims. Many of the additional theories substantially concern the *reasons* for the primarily

challenged conduct—the accommodation denials—which are not elements of the accommodation claim, and the process through which those same decisions were reached, including whether Defendants engaged in a timely, good-faith cooperative dialogue or acted with discriminatory or retaliatory intent, but those theories still substantially overlap with the evidence of what happened. The medical-inquiry and qualification claims also rely on substantially the same evidence and required discovery as the failure-to-accommodate claims. They therefore involve substantially overlapping events, communications, decisionmakers, and accommodation records, rather than wholly separate factual disputes. See FAC ¶¶ 198–203, 398–415 (ECF No. 41).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: __October 28, 2026__________________

____/s/ Cyrus E. Dugger____________________________
Cyrus E. Dugger